UNITED STATES DISRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CITIZENS NATIONAL BANK and RECEIVER FOR STRATEGIC CAPITAL BANK, | No. 12 Civ. 4000 (LTS) |
| Plaintiff, | |
| v. | |
| BEAR STEARNS ASSET BACKED SECURITIES I LLC; THE BEAR STEARNS COMPANIES LLC.; J.P. MORGAN SECURITIES LLC.; CITICORP MORTGAGE SECURITIES, INC.; CITIMORTGAGE, INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; CREDIT SUISSE MANAGEMENT LLC; CREDIT SUISSE SECURITIES (USA) LLC; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MERRILL LYNCH MORTGAGE CAPITAL INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; ALLY SECURITIES, LLC; DEUTSCHE BANK SECURITIES INC.; HSBC SECURITIES (USA) INC.; RBS SECURITIES INC.; and UBS SECURITIES LLC, | AMENDED COMPLAINT |
| Defendants. | |



Plaintiff Federal Deposit Insurance Corporation as Receiver for Citizens National Bank and Receiver for Strategic Capital Bank, for its Amended Complaint against Bear Stearns Asset Backed Securities I LLC; The Bear Stearns Companies LLC; J.P. Morgan Securities LLC; Citicorp Mortgage Securities, Inc.; CitiMortgage, Inc.; Citigroup Global Markets Inc.; Credit Suisse First Boston Mortgage Securities Corp.; Credit Suisse Management LLC; Credit Suisse Securities (USA) LLC; Merrill Lynch Mortgage Investors, Inc.; Merrill Lynch Mortgage Capital Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Ally Securities, LLC; Deutsche Bank

Securities Inc.; HSBC Securities (USA) Inc.; RBS Securities Inc.; and UBS Securities LLC, alleges as follows:

## I.  NATURE OF THIS ACTION

1.      This is an action for damages caused by violation of the federal Securities Act of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued and underwrote nineteen securities known as "certificates," which were backed by collateral pools of residential mortgage loans in twelve securitizations. Citizens National Bank (referred to in this Complaint as **CNB**) purchased ten of the certificates for approximately $67.5 million. Strategic Capital Bank (referred to in this Complaint as **SCB**) purchased nine of the certificates for approximately $73 million. When they issued and underwrote these certificates, the defendants made numerous statements of material facts about the certificates and, in particular, about the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements or omitted important information about such material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

2.      The allegations in this Complaint are based on the investigation of Plaintiff. That investigation included, for example: (i) review and analysis of the offering materials for the certificates; (ii) review and analysis of thousands of pages of documents and deposition testimony relating to, among other things, the purchase of the certificates by CNB and SCB; (iii) review and analysis of media reports, congressional testimony, court filings, and other publicly available information about the practices of the defendants and of the originators of the mortgage

loans that backed the certificates; and (iv) review and analysis of performance, downgrade, and pricing data about the securitizations involved in this Complaint.

3.     Plaintiff's investigation also included an analysis of a random sample of the relevant loans in each of the twelve securitizations. Based on that analysis, the defendants made such untrue or misleading statements or omissions about at least the following numbers of the loans.

| Securitization No.[1] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[2] | Number of Relevant Loans in the Securitizations | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 2,380 | 3,552 | 67.0% |
| 2 | 3,133 | 4,712 | 66.5% |
| 3 | 383 | 636 | 60.2% |
| 4 | 2,762 | 4,266 | 64.7% |
| 5 | 1,986 | 3,009 | 66.0% |
| 6 | 800 | 1,539 | 52.0% |
| 7 | 1,125 | 1,822 | 61.7% |
| 8 | 793 | 1,392 | 57.0% |
| 9 | 1,119 | 1,696 | 66.0% |
| 10 | 136 | 240 | 56.7% |
| 11 | 827 | 1,645 | 50.3% |
| 12 | 926 | 1,424 | 65.0% |

4.     The certificates are "securities" within the meaning of the 1933 Act. The defendants are liable under the following provisions of the 1933 Act:

*As issuers:* Bear Stearns Asset Backed Securities I LLC issued one of the certificates that CNB purchased and one of the certificates that SCB purchased. Citicorp Mortgage Securities,

---

[1]     Six of the securitizations issued two or more of the certificates that SCB and CNB purchased.

[2]     The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 7 about which defendants made untrue or misleading statements or omissions is within 5% of 1,125, that is, between 1,069 and 1,181. The same margin of error should be applied to all information in the Complaint and accompanying schedules that is based on a random sample of loans in a collateral pool.

Inc. issued one of the certificates that SCB purchased. Credit Suisse First Boston Mortgage Securities Corp. issued one of the certificates that CNB purchased and one of the certificates that SCB purchased. Merrill Lynch Mortgage Investors, Inc. issued one of the certificates that CNB purchased and one of the certificates that SCB purchased. These defendants are liable as "issuers" under Section 11 of the 1933 Act.

*As underwriters:* J.P. Morgan Securities LLC underwrote one of the certificates that CNB purchased and one of the certificates that SCB purchased. Citigroup Global Markets Inc. underwrote one of the certificates that CNB purchased and two of the certificates that SCB purchased. Credit Suisse Securities (USA) LLC underwrote one of the certificates that CNB purchased and two of the certificates that SCB purchased. Deutsche Bank Securities Inc. underwrote four of the certificates that CNB purchased. Ally Securities, LLC underwrote five of the certificates that CNB purchased and one of the certificates that SCB purchased. HSBC Securities (USA) Inc. underwrote one of the certificates that CNB purchased. Merrill Lynch, Pierce, Fenner & Smith Inc. underwrote one of the certificates that CNB purchased and one of the certificates that SCB purchased. RBS Securities Inc. underwrote two of the certificates that CNB purchased and three of the certificates that SCB purchased. UBS Securities LLC underwrote one of the certificates that SCB purchased. These defendants are liable as "underwriters" under Section 11 of the 1933 Act.

*As control persons:* The Bear Stearns Companies Inc., CitiMortgage, Inc., Credit Suisse Management LLC, and Merrill Lynch Mortgage Capital Inc., are liable as "controlling persons" of Bear Stearns Asset Backed Securities I LLC, Citicorp Mortgage Securities, Inc., Credit Suisse First Boston Mortgage Securities Corp., and Merrill Lynch Mortgage Investors, Inc., respectively, under Section 15 of the 1933 Act.

## II.  PARTIES

5.      The Federal Deposit Insurance Corporation is the receiver for CNB and the receiver for SCB (referred to in those capacities as **Plaintiff**). Under the Federal Deposit Insurance Act, the Federal Deposit Insurance Corporation, a corporation organized and existing

under the laws of the United States of America, is authorized to be appointed as receiver for failed insured depository institutions. Under the Federal Deposit Insurance Act, the FDIC is empowered to sue and complain in any court of law and to do so to pursue claims held by banks of which it is the receiver. 12 U.S.C. § 1819. Thus, the FDIC has authority to pursue claims held by CNB and SCB, including its claims made against the defendants in this action.

6.      Defendant Bear Stearns Asset Backed Securities I LLC (referred to as **BSABS**) is a corporation organized under the laws of Delaware. BSABS was the issuer of one of the certificates that CNB purchased and one of the certificates that SCB purchased.

7.      Defendant The Bear Stearns Companies LLC (formerly known as The Bear Stearns Companies Inc. and referred to as **BSCI**) is a limited liability company organized under the laws of Delaware. During the relevant time period, BSCI controlled BSABS. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, BSCI therefore is liable jointly and severally with, and to the same extent as, BSABS.

8.      Defendant J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc. and referred to as **Bear Stearns**) is a limited liability company organized under the laws of Delaware. Bear Stearns underwrote one of the certificates that CNB purchased and one of the certificates that SCB purchased.

9.      Defendant Citicorp Mortgage Securities, Inc. (referred to as **CMSI**) is a corporation organized under the laws of Delaware. CMSI issued one of the certificates that SCB purchased.

10.     Defendant CitiMortgage, Inc. (referred to as **CitiMortgage**) is a corporation organized under the laws of New York. During the relevant time period, CitiMortgage controlled CMSI. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, CitiMortgage therefore is liable jointly and severally with, and to the same extent as, CMSI.

11.     Defendant Citigroup Global Markets Inc. (referred to as **Citigroup**) is a corporation organized under the laws of New York. Citigroup underwrote one of the certificates that CNB purchased and two of the certificates that SCB purchased.

12.     Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB Mortgage Securities issued one of the certificates that CNB purchased and one of the certificates that SCB purchased.

13.     Defendant Credit Suisse Management LLC (referred to as **Credit Suisse Management**) is a limited liability company organized under the laws of Delaware. During the relevant time period, Credit Suisse Management controlled CSFB Mortgage Securities. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, Credit Suisse Management therefore is liable jointly and severally with, and to the same extent as, CSFB Mortgage Securities.

14.     Defendant Credit Suisse Securities (USA) LLC (referred to as **Credit Suisse Securities**) is a limited liability company organized under the laws of Delaware. Credit Suisse Securities underwrote one of the certificates that CNB purchased and two of the certificates that SCB purchased.

15.     Defendant Merrill Lynch Mortgage Investors, Inc. (referred to as **MLMI**) is a corporation organized under the laws of Delaware. MLMI issued one of the certificates that CNB purchased and one of the certificates that SCB purchased.

16.     Defendant Merrill Lynch Mortgage Capital Inc. (referred to as **MLMCI**) is a corporation organized under the laws of Delaware. During the relevant time period, MLMCI controlled MLMI. Under Section 15 of the Securities Act, 15 U.S.C. § 77o MLMCI therefore is liable jointly and severally with, and to the same extent as, MLMI.

17.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. (referred to as **Merrill Lynch**) is a corporation organized under the laws of Delaware. Merrill Lynch underwrote one of the certificates that CNB purchased and one of the certificates that SCB purchased.

18.     Defendant Ally Securities, LLC (formerly known as Residential Funding Securities, LLC and doing business as GMAC RFC Securities, and referred to as **GMAC**) is a corporation organized under the laws of Delaware. GMAC underwrote five of the certificates that CNB purchased and one of the certificates that SCB purchased.

19.     Defendant Deutsche Bank Securities Inc. (referred to as **DBS**) is a corporation organized under the laws of Delaware. DBS underwrote four of the certificates that CNB purchased.

20.     Defendant HSBC Securities (USA) Inc. (referred to as **HSBC**) is a corporation organized under the laws of Delaware. HSBC underwrote one of the certificates that CNB purchased.

21.     Defendant RBS Securities Inc. (formerly known as Greenwich Capital Markets, Inc. and doing business as RBS Greenwich Capital, and referred to as **RBS**) is a corporation organized under the laws of Delaware. RBS underwrote two of the certificates that CNB purchased and three of the certificates that SCB purchased.

22.     Defendant UBS Securities LLC (referred to as **UBS**) is a limited liability company organized under the laws of Delaware. UBS underwrote one of the certificates that SCB purchased.

### III.  JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o. This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

24.     Venue is proper in this Court, pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, because the defendants are found in this district, are inhabitants of this district, and transact business in this district.

### IV.  SECURITIZATION OF MORTGAGE LOANS

25.     The securities that CNB and SCB purchased are so-called **residential mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of

underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards**.

26.     In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

27.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as CNB and SCB. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

28.     In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

29.     In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

30.     One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

31.     The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average. All but three of the certificates referred to in this Complaint were rated triple-A when CNB and SCB purchased them. The other three certificates were rated double-A.

32.     Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as **depositor**, which then transfers title to the loans to the trust.

33.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

34.     **Securities underwriters**, like Citigroup, Credit Suisse Securities, RBS, Bear Stearns, Merrill Lynch, DBS, UBS, and HSBC play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust

and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

35. Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

36. Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (Neither CNB nor SCB had access to the loan tape before they purchased the certificates, but Plaintiff has reviewed data from the loan tape in preparing this Complaint.)

37. As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## V.  DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

38.     CNB purchased certificates in eight securitizations (referred to in this Complaint as Securitizations Nos. 1 through 8). SCB purchased certificates in nine securitizations (referred to in this Complaint as Securitizations Nos. 4 through 12). Both CNB and SCB purchased securities in five overlapping securitizations (Securitizations Nos. 4 through 8). Details of each trust and each certificate are stated in Item 38 of Schedules 1 through 12 of this Complaint. The Schedules correspond to Securitizations Nos. 1 through 12. Plaintiff incorporates into this paragraph 38 and alleges the contents of Item 38 of the Schedules.

39.     The prospectus supplement for each of the twelve securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 38 of each Schedule. Each prospectus supplement is incorporated into this Complaint by reference.

40.     In general, Plaintiff drew and analyzed random samples of 400 loans from the collateral pools of each of the securitizations in which CNB and SCB purchased certificates.[3]

41.     Many of the statements of material fact that the defendants made in the twelve prospectus supplements were untrue or misleading. These untrue or misleading statements included the following.

**A.     Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**1.     LTVs**

**(a)     The materiality of LTVs**

42.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

---

[3] For Securitization No. 2, Plaintiff drew and analyzed a random sample of 800 loans that backed the certificates that CNB purchased. For Securitization No. 10, Plaintiff drew and analyzed a sample of 207 of the 240 loans that backed the certificate that SCB purchased. For all other securitizations, Plaintiff drew and analyzed a random sample of 400 loans that backed the certificates that CNB or SCB purchased.

when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

43.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

44.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that CNB and SCB purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

45.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to

54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

46.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

**(b)     Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

47.     In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 47 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules.

48.     The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. CNB and SCB did understand the statements about the LTVs as statements of fact. CNB and SCB had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

**(c)     An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.**

49.     The stated LTVs of many of the mortgage loans in each securitization were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were

overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were also, therefore, untrue and misleading.

50.     Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

51.     For many of the properties that secured the mortgage loans, the model reported that LTVs presented in the prospectus supplements were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape and compiled into the tables in the prospectus supplement) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

52.     To take an example, in Securitization No. 7,[4] there were 1,822 mortgage loans in loan group 1 of the collateral pool. On 615 of the properties that secured those loans, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded

_____

[4] Both CNB and SCB purchased certificates in Securitization No. 7.

their true market values in the aggregate was $38,955,148. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of true market value on only 187 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $12,727,579. Thus, the number of properties on which the value was overstated exceeded by more than 3 times the number on which the value was understated, and the aggregate amount overstated was 3 times the aggregate amount understated.

53.     On one of the loans in Securitization No. 7, the amount of the loan was $304,000 and the stated value of the property was $380,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $256,000, resulting in a true LTV of 118.8%. Thus, the stated value was higher than the true value by 48.4%, and the stated LTV was lower than the true LTV by 38.8%. Both of these were huge discrepancies that were material to the credit quality of the loan.

54.     The overstated values of 615 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all mortgage loans had an LTV of 100% or less. In fact, 77 of the mortgage loans had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 70.013%. In fact, the weighted-average LTV of the loans was 78.7%. These differences were material for the reasons stated above.

55.     The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans in loan group 1 | 1,822 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 615 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $38,955,148 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 187 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $12,727,579 |

| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
|---|---|
| Number of loans with LTVs over 100%, as determined by the model | 77 |
| Weighted-average LTV, as stated by Defendants | 70.013% |
| Weighted-average LTV, as determined by the model | 78.7% |

56.     The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 56 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 56, and alleges as though fully set forth in this paragraph, the contents of Item 56 of the Schedules.

> **(d)     These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

57.     As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

58.     The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also

with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

59.   According to land records, many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[5] The defendants failed to disclose any of these additional liens in the prospectus supplements. These additional liens increased the risk that those owners would default in payment of the mortgage loan in the pool.

60.   To take an example, of the 1,822 properties that secured the mortgage loans in Securitization No. 7, at least 528 were subject to undisclosed liens in addition to the lien of the mortgage in the pool. For example, defendants stated that the weighted-average LTV of the properties was 70.013%, when, solely because of the additional liens on these 528 properties, the weighted-average combined LTVs of all of the loans in the pool was 75.0%.[6] This is a significant difference.

61.   On one of the loans, the original balance of the mortgage loan was $343,000, the represented value of the property was $490,000, and the reported LTV was 70%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $147,000. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 43% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases,

---

[5]      In order to ensure that liens that were paid off but were not properly removed from land records were not included in this calculation, additional liens referred to in this Complaint and the Schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

[6]      The combined LTV is the ratio of all loans on a property to the value of the property.

the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

62.    Details of the undisclosed additional liens in the securitizations are stated in Item 62 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

63.    Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

### 2.    Appraisals

64.    As discussed above in paragraph 45, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

65.    In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

        **(a)**     **The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

66.     The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 50 through 56, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 2.8 | 2.8 |
| 2 | 3.2 | 3.9 |
| 3 | 7.6 | 10.1 |
| 4 | 3.6 | 3.8 |
| 5 | 4.5 | 10.0 |
| 6 | 5.1 | 9.2 |
| 7 | 3.3 | 3.1 |
| 8 | 3.0 | 3.2 |
| 9 | 3.0 | 2.7 |
| 10 | 8.1 | 10.0 |
| 11 | 7.2 | 6.8 |
| 12 | 5.4 | 8.6 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

67.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

      **(b)**      **The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

68.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

69.    USPAP includes the following provisions:

    (a)    USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

    (b)    USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

    (c)    USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

        (i)    develop an opinion of site value by an appropriate appraisal method or technique;

        (ii)    analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

        (iii)    analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

70.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to

analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

71.     In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 71 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 71, and alleges as though fully set forth in this paragraph, the contents of Item 71 of the Schedules.

72.     Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

73.     Each of the statements referred to in paragraph 71 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

74.     By each of the untrue and misleading statements referred to in paragraphs 47 and 71 above, the defendants materially understated the risk of the certificates that they issued and underwrote.

**B.      Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.      The materiality of occupancy status**

75.     Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

76.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important

measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

> ## 2.   Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations

77.      In the prospectus supplements, the defendants made statements about the number of properties in the collateral pool of each securitization that were the primary residences of their owners. To return to the example of Securitization No. 7, the defendants stated that, of the 1,822 mortgage loans in loan group 1 of the collateral pool, 1,325 were secured by primary residences and 497 were not. Details of each such statement in each securitization are stated in Item 77 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 77, and alleges as though fully set forth in this paragraph, the contents of Item 77 of the Schedules.

78.      These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

> ## 3.   Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

79.      Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed

and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so.

80.     A significant number of the properties in the collateral pool of each securitization that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in each collateral pool.

81.     With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

82.     In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

83.     When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six

months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

84.     In Securitization No. 7, 100 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 187 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 32 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 278 of the 1,325 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 497, as defendants stated, but at least 775, a material difference. The numbers of such loans in the collateral pool of each securitization are stated in Item 84 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 84, and alleges as though fully set forth in this paragraph, the contents of Item 84 of the Schedules.

85.     By each of the untrue and misleading statements referred to in paragraph 77, the defendants materially understated the risk of the certificates that they issued and underwrote.

**C.     Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

**1.     The materiality of underwriting standards and the extent of an originator's disregard of them**

86.     Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans and only against collateral with value, condition, and

marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

> **2.** **Untrue or misleading statements about the underwriting standards of originators of the mortgage loans**

87.     In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 87 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the Schedules.

88.     Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

### 3. Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading

#### (a) The deterioration in undisclosed credit characteristics of mortgage loans made by these originators

89.     Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations the originators of the loans in the securitizations disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

90.     The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

91.     Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator Residential Accredit Loans, Inc. as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Residential Accredit Loans, Inc. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in

Figure 1 depict the incidence of EPDs in loans originated by Residential Accredit Loans, Inc. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



92.     Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



93.     Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of Exhibits A to C of this Complaint:

| Exhibit | Originator |
|---------|------------|
| A | Bear Stearns Residential Mortgage Corporation/EMC Mortgage Corporation |
| B | IndyMac Bank, F.S.B. |
| C | National City Mortgage Corporation |

**(b)     The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

94.     As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced EPDs. These EPDs are evidence that the originators of those

loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 94 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 94, and alleges as though fully set forth in this paragraph, the contents of Item 94 of the Schedules.

95.     A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 95 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 95, and alleges as though fully set forth in this paragraph, the contents of Item 95 of the Schedules.

96.     A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012 are stated in Item 96 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the contents of Item 96 of the Schedules.

97.     By each of the untrue and misleading statements referred to in paragraph 87 above, the defendants materially understated the risk of the certificates that they issued or underwrote. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

      (c)     **Other evidence shows that the originators of the loans in these securitizations routinely disregarded their underwriting standards.**

98.     In addition to the data cited above, other evidence shows that the originators of loans in these securitizations routinely disregarded their stated underwriting standards and failed to conduct adequate due diligence before securitizing loans.

### i.  EMC

99.     A significant number of the loans in Securitization No. 6 were originated by Bear Stearns Residential Mortgage Corporation (referred to in this Complaint as **Bear Res**) or acquired by EMC Mortgage Corporation (referred to in this Complaint as **EMC**) through its conduit correspondent channel and originated pursuant to EMC's underwriting guidelines.

100.     The prospectus supplement for Securitization No. 6 describes EMC's underwriting guidelines. It states, among other things, that "[s]uch underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. . . . Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process." (BSABS 2007-AC5 Pro. Sup. at S-34.)

101.     In fact, in large part because of the pressure that Bear Stearns put on it to fund loans, EMC focused more on the volume of loans that it produced than on the credit quality of those loans.

102.     The mortgage and asset-backed trading organization of Bear Stearns controlled the operations of Bear Res and EMC. The trading organization was part of the mortgage and asset-backed securities department of the fixed income division of Bear Stearns. Bear Stearns Senior Managing Director Thomas Marano managed the department and oversaw two trading

desks, one run by Senior Managing Director Jeffrey Verschleiser and the other run by Senior

Managing Director Michael Nierenberg.

103.    The trading organization's enormous appetite for loans meant that the pressure on

employees to fund loans was significant. Contemporaneous emails from persons like EMC

Mortgage Corporation Senior Vice President Jo-Karen Whitlock underscored the peril for

employees who refused a demand by the trading organization to fund loans:

> I refuse to receive any more emails from JV [senior managing director and head
> of whole loan trading, Jeffrey L. Verschleiser] (or anyone else) questioning why
> we're not funding more loans each day. I'm holding each of you responsible for
> making sure we fund at least 500 each and every day. . . .[I]f we have 500+ loans
> in this office we MUST find a way to underwrite them and buy them. . . . I was
> not happy when I saw the funding numbers and I knew that NY would NOT BE
> HAPPY. I expect to see 500+ each day. . . . I'll do whatever is necessary to make
> sure you're successful in meeting this objective.

(Email dated April 4, 2006, from J. Whitlock to loan acquisition staff.)

104.    Matthew Van Leeuwen, a mortgage analyst with EMC between 2004 and 2006,

likewise confirmed to documentary filmmaker Nick Verbitsky that "the pressure was pretty great

for everybody to just churn the mortgages on through the system." (Email dated March 30, 2009

from M. Van Leeuwen to N. Verbitsky.)

105.    Van Leeuwen also told journalist Teri Buhl that the prevailing view was: "why

worry too much about it? The loans will be off the books soon enough." (Email dated May 13,

2010, from M. Van Leeuwen to T. Buhl.)

106.    In a deposition taken in connection with cases brought by Syncora Guarantee, Inc.

and Ambac Assurance Corp. against EMC, a former employee of both Watterson Prime and

Clayton Holdings, another due diligence firm, expressed a similar view:

> Q:    Let me go back to paragraph 17 of your declaration. Let me read the
> second line here. It states that: "I recall specifically one occasion when
> representatives of Bear Stearns (the purchaser) told my supervisors that because
> Bear Stearns was willing to purchase loans that did not meet the underwriting

guidelines, we should try to find a compensating factor for every single loan that did not meet the underwriting guidelines."

A:      That is true.

. . . .

Q:      Is that a true statement?

A:      That is a true statement.

. . . .

Q:      Now, this paragraph in particular, paragraph 17, refers to a particular Bear Stearns job; correct?

A:      Yes.

Q:      Is it your testimony that on this particular job you found compensating factors that were contrived?

A:      Yes.

(Deposition Transcript at 51-52, 54-55 (Jan. 21, 2012), *Syncora Guarantee, Inc. v. EMC Mortgage Corp.*, No. 09 Civ. 3106 (PAC) (S.D.N.Y.); *Ambac Assurance Corp. v. EMC Mortgage LLC*, No. 65401/2011 (N.Y. Sup. Ct.).)

107.     Bear Stearns had little interest in identifying defective loans before securitization, or taking any other steps that might have slowed the flow of loans through the securitization pipeline. In order to ensure the steady flow of loans into securitizations, Bear Stearns routinely agreed to purchase (or "waive in") loans that its outside due diligence firms had identified as defective. For example, in the third quarter of 2006, Bear Stearns waived the recommendations made by Clayton regarding defective loans up to 65% of the time. (Email dated April 13, 2007, from Kerry O'Neill to Scott Mowry, attaching internal Clayton report (showing a 65% waiver rate for EMC and a 56% waiver rate for Bear Stearns)). EMC's waiver rate (at least for loans that Clayton reviewed) was at least 43% in each quarter of 2006. Bear Stearns's waiver rates ranged from a low of 25% in the fourth quarter to a high of 56% in the third quarter. *Id*. In 2007, Bear

Stearns was still waiving in approximately 20% of the loans that Clayton had flagged as defective. (Clayton, *Trending Reports – 1st Quarter 2006-2nd Quarter 2007* (2007)).

108.    In addition to waiving in huge numbers of loans that had been flagged during due diligence, Bear Stearns executives resisted a proposal by John Mongelluzzo, the company's head of due diligence, to test the performance of these "exception" loans against the performance of loans that were not flagged by the due diligence vendors.  (Email dated May 11, 2005, from J. Mongelluzzo to M. Haggerty, B. Silverstein and others; J. Mongelluzzo Deposition Transcript at 167-70 (Apr. 21, 2010) (*Ambac Assurance Corporation v. EMC Mortgage Corp.*, No. 08 Civ. 9464 (S.D.N.Y.)).

109.    Bear Stearns also took steps to hide the deficiencies in its due diligence. Around May 2006, Bear Stearns changed the EMC Conduit Manual to require outside due diligence vendors to purge all due diligence reports except for the final reports. (Email dated May 17, 2006, from J. Carrion to J. Whitlock attaching relevant portions of the EMC Conduit Manual.) Bear Stearns Senior Managing Director Mary Haggerty confirmed, in a deposition given in a case brought by Ambac, that this policy obscured evidence of the iterative process by which Bear Stearns agreed to purchase loans that its due diligence vendors had flagged as not meeting applicable underwriting guidelines. (*See* M. Haggerty Rule 30(b)(6) Deposition Transcript at 318-19 (Feb. 3, 2010), *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 08 Civ. 9464 (RMB) (S.D.N.Y. filed Nov. 6, 2008).)

### ii.    DLJ Mortgage Capital

110.    DLJ Mortgage Capital, Inc. (referred to in this Complaint as **DLJ Mortgage**) was the sponsor of Securitization No. 7. It purchased the mortgage loans in Securitization No. 7 in the secondary market from various loan originators and purchasers. (CSMC 2006-6 Pro. Sup. at

S-25.) One of those originators was Credit Suisse Financial Corporation (referred to in this Complaint as **Credit Suisse Financial**), an affiliate of DLJ Mortgage.

111.     Upon information and belief, DLJ Mortgage and Credit Suisse Securities both are wholly owned subsidiaries of Credit Suisse Group. (Credit Suisse Group and its affiliates, including DLJ Mortgage and Credit Suisse Securities, are referred to in this Complaint as **Credit Suisse.**)

112.     DLJ Mortgage acquired 53.22% of the loans in Securitization No. 7 through its "whole-loan flow acquisition channel from originators that [DLJ Mortgage] has determined met its qualified correspondent requirements." (CSMC 2006-6 Pro. Sup. at S-42.) Those standards required, among other things: (i) that the loans be underwritten "in accordance with underwriting guidelines designated by the Sponsor . . . or guidelines that do not vary materially from such" designated guidelines and (ii) that DLJ Mortgage "employed, at the time such mortgage loans were acquired by the Sponsor, certain quality assurance procedures designed to ensure that the applicable qualified correspondent from which it purchased the related mortgage loans properly applied the underwriting criteria designated by the Sponsor." *Id.*

113.     Documents that have been made public from a suit filed by an insurer of Credit Suisse Securities and DLJ Mortgage demonstrate that, through its own quality control procedures, Credit Suisse determined that a material number of loans it had purchased and securitized failed to meet the applicable underwriting guidelines and were likely to default.

114.     Every month Credit Suisse conducted a post-funding quality control review of a sample of the loans that it acquired or originated. The purpose of this review was ostensibly to reduce the possibility of errors, irregularities, and fraud in loans being acquired and originated. An outside due diligence vendor re-underwrote the loans, ensured that they complied with

federal and state lending laws, validated critical information including occupancy, employment, income, and assets, and reviewed the property valuation. The results of the review were then reported to Credit Suisse's quality control department.

115.    E-mails to and from Credit Suisse's quality control department show that it knew that it had "systemic problems" with the underwriting of the loans that it had purchased and securitized, which had a "historical fail rate of over 35%" for at least one of the major representations made by the seller.

116.    Credit Suisse's 35% "fail rate" is consistent with the information produced by Clayton Holdings LLC to the Financial Crisis Inquiry Commission in 2010. Clayton created a document called a "Trending Report" that aggregated the results of its due diligence for 23 investment or commercial banks, including Credit Suisse. From the first quarter of 2006 until the second quarter of 2007, Clayton rejected 32% of the loans that Credit Suisse submitted to it as falling outside the applicable underwriting guidelines. Nevertheless, Credit Suisse "waived in" and securitized one-third of the loans Clayton had identified as defective.

117.    As Credit Suisse's quality control review found an increasing number of defective loans, Credit Suisse reduced the number of loans it reviewed to "avoid … getting stuck w[ith] delinquent loans" that had to be repurchased from the securitization trust but could not be put back to the seller. One managing director admonished his colleagues to "avoid generating inordinate correspondence re[garding] potential loan defects that we may not repurchase from securitizations."

### iii.  American Home Mortgage

118.    American Home Mortgage Corporation originated some of the loans in Securitizations Nos. 7 and 12. The prospectus supplements for these Securitizations generally described the underwriting standards pursuant to which the underlying loans were originated,

including by American Home Mortgage Corp. (*See, e.g.*, CSMC 2006-6 Pro. Sup. at S-40 to S-41.)

119.    Beginning in at least 2005, American Home Mortgage Corp. and its affiliates (referred to in this Complaint as **American Home**) substantially relaxed and then disregarded their underwriting standards.

120.    Underwriters who refused to approve loans that failed to meet the guidelines were reprimanded. An American Home underwriter from Indiana who objected to American Home's course of conduct said that she was "put on the 'bad girl' list and not listened to," and that "[i]f you stood up and spoke out against any of [American Home's] policies then the managers treated you like dirt." (*See* UWinIN, Comment to Mortgage Lender Implode-O-Meter, Hindsight 20/20??? (Jan.21, 2008), http://forum.ml-implode.com/viewtopic.php?p=37072#37072.) She added that her boss overlooked fraudulent loan applications because "the client sent us lots of business." *Id*.

121.    According to an economics reporter for *The New York Times*, who wrote an article about the pitfalls of the mortgage industry in the context of his own credit struggle, American Home's loan officers viewed themselves as "dream enablers." The reporter explained how American Home extended a mortgage loan to him after looking only at his credit scores and income, choosing to ignore that he spent two thirds of his income on alimony and child support and that he was barely able to afford the mortgage payments:

> Bob [Andrews, a loan officer at American Home] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000."
>
> What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, Bob figured, it was my job to decide whether I could afford it. His job was to make it happen.

"I am here to enable dreams," he explained to me long afterward. Bob's view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage – not mine."

(Edmund L. Andrews, *My Personal Credit Crisis,* N.Y. TIMES, May 17, 2009, at MM46.)

122.     There also is evidence that some American Home officers knowingly inserted false information in loan applications without the borrowers' knowledge. Kourosh Partow, a former American Home branch manager in Anchorage, Alaska, pleaded guilty to wire fraud in 2007. (Plea Agreement at 2, *United States v. Partow*, No. 3:06-cr-00070-08-HRH (D. Alaska filed Apr. 20, 2007)). The plea agreement states that, while Partow was employed by American Home, he "significantly overstated" a borrower's income on a loan application, even though the borrower had provided him with accurate information about his income. On August 31, 2007, Partow was convicted and sentenced to 25 months in prison, and was ordered to pay fines and restitution. (Judgment, *U.S. v. Partow*, No. 3:06-CR-00070-08-HRH (D. Alaska Aug. 24, 2007)). Partow later asserted in a document submitted to the court in connection with his sentencing that his former employers (American Home and Countrywide) were aware that their loan documents "were fraught with inaccuracies" and encouraged manipulation of data. (Glenn R. Simpson, *Loan Data Focus of Probe*, THE WALL STREET JOURNAL, March 11, 2008.)

123.     American Home made the list of the "Worst 10 in the Worst 10" – an analysis by the Office of the Comptroller of the Currency that determined the originators of the most foreclosed loans in the 10 metropolitan areas hardest hit by foreclosures. In the OCC's initial analysis in November 2008, which was based on subprime and Alt-A foreclosures between 2005 and 2007, American Home made the list of "Worst 10" originators in three of the 10 metropolitan areas. When the OCC updated its analysis in November 2009 based on more recent

data, American Home made the list in seven of the 10 metropolitan areas, ranking within the top

five worst originators in three of them.

124.     In addition, several state and federal authorities have taken action against

American Home in connection with its lending practices. The New Jersey Department of

Banking and Insurance took steps to revoke American Home's license because of the company's

numerous violations of New Jersey's Licensed Lenders Act. (State of New Jersey, Department of

Banking and Insurance News Release, *OBI Takes Action To Revoke License of Two New York-*

*Based Mortgage Lenders*, Aug. 3, 2007.) Similarly, the New York State Banking Department

suspended American Home's mortgage banking license for 30 days because American Home

had failed to fund mortgage commitments. (New York Department of Financial Services Press

Release, *New York State Banking Dep't Issues Suspension Order Against American Home*

*Mortgage,* Aug. 3, 2007.)

> **D.**     **The Large Number of Mortgage Loans in the Collateral Pools About Which
> the Defendants Made Material Untrue or Misleading Statements Made Their
> Statements About the Ratings of CNB's and SCB's Certificates Untrue and
> Misleading.**

125.     In the prospectus supplements, the defendants made statements about the rating of

each certificate by ratings agencies. They stated that the ratings agencies rated each such

certificate investment grade. Details of each such statement are stated in Item 125 of the

Schedules of this Complaint. Plaintiff incorporates into this paragraph 125, and alleges as though

fully set forth in this paragraph, the contents of Item 125 of the Schedules.

126.     The ratings were important to the decision of any reasonable investor whether to

purchase the certificates. Many investors, including CNB and SCB, have investment policies that

require a certain minimum rating for all investments. The policy of CNB and SCB was to

purchase only certificates that were rated at least A.

127.    These statements by the defendants about the ratings of the certificates they issued and underwrote were misleading because the defendants omitted to state that the ratings were affected by all the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a)    loans in which the LTVs were materially understated as shown by the AVM;

(b)    loans in which the LTVs were misleading as a result of undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be owner-occupied, but were not.

128.    In Securitization No. 7, there were 615 loans whose LTVs were materially understated as shown by the AVM, 528 loans in which the LTVs were misleading because of undisclosed additional liens, 7 loans that suffered EPDs, and 278 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 1,125 loans (or 61.7% of the loans in the collateral pool) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 128 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 128, and alleges as though fully set forth in this paragraph, the contents of Item 128 of the Schedules.

129.    Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

130.    By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued and underwrote. Moreover, Plaintiff is informed and believes, and based thereon alleges, that the defendants materially understated the risk of the certificates that they issued and underwrote.

## VI.  STATUTE OF LIMITATIONS

131.    All of the claims in this Complaint are timely. Plaintiff became receiver for CNB and receiver for SCB on May 22, 2009. Under 12 U.S.C. § 1821(d)(14), the statute of limitations on all of CNB and SCB's claims asserted in this Complaint that had not expired as of May 22, 2009, is extended to no less than three years from that date. Plaintiff filed its initial Complaint less than three years from May 22, 2009.

132.    The statute of limitations applicable to the claims asserted in this Complaint had not expired as of May 22, 2009, because a reasonably diligent plaintiff would not have discovered until later than May 22, 2008, facts that show that the particular statements referred to in Items 38, 47, 71, 77, 87, and 125 of the Schedules to this Complaint were untrue or misleading. Those are statements about the 25,933 specific mortgage loans in the collateral pools of the securitizations involved in this action, not about residential mortgage loans or any type of residential mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent plaintiff did not have access until after May 22, 2008, to facts about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originators of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees did not, and still do not, make those files available to certificateholders.

133.    Moreover, on and before May 22, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010. A reasonably diligent plaintiff thus could not have brought a complaint, prior to May 22, 2008, that would have withstood a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

134.    Plaintiff discovered the untrue or misleading statements by defendants in 2011 in the course of its investigation of possible claims of CNB and SCB that Plaintiff is authorized to bring as receiver for CNB and as receiver for SCB.

135.    The claims on Securitizations Nos. 1, 3, 5, 6, 7, 8, 9, 10, 11, and 12 are timely for an additional reason. When CNB and SCB purchased the certificates in these securitizations, all of them were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations (**NRSRO's**) accredited by the Securities and Exchange Commission. Sponsors of securitizations submitted to the NRSROs the same information about the loans in the collateral pools of proposed securitizations that they included in the prospectus supplements for those securitizations, including in particular statements of the type referred to in Items 38, 47, 71, 77, 87, and 125 of the Schedules to this Complaint. The NRSROs used and relied on that information in rating the certificates to be issued in each securitization.

136.    The NRSROs monitored the certificates that they rated after those certificates were issued. If an NRSRO discovers facts that show that there was an untrue or misleading statement about a material fact in the information submitted to it for its use in rating a certificate, then the NRSRO will withdraw its rating of that certificate while it considers the impact of the untrue or misleading statement, or it will downgrade the rating of the certificate, usually to a rating below investment grade.

137.    As noted above, all of the certificates that CNB and SCB purchased in Securitizations Nos. 1, 3, 5, 6, 7, 8, 9, 10, 11, and 12 were rated triple-A at the time of purchase by at least two of Fitch, Moody's, and Standard & Poor's. With respect to these certificates, the NRSROs did not withdraw any of those ratings, or downgrade any of them to below investment grade, before May 22, 2008. The dates on which each certificate was first downgraded below investment grade are stated in Item 38 of the Schedules to this Complaint.

138.    If a reasonably diligent plaintiff would have discovered before May 22, 2008, facts that show that the particular statements referred to in Items 38, 47, 71, 77, 87 and 125 of the

41

Schedules to this Complaint were untrue or misleading, then the NRSROs, which were monitoring the certificates and are much more sophisticated than a reasonably diligent plaintiff, would also have discovered such facts and withdrawn or downgraded their ratings on the certificates to below investment grade. The fact that none of the NRSROs did so with respect to the certificates in Securitizations Nos. 1, 3, 5, 6, 7, 8, 9, 10, 11, and 12 further demonstrates that a reasonably diligent plaintiff could not have discovered before May 22, 2008, facts that show that those statements were untrue or misleading.

139.   The certificates that CNB and SCB purchased in Securitizations Nos. 2 and 4 were rated double-A by Fitch at the time CNB and SCB purchased them. They were downgraded below investment grade on May 14, 2008. For the reasons stated in paragraphs 132-133 above, no reasonably diligent plaintiff, even if it learned of the downgrade of those certificates on May 14, 2008, would have had sufficient information by May 22, 2008, to state a claim against the defendants for violation of Section 11 of the 1933 Act that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

140.   Even if a reasonably diligent plaintiff would have discovered before May 22, 2008, facts that show that the particular statements referred to in Items 38, 47, 71, 77, 87 and 125 of the Schedules to this Complaint were untrue or misleading, certain claims in this action would still be timely. As purchasers of the certificates in Securitization No. 8, CNB and SCB were, and Plaintiff as receiver for CNB and as receiver for SCB is, a member of the proposed class in *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*, No. 08-cv-10841 (S.D.N.Y.), filed on February 17, 2009.

141.   Securitization No. 8 was included in the original Class Action Complaint filed in *Public Employees' Retirement System* on February 17, 2009, and the named plaintiff in that action purchased a certificate in that Securitization. That case has settled, but the FDIC as Receiver for CNB and for SCB requested exclusion from the settlement class on February 27, 2012.

## VII.  CAUSES OF ACTION

**A.     Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

142.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 131.

143.    BSABS is the depositor of Securitization No. 6 and therefore is the issuer of the certificates. In doing the acts alleged, BSABS violated Section 11 of the 1933 Act in connection with the sale to CNB and SCB of the certificates in Securitization No. 6.

144.    CMSI is the depositor of Securitization No. 12 and therefore is the issuer of the certificates. In doing the acts alleged, CMSI violated Section 11 of the 1933 Act in connection with the sale to SCB of the certificate in Securitization No. 12.

145.    CSFB Mortgage Securities is the depositor of Securitization No. 7 and therefore is the issuer of the certificates. In doing the acts alleged, CSFB Mortgage Securities violated Section 11 of the 1933 Act in connection with the sale to CNB and SCB of the certificates in Securitization No. 7.

146.    MLMI is the depositor of Securitization No. 8 and therefore is the issuer of the certificates. In doing the acts alleged, MLMI violated Section 11 of the 1933 Act in connection with the sale to CNB and SCB of the certificates in Securitization No. 8.

147.    Bear Stearns is the underwriter of Securitization No. 6. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with the sale to CNB and SCB of the certificates in Securitization No. 6.

148.    Citigroup is the underwriter of Securitizations Nos. 4 and 9. In doing the acts alleged, Citigroup violated Section 11 of the 1933 Act in connection with the sale to CNB of the certificate in Securitization No. 4, and the sale to SCB of the certificates in Securitizations Nos. 4 and 9.

149.    Credit Suisse Securities is the underwriter of Securitizations Nos. 7 and 10. In doing the acts alleged, Credit Suisse Securities violated Section 11 of the 1933 Act in connection

with the sale to CNB of the certificate in Securitization No. 7, and the sale to SCB of the certificates in Securitizations Nos. 7 and 10.

150.   DBS is the underwriter of Securitizations Nos. 2 and 3. In doing the acts alleged, DBS violated Section 11 of the 1933 Act in connection with the sale to CNB of the certificates in Securitizations Nos. 2 and 3.

151.   GMAC is the underwriter of the certificates in Securitizations Nos. 1, 2, and 4. In doing the acts alleged, GMAC violated Section 11 of the 1933 Act in connection with the sale to CNB of the certificates in Securitizations Nos. 1, 2, and 4, and the sale to SCB of the certificate in Securitization No. 4.

152.   HSBC is the underwriter of Securitization No. 3. In doing the acts alleged, HSBC violated Section 11 of the 1933 Act in connection with the sale to CNB of the certificate in Securitization No. 3.

153.   Merrill Lynch is the underwriter of Securitization No. 8. In doing the acts alleged, Merrill Lynch violated Section 11 of the 1933 Act in connection with the sale to CNB and SCB of the certificates in Securitization No. 8.

154.   RBS is the underwriter of Securitizations Nos. 1, 5, 11, and 12. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with the sale to CNB of the certificates in Securitizations Nos. 1 and 5, and the sale to SCB of the certificates in Securitizations Nos. 5, 11, and 12.

155.   UBS is the underwriter of Securitization No. 10. In doing the acts alleged, UBS violated Section 11 of the 1933 Act in connection with the sale to SCB of the certificate in Securitization No. 10.

156.   The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 38 of the Schedules.

157.   The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make

the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 42 through 130.

158.     CNB and SCB purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months. Plaintiff therefore is not required to plead reliance on the untrue or misleading statements.

159.     In the alternative, CNB and SCB relied on the untrue or misleading statements that defendants made in the registration statements, as amended by the prospectus supplements, in deciding to purchase the certificates.

160.     Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

161.     CNB and SCB did not know when they purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

162.     When they failed on May 22, 2009, neither CNB nor SCB had discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

163.     CNB and SCB have suffered a loss on each of these certificates.

164.     Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

**B.      Liability as a Controlling Person Under Section 15 of the 1933 Act**

165.     Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 164.

166.     BSCI, by or through stock ownership, agency, or otherwise, controlled BSABS within the meaning of Section 15 of the 1933 Act.

167.    In doing the acts alleged, BSABS violated Section 11 of the 1933 Act by issuing the certificates.

168.    BSCI is therefore jointly and severally liable with and to the same extent as BSABS.

169.    CitiMortgage, by or through stock ownership, agency, or otherwise, controlled CMSI within the meaning of Section 15 of the 1933 Act.

170.    In doing the acts alleged, CMSI violated Section 11 of the 1933 Act by issuing the certificates.

171.    CitiMortgage is therefore jointly and severally liable with and to the same extent as CMSI.

172.    Credit Suisse Management, by or through stock ownership, agency, or otherwise, controlled CFSB Mortgage Securities within the meaning of Section 15 of the 1933 Act.

173.    In doing the acts alleged, CFSB Mortgage Securities violated Section 11 of the 1933 Act by issuing the certificates.

174.    Credit Suisse Management is therefore jointly and severally liable with and to the same extent as CSFB Mortgage Securities.

175.    MLMCI, by or through stock ownership, agency, or otherwise, controlled MLMI within the meaning of Section 15 of the 1933 Act.

176.    In doing the acts alleged, MLMI violated Section 11 of the 1933 Act by issuing the certificates.

177.    MLMCI is therefore jointly and severally liable with and to the same extent as MLMI.

## VIII. JURY DEMAND

178.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against defendants for damages in an amount to be determined at trial, but not less than $66 million, plus attorneys' fees, costs of court, pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff is entitled.

Dated: October 12, 2012
       New York, New York

Respectfully Submitted,

**GRAIS & ELLSWORTH LLP**

By: _____

David J. Grais (DG 7118)
Mark B. Holton (MH 4939)
Kathryn E. Matthews (KN 0932)
Leanne M. Wilson (LW 1225)
Grais & Ellsworth LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: 212-755-0100

*Attorneys for Federal Deposit Insurance
Corporation as Receiver for Citizens National Bank
and Receiver for Strategic Capital Bank*

**EXHIBIT A TO THE COMPLAINT**



Figure 1: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT B TO THE COMPLAINT



Figure 1: Percent of Loans Originated by IndyMac or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by IndyMac or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT C TO THE COMPLAINT





**SCHEDULE 1 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants, RBS and GMAC.

**Item 38.**      **Details of trust and certificate(s).**

   **(a)**      **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS6 was a securitization in June 2006 of 4,115 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation, National City Mortgage Corporation, SunTrust Mortgage, Inc. and GMAC Mortgage Corporation, an affiliate of Residential Funding Corporation. Of the 4,115 mortgage loans in the collateral pool, Homecomings Financial originated approximately 21.4% of the group I loans and 25.2% of the group II loans, National City Mortgage originated approximately 15.4% of the group I loans and 17.6% of the group II loans, SunTrust Mortgage originated approximately 14.7% of the group I loans, and GMAC Mortgage originated approximately 7.7% of the group I loans and 5.0% of the group II loans. RALI 2006-QS6 Pros. Sup. S-5; S-49 through S-50.

   **(b)**      **Description of the certificate(s) that CNB purchased:** RBS and GMAC were the underwriters of the security that CNB purchased. CNB purchased a certificate in class I-A-16 in this securitization, for which CNB paid $8,900,000 plus accrued interest on December 10, 2007. CNB's certificate was primarily paid by the 3,552 mortgage loans in loan group I.

   **(c)**      **Ratings of the certificate(s) when CNB purchased them:** Fitch: AAA; Moody's: Aaa; Standard &Poor's: AAA.

   **(d)**      **Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

**(e)** **Date on which the certificate(s) were downgraded below investment grade:** October 30, 2008.

**(f)** **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1362195/000089109206001762/e24375_424b5.txt

**(g)** **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that CNB purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, RBS and GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement ("Mortgage Loan Statistical Information") RBS and GMAC presented tables of statistics about the mortgage loans in the collateral pool.  Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 or less, $100,001.00 to $200,000.00, $200,001.00 to $300,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in loan group I. In each table the number of categories into which the loans were divided ranged from 2 to 51. Thus, in "The Mortgage Loan Statistical Information" section, RBS and GMAC made many

untrue or misleading statements about the original LTVs of the loans in loan group I.
RALI 2006-QS6 Pros. Sup. I-1 to I-7.

(b)     "The weighted average loan-to-value ratio at origination of the group I
loans will be approximately 74.81%." RALI 2006-QS6 Pros. Sup. I-7.

**Item 56.        Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in loan group I | 3,552 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,119 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $68,398,156 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 400 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $24,064,167 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 275 |
| Weighted-average LTV, as stated by defendants | 74.81% |
| Weighted-average LTV, as determined by the model | 85.3% |

**Item 62.        Undisclosed additional liens in loan group 1:**

**(a)        Minimum number of properties with additional liens:** 1,616

**(b)        Weighted average CLTV with additional liens:** 81.6%

**Item 77.        Untrue or misleading statements about owner-occupancy of the
                  properties that secured the mortgage loans:**

In the prospectus supplement, RBS and GMAC made the following statements
about the occupancy status of the properties that secured the mortgage loans in the
collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement, described in Item 47, RBS and
GMAC presented a table entitled "Occupancy Types of the Group I Mortgaged
Properties." This table divided the group I mortgage loans into the categories "Primary
Residence," "Second/Vacation" and "Non Owner-occupied." This table made untrue or
misleading statements about, among other data, the number of mortgage loans, the

principal balance outstanding, and the percent of the principal balance of the group I mortgage loans in each of these categories. RALI 2006-QS6 Pros. Sup. S-12; I-1.

(b) In the "Occupancy Types of the Group I Mortgaged Properties" table, RBS and GMAC stated that of the 3,552 mortgage loans in group I, 2,483 were secured by primary residences and 1,069 were not. RALI 2006-QS6 Pros. Sup. S-12; I-1.

**Item 84.** **Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

 **(a)** **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 240

 **(b)** **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:**  337

 **(c)** **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 151

 **(d)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 559

**Item 87.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-47 through S-50 of the prospectus supplement, RBS and GMAC made statements about the underwriting standards of Residential Funding Corporation. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2006-QS6 Pros. Sup. S-48.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2006-QS6 Pros. Sup. S-49.

**SCHEDULE 1 OF THE COMPLAINT**      **Page 4**

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2006-QS6 Pros. Sup. S-48.

**Item 94.**      **Early payment defaults in loan group I:**

    **(a)**      **Number of the mortgage loans that suffered EPDs:** 26

    **(b)**      **Percent of the mortgage loans that suffered EPDs:** 0.7%

**Item 95.**      **90+ days delinquencies in loan group I:**

    **(a)**      **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,341

    **(b)**      **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.7%

**Item 96.**      **30+ days delinquencies in loan group I:**

    **(a)**      **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,147

    **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 32.3%

**Item 125.**     **Statements about the ratings of the certificate(s) that CNB purchased:**

On pages S-8 through S-9 and S-119 through S-120 of the prospectus supplement, RBS and GMAC made statements about the ratings assigned to the certificates issued in this securitization. RBS and GMAC stated that CNB's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's and Aaa by Moody's. RALI 2006-QS6 Pros. Sup. S-8. These were the highest ratings available from these rating agencies.

RBS and GMAC also stated: "It is a condition of the issuance of the Senior Certificates . . . that they be rated "AAA" by Fitch Ratings . . . "AAA" by Standard & Poor's Ratings Services . . . and "Aaa" by Moody's Investors Service, Inc. . . . ." RALI 2006-QS6 Pros. Sup. S-119.

**SCHEDULE 1 OF THE COMPLAINT**                                        **Page 5**

**Item 128.**     **Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,119

    **(b)**     **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 1,616

    **(c)**     **Number of loans that suffered EPDs:** 26

    **(d)**     **Number of loans which the properties were stated to be owner-occupied but were not:** 559

    **(e)**     **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,380

    **(f)**     **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 67.0%

**SCHEDULE 2 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants DBS and GMAC.

**Item 38.**        **Details of trust and certificate(s).**

     **(a)**        **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18 was a securitization in December 2006 of 5,231 mortgage loans, in three groups. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, National City Mortgage Corporation, SunTrust Mortgage, Inc., Wachovia Mortgage Corporation and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC. Of the 5,231 mortgage loans in the collateral pool, Homecomings Financial originated approximately 28.9% of the group I loans, 41.2% of the group II loans, and 25.6% of the group III loans; National City Mortgage originated approximately 18.4% of the group I loans, 12.8% of the group II loans, and 14.2% of the group III loans; SunTrust Mortgage originated approximately 15.9% of the group I loans; Wachovia Mortgage originated approximately 13.0% of the group III loans and GMAC Mortgage originated approximately 4.8% of the group I loans, 3.5% of the group II loans and 0.9% of the group III loans. RALI 2006-QS18 Pros. Sup. S-6; S-55.

     **(b)**        **Description of the certificate(s) that CNB purchased:** DBS and GMAC were the underwriters of the securities that CNB purchased. CNB purchased three certificates in class 1-M-1 of this securitization, for which CNB paid $3,930,985 plus accrued interest on September 24, 2007, $3,734,436 plus accrued interest on September 27, 2007 and $3,075,871 plus accrued interest on October 12, 2007.  CNB's certificates were paid primarily by the 4,712 mortgage loans in group I and group II combined.

     **(c)**        **Ratings of the certificate(s) when CNB purchased them:** Fitch: AA.

     **(d)**        **Current ratings of the certificate(s):** Fitch: D.

**(e)     Date on which the certificate(s) were downgraded below investment grade:** May 14, 2008.

**(f)     URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/949493/000089109206003942/e25886_424b5.txt

**(g)     Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, DBS and GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement ("Mortgage Loan Statistical Information") DBS and GMAC presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 or less, $100,001.00 to $200,000.00, $200,001.00 to $300,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 11 such tables in "The Mortgage Loan Statistical Information" section for the loans in group I and group II combined. In each table the number of categories into which the loans were divided ranged from 2 to 51. Thus, in "The Mortgage Loan Statistical Information" section, DBS and GMAC made

many untrue or misleading statements about the original LTVs of the loans in loan group

I and group II combined. RALI 2006-QS18 Pros. Sup. I-1 to I-7.

      (b)      "The weighted average loan-to-value ratio at origination of the mortgage

loans [in group I and group II combined] will be approximately 77.32%." RALI 2006-

QS18 Pros. Sup. I-26.

**Item 56.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in loan groups I and II combined | 4,712 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,378 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $109,824,011 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 430 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $28,088,257 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 371 |
| Weighted-average LTV, as stated by defendants | 77.32% |
| Weighted-average LTV, as determined by the model | 89.6% |

**Item 62.**      **Undisclosed additional liens in loan groups I and II:**

      **(a)**      **Minimum number of properties with additional liens:** 1,979

      **(b)**      **Weighted average CLTV with additional liens:** 84.0%

**Item 77.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

      In the prospectus supplement, DBS and GMAC made the following statements

about the occupancy status of the properties that secured the mortgage loans in the

collateral pool of this securitization.

      (a)      In Annex I of the prospectus supplement, described in Item 47, DBS and

GMAC presented a table entitled "Occupancy Types of the Group I and Group II Loans."

This table divided the mortgage loans into the categories "Primary Residence,"

"Second/Vacation" and "Non-Owner Occupied" This table made untrue or misleading

**SCHEDULE 2 OF THE COMPLAINT**            **Page 3**

statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the principal balance of the mortgage loans in loan group I and loan group II combined in each of these categories. RALI 2006-QS18 Pros. Sup. S-15; I-21.

(b)    In the "Occupancy Types of the Group I and Group II Loans" table, DBS and GMAC stated that of the 4,712 mortgage loans in loan group I and group II combined, 3,187 were secured by primary residences and 1,525 were not. RALI 2006-QS18 Pros. Sup. S-15; I-21.

**Item 84.    Details of properties in loan groups I and II that were stated to be owner-occupied, but were not:**

**(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 389

**(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 501

**(c)    Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 230

**(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 854

**Item 87.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-53 through S-56 of the prospectus supplement, DBS and GMAC made statements about the underwriting standards of Residential Funding Company. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2006-QS18 Pros. Sup. S-54.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific

criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2006-QS18 Pros. Sup. S-55.

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2006-QS18 Pros. Sup. S-53.

**Item 94.**  **Early payment defaults in loan groups I and II:**

    **(a)**  **Number of the mortgage loans that suffered EPDs:** 68

    **(b)**  **Percent of the mortgage loans that suffered EPDs:** 1.4%

**Item 95.**  **90+ days delinquencies in loan groups I and II:**

    **(a)**  **Number of the mortgage loans that suffered 90+ days delinquencies:** 2,087

    **(b)**  **Percent of the mortgage loans in that suffered 90+ days delinquencies:** 44.3%

**Item 96.**  **30+ days delinquencies in loan groups I and II:**

    **(a)**  **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,730

    **(b)**  **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 36.7%

**Item 125.**  **Statements about the ratings of the certificate(s) that CNB purchased:**

On pages S-9 through S-10 and S-142 through S-143 of the prospectus supplement, DBS and GMAC made statements about the ratings assigned to the certificates issued in this securitization. DBS and GMAC stated that CNB's certificates were rated AA by Fitch Ratings. RALI 2006-QS18 Pros. Sup. S-9.

DBS and GMAC also stated: "It is a condition of the issuance of the Class 1-M-1 . . . Certificates that they be rated not lower than "AA" . . . by Fitch." RALI 2006-QS18 Pros. Sup. S-142.

**SCHEDULE 2 OF THE COMPLAINT**                                      **Page 5**

**Item 128.**   **Summary of loans in loan groups I and II about which the defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,378

    **(b)**   **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 1,979

    **(c)**   **Number of loans that suffered EPDs:** 68

    **(d)**   **Number of loans which the properties were stated to be owner-occupied but were not:** 854

    **(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 3,133

    **(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 66.5%

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant DBS and HSBC.

**Item 38.        Details of trust and certificate(s).**

**(a)        Description of the trust:** Residential Asset Securitization Trust 2007-A1 was a securitization in January 2007 of 636 mortgage loans, in one pool.  The mortgage loans in the collateral pool of this securitization were acquired by IndyMac Bank, F.S.B. RAST 2007-A1 Pros. Sup. S-38.

**(b)        Description of the certificate(s) that CNB purchased:** DBS and HSBC were the underwriters of the security that CNB purchased. CNB purchased a senior certificate in class A-9 of in this securitization, for which CNB paid $7,078,250 plus accrued interest on February 6, 2008.

**(c)        Ratings of the certificate(s) when CNB purchased them:** Fitch: AAA; Standard & Poor's: AAA.

**(d)        Current ratings of the certificate(s):** Fitch: D; Standard & Poor's: D.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**(f)        URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000095012307001160/y29029b5e424b5.txt

**(g)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that CNB purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**SCHEDULE 3 OF THE COMPLAINT**                                              **Page 1**

**Item 47.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, DBS and HSBC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "The Weighted Average Original Loan-to-Value Ratio of the mortgage loans was 73.60%." RAST 2007-A1 Pros. Sup. S-5.

(b)      "The weighted average loan-to-value ratio of [mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan] is approximately 76.80%, and the weighted average combined loan-to-value ratio (including the second lien) is approximately 91.80%." RAST 2007-A1 Pros. Sup. S-23.

(c)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less."  RAST 2007-A1 Pros. Sup. S-28.

(d)      In the section of the prospectus supplement entitled "The Mortgage Pool," DBS and HSBC presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, $500,000.01 to $550,000.00 etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 15 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 38. Thus, in "The Mortgage Pool" section, DBS and HSBC made many untrue or misleading statements about the LTVs of the loans the collateral pool. RAST 2007-A1 Pros. Sup. S-30 to S-36.

(e)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 73.60%." RAST 2007-A1 Pros. Sup. S-34.

**SCHEDULE 3 OF THE COMPLAINT**                                          **Page 2**

**Item 56.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 636 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 266 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $39,372,931 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 35 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,907,429 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 67 |
| Weighted-average LTV, as stated by defendants | 73.6% |
| Weighted-average LTV, as determined by the model | 87.1% |

**Item 71.**      **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, DBS and HSBC made the following statement about the appraisals of the properties that secured the mortgage acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2007-A1 Pros. Sup. S-40.

**Item 77.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, DBS and HSBC made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 47, DBS and HSBC presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Owner Occupied," Investment Property" and "Second Home." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. RAST 2007-A1 Pros. Sup. S-35.

**SCHEDULE 3 OF THE COMPLAINT**                                    **Page 3**

(b)    In the "Occupancy Types for the Mortgage Loans" table, DBS and HSBC stated that of the 636 mortgage loans in the collateral pool, 585 were secured by primary residences and 51 were not. RAST 2007-A1 Pros. Sup. S-35.

**Item 84.**    **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 40

    **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 118

    **(c)**    **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 51

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 175

**Item 87.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-38 through S-41 of the prospectus supplement, DBS and HSBC made statements about the underwriting process of the loans acquired by IndyMac Bank. All of those statements are incorporated herein by reference.

One of these statements was that: "Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions." RAST 2007-A1 Pros. Sup. S-38.

Another one of these statements was that: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2007-A1 Pros. Sup. S-39.

Another one of these statements was that: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." RAST 2007-A1 Pros. Sup. S-41.

**Item 94.       Early payment defaults:**

    **(a)       Number of the mortgage loans that suffered EPDs:** 9

    **(b)       Percent of the mortgage loans that suffered EPDs:** 1.4%

**Item 95.       90+ days delinquencies:**

    **(a)       Number of the mortgage loans that suffered 90+ days delinquencies:** 283

    **(b)       Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.5%

**Item 96.       30+ days delinquencies:**

    **(a)       Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 213

    **(b)       Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 33.5%

**Item 125.      Statements about the ratings of the certificate(s) that CNB and SCB purchased:**

On pages S-7 through S-8 and S-95 of the prospectus supplement, DBS and HSBC made statements about the ratings assigned to the certificates issued in this securitization. DBS and HSBC stated that CNB and SCB's certificates were rated AAA by Fitch Ratings and AAA by Standard & Poor's. RAST 2007-A1 Pros. Sup. S-7. These were the highest ratings available from these two rating agencies.

DBS and HSBC also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and by Fitch, Inc. . . ." RAST 2007-A1 Pros. Sup. S-8.

DBS and HSBC also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Fitch, Inc." RAST 2007-A1 Pros. Sup. S-95.

**SCHEDULE 3 OF THE COMPLAINT**                                   **Page 5**

**Item 128.**   **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 266

    **(b)**   **Number of loans that suffered EPDs:** 9

    **(c)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 175

    **(d)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 383

    **(e)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 60.2%

## SCHEDULE 4 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Citigroup and GMAC.

**Item 38.       Details of trust and certificate(s).**

**(a)       Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8 was a securitization in July 2006 of 4,266 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation, National City Mortgage Corporation and SunTrust Mortgage, Inc.  Of the 4,226 mortgage loans in the collateral pool, Homecomings Financial Network originated 19.6%, National City Mortgage Corporation originated 15.3% and SunTrust Mortgage, Inc. originated 14.3%. RALI 2006-QS8 Pros. Sup. S-5; S-44.

**(b)       Description of the certificate(s) that CNB and SCB purchased:** Citigroup and GMAC were the underwriters of the securities that CNB and SCB purchased. CNB purchased a certificate in class M-1 of this securitization, for which CNB paid $9,720,466 plus accrued interest on November 9, 2007. SCB purchased a certificate in class M-1 of this securitization, for which SCB paid $9,811,406 plus accrued interest on November 9, 2007.

**(c)       Ratings of the certificate(s) when CNB and SCB purchased them:** Fitch: AA.

**(d)       Current ratings of the certificate(s):** Fitch: D.

**(e)       Date on which the certificate(s) were downgraded below investment grade:** May 14, 2008.

**(f)       URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1366205/000089109206002083/e24601_424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB and SCB purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Citigroup and GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement ("Mortgage Loan Statistical Information") Citigroup and GMAC presented tables of statistics about the mortgage loans in the collateral pool.  Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 or less, $100,001.00 to $200,000.00, $200,001.00 to $300,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 51. Thus, in "The Mortgage Loan Statistical Information" section, Citigroup and GMAC made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2006-QS8 Pros. Sup. I-1 to I-7.

(b)     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 75.28%." RALI 2006-QS8 Pros. Sup. I-7.

**SCHEDULE 4 OF THE COMPLAINT**                                        **Page 2**

**Item 56.**        **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 4,266 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,280 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $93,161,716 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 352 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $24,388,649 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 288 |
| Weighted-average LTV, as stated by defendants | 75.28% |
| Weighted-average LTV, as determined by the model | 87.3% |

**Item 62.**        **Undisclosed additional liens:**

> **(a)        Minimum number of properties with additional liens:** 1,632

> **(b)        Weighted average CLTV with additional liens:** 81.9%

**Item 77.**        **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Citigroup and GMAC made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        In Annex I of the prospectus supplement, described in Item 47, Citigroup and GMAC presented a table entitled "Occupancy Types of the Mortgaged Properties." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied" This table made untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the principal balance of the mortgage loans in the collateral pool in each of these categories. RALI 2006-QS8 Pros. Sup. S-11; I-1.

(b)      In the "Occupancy Types of the Mortgaged Properties" table, Citigroup and GMAC stated that of the 4,266 mortgage loans in collateral pool, 2,973 were secured by primary residences and 1,293 were not. RALI 2006-QS8 Pros. Sup. S-11; I-1.

**Item 84.      Details of properties that were stated to be owner-occupied, but were not:**

      **(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 267

      **(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 395

      **(c)      Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 160

      **(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 661

**Item 87.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-44 of the prospectus supplement, Citigroup and GMAC made statements about the underwriting standards of Residential Funding Corporation. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2006-QS8 Pros. Sup. S-43.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2006-QS8 Pros. Sup. S-43.

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original

lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2006-QS8 Pros. Sup. S-42.

**Item 94.**   **Early payment defaults:**

    **(a)**   **Number of the mortgage loans that suffered EPDs:** 46

    **(b)**   **Percent of the mortgage loans that suffered EPDs:** 1.1%

**Item 95.**   **90+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,604

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.6%

**Item 96.**   **30+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,353

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 31.7%

**Item 125.**   **Statements about the ratings of the certificate(s) that CNB and SCB purchased:**

On pages S-8 through S-9 and S-100 through S-101 of the prospectus supplement, Citigroup and GMAC made statements about the ratings assigned to the certificates issued in this securitization. Citigroup and GMAC stated that CNB and SCB's certificates were rated AA by Fitch Ratings. RALI 2006-QS8 Pros. Sup. S-8.

Citigroup and GMAC also stated: "It is a condition of the issuance of the Class M-1 . . . Certificates that they be rated not lower than "AA" . . . by Fitch." RALI 2006-QS8 Pros. Sup. S-100.

**Item 128.**   **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,280

    **(b)**   **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 1,632

**SCHEDULE 4 OF THE COMPLAINT**                                      **Page 5**

**(c)**   **Number of loans that suffered EPDs:** 46

**(d)**   **Number of loans which the properties were stated to be owner-occupied but were not:** 661

**(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,762

**(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 64.7%

## SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 38.        Details of trust and certificate(s).**

**(a)        Description of the trust:** Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS16 was a securitization in November 2006 of 3,009 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, Wachovia Mortgage Corporation, National City Mortgage Company and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC. Of the 3,009 mortgage loans in the collateral pool, Homecomings Financial originated 30.4%, Wachovia Mortgage Corp. originated 15.0%, National City Mortgage originated 11.3% and GMAC Mortgage originated 8.4%. RALI 2006-QS16 Pros. Sup. S-5; S-46.

**(b)        Description of the certificate(s) that CNB and SCB purchased:** RBS was the underwriter of the securities that CNB and SCB purchased. CNB purchased a senior certificate in class A-7 of this securitization, for which CNB paid $6,435,282 plus accrued interest on December 14, 2007. SCB purchased a senior certificate in class A-7 of this securitization, for which SCB paid $6,914,471 plus accrued interest on December 7, 2007.

**(c)        Ratings of the certificate(s) when CNB and SCB purchased them:** Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

**(d)        Current ratings of the certificate(s):** Fitch: D; Standard & Poor's: D; Moody's: Caa3.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**(f)        URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1377807/000089109206003631/e25662_424b5.txt

**(g)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB and SCB purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        In Annex I of the prospectus supplement ("Mortgage Loan Statistical Information") RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 or less, $100,001.00 to $200,000.00, $200,001.00 to $300,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 50. Thus, in "The Mortgage Loan Statistical Information" section, RBS made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2006-QS16 Pros. Sup. I-1 to I-7.

**SCHEDULE 5 OF THE COMPLAINT                                    Page 2**

(b)     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.00%."  RALI 2006-QS16 Pros. Sup. I-7.

**Item 56.**     **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 3,009 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 850 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $77,522,594 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 188 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,776,636 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 218 |
| Weighted-average LTV, as stated by Defendants | 74.00% |
| Weighted-average LTV, as determined by the model | 88.8% |

**Item 62.**     **Undisclosed additional liens:**

    **(a)**     **Minimum number of properties with additional liens:** 1,151

    **(b)**     **Weighted average LTV with additional liens:** 81.5%

**Item 77.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)     On page S-11 and in Annex I of the prospectus supplement, described in Item 47, RBS presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the principal balance of the mortgage

**SCHEDULE 5 OF THE COMPLAINT**                                        **Page 3**

loans in the collateral pool in each of these categories. RALI 2006-QS16 Pros. Sup. S-11; I-1.

      (b)     In the "Occupancy Types of the Mortgage Loans" table, RBS stated that of the 3,009 mortgage loans in the collateral pool, 2,110 were secured by primary residences and 899 were not. RALI 2006-QS16 Pros. Sup. S-11; I-1.

**Item 84.**     **Details of properties that were stated to be owner-occupied, but were not:**

      **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 248

      **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 293

      **(c)**     **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 181

      **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 587

**Item 87.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-44 through S-46 of the prospectus supplement, RBS made statements about the underwriting standards of Residential Funding Company, LLC. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2006-QS16 Pros. Sup. S-44.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2006-QS16 Pros. Sup. S-45.

**SCHEDULE 5 OF THE COMPLAINT**                        **Page 4**

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2006-QS16 Pros. Sup. S-44.

**Item 94.      Early payment defaults:**

> **(a)      Number of the mortgage loans that suffered EPDs:** 30

> **(b)      Percent of the mortgage loans that suffered EPDs:** 1.0%

**Item 95.      90+ days delinquencies:**

> **(a)      Number of the mortgage loans that suffered 90+ days delinquencies:** 1,177

> **(b)      Percent of the mortgage loans that suffered 90+ days delinquencies:** 39.1%

**Item 96.      30+ days delinquencies:**

> **(a)      Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 964

> **(b)      Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 32.0%

**Item 125.      Statements about the ratings of the certificate(s) that CNB and SCB purchased:**

On pages S-8 through S-9 and S-107 through S-108 of the prospectus supplement, RBS made statements about the ratings assigned to the certificates issued in this securitization. RBS stated that CNB and SCB's certificates were rated AAA by Fitch Ratings, AAA by Standard & Poor's and Aaa by Moody's. RALI 2006-QS16 Pros. Sup. S-8. These were the highest ratings available from these rating agencies.

RBS also stated: "It is a condition of the issuance of the Senior Certificates that they be rated "AAA" by Fitch Ratings . . . "AAA" by Standard & Poor's Ratings Services . . . and "Aaa" by Moody's Investors Service, Inc. . . . ." RALI 2006-QS16 Pros. Sup. S-107.

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 5**

**Item 128.**   **Summary of loans about which the defendants made untrue or misleading statements:**

   **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 850

   **(b)**   **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 1,151

   **(c)**   **Number of loans that suffered EPDs:** 30

   **(d)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 587

   **(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,986

   **(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 66.0%

### SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant BSABS, Bear Stearns and BSCI.

**Item 38.**          **Details of trust and certificate(s).**

 **(a)**          **Description of the trust:** Bear Stearns Asset Backed Certificates, Series 2007-AC5 was a securitization in June 2007 of 1,539 mortgage loans, in two subgroups. BSABS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by EMC Mortgage Corporation, Bear Stearns Residential Mortgage Corporation and various undisclosed originators. Of the 1,539 mortgage loans in the collateral pool, approximately 57.22% were purchased by EMC Mortgage Corporation and approximately 15.63% were originated by Bear Stearns Residential Mortgage Corporation. BSABS 2007-AC5 Pros. Sup. S-5; S-33.

**(b)**          **Description of the certificate(s) that CNB and SCB purchased:** Bear Stearns was an underwriter of the securities that CNB and SCB purchased. CNB purchased a certificate in class A-2 of this securitization, for which CNB paid $9,227,600 plus accrued interest on December 14, 2007. SCB purchased a certificate in class A-2 of this securitization, for which SCB paid $8,500,000 on December 14, 2007. CNB and SCB's certificates were primarily paid by the 1,226 mortgage loans in subgroup 1.

**(c)**          **Ratings of the certificate(s) when CNB and SCB purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

**(d)**          **Current ratings of the certificate(s):** Standard & Poor's: D; Moody's: C.

**(e)**          **Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**(f)**          **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1402994/000088237707001850/p07-0833_424b5.htm

**SCHEDULE 6 OF THE COMPLAINT**                                        **Page 1**

**(g)** **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB and SCB purchased, were issued pursuant or traceable to a registration statement filed by Bear Stearns Asset Backed Securities I LLC with the SEC on form S-3 on January 30, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, BSABS and Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    The weighted average loan-to-value ratio of all of the mortgage loans in the collateral pool was 73.97%.  BSABS 2007-AC5 Pros. Sup. S-6.

(b)    The weighted average combined loan-to-value ratio of all of the mortgage loans in the collateral pool was 79.09%.  BSABS 2007-AC5 Pros. Sup. S-6.

(c)    The weighted average loan-to-value ratio of the mortgage loans in subgroup 1 was 71.78%.  BSABS 2007-AC5 Pros. Sup. S-6.

(d)    The weighted average combined loan-to-value ratio of the mortgage loans subgroup 1 was 76.16%.  BSABS 2007-AC5 Pros. Sup. S-6.

(e)    "The weighted average loan-to-value ratio at origination of [mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan] is approximately 75.29%, and the weighted average combined loan-to-value ratio at origination of such mortgage loans (including the second lien) is approximately 89.96%." BSABS 2007-AC5 Pros. Sup. S-19.

(f)    In Schedule A of the prospectus supplement (Certain Characteristics of the Mortgage Loans"), BSABS and Bear Stearns presented tables of statistics about the

mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, scheduled principal balance) and divided the loans into categories based on that characteristic (for example, loans with scheduled principal balances of $0.00 to $50,000.00, $50,000.01 to $100,000.00, $150,000.00 to $200,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 34 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 14. Thus, in "The Mortgage Pool" section, BSABS and Bear Stearns made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. BSABS 2007-AC5 Pros. Sup. A-1 to A-12.

(g)     "As of the cut-off date, the weighted average original loan-to-value ratio of the mortgage loans was approximately 73.97%." BSABS 2007-AC5 Pros. Sup. A-8.

(h)     "As of the cut-off date, the weighted average original combined loan-to-value ratio of the mortgage loans was approximately 79.09%." BSABS 2007-AC5 Pros. Sup. A-8.

(i)     "As of the cut-off date, the weighted average original loan-to-value ratio of the mortgage loans in subgroup 1 was approximately 71.78%." BSABS 2007-AC5 Pros. Sup. A-1.

(j)     "As of the cut-off date, the weighted average original combined loan-to-value ratio of the mortgage loans in subgroup 1 was approximately 76.16%." BSABS 2007-AC5 Pros. Sup. A-2.

**SCHEDULE 6 OF THE COMPLAINT**                                      **Page 3**

**Item 56.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in collateral pool | 1,539 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 550 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $54,663,974 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 108 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,912,238 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 215 |
| Weighted-average LTV, as stated by defendants | 73.97% |
| Weighted-average LTV, as determined by the model | 95.2% |

**Item 71.**      **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, BSABS and Bear Stearns made the following statement about the appraisals of the properties that secured the mortgage loans acquired by EMC Mortgage Corporation: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation." BSABS 2007-AC5 Pros. Sup. S-35.

**Item 77.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, BSABS and Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Schedule A of the prospectus supplement, described in Item 47, BSABS and Bear Stearns presented a table entitled "Occupancy Status of Mortgage Properties." This table divided all of the mortgage loans into the categories "Owner Occupied," "Investor" and "Second Home." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate

**SCHEDULE 6 OF THE COMPLAINT**                                            **Page 4**

principal balance outstanding, and the percent of mortgage loans in each of these categories. BSABS 2007-AC5 Pros. Sup. A-11.

(b)     In the "Occupancy Status of the Mortgage Properties" table, BSABS and Bear Stearns stated that of the 1,539 mortgage loans in the collateral pool, 1,117 were secured by primary residences occupied by owners and 422 were not. BSABS 2007-AC5 Pros. Sup. A-11.

(c)     In Schedule A of the prospectus supplement, BSABS and Bear Stearns presented another table entitled "Occupancy Status of Mortgage Properties in Subgroup 1." This table divided the mortgage loans in subgroup 1 into the categories "Owner Occupied," "Investor" and "Second Home." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. BSABS 2007-AC5 Pros. Sup. A-3.

(d)     In the "Occupancy Status of the Mortgage Properties in Subgroup 1" table, BSABS and Bear Stearns stated that of the 1,226 mortgage loans in subgroup 1, 943 were secured by primary residences occupied by owners and 283 were not. BSABS 2007-AC5 Pros. Sup. A-3.

**Item 84.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 104

(b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 200

(c)     **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 131

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 358

**Item 87.        Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-36 of the prospectus supplement, BSABS and Bear Stearns made statements about the underwriting guidelines of EMC Mortgage Corporation. All of those statements are incorporated herein by reference.

One of these statements was that: "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BSABS 2007-AC5 Pros. Sup. S-34.

Another one of these statements was that: "Exceptions to the underwriting standards are permitted where compensating factors are present and are managed through a formal exception process." BSABS 2007-AC5 Pros. Sup. S-34.

**Item 94.        Early payment defaults:**

      **(a)        Number of the mortgage loans that suffered EPDs:** 31

      **(b)        Percent of the mortgage loans that suffered EPDs:** 2.0%

**Item 95.        90+ days delinquencies:**

      **(a)        Number of the mortgage loans that suffered 90+ days delinquencies:** 803

      **(b)        Percent of the mortgage loans that suffered 90+ days delinquencies:** 52.2%

**Item 96.        30+ days delinquencies:**

      **(a)        Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 685

      **(b)        Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 44.5%

**Item 125.        Statements about the ratings of the certificate(s) that CNB and SCB purchased:**

On pages S-13 and S-110 of the prospectus supplement, BSABS and Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. BSABS and Bear Stearns stated that CNB and SCB's certificates were rated AAA by

Standard & Poor's Ratings Services and Aaa by Moody's Investors Service, Inc. BSABS 2007-AC5 Pros. Sup. S-13; S-110. These were the highest ratings available from these two rating agencies.

BSABS and Bear Stearns also stated: "It is a condition to the issuance of the offered certificates that each class of offered certificates be assigned at least the ratings designated below by Standard & Poor's and Moody's." BSABS 2007-AC5 Pros. Sup. S-110.

**Item 128.**   **Summary of loans in the collateral pool about which the defendants made untrue or misleading statements:**

   **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 550

   **(b)**   **Number of loans that suffered EPDs:** 31

   **(c)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 358

   **(d)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 800

   **(e)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 52.0%

**SCHEDULE 7 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CSFB Mortgage Securities, Credit Suisse Securities and Credit Suisse Management.

**Item 38.**      **Details of trust and certificate(s).**

     **(a)**      **Description of the trust:** CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-6 was a securitization in June 2006 of 2,572 mortgage loans, in three groups. CSFB Mortgage Securities was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by DLJ Mortgage Capital, Inc., Credit Suisse Financial Corporation, American Home Mortgage, and various undisclosed originators. Of the 2,572 mortgage loans in the collateral pool, DLJ Mortgage Capital, Inc. acquired 53.22%, Credit Suisse Financial Corporation originated or acquired 17.84% and American Home Mortgage originated or acquired 10.49%.  No other originator originated or acquired more than 10% of the mortgage loans. CSMC 2006-6 Pros. Sup. S-5; S-40.

     **(b)**      **Description of the certificate(s) that CNB and SCB purchased:** Credit Suisse Securities was the underwriter of the securities that CNB and SCB purchased. CNB purchased a senior certificate in class 1-A-8 of this securitization, for which CNB paid $7,147,181 plus accrued interest on April 11, 2008. SCB purchased a senior certificate in class 1-A-12 of this securitization, for which SCB paid $6,761,649 plus accrued interest on December 6, 2007. CNB and SCB's certificates were primarily paid by the 1,822 mortgage loans in loan group 1.

     **(c)**      **Ratings of the certificate(s) when CNB and SCB purchased them:** Standard & Poor's: AAA; Moody's: Aaa.

     **(d)**      **Current ratings of the certificate(s):** Standard & Poor's: D; Moody's: Caa3.

      **(e)**      **Date on which the certificate(s) were downgraded below investment grade:** December 9, 2008.

      **(f)**      **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/802106/000089109206001786/e24415_424b5.txt

      **(g)**      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB and SCB purchased, were issued pursuant or traceable to a registration statement filed by Credit Suisse First Boston Mortgage Securities Corp. with the SEC on form S-3 on January 6, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

      In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

      **(a)**      In the section of the prospectus supplement entitled "Description of the Mortgage Pool," CSFB Mortgage Securities and Credit Suisse Securities presented a table entitled "Group 1 Original LTV Ratios." This table divided the loans in group 1 into 18 categories of original LTV (for example, 10.001% − 15.000%, 15.001% − 20.000%, 20.001% - 25.000%, etc.). The table made untrue or misleading statements about the number of mortgage loans, the cut-off date principal balance outstanding and the percent of cut-off date principal balance outstanding in each of these categories. CSMC 2006-6 Pros. Sup. S-29.

      **(b)**      "The minimum original LTV ratio and the maximum original LTV ratio for the group 1 mortgage loans are 13.090% and 100.00%, respectively." CSMC 2006-6 Pros. Sup. S-29.

(c)     "The weighted average original LTV ratio for the group 1 mortgage loans is approximately 70.013%." CSMC 2006-6 Pros. Sup. S-29.

**Item 56.        Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in loan group 1 | 1,822 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 615 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $38,955,148 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 187 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $12,727,579 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 77 |
| Weighted-average LTV, as stated by Defendants | 70.013% |
| Weighted-average LTV, as determined by the model | 78.7% |

**Item 62.        Undisclosed additional liens in loan group 1:**

     **(a)        Minimum number of properties with additional liens:** 528

     **(b)        Weighted average CLTV with additional liens:** 75.0%

**Item 71.        Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by the originators: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." CSMC 2006-6 Pros. Sup. S-41.

**Item 77.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CSFB Mortgage Securities and Credit Suisse Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 7 OF THE COMPLAINT**                                    **Page 3**

(a)     In the "Description of the Mortgage Pool" section of the prospectus supplement, described in Item 47, CSFB Mortgage Securities and Credit Suisse Securities presented a table entitled "Group 1 Occupancy Types." This table divided the mortgage loans in group 1 into the categories "Primary," "Second Home", and "Investment." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the cut-off date principal balance outstanding, and the percent of the cut-off date principal balance of the mortgage loans in group 1 in each of these categories. CSMC 2006-6 Pros. Sup. S-29.

(b)     In the "Occupancy Types" table, CSFB Mortgage Securities and Credit Suisse Securities stated that of the 1,822 mortgage loans in loan group 1, 1,325 were secured by primary residences and 497 were not. CSMC 2006-6 Pros. Sup. S-29.

**Item 84.     Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

**(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 100

**(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 187

**(c)     Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 32

**(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 278

**Item 87.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-40 through S-41 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse Securities made statements about the underwriting standards of the originators. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." CSMC 2006-6 Pros. Sup. S-40.

Another one of these statements was that: "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan . . . ." CSMC 2006-6 Pros. Sup. S-41.

**Item 94.**   **Early payment defaults in loan group 1:**

    **(a)**   **Number of the mortgage loans that suffered EPDs:** 7

    **(b)**   **Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 95.**   **90+ days delinquencies in loan group 1:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 688

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.8%

**Item 96.**   **30+ days delinquencies in loan group 1:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 585

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 32.1%

**Item 125.**   **Statements about the ratings of the certificate(s) that CNB purchased:**

On pages S-6 through S-7 and S-106 of the prospectus supplement, CSFB Mortgage Securities and Credit Suisse Securities made statements about the ratings assigned to the certificates issued in this securitization. CSFB Mortgage Securities and Credit Suisse Securities stated that CNB's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. CSMC 2006-6 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

CSFB Mortgage Securities and Credit Suisse Securities also stated: "It is a condition to the issuance of the offered certificates that they be rated as indicated on pages S-6 and S-7 of this prospectus supplement by Standard & Poor's Ratings Services . . . and Moody's Investors Service, Inc. . . . ." CSMC 2006-6 Pros. Sup. S-106.

**SCHEDULE 7 OF THE COMPLAINT**                                   **Page 5**

**Item 128.**  **Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

   **(a)**  **Number of loans whose LTVs were materially understated as shown by the AVM:** 615

   **(b)**  **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 528

   **(c)**  **Number of loans that suffered EPDs:** 7

   **(d)**  **Number of loans in which the properties were stated to be owner-occupied but were not:** 278

   **(e)**  **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,125

   **(f)**  **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 61.7%

## SCHEDULE 8 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant MLMI, Merrill Lynch and MLMCI.

**Item 38.        Details of trust and certificate(s).**

(a)        **Description of the trust:** Merrill Lynch Alternative Note Asset Trust, Mortgage Pass-Through Certificates, Series 2007-F1 was a securitization in March 2007 of 1,771 mortgage loans, in two groups (further divided into four subgroups). MLMI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated by Wachovia Mortgage Corporation, Ameriquest Mortgage Company, IndyMac Bank, F.S.B and various undisclosed originators. Of the 1,771 mortgage loans in the collateral pool, Wachovia Mortgage Corporation originated 38.76%, Ameriquest Mortgage Company originated 31.96% and IndyMac Bank, F.S.B. originated 12.92%. MANA 2007-F1 Pros. Sup. S-4; S-25.

(b)        **Description of the certificate(s) that CNB and SCB purchased:** Merrill Lynch was the underwriter of the securities that CNB and SCB purchased. CNB purchased a certificate in class 2-A-1 of this securitization, for which CNB paid $8,307,090 plus accrued interest on January 29, 2008. SCB purchased a certificate in class 2-A-1 of this securitization, for which SCB paid $8,999,247 plus accrued interest on January 29, 2008. CNB and SCB's certificates were paid by the 1,392 mortgage loans in loan group 2 (and primarily from the 293 mortgage loans in subgroup 3).

(c)        **Ratings of the certificate(s) when CNB and SCB purchased them:** Moody's: Aaa; Fitch: AAA.

(d)        **Current ratings of the certificate(s):** Moody's: Caa2; Fitch: C.

(e)        **Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

**(f)      URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1389458/000095012307004617/y32454e424b5.txt

**(g)      Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that CNB and SCB purchased, were issued pursuant or traceable to a registration statement filed by Merrill Lynch Mortgage Investors, Inc. with the SEC on form S-3 on December 21, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, MLMI and Merrill Lynch made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "Approximately 11.11% of the Mortgage Loans had a Loan-to-Value Ratio at origination of more than 80%." MANA 2007-F1 Pros. Sup. S-26.

(b)      "The weighted average Loan-to-Value Ratio at origination of the Mortgage Loans was approximately 70.37%, and no Mortgage Loan had a Loan-to-Value Ratio at origination exceeding 95.00%." MANA 2007-F1 Pros. Sup. S-27.

(c)      "The weighted average Loan-to-Value Ratio at origination of the Group 2 Mortgage Loans was approximately 71.74%, and no Group 2 Mortgage Loans had a Loan-to-Value Ratio at origination exceeding 95.00%." MANA 2007-F1 Pros. Sup. S-28.

(d)      The range of Original Loan-to-Value Ratios of the mortgage loans in subgroup 3 was 11.70% to 95.00%. MANA 2007-F1 Pros. Sup. S-10.

(e)      The Weighted Average Original Loan-to-Value ratio of the subgroup 3 mortgage loans was 62.85%. MANA 2007-F1 Pros. Sup. S-10.

**SCHEDULE 8 OF THE COMPLAINT**                                      **Page 2**

(f)     In Annex II of the prospectus supplement ("The Mortgage Groups"), MLMI and Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. MANA 2007-F1 Pros. Sup. A-II-1 to A-II-35. Each table focused on a certain characteristic of the loans (for example, stated principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $100,000.00, $100,000.01 to $200,000.00, $200,000.01 to $300,000,00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original LTV" and the "Weighted Average Original CLTV." There were 12 such tables in "The Mortgage Groups" section for all of the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 50. Thus, in "The Mortgage Groups" section, MMLI and Merrill Lynch made many untrue or misleading statements about the original LTVs and original CLTVs of all of the mortgage loans in the collateral pool. MANA 2007-F1 Pros. Sup. A-II-1 to A-II-35.

(g)     "As of the Cut-off Date, the Original Loan-to-Value Ratios of the Mortgage Loans ranged from 6.49% to 95.00%." MANA 2007-F1 Pros. Sup. A-II-5.

(h)     In Annex II, MLMI and Merrill Lynch presented similar tables of statistics about the loans in subgroup 3. In these tables, MLMI and Merrill Lynch similarly made hundreds of statements about the original LTVs and CLTVs of the mortgage loans in subgroup 3.

(i)     "As of the Cut-off Date, the Original Loan-to-Value Ratios of the Sub-Group Three Mortgage Loans ranged from 11.70% to 95.00%." MANA 2007-F1 Pros. Sup. A-II-29.

**SCHEDULE 8 OF THE COMPLAINT**                                    **Page 3**

**Item 56.** **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in group 2 | 1,392 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 442 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $30,372,166 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 146 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,423,664 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 139 |
| Weighted-average LTV, as stated by defendants | 71.74% |
| Weighted-average LTV, as determined by the model | 82.1% |

**Item 62.** **Undisclosed additional liens in loan group 2:**

    **(a)** **Minimum number of properties with additional liens:** 327

    **(b)** **Weighted average CLTV with additional liens:** 76.5%

**Item 71.** **Untrue or misleading statements about compliance with USPAP:**

    In the prospectus supplement, MLMI and Merrill Lynch made the following statement about the appraisals of the properties that secured the mortgage loans originated by Ameriquest Mortgage Company: "The Ameriquest Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac . . . ." MANA 2007-F1 Pros. Sup. S-39.

    In the prospectus supplement, MLMI and Merrill Lynch made the following statement about the appraisals of the properties that secured the mortgage loans originated by Wachovia Mortgage Corporation: "All jumbo loan products originated through Wachovia require the full Uniform Residential Appraisal Report . . . [on Fannie

Mae forms].  The Uniform Residential Appraisal Report (Fannie Mae Form 1004B),
Certification and Statement of Limiting Conditions is required on all appraisals as well."
MANA 2007-F1 Pros. Sup. S-37.

**Item 77.        Untrue or misleading statements about owner-occupancy of the
                properties that secured the mortgage loans:**

In the prospectus supplement, MLMI and Merrill Lynch made the following
statements about the occupancy status of the properties that secured the mortgage loans in
the collateral pool of this securitization.

(a)        In Annex II of the prospectus supplement, described in Item 47, MLMI
and Merrill Lynch presented a table entitled "Occupancy Types." This table divided all of
the mortgage loans in the collateral pool into the categories "Primary," Investment" and
"Second Home." This table made untrue or misleading statements about, among other
data, the number of mortgage loans, the aggregate principal balance outstanding, and the
percent of mortgage loans in each of these categories. MANA 2007-F1 Pros. Sup. A-II-8.

(b)        In the "Occupancy Types" table, MLMI and Merrill Lynch stated that of
1,771 mortgage loans in the collateral pool, 1,418 were secured by primary residences
and 353 were not. MANA 2007-F1 Pros. Sup. A-II-8.

(c)        In Annex II of the prospectus supplement, described in Item 47, MLMI
and Merrill Lynch presented another table entitled "Occupancy Types for the Sub-Group
Three Mortgage Loans." This table divided the mortgage loans in Sub-Group Three into
the categories "Primary," "Investment" and "Second Home." This table made untrue or
misleading statements about the number of mortgage loans, the aggregate principal
balance outstanding, and the percent of mortgage loans in each of these categories.
MANA 2007-F1 Pros. Sup. A-II-32.

(d)        In the "Occupancy Types for the Sub-Group Three Mortgage Loans"
table, MLMI and Merrill Lynch stated that of 293 mortgage loans in subgroup 3, 240

were secured by primary residences and 53 were not. MANA 2007-F1 Pros. Sup. A-II-32.

**Item 84.**   **Details of properties in loan group 2 that were stated to be owner-occupied, but were not:**

**(a)**   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 104

**(b)**   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 184

**(c)**   **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 56

**(d)**   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 285

**Item 87.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-36 through S-38 of the prospectus supplement, MLMI and Merrill Lynch made statements about the underwriting guidelines of Wachovia Mortgage Corporation. All of those statements are incorporated herein by reference.

One of these statements was that: "Exception loans which are originated outside of stated guidelines are available to customers with demonstrated Wachovia relationships and/or strong compensating factors." MANA 2007-F1 Pros. Sup. S-37.

On pages S-38 through S-41 of the prospectus supplement, MLMI and Merrill Lynch made statements about the underwriting guidelines of Ameriquest Mortgage Company. All of those statements are incorporated herein by reference.

One of these statements was that: "The Ameriquest Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral." MANA 2007-F1 Pros. Sup. S-38.

Another one of these statements was that: "On a case-by-case basis, the Ameriquest Loan Sellers may determine that, based upon compensating factors, a loan

applicant not strictly qualifying under one of the risk categories described below, warrants an exception to the requirements set forth in the Ameriquest Underwriting Guidelines." MANA 2007-F1 Pros. Sup. S-38.

**Item 94.**    **Early payment defaults in loan group 2:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 4

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.3%

**Item 95.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 403

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 28.9%

**Item 96.**    **30+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 345

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 24.8%

**Item 125.**    **Statements about the ratings of the certificate(s) that CNB and SCB purchased:**

On pages S-1 through S-2 and S-126 of the prospectus supplement, MLMI and Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. MLMI and Merrill Lynch stated that CNB and SCB's certificates were rated AAA by Fitch Ratings and Aaa by Moody's Investors Service, Inc. MANA 2007-F1 Pros. Sup. S-1. These were the highest ratings available from these two rating agencies.

MLMI and Merrill Lynch also stated that: "It is a condition to the issuance of . . . the Class 2-A1 . . . Certificates that they be rated AAA by Fitch, Inc. and Aaa by Moody's Investors Service, Inc." MANA 2007-F1 Pros. Sup. S-126.

**SCHEDULE 8 OF THE COMPLAINT**                                    **Page 7**

**Item 128.**   **Summary of loans in loan group 2 about which the defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 442

    **(b)**   **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 327

    **(c)**   **Number of loans that suffered EPDs:** 4

    **(d)**   **Number of loans which the properties were stated to be owner-occupied but were not:** 285

    **(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 793

    **(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 57.0%

**SCHEDULE 9 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant Citigroup.

**Item 38.        Details of trust and certificate(s).**

**(a)        Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 was a securitization in March 2007 of 1,696 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC.  Of the 1,696 mortgage loans in the collateral pool, approximately 47.1% and 0.4% by principal amount were originated by Homecomings Financial and GMAC Mortgage, respectively. RALI 2007-QS5 Pros. Sup. S-5; S-44.

**(b)        Description of the certificate(s) that SCB purchased:** Citigroup was the underwriter of the security that SCB purchased. SCB purchased a senior certificate in class A-1 of this securitization, for which SCB paid $8,693,752 plus accrued interest on December 7, 2007.

**(c)        Ratings of the certificate(s) when SCB purchased them:** Fitch: AAA; Moody's: Aaa; S&P: AAA.

**(d)        Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; S&P: D.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

**(f)        URL of prospectus supplement for this securitization:**
http://www.sec.gov/Archives/edgar/data/1390318/000089109207001172/e26774_424b5.txt

**(g)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that SCB purchased, were issued pursuant or traceable to a registration statement filed by

Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement (Mortgage Loan Statistical Information") Citigroup presented tables of statistics about the mortgage loans in the collateral pool.  Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000.00 or less, $100,001.00 to $200,000.00, $200,001.00 to $300,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 49. Thus, in "The Mortgage Loan Statistical Information" section, Citigroup made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QS5 Pros. Sup. I-1 to I-6.

(b)     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.23%."  RALI 2007-QS5 Pros. Sup. I-6.

**Item 56.        Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,696 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 513 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $35,418,831 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 174 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,106,707 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 110 |
| Weighted-average LTV, as stated by defendants | 74.23% |
| Weighted-average LTV, as determined by the model | 84.4% |

**Item 62.        Undisclosed additional liens:**

> **(a)        Minimum number of properties with additional liens:** 708

> **(b)        Weighted average CLTV with additional liens:** 81.20%

**Item 77.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Citigroup made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        In Annex I of the prospectus supplement, described in Item 47, Citigroup presented a table entitled "Occupancy Types of the Mortgaged Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied" This table made untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the principal balance of the mortgage loans in the collateral pool in each of these categories. RALI 2007-QS5 Pros. Sup. S-11; I-1.

**SCHEDULE 9 OF THE COMPLAINT**                                **Page 3**

      **(b)**     In the "Occupancy Types of the Mortgaged Loans" table, Citigroup stated that of the 1,696 mortgage loans in collateral pool, 1,156 were secured by primary residences and 540 were not. RALI 2007-QS5 Pros. Sup. S-11; I-1.

**Item 84.**      **Details of properties that were stated to be owner-occupied, but were not:**

      **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 110

      **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 182

      **(c)**     **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 64

      **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 288

**Item 87.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-44 of the prospectus supplement, Citigroup made statements about the underwriting standards of Residential Funding Company, LLC. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QS5 Pros. Sup. S-42.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QS5 Pros. Sup. S-43.

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original

lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2007-QS5 Pros. Sup. S-42.

**Item 94.        Early payment defaults:**

      **(a)        Number of the mortgage loans that suffered EPDs:** 17

      **(b)        Percent of the mortgage loans that suffered EPDs:** 1.00%

**Item 95.        90+ days delinquencies:**

      **(a)        Number of the mortgage loans that suffered 90+ days delinquencies:** 755

      **(b)        Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.5%

**Item 96.        30+ days delinquencies:**

      **(a)        Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 610

      **(b)        Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 35.9%

**Item 125.        Statements about the ratings of the certificate(s) that SCB purchased:**

On pages S-7 through S-8 and S-106 through S-107 of the prospectus supplement, Citigroup made statements about the ratings assigned to the certificates issued in this securitization. Citigroup stated that SCB's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service and AAA by Standard & Poor's. RALI 2007-QS5 Pros. Sup. S-7. These were the highest ratings available from these two ratings agencies.

Citigroup also stated: "It is a condition of the issuance of the Senior Certificates . . . that they be rated "AAA" by Fitch Ratings . . . "AAA" by Standard & Poor's Ratings Services . . . and "Aaa" by Moody's Investors Service . . . ." RALI 2007-QS5 Pros. Sup. S-106.

**Item 128.        Summary of loans about which the defendants made untrue or misleading statements:**

      **(a)        Number of loans whose LTVs were materially understated as shown by the AVM:** 513

**SCHEDULE 9 OF THE COMPLAINT**                                        **Page 5**

**(b)**   **Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 708

**(c)**   **Number of loans that suffered EPDs:** 17

**(d)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 288

**(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,119

**(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 66.0%

**SCHEDULE 10 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Credit Suisse Securities and UBS.

**Item 38.      Details of trust and certificate(s).**

**(a)      Description of the trust:** Residential Asset Securitization Trust 2006-A11 was a securitization in August 2006 of 745 mortgage loans, in three groups.  The mortgage loans in the collateral pool of this securitization were acquired by IndyMac Bank F.S.B. RAST 2006-A11 Pros. Sup. S-60.

**(b)      Description of the certificate(s) that SCB purchased:** Credit Suisse Securities and UBS were underwriters of the security that SCB purchased. SCB purchased a senior certificate in this securitization, in class 1-A-3, for which SCB paid $14,085,234 plus accrued interest on February 28, 2008.  SCB's certificate was primarily paid by the 240 mortgage loans in loan group 1.

**(c)      Ratings of the certificate(s) when SCB purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

**(d)      Current ratings of the certificate(s):** Moody's: Ca; Standard & Poor's: D.

**(e)      Date on which the certificate(s) were downgraded below investment grade:** August 14, 2008.

**(f)      URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000112528206005512/b414772_424b5.txt

**(g)      Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that SCB purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration

statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse Securities and UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      As of the cut-off date, the weighted-average original Loan-to-Value ratio of all of the loans in the collateral pool was 71.70%. RAST 2006-A11 Pros. Sup S-8.

(b)      As of the cut-off date, the weighted average original loan-to-value ratio of the group 1 mortgage loans was 71.99%. RAST 2006-A11 Pros. Sup S-7.

(c)      As of the cut-off date, the weighted average loan-to-value ratio of approximately 40.92% of the group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 74.50%.  RAST 2006-A11 Pros. Sup S-27.

(d)      As of the cut-off date, the weighted average combined loan-to-value ratios (including the second lien) of approximately 40.92% of the group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 89.67%. RAST 2006-A11 Pros. Sup S-27.

(e)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95.00% or less." RAST 2006-A11 Pros. Sup S-34.

(f)      In the section of the prospectus supplement entitled "The Mortgage Pool," Credit Suisse Securities and UBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to

$450,000, $450,000.01 to $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 14 such tables in the "Mortgage Pool" section for the loans in group 1. In each table the number of categories into which the loans were divided ranged from 1 to 31. Thus, in the "Mortgage Pool" section, Credit Suisse Securities and UBS made many untrue or misleading statements about the original LTVs of the loans in group 1. RAST 2006-A11 Pros. Sup S-35 to S-39.

(g)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the group 1 mortgage loans was approximately 71.99%." RAST 2006-A11 Pros. Sup S-36.

(h)    In the "Mortgage Pool" section, Credit Suisse Securities and UBS presented similar tables of statistics about the mortgage loans in the aggregate.  In these tables, Credit Suisse Securities and UBS similarly made many untrue or misleading statements about the original LTVs of the loans in the aggregate.  RAST 2006-A11 Pros. Sup S-52 to S-58.

(i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 71.70%." RAST 2006-A11 Pros. Sup S-53.

**Item 56.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in loan group 1 | 240 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 94 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $15,115,836 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 12 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $1,506,150 |
| Number of loans with LTVs over 95.00%, as stated by defendants | 0 |
| Number of loans with LTVs over 95.00%, as determined by the model | 30 |

**SCHEDULE 10 OF THE COMPLAINT**                    **Page 3**

| Weighted-average LTV, as stated by defendants | 71.99% |
|---|---|
| Weighted-average LTV, as determined by the model | 86.2% |

**Item 71.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse Securities and UBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A11 Pros. Sup S-62.

**Item 77.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse Securities and UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In the "Mortgage Pool" section of the prospectus supplement, described in Item 47, Credit Suisse Securities and UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the group 1 mortgage loans into the categories "Owner Occupied," "Investment" and "Second Home." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance outstanding in each of these categories. RAST 2006-A11 Pros. Sup S-38.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse Securities and UBS stated that of 240 mortgage loans in group 1, 215 were secured by primary residences and 25 were not. RAST 2006-A11 Pros. Sup S-38.

(c)     In the "Mortgage Pool" section of the prospectus supplement, described in Item 47, Credit Suisse Securities and UBS presented another table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Owner Occupied," "Investment" and "Second Home."

This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance outstanding in each of these categories. RAST 2006-A11 Pros. Sup S-57.

(d)      In the "Occupancy Types for the Mortgage Loans" table, Credit Suisse Securities and UBS stated that of 745 mortgage loans in the collateral pool, 640 were secured by primary residences and 105 were not. RAST 2006-A11 Pros. Sup S-57.

**Item 84.      Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

**(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 19

**(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 45

**(c)      Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 10

**(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 57

**Item 87.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-60 through S-63 of the prospectus supplement, Credit Suisse Securities and UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference.

One of these statements was that: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." RAST 2006-A11 Pros. Sup S-63.

Another one of these statements was that: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2006-A11 Pros. Sup S-61.

**SCHEDULE 10 OF THE COMPLAINT**                                    **Page 5**

**Item 94.**      **Early payment defaults in loan group 1:**

    **(a)**      **Number of the mortgage loans that suffered EPDs:** 5

    **(b)**      **Percent of the mortgage loans that suffered EPDs:** 2.1%

**Item 95.**      **90+ days delinquencies in loan group 1:**

    **(a)**      **Number of the mortgage loans that suffered 90+ days delinquencies:** 90

    **(b)**      **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.5%

**Item 96.**      **30+ days delinquencies in loan group 1:**

    **(a)**      **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 83

    **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 34.6%

**Item 125.**      **Statements about the ratings of the certificate(s) that SCB purchased:**

On pages S-9 through S-10 and S-125 through S-126 of the prospectus supplement, Credit Suisse Securities and UBS made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse Securities and UBS stated that SCB's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's. RAST 2006-A11 Pros. Sup. S-9. These were the highest ratings available from these two rating agencies.

Credit Suisse Securities and UBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and Moody's Investors Services, Inc. . . ." RAST 2006-A11 Pros. Sup. S-10.

Credit Suisse Securities and UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . [and] Aaa by Moody's Investors Service, Inc. . . ." RAST 2006-A11 Pros. Sup. S-125.

**Item 128.**      **Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    **(a)**      **Number of loans whose LTVs were materially understated:** 94

    **(b)**      **Number of loans that suffered EPDs:** 5

**(c)**     **Number of loans in which the properties were stated to be owner-occupied but were not:** 57

**(d)**     **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 136

**(e)**     **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 56.7%

**SCHEDULE 11 OF THE COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 38.** **Details of trust and certificate(s).**

(a) **Description of the trust:** Residential Asset Securitization Trust 2006-A14CB was a securitization in November 2006 of 1,645 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were acquired by IndyMac Bank F.S.B. RAST 2006-A14CB Pros. Sup. S-53.

(b) **Description of the certificate(s) that SCB purchased:** RBS was the underwriter of the security that SCB purchased. SCB purchased a senior certificate in this securitization, in class 1-A-2, for which SCB paid $8,659,013 plus accrued interest on January 16, 2008.  SCB's certificate was primarily paid by the 379 mortgage loans in collateral allocation group 1.

(c) **Ratings of the certificate(s) when SCB purchased them:** Moody's: Aaa; Standard & Poor's: AAA; Fitch: AAA.

(d) **Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: D; Fitch: D.

(e) **Date on which the certificate(s) were downgraded below investment grade:** July 31, 2008.

(f) **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000112528206006779/b415507_424b5.txt

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that SCB purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by

prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.**   **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)   As of the cut-off date, the weighted-average original Loan-to-Value ratio of the all of the loans in the collateral pool was 73.32%. RAST 2006-A14CB Pros. Sup S-6.

(b)   As of the cut-off date, the weighted average original loan-to-value ratio of the loans in collateral allocation group 1 was 67.82%. RAST 2006-A14CB Pros. Sup S-6.

(c)   As of the cut-off date, the weighted average loan-to-value ratio of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 67.82%.  RAST 2006-A14CB Pros. Sup S-25.

(d)   As of the cut-off date, the weighted average combined loan-to-value ratios (including the second lien) of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 73.97%. RAST 2006-A14CB Pros. Sup S-25.

(e)   "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100.00% or less." RAST 2006-A14CB Pros. Sup S-32.

(f)   In the section of the prospectus supplement entitled "The Mortgage Pool," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00

$100,000.01 to 150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 13 such tables in the "Mortgage Pool" section for the loans in collateral allocation group 1. In each table the number of categories into which the loans were divided ranged from two to 35. Thus, in the "Mortgage Pool" section, RBS made many untrue or misleading statements about the original LTVs of the loans in collateral allocation group 1. RAST 2006-A114CB Pros. Sup S-34 to S-39.

(g)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in collateral allocation group 1 was approximately 67.82%." RAST 2006-A14CB Pros. Sup S-35.

(h)      In the "Mortgage Pool" section, RBS presented similar tables of statistics about the mortgage loans in the aggregate.  In these tables, RBS similarly made many untrue or misleading statements about the original LTVs of the loans in the aggregate. RAST 2006-A14CB Pros. Sup S-46 to S-51.

(i)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 73.32%." RAST 2006-A14CB Pros. Sup S-47.

**Item 56.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in the collateral pool | 1,645 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 592 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $32,140,310 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 82 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,735,566 |
| Number of loans with LTVs over 100.00%, as stated by defendants | 0 |
| Number of loans with LTVs over 100.00% as determined by the model | 103 |
| Weighted-average LTV, as stated by defendants | 73.32% |
| Weighted-average LTV, as determined by the model | 83.4% |

**SCHEDULE 11 OF THE COMPLAINT**                                    **Page 3**

**Item 71.        Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, RBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A14CB Pros. Sup S-55.

**Item 77.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        In the "Mortgage Pool" section of the prospectus supplement, described in Item 47, RBS presented a table entitled "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1." This table divided the collateral allocation group 1 mortgage loans into the categories "Primary Home" "Investment" and "Secondary Home." This table made untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup S-38.

(b)        In the "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1" table, RBS stated that of 379 mortgage loans in collateral allocation group 1, 340 were secured by primary residences and 39 were not. RAST 2006-A14CB Pros. Sup S-38.

(c)        In the "Mortgage Pool" section of the prospectus supplement, described in Item 46, RBS presented another table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Home" "Investment" and "Secondary Home." This table made

**SCHEDULE 11 OF THE COMPLAINT**                                            **Page 4**

untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup S-50.

(d)    In the "Occupancy Types for the Mortgage Loans" table, RBS stated that of 1,645 mortgage loans in the collateral pool, 1,338 were secured by primary residences and 307 were not. RAST 2006-A14CB Pros. Sup S-50.

**Item 84.    Details of properties in the collateral pool that were stated to be owner-occupied, but were not:**

**(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 115

**(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 193

**(c)    Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 132

**(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 350

**Item 87.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-53 through S-56 of the prospectus supplement, RBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference.

One of these statements was that: "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." RAST 2006-A14CB Pros. Sup S-56.

Another one of these statements was that: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2006-A14CB Pros. Sup S-54.

**Item 94.**       **Early payment defaults:**

    **(a)**       **Number of the mortgage loans that suffered EPDs:** 22

    **(b)**       **Percent of the mortgage loans that suffered EPDs:** 1.3%

**Item 95.**       **90+ days delinquencies:**

    **(a)**       **Number of the mortgage loans that suffered 90+ days delinquencies:** 830

    **(b)**       **Percent of the mortgage loans that suffered 90+ days delinquencies:** 50.5%

**Item 96.**       **30+ days delinquencies:**

    **(a)**       **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 711

    **(b)**       **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 43.2%

**Item 125.**      **Statements about the ratings of the certificate(s) that SCB purchased:**

On pages S-7 through S-8 and S-115 through S-116 of the prospectus supplement, RBS made statements about the ratings assigned to the certificates issued in this securitization. RBS stated that SCB's certificate was rated Aaa by Moody's Investors Service, Inc., AAA by Standard & Poor's and AAA by Fitch, Inc. RAST 2006-A14CB Pros. Sup. S-7. These were the highest ratings available from these three rating agencies.

RBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . Moody's Investors Services, Inc. . . . and Fitch, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-8.

RBS also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Standard & Poor's . . . and Fitch Inc. . . . and Aaa by Moody's Investors Service, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-115.

**Item 128.**      **Summary of loans in collateral allocation group 1 about which the defendants made untrue or misleading statements:**

    **(a)**       **Number of loans whose LTVs were materially understated:** 592

    **(b)**       **Number of loans that suffered EPDs:** 22

**(c)** **Number of loans in which the properties were stated to be owner-occupied but were not:** 350

**(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 827

**(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 50.3%

## SCHEDULE 12 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMSI, RBS and CitiMortgage.

**Item 38.        Details of trust and certificate(s).**

**(a)        Description of the trust:** CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2006-A6 was a securitization in November 2006 of 1,506 mortgage loans, in two pools. CSMI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage.  Approximately 57.97% of the mortgage loans in Pool I were originated by organizations not affiliated with CitiMortgage. Approximately 30.93% of the mortgage loans in Pool I were originated by American Home Mortgage Corp. CMALT 2006-A6 Pros. Sup. 10, 30.

**(b)        Description of the certificate(s) that SCB purchased:** RBS was an underwriter of the security that SCB purchased. SCB purchased a senior certificate in this securitization, in class IA-4, for which SCB paid $10,062,744 plus accrued interest on March 3, 2008. SCB's certificate was paid primarily by the 1,424 mortgage loans in Pool I.

**(c)        Ratings of the certificate(s) when SCB purchased them:** Fitch: AAA; Moody's: Aaa; S&P: AAA.

**(d)        Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; S&P: D.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** December 17, 2008.

**(f)        URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/811785/000136153006000103/cmalt2006-a6424b5.htm

**(g)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that SCB

purchased, were issued pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 47.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CMSI and RBS made the following statements about the LTVs of the mortgage loans in Pool I of this securitization.

(a)      The weighted-average loan-to-value ratio at origination of the loans in Pool I was 72.17%. CMALT 2006-A6 Pros. Sup. 8.

(b)      2.87% of the mortgage loans in Pool I had a loan-to-value ratio at origination of more than 80.00%. CMALT 2006-A6 Pros. Sup. 8.

(c)      0.36% of the mortgage loans in Pool I had a loan-to-value ratio at origination of more than 90.00%.  CMALT 2006-A6 Pros. Sup. 8.

(d)      In the Appendix of the prospectus supplement entitled "Detailed description of the mortgage loans," CMSI and RBS presented a table entitled "Distribution by loan-to-value at origination." This table divided the loans in Pool I into six categories of original LTV (for example, 65.000% and below, 65.001% - 75.000%, 75.001% to 80.000%, etc.). The table made many untrue or misleading statements about the number of mortgage loans and the aggregate principal balance in each of these categories. CMALT 2006-A6 Pros. Sup. 36.

(e)      None of the mortgage loans in Pool I had a loan-to-value ratio at origination of greater than 95.00%.  CMALT 2006-A6 Pros. Sup. 36.

**SCHEDULE 12 OF THE COMPLAINT**                                          **Page 2**

**Item 56.**        **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in Pool I | 1,424 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 520 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $60,058,909 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 96 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,006,650 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 178 |
| Weighted-average LTV, as stated by defendants | 72.17% |
| Weighted-average LTV, as determined by the model | 89.6% |

**Item 62.**        **Undisclosed additional liens in Pool I:**

      **(a)**        **Minimum number of properties with additional liens:** 360

      **(b)**        **Weighted-average CLTV with additional liens:** 75.6%

**Item 77.**        **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CMSI and RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        90.61% of the properties related to the mortgage loans in Pool I [approximately 1,290 out of 1,424] were determined by CMSI to be the primary residence of the homeowner.  CMALT 2006-A6 Pros. Sup. 8.

**Item 84.**        **Details of properties in Pool I that were stated to be owner-occupied, but were not:**

      **(a)**        **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 132

      **(b)**        **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 178

     **(c)**     **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 100

     **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 331

**Item 87.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 85 through 98 of the core prospectus, CMSI and RBS made statements about the underwriting guidelines of CitiMortgage and its affiliated originators. All of those statements are incorporated herein by reference.

One of these statements was that: "CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards." CMALT 2006-A6 Core Pros. 88.

**Item 94.**     **Early payment defaults in Pool I:**

     **(a)**     **Number of the mortgage loans that suffered EPDs:** 6

     **(b)**     **Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 95.**     **90+ days delinquencies in Pool I:**

     **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 449

     **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 31.5%

**Item 96.**     **30+ days delinquencies in Pool I:**

     **(a)**     **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 339

     **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 23.8%

**Item 125.**     **Statements about the ratings of the certificate(s) that SCB purchased:**

On pages 3 and 5 of the prospectus supplement, CMSI and RBS made statements about the ratings assigned to the certificates issued in this securitization. CMSI and RBS

stated that SCB's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's. CMALT 2006-A6 Pros. Sup. 3. These were the highest ratings available from these three rating agencies.

CSMI and RBS also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMALT 2006-A6 Pros. Sup. 5.

**Item 128.    Summary of loans in Pool I about which the defendants made untrue or misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as shown by the AVM:** 520

    **(b)    Number of loans whose LTVs were materially understated because of undisclosed additional liens:** 360

    **(c)    Number of loans that suffered EPDs:** 6

    **(d)    Number of loans in which the properties were stated to be owner-occupied but were not:** 331

    **(e)    Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 926

    **(f)    Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 65.0%