**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL DEPOSIT INSURANCE CORPORATION
*as Receiver for* CITIZENS NATIONAL BANK *and*
*Receiver for* STRATEGIC CAPITAL BANK,

*Plaintiff*,

v.

BEAR STEARNS ASSET BACKED SECURITIES I
LLC; THE BEAR STEARNS COMPANIES LLC.; J.P.
MORGAN SECURITIES LLC.; CITICORP
MORTGAGE SECURITIES, INC.; CITIMORTGAGE,
INC.; CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP.; CREDIT SUISSE
MANAGEMENT LLC; CREDIT SUISSE SECURITIES
(USA) LLC; MERRILL LYNCH MORTGAGE
INVESTORS, INC.; MERRILL LYNCH MORTGAGE
CAPITAL INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.; ALLY SECURITIES, LLC;
DEUTSCHE BANK SECURITIES INC.; HSBC
SECURITIES (USA) INC.; RBS SECURITIES INC.;
and UBS SECURITIES LLC,

*Defendants*.

No. 12-cv-4000 (LTS)

**JOINT MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

GLOSSARY OF ABBREVIATIONS AND TERMS .................................................. ix

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 6

    A.      The MBS Securitization and Offering Process ...................................... 6

    B.      The Banks Invested Heavily in MBS After the Market Collapsed. ....................... 8

    C.      The OIG and FDIC's Assessment of the Banks' Failure. ................................. 10

    D.      The FDIC's Allegations in the Amended Complaint. ........................................ 11

ARGUMENT ....................................................................................................... 12

I.     The FDIC's Claims Are Time-Barred. .......................................................... 12

    A.      The FDIC's Claims Are Barred by the One-Year Statute of Limitations. ........... 12

          1.      The FDIC has not pled compliance with § 13. ........................................ 14

          2.      The Banks had actual or constructive knowledge of all the facts on which the FDIC premises its claims prior to May 22, 2008. ..................... 15

          3.      Additional facts contributed to a reasonably diligent investor's knowledge of the claims alleged here prior to May 22, 2008. ................. 21

          4.      Other MBS investors filed complaints making nearly identical allegations prior to May 22, 2008. ........................................................ 26

    B.      The FDIC's Claims Are Also Barred by the Three-Year Statute of Repose. ....... 28

    C.      The Extender Statute Does Not Save the FDIC's Claims. ................................ 28

II.    The § 11 Claims Fail On Numerous Additional Grounds. ............................... 31

    A.      The Allegations About Appraisals and LTV Ratios Fail. ................................. 33

          1.      Appraisals and LTV ratios are statements of opinion that are not actionable absent subjective falsity – which the FDIC does not allege. ................................................................................................. 33

          2.      The FDIC provides no basis on which to infer that its AVM's output is more reliable than an appraisal, and as a matter of law the output is just an opinion that cannot be used to second-guess an appraiser's opinion. ........................................................................... 36

          3.      The AVM-based allegations do not give rise to a "plausible" claim because, without disclosing the AVM's margin of error, the allegations are meaningless. ................................................................ 38

          4.      The AVM cannot give rise to a "plausible" claim because it rests on hindsight and is preprogrammed to deem "false" every prospectus supplement ever issued in a declining real estate market. ............................................................................................. 40

          5.      The AVM-based allegations fail to state a claim because they challenge statements that were not even in the Offering Documents. ....................................................................................... 41

B.    The Allegations About Additional Liens Fail. .......................................................43

C.    The Allegations About Owner-Occupancy Rates Fail. ........................................44

D.    The Allegations About Departures From Underwriting Guidelines Fail. ............47

E.    The Allegations About Credit Ratings Fail. .........................................................50

F.    Many of the § 11 Claims Also Fail Because the Statute Expressly Requires the FDIC To Plead Reliance, Which It Has Not Done. .........................................51

  1.    Distribution Reports constitute § 11 "earning statements" for MBS. ......52

  2.    The Distribution Reports were made "generally available" when posted to the websites of the securitization trustees. ...............................57

  3.    The FDIC fails to plead facts establishing reliance by the Banks. ...........58

III.    The § 15 Claims For Control Person Liability Fail. ...........................................58

CONCLUSION ...............................................................................................................59

# TABLE OF AUTHORITIES

## CASES

*Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011) ..................................................................................15, 18, 19

*APA Excelsior III L.P. v. Premiere Techs. Inc.*, 476 F.3d 1261 (11th Cir. 2007) ..........................................................................................51, 58

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................31

*Barrios v. Paco Pharms. Servs., Inc.*, 816 F. Supp. 243 (S.D.N.Y. 1993) ...................31

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ..................................................31

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................31, 40

*Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, 2010 WL 3545389 (N.D. Ga. Sept. 10, 2010) ................................................................34, 50

*Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) ...........................16

*Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wash. 2010) ....................37

*Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355 (5th Cir. 2005) ....................................................................................30

*Cty. of Santa Clara v. Astra USA, Inc.*, 2008 WL 5055395 (N.D. Cal. Nov. 25, 2008) ..................................................................................10

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) ......................................12

*Dotson v. Griesa*, 398 F.3d 156 (2d Cir. 2005) ..............................................29

*ECA v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ..................................43

*Emps' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011) ................................................35

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ....................................33

*Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 761 F. Supp. 1010 (S.D.N.Y. 1991) ..........................................................................21

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ....................................2, 12, 21, 27

*FDIC v. Shrader & York*, 991 F.2d 216 (5th Cir. 1993) ............................................................3, 13

*FHFA v. Countrywide Fin. Corp.*, No. 12 Civ. 1059 (C.D. Cal. Oct. 18, 2012)..............................................................................................................................30

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ..............................48

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)..................................................................................32, 44, 49

*Henry v. Champlain Enters.*, 445 F.3d 610 (2d Cir. 2006) ........................................................36

*Hermann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552 (5th Cir. 2002)......................34, 50

*Huddleston v. United States*, 2012 WL 1816261 (6th Cir. May 21, 2012) ..................................30

*Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011) .........................................58

*In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011)......................................................................................................................4, 15, 40

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012).........................................................................16, 33, 35, 47, 50

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002) ..............................................................31

*In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)..............................................................................................................................58

*In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003) ..............................43

*In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005)................................................................................................................................58

*In re IndyMac MBS Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010)............................32, 33, 35, 47

*In re IndyMac MBS Litig.*, 793 F. Supp. 2d 637 (S.D.N.Y. 2011)..............................................15

*In re Lehman Bros. MBS Litig.*, 650 F.3d 167 (2d Cir. 2011)....................................................59

*In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010)..............................................................................................................................33, 37

*In re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477 (S.D.N.Y. 2011)..............................................................................................................................29

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003)..................................................................................................................49

*In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................................................................................................16

*In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650 (S.D.N.Y. 2011) ........................................................................14

*In re Morgan Stanley Pass-Through Certificates Litig.*, 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010)................................................................................17

*In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..........................4, 36

*In re Textainer P'ship Sec. Litig.*, 2006 WL 1328851 (N.D. Cal. May 15, 2006)................................................................................................................38

*In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 106687 (N.D. Cal. Oct. 5, 2010) ................................................................33

*In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) ...........................................55

*Jackson v. Broadcast Music, Inc.*, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006)................................................................................................................10

*Jodek Charitable Trust, R.A. v. Vertical Net Inc.*, 412 F. Supp. 2d 469 (E.D. Pa. 2006)...........................................................................................................30

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ....................................................48

*Lighthouse Fin. Group v. RBS Group, PLC*, 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012)........................................................................................13, 15

*Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010)................................................................................................................32

*Low v. Robb*, 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012).........................................................49

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341 (3d Cir 1986)................................................................................................................30

*Martin v. EVP Second Corp.*, 1991 WL 131176 (S.D.N.Y. July 9, 1991)..................................59

*Mass Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 WL 3578666 (C.D. Cal. Aug. 17, 2012)................................................................................45

*Mass. Mut. Life Ins. Co v. Residential Funding Co.*, 843 F. Supp. 2d 191 (D. Mass. Feb. 14, 2012) ...............................................................................44, 48

*Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D. Cal. June 8, 1994) ....................................................................................................36

*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) ...................................................................15

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL
    1473288 (S.D.N.Y. Mar. 29, 2010) ...................................................................33

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL
    3874821 (S.D.N.Y. Aug. 18, 2011)..............................................................54, 55

*N.J. Carpenters Health Fund v. Novastar Mortg., Inc.*, 2011 WL 1338195
    (S.D.N.Y. Mar. 31, 2011) ...........................................................................33, 47

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL
    1257528 (S.D.N.Y. Mar. 31, 2010) ...................................................................33

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2011 WL
    2020260 (S.D.N.Y. May 19, 2011) ...................................................................55

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group PLC*, 720
    F. Supp. 2d 254 (S.D.N.Y. 2010) ...............................................................33, 50

*NCUA v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D. Cal.) ................................................30

*NCUA v. RBS Sec., Inc.*, 2012 WL 3028803 (D. Kan. July 25, 2012) .........................................30

*NCUA v. RBS Sec., Inc.*, No. 11 Civ. 5887 (C.D. Cal.)..........................................................30

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) .......................................................13

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ............................................31

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004)....................................3, 28, 29

*Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am. Corp.*,_ F. Supp. 2d _,
    2012 WL 2847732 (S.D.N.Y. 2012) .............................................................15, 27

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial
    Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...............................................37

*Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan
    Acceptance Corp.*, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012).......................................5, 48

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance
    Corp.*, 632 F.3d 762 (1st Cir. 2011) ...........................................................35, 50

*Price v. United States*, 46 Fed. Cl. 640 (2000) ..........................................................20

*Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.* 2011 WL
    1258504 (D. Colo. Mar. 29, 2011) ...................................................................19

*RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009) ..........................................49

*Rudnick v. Franchard Corp.*, 237 F. Supp. 871 (S.D.N.Y. 1965)....................................51, 56, 58

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010)...........................................................39

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008).......................13, 16, 21

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125 (C.D. Cal. 2011) .............................................................................................27

*Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895 (E.D. Va. 2010) .......................................................38

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010).............................................................................4, 33, 35, 50

*Wilson v. Venture Fin. Group, Inc.*, 2010 WL 2028088 (W.D. Wash. May 18, 2010)........................................................................................................................9

## STATUTES AND REGULATIONS

12 U.S.C. § 1821 ..............................................................................................................3, 28, 29

12 U.S.C. § 4617 .....................................................................................................................30

15 U.S.C. § 77k ...................................................................................................................31, 51

15 U.S.C. § 77m ...............................................................................................................2, 12, 28

15 U.S.C. § 78o .......................................................................................................................57

17 C.F.R. § 229.1121...............................................................................................................7, 16

17 C.F.R. § 230.158.............................................................................................................53, 55, 57

17 C.F.R. § 240.17g-1 ..................................................................................................................7

## OTHER AUTHORITIES

Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 70 Fed. Reg. 1506 (Jan. 7, 2005) ................................................53

Black's Law Dictionary (9th ed. 2009) .......................................................................................42

FDIC, Docket No. 2010-0018, "Interagency Appraisal and Evaluation Guidelines," Final Guidance, 75 Fed. Reg. 77450, *available at* 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010)..........................................................................................37

Multijurisdictional Disclosure and Modifications to the Current Registration
  and Reporting System for Canadian Issuers, Securities Act Release No.
  33-6902, Exchange Act Release No. 34-29354, 56 Fed. Reg. 30036
  (July 1, 1991) ............................................................................................................55

SEC Release No. 33-6485, 48 Fed. Reg. 44767 (Sept. 30, 1983) (adoptive
  release) .....................................................................................................................53

SEC Release No. 34-55146, *Internet Availability of Proxy Material*, 72 Fed.
  Reg. 4148 (Jan. 29, 2007) .......................................................................................57

USPAP Advisory Opinions, 2012-2013 Edition, Advisory Opinion 18 .....................................37

## GLOSSARY OF ABBREVIATIONS AND TERMS

**AC**:                         Amended Complaint

**AVM**:                        Automated valuation model

**Banks**:                      Citizens National Bank and Strategic Capital Bank

**Certificate(s)**:             One or more of the mortgage-backed pass-through certificates that the Banks allegedly purchased from some of the Defendants, and on which the FDIC bases its claims in this action

**CLTV**:                       Combined loan-to-value ratio

**Distribution Reports**:       Monthly remittance reports published pursuant to SEC Regulation AB that contain detailed information about the financial performance of the MBS Certificates

**EPD**:                        Early payment default

**Extender Statute**:           12 U.S.C. § 1821(d)(14) – the statute of limitations for actions brought by the FDIC as conservator or receiver

**Loan tape**:                  A compilation of various data points regarding individual loans in the securitization's collateral pool providing various data points, such as property location, outstanding principal balance, original LTV, property type and, owner occupancy status

**LTV**:                        Loan-to-value

**MBS**:                        Mortgage-backed securities

**Offering(s)**:                Any of the 12 residential MBS offerings from which the FDIC alleges the Banks purchased the Certificates (*see* Schedules 1-12 to the Amended Complaint)

**Offering Documents**:         Registration statements, prospectuses, and prospectus supplements for the Offerings

**OIG**:                        Office of the Inspector General of the United States Department of the Treasury

**P.**:                         Prospectus

**P.S.**:                       Prospectus Supplement

**USPAP**:                      Uniform Standards of Professional Appraisal Practice

**BSABS 2007-AC5**:             Bear Stearns Asset-Backed Certificates, Series 2007-AC5

**CMALT 2006-A6**:  CitiMortgage Alternative Loan Trust REMIC Pass-Through
Certificates, Series 2006-A6

**CSMC 2006-6**:  CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-6

**MANA 2007-F1**:  Merrill Lynch Alternative Note Asset Trust Mortgage Pass-Through
Certificates, Series 2007-F1

**RALI 2006-QS16**:  Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through
Certificates, Series 2006-QS16

**RALI 2006-QS18**:  Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through
Certificates, Series 2006-QS18

**RALI 2006-QS6**:  Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through
Certificates, Series 2006-QS6

**RALI 2006-QS8**:  Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through
Certificates, Series 2006-QS8

**RALI 2007-QS5**:  Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through
Certificates, Series 2007-QS5

**RAST 2006-A11**:  Residential Asset Securitization Trust, Series 2006-A11

**RAST 2006-A14CB**:  Residential Asset Securitization Trust, Series 2006-A14CB

**RAST 2007-A1**:  Residential Asset Securitization Trust, Series 2007-A1

## PRELIMINARY STATEMENT

After waiting nearly three years to the day from its appointment as receiver for Strategic Capital Bank ("Strategic Capital") and Citizens National Bank ("Citizens National") (collectively, the "Banks"), the Federal Deposit Insurance Corporation ("FDIC") filed this action seeking to recover the Banks' losses resulting from their deliberate strategy of investing in distressed residential mortgage backed securities ("MBS") in late 2007 and 2008.  Despite the Banks' high-risk and ill-timed investment strategy, the FDIC blames Defendants for the Banks' losses, claiming that Defendants misrepresented the quality of the loans that backed the Banks' MBS certificates (the "Certificates").  But the disclosures in the registration statements, prospectuses, and prospectus supplements (collectively, "Offering Documents"), and regulators' post-mortem assessments of the Banks' investments, make clear that the Banks knew exactly what they were buying, and were doing so intentionally in the hope of making a profit on MBS certificates purchased at substantial discounts.

Defendants moved to dismiss the FDIC's initial Complaint, and the FDIC responded by filing an Amended Complaint on October 12, 2012.  Despite a few new allegations, the Amended Complaint does not cure any of the deficiencies identified by Defendants' prior motion.  As documented, the Banks bought millions of dollars of MBS certificates in the secondary market when the housing market was showing clear signs of decline.  After the Banks were placed into receivership on May 22, 2009, the FDIC and the Office of Inspector General of the Department of the Treasury ("OIG"), conducted inquiries into the causes of the Banks' failures and published their findings in public reports known as Material Loss Reviews.  Both reports denounced the Banks' post-financial crisis buying spree as "high-risk," "speculative and ill-timed," and blamed inadequate internal risk management controls for the losses the Banks experienced on their MBS investments.[1]

---

[1]   Ex. 1 at 3 (Material Loss Review of Strategic Capital Bank, Champaign, Illinois, Office of Inspector General, FDIC, Report No. MLR-10-007 (Dec. 2009)); Ex. 2 at 4 (Material Loss Review of Citizens National Bank, OIG-10-038 (Mar. 2010)).  All citations to exhibits are to the exhibits attached to the Declaration of Andrew T. Frankel.

Despite these conclusions, the FDIC attempts to paint a very different picture in its Amended Complaint, accusing the parties involved in the securitization process of misrepresenting the quality of the MBS certificates purchased by the Banks.  Specifically, the FDIC alleges that the Offering Documents misrepresented the credit quality of the underlying mortgages because property appraisals were allegedly overstated, loan-to-value ("LTV") ratios were allegedly inaccurate, owner-occupancy status was allegedly misrepresented, mortgage underwriting guidelines were allegedly not followed, and credit ratings of the Certificates allegedly were too high.  The FDIC asserts claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act") against 17 mostly unrelated Defendants arising from 19 of the Banks' secondary market purchases of MBS certificates from 12 separate MBS offerings (individually an "Offering," together "Offerings").  Yet, the Amended Complaint does not cure the deficiencies of the initial Complaint, and therefore must be dismissed for the same reasons: untimeliness and the failure to plead any actionable misstatement or omission.

*Untimeliness*.  The FDIC's claims are untimely under both the 1933 Act's statute of limitations and statute of repose.  *See* 15 U.S.C. § 77m.  The claims are untimely under the statute of *limitations* because a reasonably diligent investor (and certainly sophisticated MBS investors like the Banks) should have discovered its claims before May 22, 2008 (*i.e.*, more than one year before the FDIC was appointed receiver).  Thus the claims were already time-barred when the FDIC was appointed as receiver on May 22, 2009.  (*See* Section I.A, *infra*).  In fact, numerous investors filed substantively similar MBS complaints in 2007 and early 2008 against many of the same Defendants that the FDIC belatedly names in this lawsuit, demonstrating that the Banks were equally able to bring these claims by May 22, 2008.  Indeed, on this reasoning, the district court overseeing the *Countrywide* multi-district litigation recently found that identical claims brought by the FDIC as receiver for Strategic Capital were time-barred when the FDIC became receiver on May 22, 2009, and dismissed an identical complaint with prejudice.  *See FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012).

The FDIC's claims are also independently barred by the "absolute" three-year statute of *repose* applicable to 1933 Act claims.  (*See* Section I.B, *infra*).  The FDIC waited between five to six years after the MBS offerings to file this action, rendering its claims irremediably barred by § 13's statute of repose, regardless of when they were discovered.  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004) ("The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation.").

The so-called "Extender Statute," 12 U.S.C. § 1821(d)(14), does not assist the FDIC.  As an initial matter, the statute of limitations had already expired by the time the FDIC became receiver.  *See FDIC v. Shrader & York*, 991 F.2d 216, 220-27 (5th Cir. 1993) (holding the FDIC's claims time-barred where the bank should have known of the claims before the FDIC receivership began).  Moreover, the Extender Statute, by its plain terms, does not apply to statutes of repose (as opposed to statutes of limitation), nor does it apply to federal claims under the 1933 Act.  (*See* Section I.C, *infra*).[2]

***Failure to State a Claim.***  The Amended Complaint also fails to state a claim for liability under the 1933 Act.  As in its initial Complaint, the FDIC pleads virtually no facts in support of its allegations.  The FDIC does not plead any facts about the Defendants it has sued or the appraisal practices that were utilized.  Nor does the FDIC plead any facts about the majority of originators whose loans backed the certificates at issue in this case.

Instead, the FDIC rests its claims almost entirely on backwards-looking computerized and statistical analyses of the loan pools underlying the MBS certificates.  The FDIC's central allegation is that, when it runs property-by-property loan information through an automated valuation model ("AVM") today, the model calculates retrospective property values that are typically lower than the values estimated by professional appraisers contemporaneously with the originations in 2006 and 2007.  According to the FDIC, this computerized retrospective analysis is sufficient to support its allegations that Defendants made materially false statements about

---

[2]   As noted below, the Second Circuit is currently considering whether a similar extender statute extends the repose period for 1933 Act claims in an expedited appeal that was argued on November 26, 2012.

appraisals, LTV ratios, credit ratings, and other matters.  But such an approach fails to state a claim, and the Amended Complaint should be dismissed for the following reasons:

*First*, the FDIC's allegations about appraisals and LTV ratios are insufficient.  (*See* Section II.A, *infra*).  Appraisals and LTV ratios – like all estimates of value – are statements of opinion, not fact.  As such, claims based on appraisals and LTV ratios are not actionable absent facts establishing "subjective falsity."  *E.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).  The appraisal and LTV allegations fail as a matter of law because the FDIC does not even *attempt* to allege subjective falsity.  To the contrary, in a transparent effort to avoid fraud-based pleading standards, the Amended Complaint *disavows* any such allegation.

Furthermore, although the FDIC contends that appraisals were overstated based solely on its backwards-looking AVM, the FDIC provides no reason – and certainly no "plausible" reason – to suppose that its AVM is more reliable than the actual appraisals performed at the time of the originations or, in many instances, the actual sale prices of the mortgaged properties.  To the contrary, "valuation models depend so heavily on the discretionary choices of the modeler . . . and choice of 'comparables' that the resulting models and their [outputs] can only be fairly characterized as *subjective opinions*."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005).  Thus, the FDIC's AVM-based allegations present nothing more than a difference of opinion, which is not sufficient to state a misrepresentation claim.

In addition, the FDIC's allegations ensure that its AVM remains inscrutable to the point of rendering the AVM-based allegations meaningless; the FDIC does not even disclose its margin of error, which is critical to know before any inferences – let alone "plausible" inferences – can be drawn regarding whether the AVM's output is consistent or inconsistent with the appraisals the FDIC challenges.  Without disclosure of the margin of error, the AVM allegations cannot call the Offering Documents into question, and therefore cannot state a claim.  The FDIC's allegations *do* make clear, however, that the AVM is based on hindsight.  The FDIC concedes that its AVM used information that was *not available* until after the appraisers

completed their appraisals.  As a result, the AVM is preprogrammed to deem "false" every MBS prospectus supplement ever issued during a declining real estate market.  The AVM-based allegations thus amount to nothing more than fraud by hindsight, which is impermissible.  "The accuracy of offering documents must be assessed in light of information available *at the time they were published*."  *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011) (emphasis added).

*Second*, the FDIC's allegations that are not based on a computer model likewise fail to state a claim.  (*See* Sections II.B-E, *infra*).  For example, the FDIC's allegations that there were undisclosed, additional liens on certain properties do not support its claims because the FDIC admits that any such liens were put on the properties *after* the originations of the loans that back the Certificates.  Further, the allegations that the mortgage originators abandoned their underwriting guidelines are either unsupported or too conclusory to support its claims.  Instead, the FDIC relies on early payment default ("EPD") rates of the underlying loans as "evidence" that originators abandoned their underwriting guidelines.  But such allegations are insufficient to state a "plausible" claim, because allegedly poor loan performance "could [have been] caused by any number of broad economic factors besides . . . deviations from descriptions in the offering documents" and does not "establish that the[] offering documents contained material misstatements and omissions."  *Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012).

Moreover, the Offering Documents made robust disclosures of the very risks that the FDIC now cites as the basis for its § 11 claims.  For example, the Offering Documents explicitly disclosed that originators departed from their underwriting guidelines (Ex. 3); that the underlying loans may not conform to the descriptions contained in the Offering Documents (Ex. 4); that the loan-to-value figures referred only to the value of the subject mortgage on the property at the time of origination (Ex. 5); and that occupancy information was based on representations by the property owners at the time of origination (Ex. 6).  Such disclosures plainly belie the FDIC's allegations that the Offering Documents were misleading.

*Third*, the FDIC's failure to plead reliance requires dismissal of its claims pertaining to the seven Certificates purchased more than one year after the initial offering.  (*See* Sections II.F, *infra*).  Section 11 expressly requires investors that buy securities in the secondary market after more than 12 months of earning statements have been released to plead and prove reliance.  Here, the Banks bought seven certificates after the release of more than 12 monthly Distribution Reports had been released.  The Distribution Reports provided the Banks with information about the earnings and other measures of financial performance of the Certificates.  As a result, the FDIC bears the burden of pleading reliance.  The cursory, non-factual allegations of reliance that the FDIC includes in its Amended Complaint are plainly inadequate.  Indeed, the undisputed fact is that Strategic Capital and Citizens National bought the Certificates knowing full well that they were distressed.  This fact belies any assertion that the Banks relied on the Offering Documents.

*Finally*, the Amended Complaint fails to state a claim for control person liability under § 15 of the 1933 Act, both because it fails to allege a primary violation of the 1933 Act and because its allegations of control consist entirely of conclusory boilerplate, not facts.  (*See* Section III, *infra*).

In short, the Amended Complaint suffers from numerous incurable legal defects, and should be dismissed with prejudice.[3]

## BACKGROUND

### A.      The MBS Securitization and Offering Process.

MBS are fixed-income investments that provide investors with exposure to the residential real estate market.  In a typical mortgage securitization, a mortgage lender or aggregator sells hundreds or thousands of home loans it has originated or acquired to an entity that will act as the sponsor for the securitization.  (AC ¶¶ 25-27).  The sponsor may be an affiliate of the originator or a third-party financial institution.  The sponsor then "pools" the mortgage loans and deposits them into a trust in exchange for certificates, and sells the certificates to underwriters, which in

---

[3]      To aid the Court's consideration of this Motion, attached as Appendix A is a chart ("Grounds for Dismissal of Claims"), which is organized by securitization, and sets forth the Defendant(s) associated with each Offering and the corresponding grounds for dismissal.

turn sell them to sophisticated institutional investors like the Banks.  The certificates are backed by the pool of mortgages held by the trust and entitle the investors to a portion of the income stream generated by the homeowners' monthly mortgage payments.  (*Id.*)

The incoming cash flows are usually divided into "tranches" corresponding to different certificate classes in an MBS offering.  (AC ¶ 29).  Tranches are differentiated based on the priority of payment, the degree of risk, the yield to investors, and the credit rating of an independent and nationally recognized rating agency.  *See* 17 C.F.R. § 240.17g-1.  Generally, the certificates from the more senior tranches (*i.e.*, those with comparatively less risk) will pay lower yields, while certificates from the more subordinate tranches (*i.e.*, those with comparatively greater risk) will pay higher yields.  (AC ¶ 30).

MBS certificates are registered for sale with the Securities and Exchange Commission ("SEC").  An MBS issuer typically files a shelf registration statement that contains general information about the issuer and allows the issuer to register securities for sale in the future, but does not contain detailed information about the securities that may be offered for sale because that information may not yet exist.  When conducting an MBS offering, the issuer uses a prospectus and prospectus supplement to convey detailed information about the offering to potential investors, including information about the certificates, the pool of mortgages that backs them, and the risks associated with the offering.[4]  The prospectus and prospectus supplements encourage investors to consider general and specific risk factors before purchasing certificates.[5]

---

[4]   For three of the Certificates (MANA 2007-F1, RALI 2007-QS5, and CMALT 2006-A6), Free Writing Prospectuses were filed shortly before the Offerings.  These filings contained multiple loan-level data points, including loan numbers, property type, property location, LTV ratios, owner-occupancy status, and original and remaining balances on the mortgage loans.  Ex. 7 contains an excerpt of the Free Writing Prospectus for RALI 2007-QS5.  Four other Certificates (RALI 2006-QS6, RALI 2006-QS18, RALI 2006-QS8 and RALI 2006-QS16), filed loan-level data within a month of the Offerings.  Sometimes listed under the heading "loan schedule" when filed as an exhibit to a Form 8K, these disclosures also provided LTV ratios, property location, and original and remaining balances on the mortgage loans.  Ex. 8 contains an excerpt of a loan schedule for RALI 2006-QS6.  These filings are also accessible on the SEC's public website by searching the trust name at http://www.sec.gov/edgar/searchedgar/ companysearch.html.

[5]   *See* Ex. 9 (cover pages of Offering Documents warning investors to review relevant "risk factors" before purchasing certificates).

After the initial offering, investors have access to specific loan information through monthly trustee reports ("Distribution Reports").  The issuance of Distribution Reports is mandated by SEC Regulation AB.  Among other things, Distribution Reports "[d]escribe the [cash] distribution for the [monthly] period and the performance of the asset pool during the . . . period," including "[d]elinquency and loss information for the period," 17 C.F.R. § 229.1121(a), and generally provide details on the certificates' performance over the period.[6]  The Offering Documents directed investors to the websites where the monthly reports could be accessed.[7]

### B.      The Banks Invested Heavily in MBS After the Market Collapsed.

Prior to their failure in 2008, Citizens National and Strategic Capital were Illinois-based banks under common control of John E. Gorman and Gary L. Svec (d/b/a JGS Investment Group).[8]  Prior to the fall of 2007, neither Bank had invested in any type of mortgage-backed security.  (Ex. 1 at 4; Ex. 2 at 7).  But between September 2007, when the housing market had already shown clear signs of decline, and April 2008, the Banks collectively invested over $150 million in the Certificates.  Starting in September 2007, Citizens National invested over $7.5 million in RALI 2006-QS18.  (*See* Item 38(b) of Schedule 2 to AC).  Citizens National increased its investment in RALI 2006-QS18 in October to $10.7 million.  (*Id.*).  In November 2007, the Banks collectively invested $19.5 million in RALI 2006-QS8.  (*See* Item 38(b) of Schedule 4 to AC).  By the end of December 2007, the Banks had purchased an additional five MBS certificates for an additional $55 million.  (*See* Item 38(b) of Schedules 1, 5, 6, 7 and 9 to AC).  Between January and April 2008, the Banks invested another $64 million in six more MBS certificates, with the final investment of $7 million in CSMC 2006-6 in April 2008.  (*See* Item 38(b) of Schedules 3, 7, 8, 10, 11 and 12 to AC).  As illustrated in Figure 1, the distinct

---

[6]     Ex. 10 contains a copy of the April, 2008 Distribution Report for RAST 2006-A11 and is representative of the information contained in the monthly Distribution Reports for all of the Certificates.

[7]     Ex. 11 (excerpts of Offering Documents informing investors of the websites where the monthly reports could be accessed).

[8]     Together, Gorman and Svec owned a majority stake in the Banks' respective holding companies, Citizens Central Bancorp, Inc. and Strategic Capital Bancorp, Inc.  (Ex. 1 at 2; Ex. 2 at 24).

downward trend in housing prices during this time did not dissuade the Banks from investing in the Certificates.

<u>Figure 1</u>



In 2008, the FDIC issued a cease-and-desist order to Strategic Capital to "compel the bank to discontinue its high-risk investment strategy."  (Ex. 1 at 13).  Specifically, the FDIC ordered Strategic Capital to stop "[o]perating with an excessive concentration of risk in securities backed by nontraditional mortgages with less than full documentation on underlying loans."[9] Similarly, the Office of the Comptroller of the Currency warned Citizens National that its risk management controls were inadequate, and urged it to "supplement credit ratings [given to MBS] with internal credit analysis."  (Ex. 2 at 8).  These warnings appear to have gone unheeded.

---

[9]   Ex. 12 (*In re Strategic Capital Bank*, Order to Cease and Desist, 2008 WL 4592001, at *12-13 (F.D.I.C. Aug. 14, 2008)).

9

**C.      The OIG and FDIC's Assessment of the Banks' Failure.**

After the FDIC was appointed receiver for the Banks, the FDIC and the OIG conducted Material Loss Reviews for Strategic Capital and Citizens National respectively, which addressed, among other things, the Banks' MBS investments.[10]  Both the FDIC and the OIG agreed that the Banks' management had engaged in a "speculative and ill-timed growth strategy involving high-risk assets and volatile funding" that was in "contravention to long-standing supervisory guidance."  (Ex. 1 at 3; *see also* Ex. 2 at 2 ("[Citizens National] failed because management undertook a high-risk strategy of investing heavily in private-label collateralized mortgage obligations [a type of mortgage-backed security] and commercial real estate loan participations.")).  The OIG and the FDIC found that the Banks "embarked on [this] speculative growth strategy by increasing [their] reliance on brokered deposits to fund significant concentrations in . . . private label mortgage-backed securities . . . backed by nontraditional mortgages with less than full documentation . . . [and commercial real estate loan participations]."  (Ex. 1 at 3-4; *see also* Ex. 2 at 2).[11]

The FDIC's report noted that Strategic Capital's management "concluded that [2007] was an opportunistic time to invest in private-label MBS because these securities were being offered at a significant discount."  (Ex. 1 at 4).  But, the FDIC observed, in the short span of time between the fourth quarter of 2007 and the first quarter of 2008 when the Banks made their MBS investments, "market conditions rapidly deteriorated, and [the Banks] faced credit downgrades associated with [their] investment portfolio[s]."  (Ex. 1 at 3).  Ultimately, the FDIC found that

---

[10]   Material Loss Review reports are publicly available and judicially noticeable.  *See Wilson v. Venture Fin. Group, Inc.*, 2010 WL 2028088, at *11 (W.D. Wash. May 18, 2010) (taking judicial notice of FDIC material loss review because "[t]he Loss Review is a public report of the FDIC's Office of Inspector General"); *see also Jackson v. Broadcast Music, Inc.*, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006); *Cty. of Santa Clara v. Astra USA, Inc.*, 2008 WL 5055395, at *2 n.1 (N.D. Cal. Nov. 25, 2008).

[11]   The FDIC acknowledged that Strategic Capital's MBS certificates, several of which were also purchased by Citizens National, were "private-label MBS that were largely backed by nontraditional mortgages and many of the securities featured concentrations in California and Florida," and further explained the difference between agency-issued MBS and private-label MBS, which are "generally comprise[d] [of] nonconforming loans."  (Ex. 1 at 4 & n.4).

the "rapid growth and high concentration in assets vulnerable to economic downturn resulted in significant losses to [the Banks]."  (Ex. 2 at 6).

The OIG, in reviewing Citizens National, likewise concluded that "[t]he decision to purchase the private-label [MBS] in such a short period of time was made by the bank's senior management."  (Ex. 2 at 7).  But as Citizens National was taking on increased risk, its board of directors "did not ensure that bank management identified, measured, monitored, and controlled the high risks associated with [its] assets" or "establish adequate controls commensurate with the risks associated with these assets."  (Ex. 2 at 2, 4).

**D.    The FDIC's Allegations in the Amended Complaint.**

Despite the clear conclusions of the Banks' deliberate risk taking, the FDIC now seeks to recoup the Banks' investment losses through litigation against the Certificates' issuers and underwriters.  The Amended Complaint is one of three substantively identical pleadings that the FDIC has brought as receiver for one or both of the Banks based on the Banks' purchases of MBS certificates.[12]  As noted, the district court overseeing the *Countrywide* MDL has already dismissed one of the *Strategic Capital* complaints as untimely under the 1933 Act's statute of limitations, briefing on the other *Strategic Capital* complaint is scheduled to commence in December 2012.

In this, as in its other complaints, the FDIC alleges that the Offering Documents were false or misleading because (a) the LTV ratios of the mortgages were allegedly understated due to properties being appraised during the housing boom for more than they were "really" worth; (b) the LTV ratios were additionally understated because there were undisclosed liens on some of the properties; (c) owner-occupancy rates were allegedly overstated on account of some homeowners not living in the properties despite indicating that they would on their loan applications; (d) the Offering Documents did not disclose that mortgage originators had allegedly

---

[12]  Ex. 13 (Complaint, *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 12-cv-04354 (C.D. Cal. May 18, 2012)); Ex. 14 (Complaint, *FDIC as Receiver for Strategic Capital Bank v. J.P. Morgan Secs. LLC*, No. 12-cv-8415 (C.D. Cal. May 18, 2012), transferred from, 12-cv-4001 (S.D.N.Y. Oct. 10, 2012)).

abandoned their mortgage underwriting guidelines; and (e) the credit ratings conferred on the Certificates by Moody's, S&P and/or Fitch (nationally recognized credit rating agencies) were allegedly higher than they should have been.

The FDIC bases these allegations not on any meaningful pre-suit investigation, but rather on after-the-fact analyses of publicly available loan data – analyses that the Banks could have performed years before the FDIC became receiver and filed this lawsuit. Drawing few distinctions among the various unrelated Defendants,[13] the Amended Complaint tries to place the blame on Defendants for the Banks' mismanagement of their MBS investments, divining misstatements in the Offering Documents based on purely retrospective, automated analyses. These allegations, however, could have been made prior to May 22, 2008, and in any event, are insufficient to state a claim. For the reasons set forth below, the Amended Complaint should be dismissed with prejudice.

## ARGUMENT

### I.   THE FDIC'S CLAIMS ARE TIME-BARRED.

Section 13 of the 1933 Act imposes a one-year statute of limitations and a three-year statute of repose on claims brought under §§ 11 and 15. 15 U.S.C. § 77m (limitations and repose periods for § 11 claims); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well."). The statutes of limitations and repose operate independently; either can bar a claim, and here, both mandate dismissal.

### A.   The FDIC's Claims Are Barred by the One-Year Statute of Limitations.

The FDIC's claims were barred by the 1933 Act's one-year statute of limitations prior to its appointment as receiver for the Banks on May 22, 2009. Section 13 precludes a § 11 claim from being brought more than "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." 15

---

[13]   The details of each Offering and any differences in allegations against each Defendant have been relegated to "schedules" attached to the Amended Complaint.

U.S.C. § 77m.  Thus, "[t]he statute of limitations begins to run when the plaintiff has or should have knowledge sufficient to draft a complaint under Rule 12(b)(6)." *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *7.

Because the FDIC's claims could have been initiated a full year prior to the FDIC's appointment as receiver, they were already time-barred under § 13 when the FDIC became receiver, and therefore remain time-barred today. *Id.* at *2 ("[I]f SCB [Strategic Capital] discovered or should have discovered the misstatements before May 22, 2008, then the claims here were not live when the FDIC was appointed receiver, and are untimely now").  This is because, when the FDIC is appointed as receiver for a bank, it "steps into the shoes" of the bank, making "any defense [that is] good against the [bank] . . . good against the [FDIC]." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994); *accord FDIC v. Shrader & York*, 991 F.2d 216, 220-27 (5th Cir. 1993) (holding the FDIC's claims time-barred where the bank should have known of the claims before the FDIC receivership began).

As shown below, the statute of limitations requires dismissal with prejudice here because (a) the FDIC has not met, and cannot meet, its threshold burden of pleading compliance with § 13; (b) all the facts on which the FDIC bases its Amended Complaint were publicly available, and thus available to the Banks more than one year before the FDIC was appointed as receiver (*i.e.*, before May 22, 2008 (the "Limitations Date")); (c) a wealth of additional information was available to the Banks prior to the Limitations Date; and (d) other complaints bringing substantially identical allegations were filed prior to the Limitations Date, demonstrating that reasonable investors were able to bring such complaints and that the Banks equally were able to do so.[14]

---

[14]   Distribution Reports, press coverage, ratings events, prior lawsuits, and regulatory filings referenced throughout this brief are judicially noticeable for determining that the Banks had actual or constructive knowledge of their claims before May 22, 2008.  *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents"); *Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am. Corp.*, -- F. Supp. 2d --, 2012 WL 2847732, at *21-23 n.6 (S.D.N.Y. July 11, 2012) (dismissing plaintiff's § 11 claims as time-barred where the defendants "rel[ied] on news articles, SEC filings, and various lawsuits to

1.    The FDIC has not pled compliance with § 13.

As an initial matter, the FDIC has failed to meet its burden of pleading facts establishing that its claims were timely filed.  Under § 11, the statute of limitations is not merely an affirmative defense; it is a "substantive element of the cause of action," and therefore a complaint must allege "(1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier; and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery."  *Lighthouse Fin. Group v. RBS Group, PLC*, 2012 WL 4616958, at *12 (S.D.N.Y. Sept. 28, 2012).  The FDIC alleges none of these facts.

Instead, the FDIC makes only conclusory allegations that "a reasonably diligent plaintiff would not have discovered [the relevant facts] until later than May 22, 2008" because the "specific loans" and "loan files" for the mortgage loans backing the certificates were not available.  (AC ¶ 132).  The Amended Complaint, however, is not based on loan files, but on an "automated valuation model" that analyzed loan information that was available to the Banks at the time of the offerings or soon thereafter.  While the FDIC asserts, in wholly conclusory terms, that "on or before May 22, 2008, there were not available to a reasonably diligent plaintiff . . . data about those specific loans" to subject to such analyses, because "[s]uch data became available for the first time in early 2010," (AC ¶ 132), the FDIC does not say what this data was or why it could not be accessed until 2010.  Moreover, the FDIC cannot credibly contend that such data was necessary to state a claim given the wealth of other information that was available prior to May 22, 2008.  (*See* Sections I.A.3 and I.A.4, *infra*).  Indeed, the FDIC's contention in the *Countrywide* action that its claims were timely because "[s]pecific loan level information was only available in early 2010" was flatly rejected.  *FDIC as Receiver for Strategic Capital v. Countrywide*, 2012 WL 5900973, at *6.

---

demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation prior to" the limitations date).

This Court's prior ruling in *In re Morgan Stanley Mortgage Pass-Through Certificates Litigation* mandates dismissal based on the FDIC's failure to plead compliance with § 13.  810 F. Supp. 2d 650, 663 (S.D.N.Y. 2011) (Swain, J.).  In *Morgan Stanley*, the Court found similar conclusory boilerplate allegations to be inadequate.  *Id.* at 663.  Holding that the allegations "failed to allege with the requisite specificity the time and circumstances of [plaintiffs'] discovery of the conduct that forms the basis of [plaintiffs'] claims," the court dismissed the 1933 Act claims as untimely.  *Id.*  Because the FDIC has similarly failed to plead why the facts serving as the basis for the Amended Complaint could not have been discovered earlier, dismissal is also required here.  And as shown below, because the FDIC cannot allege that its claims are timely, dismissal should be with prejudice.

> 2. <u>The Banks had actual or constructive knowledge of all the facts on which the FDIC premises its claims prior to May 22, 2008.</u>

A reasonable investor would have been able to access all the facts that form the basis of the Amended Complaint before May 22, 2008 – more than one year before the FDIC was appointed receiver for the Banks.  Moreover, between the monthly Distribution Reports and what was publicly known about the mortgage market before May 22, 2008, a reasonable investor had constructive knowledge of the claimed misrepresentations, including the alleged misrepresentations relating to underwriting standards, LTV ratios, and appraisal values.  Indeed, the FDIC's own allegations confirm that all the facts on which the FDIC relies in bringing this action were discoverable before May 22, 2008.

The FDIC's Amended Complaint is very different from most MBS complaints.  It largely eschews reliance on confidential witnesses, detailed facts about mortgage originators' alleged origination practices, or the other sorts of allegations that courts routinely encounter in MBS litigation.  Instead, the FDIC relies almost entirely on computerized and statistical analyses of data concerning the mortgages backing the Certificates.  The FDIC's approach is curious because, as shown below, the data on which it relies was available to the Banks before May 22, 2008, meaning that the Banks could have made *every category of allegation the FDIC now*

*makes*.  Accordingly, if, as the FDIC contends, the facts it alleges suffice to *state* a claim, then

they also *bar* the claim under the statute of limitations.  *See*, *e.g.*, *Allstate Ins. Co. v.

Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1180 (C.D. Cal. 2011) ("[Plaintiff] is faced here

with a Hobson's choice.  If it is correct in its [theory of liability], then it was on notice of that

claim before [the limitations date].  If it is wrong, as it is forced to argue for the purposes of this

motion, then its claim is insufficient.").  The FDIC cannot have it both ways.[15]

> a.  *A reasonably diligent investor could have made the same*
> *allegations regarding underwriting standards prior to May 22,*
> *2008.*

The FDIC alleges that the Offering Documents failed to disclose that mortgage

originators were systematically disregarding their own mortgage underwriting standards.  (AC

¶¶ 87-88).  The FDIC asserts that the originators' disregard of their underwriting standards is

evidenced by the number of early payment defaults and purportedly high rates of delinquencies

in the securitizations.  (*Id.* at ¶¶ 90, 94).  But these allegations could have been made prior to

May 22, 2008 and are therefore all time-barred.

Early payment defaults ("EPD"), by definition, occur *early* in the life of a securitization.

Indeed, according to the FDIC, an EPD is any loan that "became 60 or more days delinquent

*within six months after [it was] made*."  (AC ¶ 91 (emphasis added)).  If EPDs are, as the FDIC

alleges, "strong evidence that the originator did not follow its underwriting standards in making

the loan," (*id.*), then the Banks had this "strong evidence" before May 22, 2008 because the

monthly Distribution Reports provided details on the performance of the loans backing the

---

[15]  Defendants acknowledge that the Court recently held that the Supreme Court's decision in *Merck &
Co. v. Reynolds*, 130 S. Ct. 1784 (2010), applies to § 11 claims.  *See In re Bear Stearns Mortg. Pass-
Through Certificates Litig.*, 851 F. Supp. 2d 746, 762-63 (S.D.N.Y. 2012) (Swain, J.).  Nonetheless,
Defendants respectfully submit that *Merck* does not apply and urge the Court to hold otherwise in
accordance with significant case law in this District.  *See*, *e.g.*, *In re IndyMac MBS Litig.*, 793 F.
Supp. 2d 637, 648 (S.D.N.Y. 2011) (noting that *Merck*'s holding was "based on the precise language
of" 28 U.S.C. § 1658(b) and therefore "does not apply" to § 11 claims); *Pa. Pub. School Emps.' Ret.
Sy*s., 2012 WL 2847732, at *20; *Barclays*, 2011 WL 31548, at *6; *Lighthouse*, 2012 WL 4616958, at
*12 n.11.  As discussed below, however, this lawsuit is untimely under either the *Merck* standard or
the inquiry notice standard.  *Cf. Pa. Pub. School Emps.' Ret. Sys.*, 2012 WL 2847732, at *20 (noting
that the choice between *Merck* and an inquiry notice standard makes "no difference . . . because of the
more relaxed requirements for pleading a Section 11 claim than pleading a Section 10-b claim").

Certificates, including delinquency and loss information.[16]  Indeed, as Figure 2 demonstrates, the

Distribution Reports for the Certificates clearly showed an increase in delinquencies and defaults

for the mortgage loans backing each of the Certificates prior to May 22, 2008.[17]

<u>Figure 2</u>



Number of Delinquencies, Defaults, Foreclosures, Bankruptcies, and Real-Estate-Owned Properties as Percentages of the Total Loans

These percentages were compiled using data from the distribution reports for each certificate. The distribution reports were released to investors on a monthly basis and remain publicly available on the trustees' websites.

As Figure 2 above demonstrates, by April 2008, the delinquency and default rates for the

Banks' Certificates ranged from 6.3% to as high as 21.37%, and had been rising steadily.  For

example, the October 2007 Distribution Report for RALI 2006-QS18 reflected delinquencies of

---

[16]  Distribution Reports for each Offering are available to the public on websites maintained by the securitization trustees, and the Banks are thus "chargeable with knowledge of [their] contents." *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 (S.D.N.Y. 2000); *accord In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (charging plaintiffs with knowledge, at dismissal stage, of SEC mandated disclosures on issuers' websites).

[17]  Ex. 15 contains the portions of the Distribution Reports used to create Figure 2.  Distribution Reports are publicly available on the trustees' websites pursuant to SEC Regulation AB, and are judicially noticeable.  *See Staehr*, 547 F.3d at 425 (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the fact that . . . regulatory filings contained certain information, without regard to the truth of their contents").

just 2.86%, which increased monthly to 9.49% (November 2007), 11.17% (December 2007), 12.61% (January 2008), 13.02% (February 2008), 13.84% (March 2008), and 14.65% (April 2008) – a *four-fold* increase.  *Cf. In re Morgan Stanley Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (Swain, J.) ("*Morgan Stanley I*") (concluding that "notice arose well before May 2008" in part on the basis of Distribution Reports demonstrating delinquencies rising "from 9% in October 2007, to more than 13% in December 2007, and to more than 20% in March 2008").  If the existence of such default rates are sufficient to support a claim, as the FDIC contends, then they also bar the claim because the Banks had the information from the Distribution Reports well before May 22, 2008.[18]

> b.  *A reasonably diligent investor could have made the same allegations regarding LTV ratios prior to May 22, 2008.*

The FDIC contends that the appraisals used to determine the LTV ratios in the Offering Documents materially overstated the value of the properties securing the loans. (AC ¶ 49).  The FDIC premises this assertion on a retrospective automated valuation model ("AVM") that relies on "the actual sales prices of comparable properties in the same locale shortly before the specified date" the property was sold.  (*Id.* ¶ 50).  Because the securitizations closed in 2006 and 2007, the relevant "specified date(s)" would have been no later than 2007.  Thus, the FDIC has implicitly conceded that the inputs into the valuation model consisted of facts that necessarily were in the public domain long before May 22, 2008.

The FDIC nevertheless contends that the claims somehow did not accrue until it finally chose to run its valuation analysis.  (*See* AC ¶ 133).  This same flawed reasoning was flatly rejected by the court overseeing the *Countrywide* MBS multi-district litigation.  *See Allstate Ins. Co.*, 824 F. Supp. 2d 1164.  In *Allstate*, the complaint was based in part on "a study of 19,000 individual loans" that purportedly showed misstatements concerning property valuations, and the plaintiff argued it could not have pleaded its claims "until this 'loan-level' analysis was complete

---

[18]   To the extent that the FDIC's allegations do not evidence high default rates, it simply demonstrates that the FDIC – by its own logic – has failed to state a claim.  *See* Section II.D, *infra*.

in 2010." *Id.* at 1180 & nn.20-21.  In holding that the claims were untimely, the court explained that plaintiffs were confusing "facts" with "analysis," *id.* at 1180, and further explained:

> Most of the conclusions from [plaintiff's] analysis appear to be opinions in that they rely upon complex and unverifiable mathematical models. . . . To the extent that any of the loan-level analysis' results are factual, those facts must be considered summaries of other, previously disclosed facts. . . . *[The plaintiff] could have analyzed that information whenever it wished; the fact that it declined to do so does not toll the statute of limitations. . . .*

*Id.* at 1180-81 (emphasis added).  The court further held that "a summary statistic is available (even if not compiled) on the date that the *underlying facts* are available," and that if the statistics advanced by the plaintiff were "essential to stating a claim, a reasonable investor could and should have engaged someone to . . . analyze the numbers well before 2008."  *Allstate Ins. Co.*, 824 F. Supp. 2d at 1181 (emphasis added).  The court in *Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.* reached the same conclusion and dismissed claims as untimely because "simple tests could have revealed the . . . errors," and "had [plaintiff] promptly investigated . . . , it would have readily determined that the errors were material."  2011 WL 1258504, at *10 (D. Colo. Mar. 29, 2011).

The same result follows here for the same reasons.  The facts underlying the FDIC's AVM-based claims were "widely available" at the time the securitizations closed in 2006 and 2007.  *Allstate Ins. Co.*, 824 F. Supp. 2d at 1184 n.24 (holding that "inputs" to "industry-standard automated valuation model" were "widely available at the time" of the challenged offerings); *cf.* AC ¶ 50 (noting that FDIC used "industry standard automated valuation model").  The FDIC even admits that "AVMs have been in widespread use for many years." (AC ¶ 50).  Indeed, AVM products were marketed to secondary market MBS investors in 2007 to help them examine property values and identify fraud in loan pools.[19]  Because the facts on which the FDIC bases it

---

[19]   *See*, *e.g.*, Ex. 16 (Glen Fest, *Mortgage Securities: Slow MBS Market Hikes Fraud Risk*, Am. Banker, Mar. 1, 2007 ("Mortgage risk technology vendors . . . are prepping for this new need with tools that can help with a second look at loans in the secondary market.  CoreLogic . . . extends an investor services module to secondary buyers that builds on its automated valuation specialty to lenders.")); Ex. 17 ("Finally Catching On," Mortgage Banking (Vol. 66, Issue 4) (Jan. 1, 2006)).

LTV- and appraisal-related allegations were accessible to the Banks well before May 22, 2008, the FDIC's claims as to LTV ratios and appraisals are untimely.

> c. *A reasonably diligent investor could have made the same allegations regarding additional liens prior to May 22, 2008.*

The FDIC alleges that LTV ratios were also misstated because there supposedly were additional liens on some of the properties at the time of the securitizations in 2006 and 2007. (AC ¶ 59). The FDIC bases these allegations exclusively on "land records," *id.*, which necessarily were publicly available when the securitizations closed in 2006 and 2007. *See Price v. United States*, 46 Fed. Cl. 640, 648 (2000) ("[T]he plaintiff should have sought, and could have discovered, the true condition of the property . . . by exercising reasonable diligence. . . . [He] easily could have gained this knowledge by examining the publicly available land records."). Because the Amended Complaint does not explain why the Banks failed to retrieve and analyze these land records before May 22, 2008, the "additional lien" allegations are FDIC's time-barred.

> d. *A reasonably diligent investor could have made the same allegations regarding owner-occupancy rates prior to May 22, 2008.*

The FDIC alleges that "[a] significant number of the properties in the collateral pools of the securitization that were stated to be primary residences actually were not." (AC ¶ 80). The FDIC purportedly came up with this allegation by analyzing (a) whether homeowners received property tax and other bills at the mortgaged properties or at different addresses "*six months after the closing of the mortgage*" (*i.e.*, shortly after the securitizations closed in 2006 and 2007) and (b) whether the homeowners designated the properties as "homesteads" in publically available land records. (*Id.* ¶¶ 81-82 (emphasis added)). Nowhere does the FDIC allege why the Banks could not have conducted the same review – and reached the same conclusions – before May 22, 2008. Because the FDIC's allegations could have been made by the Banks prior to May 22, 2008, the owner-occupancy allegations are necessarily time-barred.

e.   *A reasonably diligent investor could have made the same allegations regarding credit ratings prior to May 22, 2008.*

The FDIC's allegations regarding credit ratings for the Certificates are wholly derivative of its other allegations.  The FDIC merely alleges that because of the purported misrepresentations and omissions concerning LTV ratios, additional liens, underwriting guidelines, and owner-occupancy rates, the Certificates' credit ratings should have been lower than they were.  (AC ¶ 127(a)-(d)).  For the same reasons that the Banks could have made these predicate allegations prior to May 22, 2008, the Banks also could have made the same allegations regarding the Certificates' credit ratings prior to that date.  Indeed, two of the Certificates were downgraded below investment grade prior to May 22, 2008 (*id.* ¶ 139), and the majority of the remaining Certificates were put on negative watch or outlook by one or more of the major rating agencies before May 2008.  (*See* Appendix B).[20]  Accordingly, there is no basis for the FDIC to maintain that the Banks could not have made the same allegations prior to May 22, 2008.

\*   \*   \*

Simply put, the facts underlying the FDIC's *precise allegations* in this lawsuit were available to the Banks before May 22, 2008, thus giving the Banks actual or constructive knowledge of those facts prior to May 22, 2008.  Accordingly, the claims are time-barred and should be dismissed with prejudice.

3.   Additional facts contributed to a reasonably diligent investor's knowledge of the claims alleged here prior to May 22, 2008.

An overwhelming amount of additional publicly available information underscores that the Banks had actual or constructive knowledge of their claims prior to May 22, 2008.  As this Court has previously held, MBS claims under the 1933 Act can be rendered untimely based on Distribution Reports showing rising delinquencies (*see* Section I.A.2 , *supra*); ratings

---

[20]   Appendix B provides a table showing rating activity prior to the Limitations Date for the class of certificates purchased by the Banks as well as each Offering's two most subordinate classes.  Ratings actions are judicially noticeable.  *See Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 761 F. Supp. 1010, 1019 (S.D.N.Y. 1991) (taking judicial notice of Dun & Bradstreet's financial ratings); *see also Staehr*, 547 F.3d at 425.

21

downgrades of the certificates prior to the limitations date; "news reports of questions regarding the integrity of ratings of subprime instruments"; and prior lawsuits involving "similar allegations regarding MBS-related misconduct."  *Morgan Stanley I*, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010); *accord FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 at *8 (finding that "media sources, complaints and judgments created a roadmap" for MBS investors to initiate litigation).  All these factors are present here.

a.      *Rating agency reports revealed growing pessimism about the quality of the Certificates held by the Banks.*

Two of the Certificates that the Banks purchased, RALI 2006-QS18 and RALI 2006-QS8, were downgraded below investment grade prior to May 22, 2008.  (AC ¶ 139).  Eight out of the remaining ten certificates were put on negative outlook by one or more of the rating agencies prior to May 2008.  Additionally, many of the classes in the Offerings that were subordinate to the classes purchased by the Banks were downgraded throughout 2007 and 2008.  Indeed, prior to May 22, 2008, *every* securitization at issue in this action included at least one subordinate class that had dropped below investment grade.  (*See* Appendix B).

These downgrades, and the accompanying reports published by the rating agencies, were sufficient to give investors such as the Banks actual or constructive knowledge of the purported problems with the Certificates in advance of May 22, 2008.  Indeed, in March 2008, Fitch warned MBS investors that the "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes, most notably for the later 2006 and 2007 transactions."  (Ex. 19).  As sophisticated MBS investors, the Banks understood the structure of the MBS transactions and the consequential impact of the ratings downgrades on the Certificates.

b.      *News articles and other publicly available information supplied additional negative views on the mortgage industry in general and the underwriters and issuers of the Banks' Certificates in particular.*

From the time that the Certificates were first issued through May 22, 2008, investors were subjected to a constant barrage of mainstream news articles highlighting the difficulties

experienced by mortgage originators and criticizing MBS products, thereby giving the Banks actual or constructive knowledge of the very deficiencies alleged in the Amended Complaint.  As early as March *2007*, Bloomberg reported that GMAC/Residential Capital bonds had been cut from "buy" to "neutral" because of, among other things, increasing "concerns about rising default rates on subprime mortgages."  (Ex. 20).  Residential Capital's affiliates sponsored, issued, underwrote, and originated all of the loans for five of the 12 securitizations at issue here (RALI 2006-QS6, RALI 2006-QS16, RALI 2006-QS18, RALI 2006-QS8, and RALI 2007-QS5).

In August 2007, *Business Week* published an article detailing IndyMac's alleged practice of doctoring loan documents to qualify ineligible borrowers.  (Ex. 23).  IndyMac was the sponsor and originator for RAST 2006-A11, RAST 2006-A14CB, and RAST 2007-A1, and was an originator for MANA 2007-F1.  Shortly thereafter, Ameriquest, an originator for MANA 2007-F1, announced the sale of its last remaining retail mortgage operations to Citigroup, marking the culmination of the company's total collapse during the "sub-prime meltdown."  (Ex. 24).  It was widely publicized that Ameriquest's financial difficulties were a result of falling loan demand and rising defaults in 2006 and 2007.  (*Id.*).

In January 2008, Wachovia filed a Form 8-K disclosing that it was not adhering to certain policies regarding write-downs of option ARM loans, thereby underscoring its material exposure to nonperforming mortgage loans.  (Ex. 36).  Wachovia was an originator in RALI 2006-QS16, RALI 2006-QS18, and MANA 2007-F1.

By early 2008, major news outlets, including *The New York Times*, *The Wall Street Journal*, and *The Los Angeles Times*, reported on government investigations into firms, including Defendants, that provided loan analysis services to MBS market participants.  (Exs. 28-33).  *The Wall Street Journal* also reported that the FBI was specifically "investigat[ing] mortgage fraud in several states where they have noted high fraud activity, including California, Texas, Florida, and Arizona."[21]  (Ex. 32).  Around the same time, shareholders began initiating class actions

---

[21]    The Offering Documents for all the Banks' Certificates disclosed that a plurality of the mortgage

against mortgage originators seeking recovery for declines in share prices that were allegedly caused by originators' disregard of underwriting standards and other practices leading to high rates of delinquencies and defaults.  (Exs. 34, 36, 40).

In March 2008, the President's Working Group on Financial Markets issued a policy statement discussing the "causes of the recent turmoil, including lax underwriting standards for mortgages, particularly for subprime mortgages; an erosion of market discipline in the securitization process; [and] flaws in credit rating agencies' assessments of some complex structured credit products. . . ."  (Ex. 46).  That same month, Fitch placed seven of the Certificates on negative watch, explaining that the rapid increase of defaults in the collateral pools was partially "attributable to the use of high risk mortgage products such as 'piggy-back' second liens and stated-income documentation programs, which in many instances were poorly underwritten and susceptible to borrower/broker fraud" – essentially presaging the FDIC's allegations.  (Ex. 19).

Appendix C provides a chronology of the publicly available news and other reports relevant to the Certificates, which are too numerous to mention individually in this memorandum.  This information demonstrates that the Banks should have discovered their claims prior to May 22, 2008.

> c.   *The alleged problems with American Home, DLJ Mortgage, and EMC were widely publicized.*

The Amended Complaint adds new allegations that certain entities that originated or acquired mortgage loans partially backing three of the Offerings (BSABS 2007-AC5, CSMC 2006-6, and CMALT 2006-A6) disregarded their underwriting guidelines and failed to conduct

---

loans in the collateral pools were originated in California, Texas, Florida, and Arizona.  *See* Ex. 37 (excerpts of Offering Documents disclosing the geographic concentrations of mortgage loans).  Additionally, these Offering Documents expressly warned investors that "[i]f the regional economy or housing market weakens in . . . any [] region having a significant concentration of properties underlying the mortgage loans, the mortgage loans in that region may experience high rates of loss and delinquency, resulting in losses to certificate holders."  *See, e.g.*, RALI 2006-QS6, P.S. at S-2 in Ex. 38 (excerpts of Offering Documents warning that the high concentration of mortgage loans in certain states created additional risks to investors).

adequate due diligence before securitizing loans. (AC ¶¶ 98-124).[22] But diligent investors should have been aware of the issues that these entities – American Home, DLJ Mortgage, and EMC – were facing prior to May 22, 2008. Thus these new allegations concerning the practices used by these entities to originate or acquire mortgage loans merely provide further confirmation that the FDIC's claims are time-barred.

As to American Home (an originator in CMALT 2006-A6 and CMSC 2006-6), the FDIC concedes that its problems were widely reported before May 22, 2008. (*See* AC ¶ 122). The FDIC alleges that an American Home sales executive pleaded guilty to mortgage fraud in April 2007 and was sentenced to 25 months in prison later that year. (*Id.*) The FDIC also relies on press releases issued in *August 2007* announcing the revocation and suspension of American Home's mortgage banking licenses in New Jersey and New York, respectively. (AC ¶ 124). Additionally, the FDIC cites an internet report from *January 2008* describing the allegations of an American Home underwriter that her employer purposely overlooked fraudulent loan applications. (AC ¶ 120). Most significantly, however, American Home filed for bankruptcy on August 6, 2007 – several months before the Banks purchased certificates from these securitizations. (Ex. 22).

DLJ Mortgage (sponsor of CSMC 2006-6), made headlines in late 2007 when it instituted several lawsuits against mortgage brokerages from which it had purchased loans for its securitizations, claiming that the originators refused to repurchase numerous loans which had suffered EPDs. (Exs. 27).

Finally, as to EMC (an originator in BSABS 2007-AC5) information relating to its loan origination operations was in the public domain prior to May 22, 2008. For example, on May 31, 2007, *The Financial Times* reported on EMC's practice of granting loan modifications for mortgages in arrears, explaining that "loan modifications by [EMC] ha[d] increased by more than 300 per cent since February," specifically mentioning that these mortgages were packaged

---

[22]  The FDIC makes *no* allegations with respect to the originators whose loans backed the remaining nine Offerings, and the new allegations are irrelevant to those nine Offerings and the associated Defendants.

into MBS products. (Ex. 21). And although a significant number of loans in BSABS 2007-AC5 were acquired by EMC, the Banks bought even more certificates in that securitization in December 2007 – *after* these reports had become public.

Given this mainstream press coverage, a reasonably diligent investor could have made similar allegations relating to these three entities' alleged abandonment of their guidelines in the origination or acquisition of loans prior to May 22, 2008.

> ### 4. Other MBS investors filed complaints making nearly identical allegations prior to May 22, 2008.

Many investors brought MBS claims prior to May 22, 2008, demonstrating that the Banks were equally able to do so. Indeed, no fewer than five MBS complaints were filed in late 2007 and early 2008 against Defendants in this action. These complaints made the same allegations that the FDIC makes here – namely, that underwriting guidelines were abandoned and that appraisal values, LTV ratios, credit ratings, and owner-occupancy status were misrepresented. For example:

(1) In *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, No. 2:07-cv-05423 (E.D. Pa.) (filed Dec. 24, 2007), MBS investors alleged – just as the FDIC does here – that Merrill Lynch's "representations regarding the quality of the loans in the portfolio . . . were . . . false," including with respect to "the appraisal[s] of the collateral," "Loan-to-Value ratios," "the purpose of the real property serving as collateral (primary residence, second home, etc.)," and whether the "loans actually met the lenders' underwriting criteria." (Ex. 26 at ¶¶ 71-72).

(2) In *City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. 08-005187 (N.Y. Sup. Ct.) (filed March 19, 2008), the complaint alleged that the "appraisals of many properties were inflated," and that underwriting standards were abandoned because the originators were "granting exceptions as a matter of course." (Ex. 48 at ¶¶ 5, 26).

(3) In *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08 Civ. 10446 (RGS) (D. Mass.) (filed Jan. 31, 2008), the complaint named, *inter alia*, Greenwich Capital Markets, Inc. (RBS), UBS Securities Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc., as defendants and alleged materially false and misleading statements and/or omissions about "(i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans." (Ex. 39 at ¶ 4).

(4) In *Luther v. Countrywide Financial Corp.*, No. BC 380698 (Cal. Super. Ct.) (filed Nov. 14, 2007), which named, *inter alia*, UBS Securities LLC, Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., Greenwich Capital Markets, Inc. (RBS), and J.P. Morgan

Securities Inc. as defendants, MBS investors alleged that offering documents failed to disclose underwriting deficiencies and appraisal manipulations.  (Ex. 25 at ¶¶ 7-9).

(5) In *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713 (E.D.N.Y.) (filed Mar. 26, 2008), MBS investors alleged misstatements regarding underwriting standards and inflated appraisals of the underlying collateral in multiple J.P. Morgan MBS trusts.  (Ex. 49 at ¶¶ 7-9).

The ability of other MBS investors to bring nearly identical claims confirms that the Banks could have brought the same claims that the FDIC brings now prior to May 22, 2008. (*See* Appendix D).[23]  Indeed, claims brought by the FDIC as receiver for Strategic Capital were recently dismissed primarily due to the existence of previously filed complaints making similar allegations.  *FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973.  Finding that complaints filed prior to May 22, 2008 made "[e]ach of the[] allegations [that] are found, at times verbatim, in the FDIC's complaint," the court concluded that "[b]y May 22, 2008, [Strategic Capital] knew that misrepresentations were made in the Offering Documents."  *Id.* at *8.  Together, the "media sources, complaints and judgments" that were publicly available to Strategic Capital "created a roadmap for holders of [] MBS" to initiate litigation.  *Id.*  Accordingly, the court found that "the complaint was time-barred before May 22, 2009 when the FDIC took receivership."  *Id.*

The result should be the same here.  The lawsuits filed against Defendants before May 22, 2008 confirm that a reasonable investor was aware of the claims brought here.  This is especially so given that the Banks had actual or constructive knowledge of the rising defaults and delinquencies in the mortgage pools backing its Certificates – the supposed "strong evidence" of underwriting misconduct upon which the FDIC relies.  (AC ¶ 91).  But, rather than bring legal action, the Banks purchased even more MBS as the defaults allegedly rose.  (*See* Background, *supra*).  As confirmed in recent MBS decisions, the ability of other MBS investors to bring nearly identical claims prior to May 22, 2008 establishes that the FDIC had the same ability. Accordingly, its claims are untimely and therefore must be dismissed with prejudice.  *See Pa.*

---

[23] Appendix D provides a table comparing the allegations made by the FDIC here to the allegations made by other MBS investors in lawsuits filed prior to May 22, 2008, showing that the Banks could have brought these claims prior to the FDIC's appointment as receiver.

*Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, -- F. Supp. 2d --- , 2012 WL 2847732, at *21 (S.D.N.Y. 2012) (dismissing § 11 claims as untimely based primarily on the filing of other lawsuits); *FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *5, 8  (same); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011) (dismissing claims in part because the filing of other complaints revealed that a reasonable investor would have been aware of its potential claims prior to the limitations date).

*        *        *

In short, the Banks not only had actual or constructive knowledge of all the facts underlying the precise allegations that the FDIC makes in this lawsuit, but they also had a wealth of additional publicly available information which contributed to their knowledge of the claims. Accordingly, the FDIC's claims are time-barred and should be dismissed with prejudice.

**B.      The FDIC's Claims Are Also Barred by the Three-Year Statute of Repose.**

In addition to being untimely under the statute of limitations, the FDIC's claims are barred under § 13's statute of repose.  Section 13 unambiguously provides that "[i]n no event shall any action be brought to enforce liability created under section [11] . . . more than three years after the security was bona fide offered to the public."  15 U.S.C. § 77m.  Here, there is no question that more than three years have elapsed since the Certificates were bona fide offered to the public: all of the Certificates were first offered for sale in 2006 and 2007, more than three years before the FDIC filed suit.[24]  Accordingly, the FDIC's claims are barred by § 13's "absolute" statute of repose.  *P. Stolz Family P'ship L.P.*, 355 F.3d at 103 ("The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation.").

**C.      The Extender Statute Does Not Save the FDIC's Claims.**

Contrary to the FDIC's suggestion, the Extender Statute does not render the FDIC's claims timely.  The FDIC asserts that "[u]nder 12 U.S.C. § 1821(d)(14)  [(the "Extender

---

[24]      *See* Item 37(a) of Schedules to AC (setting forth month and year of each Offering).

Statute")], the statute of limitations on all of Citizens National and Strategic Capital's claims asserted in this Complaint *that had not expired as of May 22, 2009*, is extended to no less than three years from that date." (AC ¶ 131 (emphasis added)).

As an initial matter, the Extender Statute cannot save the FDIC's claims because the statute of limitations expired prior to the FDIC's appointment as receiver for the Banks.  (*See* Section I.A, *supra*); *see also Shrader*, 991 F.2d at 220-27 (holding the FDIC's claims time-barred because the bank should have known of the claims before the FDIC receivership began). The FDIC acknowledges (as it must), a claim must be viable on the date of appointment before it can receive the benefit of the Extender Statute, but that was not the case here.  Because the FDIC's claims were barred by the statute of limitations prior to its appointment as receiver for the Banks, the Court does not need to address the issue of whether the Extender Statute would have applied to the FDIC's claims had they been timely.

The FDIC's reliance on the Extender Statute fails for the additional reason that the Extender Statute does not extend the three-year repose bar under § 13.  As the text of the Extender Statute makes plain, the provision only applies to "statutes of *limitations*;" it does not apply to statutes of *repose*.  12 U.S.C. § 1821(d)(14) (emphasis added).  It is well settled that statutes of limitations are fundamentally different from statutes of repose: statutes of limitations are procedural rules whereas statutes of repose are substantive components of the underlying cause of action.  *In re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (explaining the difference between statues of limitations and statutes of repose).  Indeed, the Second Circuit has explained that "[u]nlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather [it] *defines the right involved* in terms of the time allowed to bring suit."  *P. Stolz*, 355 F.3d at 103.  Thus the Extender Statute is of no consequence because the 1933 Act's statute of repose barred all of the FDIC's claims nearly two years before it filed this action.  (*See* Section I.B, *supra*).

Similarly, by its plain language, the Extender Statute only applies to state law claims and thus cannot salvage the FDIC's federal securities claims.  The text of the statute discusses the

limitations period for contract and tort claims, noting that it is "the longer of" (a) six years from the beginning of the receivership for a "contract claim" or three years for a "tort claim"; or (b) the period applicable "under *State* law." 12 U.S.C. § 1821(d)(14)(A)(ii), (B). By speaking in terms of state law and pegging the limitations period solely to state law, on its face the statute only applies to state law claims. *See Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005) (holding that "the phrase 'under color of state law'" in federal civil rights statutes "appl[ies] only to state actors, not federal officials"). Any suggestion that the Extender Statute also applies to federal claims is untenable.

Finally, the statute's plain language limits its scope to only claims that sound in contract or tort. The FDIC, however, has asserted statutory claims under the 1933 Act, which like many statutory claims, sound neither in contract nor in tort, and as such can only be described as *sui generis*.[25] The FDIC's claims under the 1933 Act therefore fall outside the scope of the Extender Statute.

While every relevant principle of statutory construction dictates that the Extender Statute does not assist the FDIC in this action, courts have nonetheless reached conflicting conclusions as to whether such extender provisions apply to statutes of repose such as § 13.[26] This very issue

---

[25]   *See, e.g.*, *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 352-53 (3d Cir 1986) (because "RICO is a strictly statutory remedy . . . . it is truly *sui generis* and [] particular claims cannot be readily analogized to causes of action known at common law"); *Jodek Charitable Trust, R.A. v. Vertical Net Inc.*, 412 F. Supp. 2d 469, 483 (E.D. Pa. 2006) ("Section 8-401 is a *sui generis* statutory creation," which "creates neither a tort nor a contract cause of action.").

[26]   *See NCUA v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D. Cal.) (Mar. 15, 2012 Tentative Ruling) (finding that "the Extender Statute does not operate to extend any statute of repose"), *adopted by* Civil Minutes of Sept. 4, 2012; *NCUA v. RBS Sec., Inc.*, No. 11 Civ. 5887 (C.D. Cal.) (Dec. 19, 2011 Tentative Ruling) (refusing to construe 12 U.S.C. § 1787(b)(14), a similar extender statute, to displace § 13 in MBS action brought by the National Credit Union Administration Board); *see also Huddleston v. United States*, 2012 WL 1816261, at *2 (6th Cir. May 21, 2012) (federal statute of limitations applicable to claims under the Federal Tort Claims Act, 28 U.S.C. § 2401, did not preempt a statute of repose, because a statute of repose imposes "a substantive requirement, not just a procedural hurdle"); *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 362 (5th Cir. 2005) (a federal statute that expressly preempts only state statutes of limitations does not also preempt statutes of repose, because "the differences between statutes of limitations and statutes of repose are *substantive, not merely semantic*") (emphasis added). *But see FHFA v. Countrywide Fin. Corp.*, No. 12 Civ. 1059 (C.D. Cal. Oct. 18, 2012) (applying 12 U.S.C. § 4617(b)(12) to 1933 Act claims); *NCUA v. RBS Sec., Inc.*, 2012 WL 3028803 (D. Kan. July 25, 2012) (applying § 1787(b)(14) to 1933 Act claims), *interlocutory appeal certified*, 2012 WL 4210500, at *3 (Sept. 19, 2012) (finding that "there are substantial grounds for a difference of opinion" on the issue, and that defendants'

is currently before the Second Circuit in connection with an expedited interlocutory appeal in
*Federal Housing Finance Agency v. UBS Americas, Inc.*, No. 12-3207 (2d Cir.), which was fully
briefed on November 9, 2012, and argued on November 26, 2012.  On appeal, the Second Circuit
is considering whether 12 U.S.C. § 4617(b)(12), a similar extender statute, applies to 1933 Act
claims in an MBS action brought by the Federal Housing Finance Agency.[27]  In view of the fact
that the Second Circuit is expected to rule on this issue in the near future, Defendants
respectfully submit that if the Court does not find that the FDIC's claims were barred by the
1933 Act's statute of limitations prior to its appointment as receiver for the Banks, then in the
interest of judicial efficiency, the Court should defer ruling on the applicability of the Extender
Statute pending the Second Circuit's ruling.[28]

## II.    THE § 11 CLAIMS FAIL ON NUMEROUS ADDITIONAL GROUNDS.

The Amended Complaint also should be dismissed because it does not state a "plausible"
claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007)).  A complaint under § 11 must plead a materially false or misleading
statement, which is evaluated by considering the challenged document and other publicly
available information as a whole, including any warnings or cautionary statements.  *See* 15
U.S.C. § 77k(a); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (Fact is immaterial unless
it "would have been viewed by the reasonable investor as having significantly altered the total
mix of information made available."); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002)
(holding that an issuer is "under no obligation to disclose information on industry-wide trends

---

arguments are not "implausible or without force").

[27]  The Tenth Circuit also recently agreed to hear an interlocutory appeal involving this issue.  *See Nomura Home Equity Loan Inc. v. Nat'l Credit Union Admin. Bd.*, No. 12-606 (10th Cir. Nov. 6, 2012).

[28]  Defendants proposed to the FDIC that the parties agree to defer briefing the applicability of the Extender Statute entirely in view of the fact that the Second Circuit accepted interlocutory review on an expedited basis in *FHFA v. UBS*.  Inexplicably, however, the FDIC refused this request. Defendants are prepared to submit additional briefing on this issue in the event the Court determines it should decide this issue notwithstanding the pendency of the *FHFA v. UBS* appeal, and do not intend to waive any of their rights or defenses by not addressing these issues further in this memorandum.

that [is] available to the public"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("It is undisputed that the prospectuses must be read as a whole.").

Here, as shown below, the Offering Documents contained robust disclosures warning of the very risks the FDIC now cites, with the benefit of hindsight, as the basis for its § 11 claims. *See*, *e.g.*, *Barrios v. Paco Pharms. Servs., Inc.*, 816 F. Supp. 243, 252 (S.D.N.Y. 1993) (no actionable misstatement "[w]hen an offering document exactly states the cautionary 'fact' that the plaintiff claims has been covered up or misrepresented"). The Offering Documents further informed investors that the underlying loans may not conform to the descriptions contained in the Offering Documents, and contained provisions regarding how to address that situation.[29] The Offering Documents' disclosures thus belie the FDIC's theory of the case, namely, that they somehow made definitive representations that the mortgages conformed to those descriptions and always would. To the contrary, the disclosures "change[d] the nature of [the sponsor's] representation[s]," ensuring as a matter of law that they did not contain any "actionable misrepresentations" about the credit quality of the mortgages. *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010) (affirming dismissal of MBS claims on the basis of disclosures that are substantively identical to those included in Exhibit 4); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28, 2010) (dismissing MBS claims on this basis).[30]

But quite apart from these incurable infirmities in the FDIC's case, its Amended Complaint – which, as noted, rests almost exclusively on computerized and statistical models – fails to state a plausible claim as to any category of misstatement it alleges.

---

[29]   *See* Ex. 4 (excerpts of Offering Documents explaining that the sponsor will be obligated to cure any breach of a representation regarding the mortgage loans by repurchasing or replacing the affected mortgage).

[30]   The FDIC has, in fact, argued in other actions that allegations similar to those it has alleged here were conclusory and non-actionable. *See*, *e.g.*, Ex. 51 (IndyMac Defendants' Motion to Dismiss, *In re IndyMac MBS Litig.*, No. 09-CIV-4583 (S.D.N.Y. Nov. 23, 2009)). In *IndyMac*, the court dismissed allegations similar to those here concerning appraisals, LTV ratios and ratings. *In re IndyMac MBS Litig.*, 718 F. Supp. 2d 495, 508-12 (S.D.N.Y. 2010). The FDIC should not be allowed to deviate from the positions taken by the FDIC and other defendants in *IndyMac* regarding the inadequacy of the similar allegations about supposed misstatements concerning appraisals, LTV ratios, and ratings.

A.    **The Allegations About Appraisals and LTV Ratios Fail.**

The FDIC's allegations about appraisals and LTV ratios fail for a number of independently dispositive reasons: (a) appraisals and LTV ratios are merely opinions that are not actionable absent subjective falsity, which the FDIC does not allege; (b) the appraisal- and LTV-related allegations rest entirely on an AVM but, as a matter of law, all the AVM did was generate another opinion that cannot be used to second-guess a contemporaneous appraisal opinion; (c) because the FDIC does not disclose the AVM's margin of error, it is impossible to tell whether the AVM's output is consistent or inconsistent with the Offering Documents; (d) the AVM is improperly based on hindsight and is preprogrammed to deem "false" every MBS prospectus supplement ever issued in a declining real estate market, and thus cannot give rise to a plausible claim; and (e) in any event, the FDIC improperly is using the AVM's output to second-guess LTV ratios that are not even in the Offering Documents.

1.    Appraisals and LTV ratios are statements of opinion that are not actionable absent subjective falsity – which the FDIC does not allege.

As this Court previously has recognized, appraisals and their associated LTV ratios are nothing but "statement[s] of subjective opinion." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012) (Swain, J.); *accord Tsereteli*, 692 F. Supp. 2d at 393 ("[N]either an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses.").[31]  Accordingly, courts consistently hold that appraisals and LTV ratios are not false unless they are both objectively false (*i.e.*, the appraisal did not represent market value), and subjectively false (*i.e.*, the opinion was not genuinely held, and thus was deliberately misrepresented).  *See, e.g., N.J. Carpenters Health*

---

[31]    *See also, e.g., N.J. Carpenters Health Fund v. Novastar Mortg., Inc.*, 2011 WL 1338195, at *11 n.9 (S.D.N.Y. Mar. 31, 2011); *In re IndyMac MBS Litig.*, 718 F. Supp. 2d at 511; *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *7 (S.D.N.Y. Mar. 29, 2010); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 106687, at *19 (N.D. Cal. Oct. 5, 2010).

*Fund v. Novastar Mortg., Inc.*, 2011 WL 1338195, at *11 n.9 (S.D.N.Y. Mar. 31, 2011); *In re IndyMac MBS Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010); *Tsereteli*, 692 F. Supp. 2d at 393;  *see also generally Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("[W]hen a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed.").

The FDIC, attempts to imply objective falsity through the AVM, but does not allege subjective falsity on the part of *anyone* – not the appraisers, not the originators, and certainly not Defendants.  To the contrary, the FDIC "expressly *excludes* . . . any allegation that could be construed as alleging fraud or intentional or reckless conduct" so as to avoid triggering fraud-based pleading standards.  (AC ¶ 160).  That is dispositive.  *See Hermann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 563 (5th Cir. 2002) ("[T]he district court's dismissal of the [plaintiffs' securities] claim was proper because such a claim would require proof of fraudulent intent, and the [plaintiffs] expressly disavowed this essential element in their complaint."); *Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, 2010 WL 3545389, at *6 (N.D. Ga. Sept. 10, 2010) ("Plaintiff does not allege – and specifically disavows – that [the defendant] did not believe the opinions and judgments it stated in the [registration statement and prospectus supplement] . . . . Plaintiff's complaint, therefore, does not state a claim under Section[] 11 . . . .").

Accordingly, without allegations of subjective falsity, all the FDIC's allegations to the effect that appraisals were overstated and that LTV ratios were understated are not actionable and must be dismissed.  This includes, without limitation, the allegations contained in Items 47, 56, 128(a), and 128(b) of the "Schedules" to the Amended Complaint.

The FDIC also alleges that some of the Offering Documents inaccurately stated that appraisals had been conducted in accordance with USPAP.  (*See* AC ¶ 71 & Item 71 of Schedules 3, 6, 7, 8, 10, & 11 to AC).  These allegations fail for two additional reasons.

*First*, the FDIC does not even make these allegations with respect to half the Offerings. The FDIC's allegations about USPAP violations are found in Item 71 of the Schedules to the Amended Complaint, but the FDIC omits Item 71 with respect to six of the twelve Offerings: RALI 2006-QS6; RALI 2006-QS18; RALI 2006-QS8; RALI 2006-QS16; RALI 2007-QS5; and CMALT 2006-A6.  (*See* Schedules 1, 2, 4, 5, 9, and 12 to AC (all lacking Item 71)).  The FDIC's allegations about USPAP violations therefore add nothing to the claims against the Defendants associated with these offerings.[32]

*Second*, even with respect to the other Offerings,[33] all the FDIC provides is the "bare assertion that appraisals were not made in accordance with USPAP," which is a "legal conclusion not entitled to the assumption of truth."  *Emps' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 153 (S.D.N.Y. 2011).  As one court explained in dismissing similarly conclusory allegations:

> [T]he only fact alleged in support of the allegation that the appraisals were not made in accordance with USPAP is that [an] OIG Report supposedly said that [the] appraisals "were not in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP)."  Were this statement made by the plaintiffs themselves in the amended complaint, as opposed to its having been attributed to OIG, it would have been a *legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations*.  That the conclusory assertion comes not from plaintiffs but from the OIG would make it no less conclusory.

*Tsereteli*, 692 F. Supp. 2d at 393 (emphasis added); *accord Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774 (1st Cir. 2011) (affirming dismissal of USPAP allegations because the complaint merely "allege[d] in a single general statement that the appraisals underlying the loans at issue . . . failed to comply with USPAP requirements"); *IndyMac*, 718 F. Supp. 2d at 510 (dismissing "allegation[s] [that] contain[ed] insufficient factual amplification to support a plausible inference that the appraisers . . . were subjected to pressure or that they succumbed to it in a way that violated USPAP").  *Contrast*

---

[32]   These Defendants are RBS Securities Inc.; Deutsche Bank Securities; Ally Securities LLC; Citigroup Global Markets, Inc.; Citicorp Mortgage Securities, Inc.; and CitiMortgage, Inc.

[33]   *See* Item 71 of Schedules 3, 6, 7, 8, 10, & 11 to AC.

*Bear Stearns*, 851 F. Supp. 2d at 769 (distinguishing *Tsereteli* because, unlike both *Tsereteli* and here, USPAP allegations were based on alleged facts demonstrating that "originators systematically disregarded their stated appraisal standards, and strong-armed appraisers to inflate property values").

Because the FDIC does not allege, but affirmatively disavows, any allegation of subjective falsity, and because its USPAP allegations are patently insufficient, all of its appraisal- and LTV-related claims should be dismissed.

> 2.    The FDIC provides no basis on which to infer that its AVM's output is more reliable than an appraisal, and as a matter of law the output is just an opinion that cannot be used to second-guess an appraiser's opinion.

The FDIC's AVM-based allegations fail for the additional reason that the FDIC provides no basis on which to suppose that its AVM is any more reliable than the appraisals it is second-guessing.  Basically, the FDIC just asks the Court to trust its computer because, after all, output from a computer must be "objective," "accurate," and "true."  (AC ¶ 50).  But as a legal and a factual matter, the FDIC's *ex post* AVM cannot substitute for contemporaneous appraisals of the actual properties at issue.

*First*, the FDIC cannot use the output of its AVM to challenge contemporaneous appraisals *as a matter of law*.  This is because the AVM's output, like the appraisals themselves, constitutes an *opinion* – and a difference of opinion cannot give rise to a misrepresentation claim. *See*, *e.g.*, *Henry v. Champlain Enters.*, 445 F.3d 610, 619 (2d Cir. 2006) ("There is no universally infallible index of fair market value.  There may be a range of prices with reasonable claims to being fair market value."); *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *4 (N.D. Cal. June 8, 1994) ("This court need not reconcile those differences of opinion [as to accounting practices], because they are just that; that is, differences of opinion. They are not evidence of misstatements or material omissions.").

Other courts have rejected allegations similar to the FDIC's.  For example, in *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005), the plaintiffs relied on the defendant's own valuation models to allege as "fact" that a company was worth less than the

defendant had stated.  *Id.* at 251.  The court "reject[ed] plaintiffs' characterization of valuation models as 'fact' rather than 'opinion,'" explaining:

> [F]inancial valuation models depend so heavily on the discretionary choices of the modeler . . . and choice of "comparables" that the resulting models and their predictions can only fairly be characterized as *subjective opinions*.  Like other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless *opinions and not objective facts*.

*Id.* at 251-52 (emphasis added).

As in *Salomon*, the FDIC's AVM-based allegations amount to nothing more than a difference of opinion, which cannot form the basis of a § 11 claim.  *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (use of risk model that proved to be objectively erroneous and that had different prediction than other models did not sustain claim of falsity); *see also In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 495 (S.D.N.Y. 2010) (allegations that rating agencies "used out-of-date models" and "did not implement updated models" were insufficient); *Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010) ("[The] fact that the [credit] ratings [for MBS] would have been different under a different methodology is insufficient to state a claim [under § 11].").

*Second*, even if the output of an AVM were something other than an opinion based on unverified mathematical models – which it is not – the FDIC's AVM-based allegations would still fail because an AVM is not an appraisal, but an entirely different method of valuation.  Moreover, the FDIC has pleaded no basis on which to infer that an AVM is more reliable than an appraisal, especially when performed with the benefit of hindsight following a precipitous and unprecedented decline in home prices.

Indeed, the FDIC publicly has taken the position that "the result of an [AVM], by itself or signed by an appraiser, is not an appraisal," and that "an AVM . . . is not, in and of itself, an alternative to an evaluation."  FDIC, Docket No. 2010-0018, "Interagency Appraisal and Evaluation Guidelines," Final Guidance, 75 Fed. Reg. 77450, 77455, 77459, 77468-69, *available*

*at* 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010).  And like the FDIC, the Appraisal Standards

Board – on which the FDIC relies in its complaint (AC ¶¶ 68-70) – has made clear that "[t]he

output of an AVM is not, by itself, an appraisal."[34]  But, other than the FDIC's conclusory

assurances that the AVM is objective and accurate (yet another opinion), it provides no

explanation for why its retrospective AVM should be considered better at coming up with a

value for a property in 2006 or 2007 than a professional appraiser in 2006 and 2007.  Because

the AVM's output is merely an opinion, and because, in any event, the FDIC fails to plead any

basis to establish that its AVM's output is more reliable than an appraisal, the FDIC's AVM-

based allegations flunk *Twombly*'s "plausibility" standard.

> 3.    The AVM-based allegations do not give rise to a "plausible" claim
>       because, without disclosing the AVM's margin of error, the allegations are
>       meaningless.

The FDIC's AVM-based allegations do not state a claim for the further reason that the

FDIC says virtually nothing about how its model works, and thus provides no basis on which to

infer that the model's output is plausible.  *See*, *e.g.*, *In re Textainer P'ship Sec. Litig.*, 2006 WL

1328851, at *5 (N.D. Cal. May 15, 2006) (dismissing securities claim because the "conclusory

allegations as to an unspecified analysis performed by an unnamed or otherwise identified

consultant and which fail to include any information about the consultant's qualifications, how

the analysis was performed, or the data upon which the consultant relied, are inadequate").

The FDIC has failed even to disclose the AVM's margin of error.[35]  Because the FDIC

has not disclosed this basic fact, it is impossible to draw any reasonable inferences – much less,

plausible inferences – about whether the model's outputs are consistent or inconsistent with the

Offering Documents.  *See*, *e.g.*, *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 903 n.11 (E.D. Va.

---

[34]   USPAP Advisory Opinions, 2012-2013 Edition, Advisory Opinion 18, at A-42, *available at*
       http://www.uspap.org/#/166/ (visited Oct. 21, 2012).

[35]   The Amended Complaint's only reference to any margin of error appears in footnote 2 on page 3.
       That footnote, however, merely says that there is a 5% margin of error associated with the FDIC's
       conclusions about loan pools *as a whole* based on its statistical sampling of properties in each loan
       pool.  It says nothing about the AVM's margin or range of error when retroactively estimating the
       value of any *individual piece of property*.

2010) (observing that "[a]rguments based on statistics" can constitute "misleading statements" if the margin of error is not taken into account).  To illustrate, the FDIC deems a 5% discrepancy between the AVM's valuation and a contemporaneous appraisal to be material.  (*See* Item 56 of Schedules to AC).   Thus, if the AVM retroactively valued a property at $100,000 that appraised contemporaneously for $105,000, then the FDIC would allege that the appraisal was overstated and the LTV was understated.  If the FDIC's AVM has a margin of error that is greater than 5%, however, then the appraisal and LTV would be appropriate *according to the AVM itself*.[36]

The FDIC's failure to disclose the margin of error does not appear to be an oversight. The FDIC's AVM appears to be the "ValuePoint 4" model provided by an AVM purveyor called CoreLogic.  (*See* Ex. 53 at 2 (Gretchen Morgenson, *The Inflatable Loan Pool*, N.Y. Times, June 19, 2010 (reporting that other complaints filed by the FDIC's counsel, which are virtually identical to the FDIC's complaint here, relied on "CoreLogic's valuation model, called VP4"))). The FDIC's ValuePoint 4 model is publicly reported by CoreLogic to have a 10% margin of error.  (Ex. 52 (CoreLogic, *Forecast Standard Deviation & AVM Confidence Scores* ("The ValuePoint 4 confidence score is specifically designed to address issues of over-valuation.  Its confidence scores represents the probability that the value is no more than 10% greater than the true value of the property.")))  Thus, although the FDIC deems any loan with an appraisal that is just 5% higher than its AVM's output to have rendered the Offering Documents false, the AVM's output appears to have a *10% margin of error.*

This is not an issue of fact that must await adjudication at some further stage of this case. It is a threshold issue about whether the FDIC's allegations give rise to a "plausible" claim. Because the FDIC has not disclosed its AVM's margin of error, there is simply no basis on which to conclude that the AVM has said *anything* to call the Offering Documents into question.

---

[36]   See Ex. 52 at 2 (CoreLogic Inc., Forecast Standard Deviation & AVM Confidence Scores).

4.  The AVM cannot give rise to a "plausible" claim because it rests on hindsight and is preprogrammed to deem "false" every prospectus supplement ever issued in a declining real estate market.

A "plaintiff[] may not plead fraud by hindsight."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).  Yet the FDIC's AVM plainly is based on hindsight, and indeed, is foreordained to deem "false" every MBS prospectus supplement ever issued during a declining real estate market.  The FDIC's own AVM provider explains why this is so:

> [A] retrospective AVM . . . is different than replicating the value that the model would have produced had it been run on the historical date. As a result, *users should expect retro values to differ from original values* produced in the past. . . . Depending on the time elapsed between the current and retrospective dates, any or all of [the data input into the AVM] may change. . . . [A] *retrospective AVM will most likely differ from what the same AVM . . . would have reported had it been run originally [on an earlier date].*

(Ex. 54 at 1 (emphasis added)).  In other words, when a retrospective AVM attempts to peer back through time to estimate property values years earlier, it uses comparable sales data that was so recent at the time the property was appraised that it was *not available to the appraiser*.[37]

Accordingly, pleading that appraisers got it wrong based on a retrospective AVM is improper pleading by hindsight, for "[t]he accuracy of offering documents must be assessed in light of information *available at the time they were published*."  *Barclays*, 2011 WL 31548, at *5 (emphasis added).  The Amended Complaint's AVM-based allegations must be dismissed on this ground alone.  The deficiency is all the more glaring because, in a falling market, the comparable sales that a backwards-looking AVM would consider tend to be at lower prices than the comparable sales that appraisers were able to consider.  Necessarily then, the AVM will tend retroactively to come up with lower property values in a falling market than the appraisers did at the time.

---

[37]  As the publication notes, a retrospective AVM considers comparable sales taking place prior to the valuation date but not recorded until after that date.  (*See* Ex. 54 at 1 ("Updated data . . . allows us to . . . consider comparable properties that sold prior to or on [a chosen date], but the sale was recorded after [that date]."); *see also* AC ¶ 50 (alleging that the FDIC's AVM uses "actual sale prices of comparable properties . . . *shortly* before the specified date")).

Because the output of a computer model that is predestined to indict every offering document ever issued during a declining market is, at most, merely "consistent with" an offering document being false, it does not "cross the line" into "plausibly" showing falsity, and thus does not state a claim. *Twombly*, 550 U.S. at 557 & n.5.

5.    <u>The AVM-based allegations fail to state a claim because they challenge statements that were not even in the Offering Documents.</u>

The FDIC's AVM-based allegations also fail because the FDIC is using the AVM's output to challenge statements that were not even in the Offering Documents. As the Offering Documents disclosed, appraised values were not always used to generate LTV ratios (*i.e.*, were not always used as the denominator in the loan-to-value calculation). For purchase-money loans, LTV ratios were calculated using *either* the appraised values *or* the sales prices of the mortgaged properties, whichever was *lower*.[38] As alleged in the Amended Complaint, however, the FDIC admits that it assumed in its comparison between its AVM's output and the Offering Documents' figures that LTV ratios in the Offering Documents were always calculated based on *appraised* value. (*See* AC ¶ 51 (alleging that the "denominator" in LTV values in the Offering Documents was "the appraised value of the property as stated in the loan tape")). The FDIC thus is challenging LTV ratios that were not even in the Offering Documents – effectively setting up a strawman instead of challenging what the Offering Document actually said.

The FDIC's erroneous approach *guarantees* that for all the properties where Defendants used purchase prices instead of appraisal values to calculate LTV ratios, the FDIC simply has gotten the Offering Documents' LTV numbers wrong. To make matters worse, the LTV ratios the FDIC falsely imputes to Defendants are *guaranteed* to be lower on average than the LTV ratios that actually were included in the Offering Documents (because a lower ratio always results from using a higher denominator (as in the case of always using appraised value as the denominator, instead of the lower of purchase price or appraised value)). Thus, the comparison

---

[38]   *See* Ex. 5 (excerpts of Offering Documents disclosing the manner in which LTV ratios were calculated).

that the FDIC draws, based on erroneous LTV numbers ascribed to Defendants, cannot form the basis of a misrepresentation claim.

Furthermore, the FDIC *cannot* allege that purportedly overstated appraisals rendered false the LTV ratios for purchase-money loans that actually *were* in the Offering Documents: (a) if the purchase price was lower than the appraised value, then the appraisal was ignored when calculating the LTV ratio, which makes the appraisal irrelevant; and (b) if the purchase price was higher than the appraised value, then the appraisal could not have been inflated because it was actually *lower* than the fair market value of the property.  *See* Black's Law Dictionary (9th ed. 2009) (defining "fair market value" as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction").  Either way, the FDIC has no basis on which to challenge the LTV ratios for purchase-money loans that actually were in the Offering Documents – which undoubtedly explains why the FDIC instead invented LTV ratios that are nowhere found in the Offering Documents in order to be able to call something "false."

Further, the FDIC's erroneous approach (which was pointed out to the FDIC in the motion to dismiss the original Complaint) means that all the AVM-based allegations are meaningless, not just the allegations relating to purchase-money loans.  The FDIC alleges that it sampled a set of properties to come up with conclusions about the *entire* loan pool (AC ¶¶ 3, 40), but it then used the wrong LTV numbers for a large percentage of the loans in the pool (*i.e.*, all the purchase-money loans).  Claims about an entire loan pool based on sampling flawed and incorrect data do not mean anything.  The FDIC cannot state a claim by challenging LTV ratios that were not even incorporated into the Offering Documents.

*     *     *

In sum, the FDIC's allegations about appraisals and LTV ratios fail on multiple grounds, and should be dismissed with prejudice.

42

**B.      The Allegations About Additional Liens Fail.**

The FDIC's allegations about undisclosed additional liens on some of the properties (*see* AC ¶ 59) are pure makeweight.

The FDIC admits that any undisclosed additional liens were put on the properties *after* the mortgages that back the Certificates were originated.  (*See id.* ¶ 59 n.5 (noting that the FDIC excluded from its allegations any additional liens dated on or before the date of origination of the subject mortgage)).  In other words, the FDIC does not allege that the LTV ratios incorrectly omitted additional liens in place when the mortgages at issue in the case were originated.  Instead, the FDIC merely complains that the total amount borrowed changed *after* the subject mortgages were originated, and before the securitizations closed, because some of the borrowers subsequently obtained second mortgages.  (*See id.* (alleging that "many of the properties that secured mortgage loans . . . were subject to liens in addition to the lien of the mortgage . . . *at the time of the closing of these securitizations*," not at the time of origination)).  The FDIC then asserts that LTV ratios were somehow misstated.  (*Id.*)

The Offering Documents foreclose any claim based on this theory.  *First*, the Offering Documents make explicit that the "LTV" or "loan-to-value" ratios they provided consist of the ratio of only the *subject mortgage* to the value of the property.  (*See* Excerpts of Offering Documents in Ex. 5).  Nothing in any of the Offering Documents suggests that these reported "LTV" numbers were combined LTV ratios ("CLTVs") reflecting both subject mortgages and additional liens.  Therefore, the Offering Documents did not misrepresent anything by failing to disclose additional liens.  The Offering Documents, furthermore, made clear that the LTV figures referred only to the value of the subject mortgage on the property at the time of *origination – i.e.*, not at some later date, such as the date of securitization.  (*Id.*)  Thus, the Offering Documents were not, and could not have been, "misleading" about the presentation of LTV ratios.

*Second*, as to four of the Offerings that provided CLTV data that expressly took into account additional liens – RAST 2007-A1, BSABS 2007-AC5, RAST 2006-A11, and RAST 2006-A14CB –  the FDIC does not even allege that information pertaining to "additional liens"

was misstated.[39]  This is no surprise, because the disclosures for these Offerings demonstrate that

the CLTV ratios were calculated based on loans existing *at the time of origination*, not at

securitization, and so there could be no possible misstatement under the FDIC's allegations.[40]

Thus, the additional lien allegations made in paragraphs 57 to 63 of the Amended Complaint

must be dismissed with respect to Defendants alleged to have issued or underwritten these four

Offerings.

Because the FDIC cannot identify a misstatement arising from post-origination additional

liens, its allegations about additional liens must be dismissed with prejudice.

### C.    The Allegations About Owner-Occupancy Rates Fail.

The FDIC's allegations that the Offering Documents overstated owner-occupancy rates

fail for three reasons.

*First*, the Offering Documents expressly warned that owner-occupancy rates were based

on borrower representations and that there were no guarantees of the truth of those

representations or guarantees against borrower fraud.  The Offering Documents all contained

language that is substantially identical to the following: "Occupancy type is based on

*representations of the mortgagor* at the time of origination of the related mortgage loan."[41]  The

---

[39]   *See* AC ¶ 62 (alleging that additional lien allegations are set forth in Item 62 to Schedules to
Amended Complaint); Schedules 3, 6, 10 and 11 to AC (containing no "Item 62").

[40]   As to another Offering that provided CLTV information – MANA 2007-F1 – not only were the
disclosed CLTV figures "Original CLTVs" calculated at the time of origination, as opposed to
securitization, (*see* MANA 2007-F1, P.S. at A-II-1 in  Ex. 55 (excerpts of Offering Documents
disclosing CLTV information), but the FDIC alleges less than a one percent difference between its
recalculated CLTV and the disclosed amount.  *Compare* Item 62(b) to Schedule 8 to AC (alleging
76.5% CLTV) *with* MANA 2007-F1 Offering Document excerpt in Ex. 55 (disclosing 75.52%
weighted average original CLTV).  This 0.98% difference is well within the FDIC's alleged 5%
margin of error, (*see* AC ¶ 3 n.2), and is immaterial as a matter of law.  *See, e.g., In re Duke Energy
Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (citing cases holding that misstatements
ranging from 2% to 9% were immaterial as a matter of law); *see also ECA v. JP Morgan Chase Co.*,
553 F.3d 187, 204 (2d Cir. 2009) (conducting materiality analysis based on "five percent numerical
threshold" for materiality of alleged misstatement).

[41]   *See, e.g.,* CSMC 2006-6, P.S. at S-29, S-33, S-37 in Ex. 6 (excerpts of Offering Documents disclosing
that occupancy data was based on representations made by the borrowers) (emphasis added).

Offering Documents also disclosed that there was a possibility of misrepresentation by the borrowers.[42]

Because the FDIC does not and cannot allege that Defendants misreported the extent to which borrowers *said* they would live in the properties, its misrepresentation claims based on these disclosures fail.  *See*, *e.g.*, *Mass. Mut. Life Ins. Co v. Residential Funding Co.*, 843 F. Supp. 2d 191, 205 (D. Mass. Feb. 14, 2012) ("The disclosures specifically stated that all owner-occupancy rates were based *only* on borrowers' representations" and "thus put investors on notice that none of the owner-occupancy information had been verified by Defendants and that the rates represented only the self-reported data provided by borrowers, which might be inaccurate."); *Footbridge*, 2010 WL 3790810, at *9 (rejecting allegations that "statements regarding owner-occupancy levels were false because the number of owner-occupied properties was lower than defendants represented," because "[t]he [complaint] does not allege that the percentages reported . . . are inaccurate representations of the data received from borrowers"); *see also Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 WL 3578666, at *2 (C.D. Cal. Aug. 17, 2012) ("The mere fact that the Offering Documents included 'data charts' does not undermine the repeated warnings about the possibility of misrepresentations, or transform the accurate repetition of occupancy rates into misstatements.").

*Second*, the inferences the FDIC would have the Court draw from its owner-occupancy allegations cannot plausibly be drawn.  The FDIC admits that it conclusively presumed that a borrower did not live in the subject property if (a) the borrower had tax bills sent to another address (such as an office address or a post office box); (b) the borrower had other bills sent to another address; or (c) the borrower did not want to pay the money necessary to designate the property a "homestead."  (AC ¶¶ 80-84).  Such facts, however, are as consistent with borrowers living in the properties as with not living in them, and thus fail under *Twombly*.

---

[42]   *See* Ex. 56 (excerpts of Offering Documents disclosing the possibility of misrepresentations by mortgagors).

*Third*, the FDIC's owner-occupancy allegations refute themselves.  The FDIC postulates that if a borrower satisfies *any one* of its three criteria for assessing occupancy, the borrower must have been lying on the loan application when stating an intent to live in the property.  (*See id.* ¶ 84; *see also* Item 84 to Schedules to AC).  Thus, for example, the FDIC necessarily postulates that if a borrower had tax bills sent to another address, the borrower must not live in the premises – even if the borrower had *all other bills* sent to the subject property and even if the borrower *did* designate the property as a "homestead."

This makes no sense: When a borrower mainly acts in ways that allegedly are consistent with living in the premises, then the only plausible inference is that the borrower lives in the premises.  The FDIC alleges that between 15% and 30% of the borrowers on the mortgages underlying the Certificates did not live in the premises as they said they would, but for the vast majority of those properties, the borrowers acted consistently with living in the premises in two of the three ways (*e.g.*, they had non-tax bills sent to the property and declared it a homestead).  (*See* Appendix E).  Indeed, for the majority of the Offerings, fewer than 5% of the properties had borrowers who allegedly acted inconsistently with living in the properties in two or more of the three ways – which falls within what the FDIC says is the margin of error in its analysis.  (*See* Appendix E; *see also* AC ¶ 3 n.2 (noting 5% margin of error for conclusions about loan pools as a whole)).[43]  For such Offerings, the only inference to be drawn is that the actual owner-occupancy rates are consistent with what the borrowers said, as reported in the Offering Documents.

The FDIC's "owner-occupancy" allegations should be dismissed with prejudice.

---

[43]   The FDIC's own allegations reveal the small number of homeowners who allegedly acted inconsistently with occupancy in two or more of the three ways the FDIC says are relevant to assessing occupancy.  For each Offering, the FDIC alleges that a certain number of borrowers acted in *one or more* of the three ways, and it counts the same borrower multiple times if the borrower acted in multiple such ways.  (*See* Item 84(a)-(c) of Schedules to the AC).  For example, the FDIC would count the same borrower twice if the borrower had tax bills sent to another address, and also had other bills sent to another address.  (*Id.*)  The FDIC then "eliminat[es] duplicates" amongst these borrowers to come up with a total number of borrowers who acted in *at least one* of the three ways.  (*See* Item 84(d) to Schedules to AC).  Necessarily, the number of "duplicates" the FDIC eliminated represents the maximum number of borrowers who allegedly acted inconsistently with occupancy in *more than* one of the three ways.  (*See* Appendix E).

**D.     The Allegations About Departures From Underwriting Guidelines Fail.**

The FDIC's allegations about departures from underwriting standards also must be dismissed.  The FDIC cannot proceed on a theory that the originators *sometimes* departed from their underwriting guidelines, because the Offering Documents were explicit that the originators did so.[44]  In fact, the FDIC freely concedes that the Offering Documents disclosed that the originators "made exceptions to [their] standards."  (AC ¶ 87).  Accordingly, the FDIC's theory instead is that "the originators were making wholesale, rather than case-by-case, exceptions" – in effect, that the originators *abandoned* their underwriting guidelines.  (*Id.* ¶ 88).  These allegations fail.

For all but three of the Offerings, the FDIC provides no facts whatsoever about what any originator did or did not do, much less facts suggesting they made "wholesale" exceptions to their guidelines.[45]  The FDIC does not, for example, allege facts via confidential witnesses about particular originators or particular practices they employed – allegations that courts in other cases sometimes have found sufficient.  *See, e.g.*, *Bear Stearns*, 851 F. Supp. 2d at 767-68; *IndyMac*, 718 F. Supp. 2d at 509-10.  Accordingly, the Amended Complaint must be dismissed because it merely contains conclusions, not facts.  *See, e.g.*, *Novastar*, 2011 WL 1338195, at *10-11 (rejecting allegations that the defendants misrepresented their commitment to underwriting guidelines where the facts alleged did not provide "*factual* allegations to support [the plaintiff's] statements") (emphasis added).  The failure to allege facts supporting a

---

[44]   *See* Ex. 3 (excerpts of Offering Documents disclosing that originators were permitted to make exceptions to their underwriting standards).

[45]   The Offerings as to which the FDIC makes no allegations concerning any relevant mortgage originator are RALI 2006-QS6, RALI 2006-QS18, RAST-2007-A1, RALI-2006-QS8, RALI 2006-QS16, RALI 2007-QS5, MANA 2007-F1, RAST 2006-A11, and RAST 2006A14CB.  Thus the FDIC describes no conduct by any originators whom it associates with Defendants Ally Securities LLC, Deutsche Bank Securities Inc., HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Merrill Lynch Mortgage Investors, Merrill Lynch Mortgage Capital Inc., and Merrill Lynch, Pierce, Fenner & Smith Inc.  As discussed below, the few allegations that the FDIC makes as to originators behind the other three Offerings also fail to support the allegation that underwriting guidelines were abandoned.

systematic abandonment of underwriting standards is fatal, because the Offering Documents clearly disclosed a wide variety of limitations to underwriting standards.[46]

The FDIC contends that high EPD rates are "strong evidence" that the originators abandoned their guidelines.  (AC ¶ 91; *see also* Item 94 to Schedules to AC).  But a bare allegation of high EPD rates does not suffice to state a claim.  As courts have held, allegedly poor loan performance "could [have been] caused by any number of broad economic factors besides . . . deviations from descriptions in the offering documents" and would not itself "establish that the[] offering documents contained material misstatements and omissions." *Plumbers' & Pipefitters'*, 2012 WL 601448, at *11; *accord Mass. Mutual*, 2012 WL 479106, at *11 (information concerning delinquencies and defaults merely "indicated that the loans were performing poorly," not that underwriting standards were abandoned).[47]

The FDIC's remaining statistics are likewise facially insufficient.  Its allegations about the rate at which loans "were *ever* 90 or more days delinquent" and the number of loans in each pool "that were 30 or more days delinquent *as of 2012*" (AC ¶¶ 95-96), provide no basis for a misrepresentation claim.  Default rates in the worst housing market since the Great Depression

---

[46]  *First*, the Offering Documents disclosed that certain loans "d[id] not require a statement of income (and therefore no calculation of debt-to-income ratio)" or "verification of stated income or stated assets."  (*See*, *e.g.*, CMALT 2006-A6, P. at 89 in Ex. 57 (excerpts of Offering Documents disclosing the use of reduced and stated income documentation programs in the underwriting process)).  *Second*, the Offering Documents disclosed that the underwriting guidelines used were less stringent than those established by Fannie Mae or Freddie Mac and, as a result, loans could experience higher rates of default.  (*See* Ex. 58 (excerpts of Offering Documents disclosing that underwriting guidelines may not satisfy the standards required by Fannie Mae or Freddie Mac)).  *Third*, the Offering Documents disclosed that "the mortgage loans may have been made to mortgagors with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income," and that the loans "[c]onsequently . . . may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards." (*See*, *e.g.*, CSMC 2006-6, P. at 7 in Ex. 59 (excerpts of Offering Documents disclosing various factors that could lead mortgagors to default on their loans)).  And *fourth*, one Offering Document disclosed that neither depositors nor any affiliates re-underwrote (*i.e.*, confirmed the information underlying) any of the loans.  CSMC 2006-6, P.S. at S-40 in Ex. 60).

[47]  The FDIC cannot have it both ways.  Either the EPD rates were high, giving the Banks knowledge of their claims (*see* Section I.A.2, *supra*), or they fail to establish that originators abandoned their underwriting guidelines.  Either way, the claims fail.

say absolutely nothing about the extent to which any mortgage originator departed from its underwriting guidelines *years earlier*.  *See*, *e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (affirming dismissal of securities claims at the pleading stage; "[w]hen the plaintiff's loss coincides with a marketwide phenomenon . . . , the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("[T]he substantial period between the alleged fraud and [the plaintiff's] loss, coupled with the concurrence of that loss with the real estate market crash, is additional support for the conclusion that the fraud was not a substantial cause of [the] injury.").

Moreover, the FDIC's conclusory allegations regarding certain of the entities that supplied a portion of the loans for three of the Offerings are too conclusory to plausibly support the FDIC's claims for relief.  *See Novastar*, 2011 WL 1338195, at *10-11 (dismissing MBS investor's § 11 claims regarding loan originators' underwriting guidelines as "conclusory" where plaintiffs relied on "news articles and broad investigations" not tied to origination practices for the specific mortgages at issue).  The FDIC points to nothing to suggest that EMC, DLJ Mortgage or American Home took a cavalier approach to the underwriting or acquiring of the loans that were involved in the securitizations at issue here.  Rather, the FDIC provides a selection of anecdotal accounts, much of which was public knowledge, (*see* Section I.A.3, *supra*), in an attempt to imply that the same practices may have been used on the mortgages that were securitized for these offerings.  But such "allegations [] taken from press reports relating to charges against [Defendants] that have no relation to the claims in this case . . . do[] not allege particular facts" necessary to support the FDIC's generic claims.  *Footbridge*, 2010 WL 3790810, at *5, 11.[48]

---

[48]   In addition, the FDIC's allegations regarding certain loan originators' adherence to their underwriting guidelines rely on deposition testimony from separate ongoing litigations.  (AC ¶¶ 106, 108-09, 124).  These allegations should not be considered.  "Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule

Accordingly, the FDIC's allegations about underwriting guidelines must be dismissed.

**E.      The Allegations About Credit Ratings Fail.**

The FDIC's allegations that the Certificates' credit ratings were too high also fail, for at least four reasons.

*First*, these allegations are entirely derivative of the other allegations discussed above, and thus fail along with them.  (*See* AC ¶ 127(a)-(d) (incorporating other allegations of Amended Complaint as basis for credit ratings allegations)).

*Second*, the FDIC does not and cannot allege that the Offering Documents misrepresented the credit ratings that the third-party rating agencies actually bestowed on the Certificates.  The FDIC does not, for example, allege that the Offering Documents stated that Fitch rated the securities AAA when it actually rated them AA.  The FDIC's precise allegations have been dismissed from other MBS cases on this basis: "The . . . [certificates] actually received the ratings listed in the prospectus supplements, and Plaintiff[] do[es] not allege to the contrary, so there is no misstatement on the face of the documents."  *N.J. Carpenters Vacation Fund*, 720 F. Supp. 2d at 271; *accord Plumbers' Union*, 632 F.3d at 775 (because ratings "were accurately reported by defendants . . . nothing more is required").

*Third*, as this Court previously held, "investment ratings are subjective opinions and, accordingly, only actionable where the speaker did not truly believe the statements at the time [they were] made public."  *Bear Stearns*, 851 F. Supp. 2d at 770; *accord Lehman*, 684 F. Supp. 2d at 494-95 (rating agencies' publication of ratings based on models that were allegedly known by some employees to be inaccurate did not amount to actionable misstatement absent allegation that "rating agencies did not truly hold those opinions at the time they were made public"); *see also Tsereteli*, 692 F. Supp. 2d at 394-95 (holding that credit ratings reflect "a statement of

12(f) of the Federal Rules of Civil Procedure."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *accord Low v. Robb*, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012) (striking from complaint references to allegations in other litigations); *Footbridge*, 2010 WL 3790810, at *5 (striking from complaint allegations based on pleadings and settlements in other cases and investigations); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (striking exhibits that contain two complaints filed in actions that had not been resolved on the merits).

opinion by each agency that it believed, based on the models it used and the factors it considered, that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating"). The FDIC, however, does not allege subjective falsity on the part of anyone – not the rating agencies, and certainly not Defendants. Indeed, as noted, it *disavows* any such allegation (*see* AC ¶ 160), and that is dispositive. *See Hermann*, 302 F.3d at 564; *Belmont*, 2010 WL 3545389, at *7.

*Fourth*, the allegations about credit ratings fail because the Offering Documents disclosed that the credit ratings assigned to the Certificates were "subject to revision or withdrawal at any time" and were "not . . . recommendation[s] to buy, sell or hold . . . securit[ies]."[49] The FDIC cannot allege a material misstatement of fact in such circumstances.

### F.   Many of the § 11 Claims Also Fail Because the Statute Expressly Requires the FDIC To Plead Reliance, Which It Has Not Done.

The FDIC's claims with respect to seven of the Certificates must be dismissed because it fails to plead facts establishing that the Banks relied on any alleged misstatement or omission.

An investor's presumed reliance on a registration statement ends under § 11 "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). If an investor makes purchases thereafter, its "*right of recovery [is] conditioned on proof that [the investor] acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission.*" *Id.* (emphasis added). The reason is obvious: "[I]n all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated on that statement rather than on the information disclosed upon registration." *Rudnick v. Franchard Corp.*, 237 F. Supp. 871, 873 (S.D.N.Y. 1965) (quoting H.R. No. 73-1838, at 41

---

[49]   *See*, *e.g.*, RAST 2007-A1, P.S. at S-95 in Ex. 61 (excerpts of Offering Documents disclosing that credit ratings were subject to change and were not recommendations to purchase MBS). Further, the Offering Document for CSMC 2006-6 disclosed that the selection of loans "took into account investor preferences and the depositor's objective of obtaining the most favorable combination of ratings on the certificates." (CSMC 2006-6, P.S. at S-25 in Ex. 61).

(1934) (Conf. Rep.)); *accord APA Excelsior III L.P. v. Premiere Techs. Inc.*, 476 F.3d 1261, 1275 (11th Cir. 2007).

Here, the Banks purchased seven of the Certificates after Distribution Reports were made generally available for at least 12 months after the effective date of the prospectus supplements for the following six Offerings:

| Purchaser(s) | Offering | Prospectus Supplement Date | 12 Mo. Earning Statement | Purchase Date |
|---|---|---|---|---|
| Citizens National | RALI 2006-QS6 | 6/29/2006 | 7/20/2007 | 12/10/2007 |
| Citizens National Strategic Capital | RALI 2006-QS8 | 7/27/2006 | 8/23/2007 | 11/9/2007 |
| Citizens National | CSMC 2006-6 (tranche 1-A-8) | 6/30/2006 | 7/25/2007 | 4/11/2008 |
| Strategic Capital | CSMC 2006-6 (tranche 1-A-12) | 6/30/2006 | 7/25/2007 | 12/6/2007 |
| Strategic Capital | RAST 2006-A11 | 8/31/2006 | 9/25/2007 | 2/28/2008 |
| Strategic Capital | RAST 2006-A14CB | 11/6/2006 | 11/26/2007 | 1/16/2008 |
| Strategic Capital | CMALT 2006-A6 | 11/30/2006 | 12/21/2007 | 3/3/2008 |

The FDIC, however, fails to plead any facts demonstrating that the Banks relied on the statements in the Offering Documents that it alleges were false.  Accordingly, its claims with respect to these seven Certificates must be dismissed.[50]

1.  Distribution Reports constitute § 11 "earning statements" for MBS.

Distribution Reports for MBS are "earning statements" in every sense of the word.  They provide investors in MBS with detailed information about the *earnings* of the certificates, plus other facts about their financial performance, such as the allocation of cash flows, defaults, delinquencies, and prepayments.  (*See*, *e.g.*, Ex. 10).  Distribution Reports detailing 12 months of

---

[50]  The Defendants associated with these seven Certificates are RBS Securities, Inc.; Ally Securities LLC; Credit Suisse First Boston Mortgage Securities Corp.; Credit Suisse Securities (USA) LLC; Credit Suisse Management LLC; UBS Securities LLC; Citicorp Mortgage Securities, Inc.; CitiMortgage, Inc.; and Citigroup Global Markets, Inc.

the *actual performance* of MBS certificates are precisely the sort of documents reasonable investors in the secondary market rely on, as opposed to the dated information in the original Offering Documents.

But the Court need not rely on common sense, adequate though that would be, to conclude that Distribution Reports for MBS are "earning statements" within the meaning of § 11. SEC regulations likewise dictate this result.  The SEC enacted Rule 158 in 1983 to provide guidance on what constitutes an "earning statement."  *See* 17 C.F.R. § 230.158(a); Definition of Terms, Securities Act Release, No. 33-6485, 48 Fed. Reg. 44767 (Sept. 30, 1983) (adoptive release).  The SEC eschewed a rigid, rules-based approach recognizing that while an "earning statement" may be sufficient if it includes the sort of "statement[] of income" that is contained in more typical SEC reports like Forms 10-K and 10-Q, *see* 17 C.F.R. § 230.158(a)(1)(i), the SEC also would permit other types of information contained in other types of documents to qualify as "earning statements."  The SEC accomplished this in Rule 158 in two ways.  *First*, it included a non-exclusivity provision stating that "[a]n 'earning statement' not meeting the requirements of this paragraph" concerning statements of income as found in traditional SEC reports "may otherwise be sufficient" for § 11 purposes.  *Id.* § 230.158(a).  And *second*, the SEC provided that the necessary information could be "contained in one report or any combination of reports," *id.* § 230.158(a)(2), meaning that "the information in the 'earning statement' may be contained in multiple documents."  48 Fed. Reg. at 44768.  As the SEC explained, Rule 158, as adopted, "provide[s] explicitly that paragraph (a)['s] [description of an earning statement] is nonexclusive."  *Id*. at 44767.

Distribution Reports provide the relevant § 11 "earning statements" in the context of MBS.  In 2005, the SEC adopted Regulation AB, which concerns the reporting requirements for asset-backed securities ("ABS"), which include MBS.  *See* Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 70 Fed. Reg. 1506 (Jan. 7, 2005).  The SEC exempted ABS issuers from filing Form 10-Q quarterly reports and from filing audited financial statements with their Form 10-K annual reports.  *See* 70 Fed. Reg. at 1510,

53

1561-62, 1568-69.  As the SEC explained in granting these exemptions, the financial data in

Forms 10-Q and 10-K "are designed primarily for *corporate* issuers and their securities" and

simply "*do not elicit relevant information for most asset-backed securities transactions*."  *Id.* at

1508 (emphasis added).  As the SEC noted, ABS investors are focused on the performance of an

*underlying asset pool*, not the performance of a company:

> Asset-backed securities and ABS issuers differ from corporate securities and
> operating companies.  In offering ABS, there is generally no business or
> management to describe.  *Instead, information about the transaction structure
> and the characteristics and quality of the asset pool and servicing is often what is
> most important to investors.*

*Id.* (emphasis added).

Accordingly, Form 10-D was created by the SEC as a *substitute* for Forms 10-Q and 10-

K to provide ABS investors with relevant earnings information about the asset pools that back

the securities.  *Id.* at 1509-10.  Form 10-D's centerpiece is the distribution and pool performance

information.  *See id.* at 1565-66.  The distribution report(s) required to be attached as an exhibit

to the Form 10-D provides detailed information about the financial performance of the

underlying asset pool and about allocations and distributions of cash flows to certificate holders.

*See id.* at 1565-66.  "[T]he distribution report . . . will likely contain most, if not all, of the

disclosures about the distribution and pool performance that will be required" under the federal

securities laws' reporting regime and therefore will typically satisfy an MBS issuer's disclosure

obligations.  *Id.* at 1566.

Even though the Distribution Reports contain the type of detailed financial information

investors look for in earning statements, and even though the SEC specifically provided that

Distribution Reports are intended to substitute for other types of earning statements contained in

more traditional SEC reports, a few courts have concluded that Distribution Reports do not

constitute "earning statements" for purposes of § 11.[51]  But these rulings are not persuasive and

---

[51]    *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 215 (S.D.N.Y.
2012); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 114-15
(S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821, at *7
(S.D.N.Y. Aug. 18, 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2011 WL
2020260, at *6 (S.D.N.Y. May 19, 2011).

should not be extended here because none of them addressed the relevant history of the statute or

the regulatory framework regarding MBS, which makes clear that Distribution Reports were

intended to serve as earning statements for MBS issuers.  For example, several courts have held

that § 11 "earning statements" must contain statements of income like those found in Forms 10-

K or 10-Q, *see Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 215

(S.D.N.Y. 2012); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97,

114-15 (S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2011 WL

2020260, at *6 (S.D.N.Y. May 19, 2011), and have either ignored the non-exclusivity provision

of Rule 158(a)[52] or have misinterpreted that provision as applying only where a "'subsidiary [is]

issuing debt securities guaranteed by its parent.'"  *N.J. Carpenters Health Fund v. DLJ Mortg.

Capital, Inc.*, 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 18, 2011) (quoting 17 C.F.R.

§ 230.158(a)(2)).[53]

　　　　These decisions also are inconsistent with SEC Rule 158, which expressly provides that

reports not specifically identified therein can constitute § 11 earning statements.  *See* 17 C.F.R.

§ 230.158(a).  Further, the rulings are inconsistent both with the SEC's own interpretive

---

[52]　Each of those courts also extended an inapposite decision in *In re WorldCom, Inc. Securities
Litigation*, 219 F.R.D. 267 (S.D.N.Y. 2003).  In *WorldCom*, a case involving corporate stock and debt
securities, but not ABS, the issue before the court was whether a class could be certified where a
number of putative class members purchased after the issuer made generally available its financial
information in a Form 10-Q quarterly report.  *See id.* at 293.  The *WorldCom* court held that the
quarterly report did not constitute a § 11 earning statement, and therefore did not raise any individual
questions of reliance, because it contained materially misleading statements.  *See id.* at 293-94.  But
the court in *WorldCom* did not purport to interpret the non-exclusivity language of SEC Rule 158.
The court would have had no basis to do so given that the filing at issue was a Form 10-Q quarterly
report.

[53]　In *DLJ*, Judge Crotty found that the non-exclusivity provision "was not a general exception."  *DLJ*,
2011 WL 3874821, at *7.  But that holding is entirely inconsistent with the SEC's guidance that the
requirements in "*paragraph (a)* [are] nonexclusive."  48 Fed. Reg. at 44767-68 (emphasis added).
When Rule 158 was first adopted, the text of subsection (a) was contained within a single paragraph,
thus explaining the SEC's comments regarding the non-exclusivity provision's scope.  *Id.* at 44770.
In 1991, the SEC amended Rule 158 to provide that filings by Canadian issuers could constitute § 11
"earning statements," and moved the non-exclusivity provision to its current location.  *See*
Multijurisdictional Disclosure and Modifications to the Current Registration and Reporting System
for Canadian Issuers, Securities Act Release No. 33-6902, Exchange Act Release No. 34-29354, 56
Fed. Reg. 30036, 30043 n.68, 30054 (July 1, 1991).  There is nothing in the adoptive release even
remotely suggesting that the SEC intended to change the scope of the non-exclusivity provision.  *Id.*

statement that "paragraph (a) [of Rule 158] is nonexclusive," 48 Fed. Reg. at 44767-68, and the SEC's determination that MBS issuers should be exempt from general reporting requirements on Forms 10-K and 10-Q because (unlike Distribution Reports) these forms do not provide the type of information of interest to MBS investors.  *See* 70 Fed. Reg. at 1508, 1510.  Indeed, those courts fail to recognize that the SEC itself explicitly has exempted MBS issuers from filing financial statements under cover of Forms 10-K and 10-Q.  Instead, their decisions require the illogical result that if MBS issuers want to secure the protections afforded under § 11 for aftermarket purchases, they must file statements of income on traditional SEC forms – contrary to the SEC's determination that it does *not* want them to do that.[54]

Moreover, treating Distribution Reports as earnings statements is consistent with the purposes of the reliance requirement under § 11.  As discussed, that requirement is predicated on the commonsense notion that once detailed financial information describing the performance and value of the security has been made available to investors, investors should be presumed to rely on that information rather than on prior registration statements.  *See Rudnick*, 237 F. Supp. at 873 & n.1.  Thus, to the extent an investor claims that a dated registration statement was false or misleading, the investor should be required to show that, in fact, it relied on the misstatement or omission.  *See id.*  As discussed above, the Distribution Reports provide detailed financial information about the performance of the loans supporting the Certificates, including principal and interest distributions and balances for each tranche; the number and value of payoffs, defaults and prepayments; and information about modifications, credit enhancements, cash flows, and uses of funds, among other financial information.  To an MBS investor, the Distribution Reports provide the key financial information about the Certificates' supporting assets in the same manner that a traditional earnings statement provides key information concerning corporate financial performance to an investor in a traditional security such as stock.

---

[54]   As the SEC explained in the adoptive release for Rule 158, the rule was modified to avoid "making mandatory the filing of optional" statements of income, which would "confuse rather than inform investors."  48 Fed. Reg. at 44767.

In short, Distribution Reports are not only § 11 "earning statements" within the meaning of applicable SEC regulations, but in every common sense meaning of the phrase.

2.      The Distribution Reports were made "generally available" when posted to the websites of the securitization trustees.

Because the Distribution Reports for the seven Certificates were made "generally available" to investors for at least 12 months prior to the Banks' purchases of the MBS, the reliance requirement under § 11 applies.  An earnings statement is made "generally available" when filed with the SEC or made available to shareholders by "other methods."  17 C.F.R. § 230.158(b).  This catch-all provision was included so that issuers that have obtained suspensions from their duty to file SEC reports pursuant to § 15(d) of the Securities Exchange Act of 1934[55] can still satisfy the § 11 "earning statement" requirements.[56]

Here, Defendants obtained § 15(d) reporting suspensions for the Offerings.[57]  Therefore, in lieu of filing the Distribution Reports with the SEC, Defendants made them generally available to investors through the websites of the securitization trustees.[58]  Consistent with SEC regulations, the Offering Documents for each Offering disclose to investors how to access those websites and obtain the Distribution Reports.  (*See* Ex. 11).  *See also* 70 Fed. Reg. at 1551.  This is more than sufficient to satisfy the "generally available" requirement.  *See* Internet Availability

---

[55]  *See* 15 U.S.C. § 78o(d) (suspending duty to file SEC periodic reports if there are fewer than 300 holders of each class of securities).

[56]  *See* 48 Fed. Reg. at 44768 ("[T]he Commission believes that the number of registrants that have made public offerings within a preceding twelve month period, but no longer have a reporting obligation under Section 15(d) of the Exchange Act, is small.  *Because [Rule 158(b)] is non-exclusive, these registrants can meet the general availability requirement . . . in ways other than those specified.*") (emphasis added).

[57]  *See* Ex. 62.  This is not surprising.  When adopting Regulation AB, the SEC noted that most certificates in MBS offerings "are not presently listed and are held by less than three hundred record holders" and that "most publicly offered asset-backed securities cease reporting with the Commission" after the end of the first fiscal year.  70 Fed. Reg. at 1561.

[58]  The distribution reports are publicly available on the following websites: (a) for the RALI offerings: https://www.gmacrfc.com/investors/; (b) for the CMALT offering: https://sf.citidirect.com/; (c) for the RAST (IndyMac) and CSMC offerings: https://tss.sfs.db.com/investpublic/; and (d) for the MANA and BSABS offerings: http://www.ctslink.com/SelectShelfType.do?shelfType=MBS.  For security purposes, some of the websites require the visitor to create a user name and password.

of Proxy Material, Exchange Act Release No. 34-55146, 72 Fed. Reg. 4148, 4162 (Jan. 29, 2007) (permitting distribution of proxy materials to investors by means of the internet).

### 3. The FDIC fails to plead facts establishing reliance by the Banks.

The FDIC fails to plead any facts establishing that the Banks relied on the Offering Documents.  As discussed, § 11 "places the burden on the purchaser to show that he actually relied on the defective registration statement if an intervening earnings statement has been issued."  *APA Excelsior*, 476 F.3d at 1275.  The FDIC's mere conclusory assertion that the Banks "relied on the untrue or misleading statements that defendants made in the registration statements, as amended by the prospectus supplements, in deciding to purchase the certificates" does not meet this burden with respect to the Certificates that had more than 12 months of available earnings statements.  (AC ¶ 159).

The FDIC's conclusory assertion is also directly contrary to the OIG and FDIC's prior assessment of the Banks in the Material Loss Reviews.  As discussed, the Banks pursued a strategy of intentionally investing in distressed MBS, seeking to take advantage of the market discounts.  (*See* Background, *supra*).  Such a speculative and "high-risk investment strategy" of targeting certificates with "ongoing deteriorating collateral performance," (Ex. 1 at 6, 13), which the FDIC itself concluded was indicative of improper practices *by the Banks*, refutes any plausible claim that the Banks relied on any alleged misrepresentations in the offering materials. *See Rudnick*, 237 F. Supp. at 872-73 (plaintiff who purchased securities because "the price of the stock had dropped drastically" since his initial purchase and after intervening earning statement could not establish reliance as a matter of law).  Because the FDIC has not pleaded any *facts* suggesting reliance, the § 11 claims with respect to the Banks' purchases of the seven Certificates from the following six Offerings must be dismissed with prejudice: RALI 2006-QS6, RALI 2006-QS8, CSMC 2006-6, RAST 2006-A11, RAST 2006-A14CB and CMALT 2006-AS.

## III.    THE § 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL.

The FDIC's § 15 claims "necessarily fail[]" because the FDIC has not adequately alleged an underlying violation of § 11.  *Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d

Cir. 2011).  Further, the FDIC does not adequately allege control; all it offers is the boilerplate

that some Defendants "controlled" others "by or through stock ownership, agency, or otherwise."

(AC ¶¶ 166, 169, 172, 175).  Such "[c]onclusory allegations of control are insufficient as a

matter of law."  *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12 (S.D.N.Y.

Aug. 8, 2005); *accord In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5-7

(S.D.N.Y. Feb. 20, 2002) (cursory allegation that one defendant "had the power to influence and

control and did influence and control the decision-making of" another insufficient to state a

claim for controlling person liability); *Martin v. EVP Second Corp.*, 1991 WL 131176, at *3

(S.D.N.Y. July 9, 1991) (rejecting conclusory allegation that "EVP was at all times material

hereto a controlling person of the Partnership within the meaning of Section 15 of the Securities

Act and Section 20(a) of the Exchange Act").[59]

## CONCLUSION

For the reasons stated above, the Amended Complaint should be dismissed with

prejudice.

Dated:  December 6, 2012                              Respectfully submitted,
            New York, New York

---

[59]  The standards for "control" are the same under § 15 as they are under § 20(a) of the Securities
Exchange Act of 1934, and case law under the latter is therefore applicable.  *See In re Lehman Bros.
MBS Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011).

SIMPSON THACHER & BARTLETT LLP

By:_____/s/ Andrew T. Frankel_____

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alexandra C. Pitney (lpitney@stblaw.com)
425 Lexington Avenue
New York, New York  10017
Phone: (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Defendants Bear Stearns Asset
Backed Securities I LLC, The Bear Stearns
Companies LLC, J.P. Morgan Securities
LLC, Deutsche Bank Securities Inc., RBS
Securities Inc., and UBS Securities LLC*

MUNGER, TOLLES & OLSON LLP

By:_____/s/ James C. Rutten_____

Marc T.G. Dworsky (Marc.Dworsky@mto.com)
James C. Rutten (James.Rutten@mto.com)
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
Phone: (213) 683-9100
Fax: (213) 687-3702

Achyut J. Phadke (Achyut.Phadke@mto.com)
560 Mission Street, 27th Floor
San Francisco, California  94105-2907
Phone:  (415) 512-4000
Fax:  (415) 512-4077

*Attorneys for Defendants Merrill Lynch
Mortgage Investors, Inc., Merrill Lynch
Mortgage Capital, Inc., and Merrill Lynch,
Pierce, Fenner & Smith Inc.*

CRAVATH, SWAINE & MOORE LLP

By:_____/s/ Richard W. Clary_____

Richard W. Clary (rclary@cravath.com)
Julie A. North (jnorth@cravath.com)
Richard J. Stark (rstark@cravath.com)
Michael T. Reynolds
(mreynolds@cravath.com)
825 Eighth Avenue
New York, New York  10019
Phone: (212) 474-1000
Fax: (212) 474-3700

*Attorneys for Defendants Credit Suisse
Securities (USA) LLC, Credit Suisse First
Boston Mortgage Securities Corp., and Credit
Suisse Management LLC*

MAYER BROWN LLP

By:_____/s/ Michael O. Ware_____

Michael O. Ware (mware@mayerbrown.com)
S. Christopher Provenzano
(cprovenzano@mayerbrown.com)
1675 Broadway
New York, New York  10019
Phone: (212) 506-2500
Fax: (212) 262-1910

*Attorneys for Defendants HSBC Securities
(USA), Inc. and Ally Securities, LLC*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By:_____/s/ Brad S. Karp_____

Brad S. Karp (bkarp@paulweiss.com)
Bruce Birenboim
(bbirenboim@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants Citicorp Mortgage
Securities Inc., CitiMortgage Inc., and
Citigroup Global Markets Inc.*

Appendices A-E

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

## Appendix A – Grounds for Dismissal of Claims

| Deal No. | Certificate | Defendant(s) | Defendant's Alleged Role | Certificate Issue Date | Banks' Alleged Purchase Date(s) | Untimely – 1933 Act 1 yr Statute of Limitations[1] | Untimely – 1933 Act 3 yr Statute of Repose (bar date)[2] | No Actionable Misstatements or Omissions | No Control Person Liability (Defendant) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | RALI 2006-QS6 | GMAC<br>RBS | Underwriter<br>Underwriter | 6/29/2006 | 12/10/2007 | X | 6/29/2009 | X | n/a |
| 2 | RALI 2006-QS18 | GMAC<br>DBS | Underwriter<br>Underwriter | 12/28/2006 | 9/24/2007<br>9/27/2007<br>10/12/2007 | X | 12/28/2009 | X | n/a |
| 3 | RAST 2007-A1 | HSBC<br>RBS | Underwriter<br>Underwriter | 1/30/2007 | 2/6/2008 | X | 1/30/2010 | X | n/a |
| 4 | RALI 2006-QS8 | Citigroup<br>GMAC | Underwriter<br>Underwriter | 7/28/2006 | 11/9/2007 | X | 7/28/2009 | X | n/a |
| 5 | RALI 2006-QS16 | RBS | Underwriter | 11/29/2006 | 12/14/2007<br>12/7/2007 | X | 11/29/2009 | X | n/a |
| 6 | BSABS 2007-AC5 | BSABS<br>Bear Stearns<br>BSCI | Issuer<br>Underwriter<br>Control Person | 6/29/2007 | 12/14/2007 | X | 6/29/2010 | X | X |
| 7 | CSMC 2006-6 | CSFB Mortgage Secs.<br>Credit Suisse Secs.<br>Credit Suisse Mgmt. | Issuer<br>Underwriter<br>Control Person | 6/29/2006 | 4/11/2008<br>12/6/2007 | X | 6/29/2009 | X | X |
| 8 | MANA 2007-F1 | MLMI<br>Merrill Lynch<br>MLMCI | Issuer<br>Underwriter<br>Control Person | 3/26/2007 | 1/29/2008 | X | 3/26/2010 | X | X |
| 9 | RALI 2007-QS5 | Citigroup | Underwriter | 3/29/2007 | 12/7/2007 | X | 3/29/2010 | X | n/a |
| 10 | RAST 2006-A11 | Credit Suisse Secs.<br>UBS | Underwriter<br>Underwriter | 8/29/2006 | 2/28/2008 | X | 8/29/2009 | X | n/a |
| 11 | RAST 2006-A14CB | RBS | Underwriter | 11/3/2006 | 1/16/2008 | X | 11/3/2009 | X | n/a |
| 12 | CMALT 2006-A6 | CMSI<br>RBS<br>CitiMortgage | Issuer<br>Underwriter<br>Control Person | 11/29/2006 | 3/3/2008 | X | 11/29/2009 | X | X |

---

[1] All claims were barred as of May 22, 2009 (the date of the FDIC's appointment as receiver) because the Banks had actual or constructive knowledge of the alleged claims before May 22, 2008.

[2] Bar dates calculated from the date each of the Certificates was offered for sale.

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

### Appendix B – Downgrades of Certificates and Subordinate Classes Before May 22, 2008

| | Certificate | Class | Original Rating F/M/S&P | Oct. 2007 | Nov. 2007 | Dec. 2007 | Jan. 2008 | Feb. 2008 | Mar. 2008 | Apr. 2008 | May 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | RALI 2006-QS6 | 1-A-16 1-M-3 1-M-2 | AAA/Aaa/AAA BBB/-/- A/-/- | | | Fitch: B*- Fitch: BBB+*- | | | | Mdy's: AAA*- | Fitch: C Fitch: CC |
| 2 | RALI 2006-QS18 | 1-M-1 1-M-2 1-M-3 | AA/-/- A/-/- BBB/-/- | | | | Fitch: A+*- Fitch: BB Fitch: C | | Fitch: BB*- | | Fitch: CCC Fitch: CC |
| 3 | RAST 2007-A1 | A-9 B-2 B-3 | AAA/-/AAA -/-/A -/-/BBB | S&P: BBB+ S&P: BB+ | | | | S&P: BBB+*- S&P: BB+*- | Fitch: AAA*- | | |
| 4 | RALI 2006-QS8 | M-1 M-2 M-3 | AA/-/- A/-/- BBB/-/- | | | Fitch: AA- Fitch: BBB+*- Fitch: B*- | | | Fitch: AA-*- | | Fitch: CCC Fitch: CC Fitch: C |
| 5 | RALI 2006-QS16 | A-7 M-2 M-3 | AAA/Aaa/AAA A/-/- BBB/-/- | | | | Fitch: BBB- Fitch: CC | | Fitch: AAA*- Fitch: BBB-*- | Mdy's: Aaa*- | Fitch: CC Fitch: C |
| 6 | BSABS 2007-AC5 | A-2 B-2 B-3 | -/Aaa/AAA -/A2/A -/Baa2/BBB | S&P: BBB- | | | Mdy's: Ba2 Mdy's Caa1 | S&P: A*- S&P: BBB-*- | | Mdy's: B2 | |
| 7 | CSMC 2006-6 | 1-A-8 1-A-12 B-4 B-5 | -/Aaa/AAA -/Aaa/AAA -/Baa3/BBB -/-/BBB- | | Mdy's:Ba3 | S&P: BB S&P: BB | | S&P: BB*- S&P: BB*- | | Mdy's: Aaa*- /S&P: AAA*- Mdy's: Ca/S&P: CC S&P: CC | |
| 8 | MANA 2007-F1 | 2-A-1 M-2 M-3 | AAA/Aaa/- A/-/- BBB/-/- | | | | | | Fitch: AAA*- Fitch: A*- Fitch: BBB*- | Mdy's: Aaa*- | Fitch: CC Fitch: C |
| 9 | RALI 2007-QS5 | A-1 M-2 M-3 | AAA/Aaa/AAA A/-/- BBB/-/- | | | | Fitch: BBB+ Fitch: BB- | | Fitch: AAA*- Fitch:BBB+*- Fitch: BB-*- | Mdy's: Aaa*- | Fitch: CCC Fitch: C |
| 10 | RAST 2006-A11 | 1-A-3 B-2 B-3 | -/Aaa/AAA -/-/A -/-/BBB | | | S&P: BB S&P: B | | S&P: BB*- S&P: B*- | | S&P: AAA*- S&P: CC S&P: CC | Mdy's: Aaa*- |
| 11 | RAST 2006-A14CB | 1-A-2 B-2 B-3 | AAA/Aaa/AAA A/-/- BBB/-/- | Fitch: BBB+ Fitch: BB | | | | | Fitch: AAA*- Fitch: BBB+*- Fitch: BB*- | | Mdy's: Aaa*- Fitch: CC Fitch: C |
| 12 | CMALT 2006-A6 | IA-4 B-2 B-3 | AAA/Aaa/AAA A/-/- BBB/-/- | Fitch: A- Fitch: BB+ | | | | | Fitch: AAA*- Fitch: A-*- Fitch: BB+*- | | |

Note 1: Table was compiled using publicly available ratings information from Bloomberg and the rating agencies' websites.  *See* Ex. 18.
Note 2: *- indicates that the rating agency has placed the class on negative watch or negative outlook.

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

**Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008**

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| March 26, 2007 | Bloomberg reports that GMAC/ResCap bonds were cut from "buy" to "neutral" by Banc of America Securities due to the departure of top executives and because of increasing "yield premiums on ResCap bonds . . . on concerns about rising default rates on subprime mortgages." (Ex. 20). **Residential Capital's affiliates sponsored, issued, underwrote, and originated RALI 2006-QS6, RALI 2006-QS16, RALI 2006-QS18, RALI 2006-QS8, and RALI 2007-QS5.** |
| May 31, 2007 | The Financial Times reports on the "crisis in the US subprime mortgage market," noting that EMC Mortgage Corporation's loan modifications for struggling mortgagors had increased 300% since early 2007, and indicating that these loans had been securitized. (Ex. 21). **EMC Mortgage Corporation and its affiliates originated and acquired the mortgages in BSABS 2007-AC5.** |
| August 6, 2007 | American Home Mortgage files for bankruptcy. (Ex. 22). **American Home Mortgage was a significant originator in CMALT 2006-A6 and CSMC 2006-6.** |
| August 20, 2007 | Business Week publishes an article detailing IndyMac's alleged practice of doctoring loan documents to qualify ineligible borrowers for mortgages. Ameriquest is also mentioned as a mortgage lender that may have "crossed the line from lax underwriting to outright fraud." (Ex. 23). **IndyMac was the sponsor and originator for RAST 2006-A11, RAST 2006-A14CB, and RAST 2007-A1, and was one of the originators for MANA 2007-F1.** |
| September 2007 | Ameriquest announces the sale of its last remaining retail mortgage operations to Citigroup, marking the culmination of the company's total collapse during the "sub-prime meltdown." As had been widely publicized, Ameriquest's financial difficulties were a result of falling loan demand and rising defaults in 2006 and 2007. (Ex. 24). **Ameriquest was an originator for MANA 2007-F1.** |

Black: News Articles and Press Releases      Green: SEC Filings and Related Documents
Red: Ratings Events                          Blue: Complaints Filed Prior to May 22, 2008

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

## Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| November 14, 2007 | MBS investors file class action complaint in Luther v. Countrywide Fin. Corp., No. BC 380698 (Cal. Super. Ct.) against, inter alia, UBS Securities LLC., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., Greenwich Capital Markets, Inc. (RBS), Bear Stearns, Credit Suisse and J.P. Morgan Securities Inc., alleging that registration statements for MBS issued or underwritten by defendants failed to disclose underwriting deficiencies and inflated appraisals in connection with the underlying mortgages.  The complaint acknowledges that "[b]y the summer of 2007, the amount of uncollectable mortgage loans underlying the certificates began to be revealed to the public."  (Ex. 25 at ¶¶ 7-9). |
| December 4, 2007 | Fitch **downgrades** the Banks' RALI 2006-QS8 certificates from AA to AA-. |
| December 24, 2007 | MBS investors file complaint in Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., No. 2:07-cv-05423 (E.D. Pa.) alleging that "Merrill's representations regarding the quality of the loans in the portfolio . . . were . . . false," including with respect to "the appraisal[s] of the collateral," "Loan-to-Value ratios," "the purpose of the real property serving as collateral (primary residence, second home, etc.)," and whether the "loans actually met the lenders' underwriting criteria." (Ex. 26 at ¶¶ 71-72). |
| Late 2007 | DLJ Mortgage Capital, sponsor of CSMC 2006-6,  institutes several lawsuits against mortgage brokerages from which it bought and aggregated loans for securitization, claiming that the originators refused to repurchase numerous loans which had suffered EPDs.  (Ex. 27). |
| Early 2008 | Major news outlets, including the New York Times, Wall Street Journal, and Los Angeles Times, report on government investigations into firms that provided loan analysis services to MBS market participants, including Defendants.  Reports state that vendors had seen material increases in the number of defective loans, and that many of these defective loans nevertheless had been securitized.  (Exs. 28-33). |
| January 16, 2008 | Fitch **downgrades** the Banks' RALI 2006-QS18 certificates from AA to A+ with a negative outlook. |

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

### Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| January 18, 2008 | Investors file their Second Amended Complaint against IndyMac, relying on public "securities analyst reports, press releases, media reports and other publications," to allege that the bank "engage[d] in knowingly reckless mortgage production . . . [by] exploit[ing] internal control weaknesses . . . to drive loan originations and sales growth." (Ex. 34 at ¶¶ 1-5). |
| January 22, 2008 | Wachovia discloses in a Form 8-K that it failed to adhere to certain policies regarding write-downs of option ARM loans, underscoring Wachovia's material exposure to non-performing mortgage loans. (Ex. 35). **Wachovia was an originator in RALI 2006-QS16, RALI 2006-QS18 and MANA 2007-F1.** |
| January 24, 2008 | Investors file a class action complaint against National City for violations of the Securities Exchange Act of 1934, alleging, inter alia, that "subprime mortgages on the Company's books were a much bigger risk to the Company's financial position than represented" and that National City "continued to hold a large amount of problematic loans." According to the complaint, "the market became aware of the risk of defaults in mortgages held by National City, as well as those held by other banks" in July 2007. (Ex. 36 at ¶¶ 8, 24-25). **National City originated loans in RALI 2006-QS6, RALI 2006-QS18, and RALI 2006-QS8.** |
| January 30, 2008 | The Wall Street Journal reports that the FBI was "investigat[ing] mortgage fraud in several states where they have noted high fraud activity, including California, Texas, Florida and Arizona . . . [as well as] possible fraud in the secondary market for mortgages, which could implicate well-known financial firms."[1] The report noted that "[t]he faltering U.S. housing market and a rise in defaults and foreclosures, particularly among low-end borrowers, has whipsawed global stock and bond markets, led to the dismissal of Wall Street chiefs and resulted in losses by banks, hedge funds and securities firms." (Ex. 32). |

---

[1] The Offering Documents disclosed that a plurality of the mortgage loans in the collateral pools were originated in California, Texas, Florida, and Arizona. *See* Ex. 37 (excerpts of Offering Documents disclosing the geographic concentrations of mortgage loans). Additionally, these Offering Documents expressly warned investors that "[i]f the regional economy or housing market weakens in . . . any [] region having a significant concentration of properties underlying the mortgage loans, the mortgage loans in that region may experience high rates of loss and delinquency, resulting in losses to certificate holders." *See*, *e.g.*, RALI 2006-QS6, P.S. at S-2 in Ex. 38 (excerpts of Offering Documents disclosing that the high concentration of mortgage loans in certain states created additional risks to investors).

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

### Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| January 31, 2008 | MBS investors file complaint in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08 Civ. 10446 (D. Mass.) against, inter alia, Greenwich Capital Markets, Inc. (RBS), UBS Securities Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc, alleging that MBS "Registration Statements [filed by defendants with the SEC] were materially false and misleading in that they included false statements and/or omissions about: (i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans." (Ex. 39 at ¶ 4). |
| February 5, 2008 | Investors file a class action lawsuit against, inter alia, Wachovia, Citigroup Global Markets Inc., Merrill Lynch Pierce, Fenner & Smith Inc., and UBS Securities LLC alleging that that Wachovia "had been heavily involved in mortgages involving the pay-option adjustable rate mortgages ("ARMs") . . . [that] would become toxic . . . ." The complaint faults the Wachovia's 2006 acquisition of a California mortgage brokerage house "specializing in adjustable rate mortgages," explaining that "[b]y early 2007, Wachovia was already experiencing problems from these and other mortgages." (Ex. 40 at ¶¶ 5, 48). |
| February 8, 2008 | The Los Angeles Times reveals that "Standard & Poor's . . . overhaul[ed] its grading process in response to criticism that its ratings on mortgage bonds helped precipitate the sub-prime meltdown" saying that it would now begin to "[f]lag ratings on securities such as mortgage-backed bonds, to help distinguish them from corporate and government ratings." (Ex. 41). |
| February 27, 2008 | Residential Capital's 2007 Annual Report on SEC Form 10-K discloses that it suffered a $4.3 billion loss in 2007, compared to net income of $705.1 million in 2006. The 10-K explains that its 2007 results were "adversely affected by domestic economic conditions, including increases in delinquencies on our mortgage loans held for investment portfolio and a significant deterioration in the securitization and residential housing markets." A May 5, 2008 8-K further reports that "[t]here is a significant risk that we will not be able to meet our debt service obligations, be unable to meet certain financial covenants in our credit facilities, and be in a negative liquidity position in June 2008." (Exs. 42-43). |

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

**Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008**

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| February 29, 2008 | IndyMac reports net losses of $614.8 million for 2007, down from profits of $342.9 million for 2006.   IndyMac added that many of its products had experienced "a significant increase in delinquencies," particularly in "higher [LTV] first and second lien loans."  (Ex. 44). |
| March 6, 2008 | Fitch places the Banks' RAST 2007-A1, RALI 2006-QS8, RALI 2006-QS16, MANA 2007-F1, RALI 2007-QS5, RAST 2006-A14CB, and CMALT 2006-A6 certificates on negative watch.  In a corresponding press release, Fitch states that a detailed review of its MBS ratings is necessary due to rapidly rising delinquency levels in the collateral partially "attributable to the use of high risk mortgage products such as 'piggy-back' second liens and stated-income documentation programs, which in many instances were poorly underwritten and susceptible to borrower/broker fraud."  (Ex. 19). |
| March 11, 2008 | The Wall Street Journal reports that Kourash Partow, an American Home Mortgage sales executive convicted of mortgage fraud, sought a lighter sentence on the grounds that his employers encouraged the intentional misrepresentation of loan performance data and the adequacy of loan underwriting.  (Ex. 45). |
| March 13, 2008 | The President's Working Group on Financial Markets issues a policy statement offering the group's "insight on causes of recent market issues." The Working Group described these causes as "lax underwriting standards for mortgages, particularly for subprime mortgages; an erosion of market discipline in the securitization process; flaws in credit rating agencies' assessments of some complex structured credit products; risk management weaknesses at global financial institutions; and regulatory policies that failed to mitigate risk management weaknesses."  (Ex. 46). |
| March 14, 2008 | Moody's Investors Service downgrades National City's credit rating on concerns that National City would "likely face sizable losses in its home equity portfolio" and "could face mounting losses in its residential development and land loan portfolios as well."  (Ex. 47). |

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

**Appendix C – Chronology of Information Publicly Available to MBS Investors Prior to May 22, 2008**

| Date | Event Contributing to the Banks' Knowledge of Alleged Claims |
|---|---|
| March 19, 2008 | Investors in Citigroup MBS file complaint in City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc., No. 08-005187 (N.Y. Sup. Ct.) against Citigroup Global Markets and other Citigroup entities alleging, inter alia, that "appraisals of many properties were inflated," that "appraisals were not done . . . in compliance with USPAP," that "[e]xceptions" to underwriting standards were abandoned because the originators were "granting exceptions as a matter of course," and that defendants made false statements regarding "the maximum loan-to-value ratios used to qualify borrowers."  (Ex. 48 at ¶¶ 4-5, 36). |
| March 26, 2008 | Investors in J.P. Morgan MBS file complaint in Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08 Civ. 1713 (E.D.N.Y.) alleging misstatements regarding underwriting standards and inflated appraisals of the underlying collateral in multiple J.P. Morgan MBS trusts.  The complaint includes allegations that SunTrust Mortgage "de-emphasized the quality control and due diligence of the loan origination process" and aggressively pushed "adjustable rate mortgages ('ARMs'), which were much more likely to default."  (Ex. 49 at ¶¶ 7, 45).  **SunTrust originated loans in RALI 2006-QS6, RALI 2006-QS18, RALI 2006-QS8 and RALI 2006-QS18.** |
| April 2008 | Moody's places the Banks' RALI 2006-QS6, RALI 2006-QS8, CSMC 2006-6 (Class 1-A-12), MANA 2007-F1 and RALI 2007-Q05 certificates on negative watch.  S&P places the Banks' RAST 2006-A11 and CSMC 2006-6 (Class 1-A-12) certificates on negative watch. |
| April 21, 2008 | National City files a Form 8-K disclosing a first quarter loss of $1.4 billion, "reflect[ing] expected probable losses in residential real estate loans."  (Ex. 50). |
| May 9, 2008 | Moody's places the Banks' RAST 2006-A11 and RAST 2006-A14CB certificates on negative watch. |
| May 14, 2008 | Fitch **downgrades** the Banks' RALI 2006-QS18 and RALI 2006-QS8 certificates below investment grade, giving them both a rating of CCC. |

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

### Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008

| Allegations regarding Inflated or Inaccurate Appraisals | |
|---|---|
| Amended Complaint | "In connection with these securitizations, there was an undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans."  ¶ 65 |
| | "[T]he appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties."  ¶ 66 |
| | "[A] material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations."  ¶ 67 |
| Complaints filed before May 22, 2008 make similar allegations | |
| Luther[1] | "The appraisals of many properties were inflated as appraisers were pressured to provide the desired appraisal value regardless of the actual value of the underlying property so the loan could close." ¶ 17 |
| | "Inflated and unreliable [appraisals]  render[ed] the loan-to-value ratio guidelines essentially meaningless." ¶ 53 |
| City of Ann Arbor[2] | "The appraisals of many properties were inflated, as appraisers . . . were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations." ¶ 5 |
| Plumbers' & Pipefitters' Local #562[3] | "[A]ppraisals were unreliable due to lack of controls on the part of [Defendants] . . . . Moreover, the originators had exerted pressure on appraisers to produce pre-determined appraisal values that were not based on the actual values of the properties." ¶ 34 |
| Plumbers Union Local No. 12[4] | "[A]ppraisals of many properties were inflated." ¶ 5 |
| | "The property appraisals for the mortgage loans were not objective, meticulous or compliant with [USPAP]." ¶ 44 |

---

[1] Luther v. Countrywide Home Loans Servicing LP, No. BC 380698 (Cal. Super. Ct.), complaint filed Nov. 14, 2007 (Ex. 25).
[2] City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,  No. 08-cv-1418 (E.D.N.Y.), complaint filed Mar. 19, 2008 (Ex. 48).
[3] Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp., I., No. 08-cv-1713 (E.D.N.Y.), complaint filed Mar. 26, 2008 (Ex. 49).
[4] Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08-cv-10446 (D. Mass.), complaint filed Jan. 31, 2008 (Ex.  39).

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008**

| Allegations regarding Conformity with USPAP | |
| --- | --- |
| Amended Complaint | "[A] material number of mortgage loans in the collateral pools had appraisals conducted [sic] that deviated from USPAP."  ¶72 |
| Complaints filed before May 22, 2008 make similar allegations | |
| Luther | "[T]he appraisals were not in conformity with Fannie Mae or Freddie Mac standards as they were not a reasonable estimate of the actual value of the homes in question."  ¶ 53 |
| City of Ann Arbor | "[P]rior to 2007, [American Home Mortgage's] appraisal process had been substantially eroded such that many of the real estate properties underlying the Alt-A loans were not the subject of legitimate appraisals done in compliance with USPAP standards . . . ." ¶ 36 |
| Plumbers Union Local No. 12 | "[A]ppraisers were rewarded for their willingness to . . . violat[e] USPAP regulations."  ¶ 5   "The property appraisals for the mortgage loans were not objective, meticulous or compliant with [USPAP]."  ¶ 44 |

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008**

| Allegations regarding Abandonment of Underwriting Standards | |
|---|---|
| Amended Complaint | "[The Offering Documents] omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale . . . exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.  ¶ 88 |
| Complaints filed before May 22, 2008 make similar allegations | |
| City of Ann Arbor | "The underwriting, quality control, and due diligence practices and policies utilized were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application."  ¶ 5 <br><br> American Home Mortgage "regularly granted exceptions [to its underwriting standards] even where 'compensating factors' were not present. "  ¶ 36 <br><br> American Home Mortgage "grant[ed] mortgages to customers with little or no money down.  Exceptions were not made for 'quality' loans, but rather were granted as a matter of course."  ¶ 36 |
| Luther | "Countrywide Home Loans was granting exceptions to 'standard underwriting practices,' regardless of whether 'compensating factors' existed."  ¶ 53 <br><br> "Stated Income loans were not adequately reviewed . . . This permitted many loans to be closed where there was no reasonable basis to conclude that the borrower would ever be able to keep up with monthly mortgage payments."  ¶ 53 |
| Plumbers' & Pipefitters' Local #562 | "The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application."  ¶ 7 <br><br> "[T]he originators and other lenders that sold mortgage loans to [the issuer] had become so aggressive in approving and funding loans that many of the mortgage loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender."  ¶ 32 <br><br> "SunTrust did not limit alternative documentation situations to those where 'acceptable compensating factors' existed."  ¶ 45 |

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008**

| | |
|---|---|
| Plumbers Union Local No. 12 | "The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application." ¶ 5 |
| | "[N]o-documentation loans were not limited to situations where assets could be verified, which meant that mortgage loans were approved and funded for borrowers with both insufficient assets and insufficient income." ¶ 42 |
| Luminent Mortgage Capital Inc.[5] | "Plaintiff . . . relied on Merrill's due diligence on the Mortgage Loans to ensure that those loans actually met the lenders' underwriting criteria (i.e., that the borrower's financial profile actually met the lender's purported minimum standards for extending a mortgage loan) and otherwise satisfied the standard criteria for "Alt-A" quality loans regarding, inter alia, the appraisal of the collateral; the amount of assets held by the borrower; the borrower's employment history, income, and debt ratio; and the location of the real property. . . .  Of course, if the information on the deal tape and other information provided by Defendants was materially inaccurate, Plaintiff's entire calculus regarding the desirability of the Junior Certificates would be rendered inaccurate and useless." ¶¶ 72, 74 |
| **Allegations regarding Rate of Loan Delinquencies** | |
| Amended Complaint | "A high rate of delinquency at any time in a group of mortgage loans is [] evidence that originators of those loans may have disregarded their underwriting standards in making the loans." ¶ 95 |
| **Complaints filed before May 22, 2008 make similar allegations** | |
| Luminent Mortgage Capital Inc. | "Here, a review of the performance of the loan portfolio over time demonstrates an unusually high rate of early payment defaults, as well as unusually high rates of delinquencies." ¶ 75 |
| | "[E]arly payment default and delinquency rates . . . prove that the material information referenced [in the complaint was] materially false." ¶ 79 |
| Plumbers' & Pipefitters' Local #562 | "The delinquency and foreclosure rates of the mortgage loans securing the Certificates has grown faster and in greater quantity than what would be expected for mortgage loans of the types described in the Prospectus Supplements." ¶ 10 |
| Plumbers Union Local No. 12 | "The delinquency rates on the underlying mortgage loans have skyrocketed." ¶ 53 |

---
[5] Luminent Mort. Capital, Inc. v. Merrill Lynch & Co., No. 2:07-cv-05423 (E.D. Pa.), complaint filed Dec. 24, 2007 (Ex. 26).

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008**

| Allegations regarding Ratings of the Certificates | |
|---|---|
| Amended Complaint | "The[] statements by the defendants about the ratings of the certificates they issued and underwrote were misleading because the defendants omitted to state that the ratings were affected by all the material untrue or misleading statements about specific mortgage loans in the collateral pools." ¶ 127 |
| Complaints filed before May 22, 2008 make similar allegations | |
| City of Ann Arbor | "As a result [of false statements regarding underwriting, appraisals and LTVs] defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings." ¶ 6 |
| Luther | "Defendants were able to get AAA ratings on many of the tranches of certificates, however due to the undisclosed underwriting defects and appraisal manipulations, these tranches were in fact not equivalent to AAA-rated corporate bonds." ¶ 8 |
| Plumbers' & Pipefitters' Local #562 | Ratings agencies "offered superior credit ratings on the Certificates as a result of defendants' failure to disclose the underwriting defects and appraisal manipulations." ¶ 8 |
| Plumbers Union Local No. 12 | "As a result [of false statements regarding underwriting, appraisals and LTVs] defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other bonds with the same credit ratings." ¶ 6 |
| Allegations regarding Second Liens on Properties | |
| Amended Complaint | "[M]any of the properties that secured mortgage loans in the collateral pool of each securitization were subject to [undisclosed] liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations." ¶ 59 |
| Complaints filed before May 22, 2008 make similar allegations | |
| Luther | "Countrywide Home Loans did not verify that borrowers had sufficient cash to meet down payments and closing costs, which led to many 'silent second' liens [on the properties]." ¶ 55 |
| Plumbers Union Local No. 12 | "[T]he loan-to-value ratio limits represented in the Registration Statements were misleading . . . as a result of . . . second liens on properties whereby borrowers secretly borrowed their down payments." ¶ 44 |

*FDIC (Citizens National and Strategic Capital) v. Bear Stearns Asset Backed Securities I LLC, et al.*
12-cv-4000 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to May 22, 2008**

| Allegations regarding Owner-Occupancy Status | |
|---|---|
| Amended Complaint | "[M]ortgage loans on primary residences usually have more favorable terms . . . than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.  Plaintiff is informed and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so."  ¶ 79 |
| Complaints filed before May 22, 2008 make similar allegations | |
| City of Ann Arbor | "[American Home Mortgage] was, as a matter of course, awarding loans to speculators who were not occupying the homes without properly verifying income.  AHM knew the high proportion of non-owner occupied loans would decrease the borrowers' 'willingness' to continue to pay loan payments if home prices stagnated or dropped."  ¶ 35 |
| Luminent Mortgage Capital Inc. | "Specifically, in evaluating whether to invest in the Junior Certificates, Plaintiff considered and relied upon standard metrics concerning the underlying loans, such as . . . the purpose of the real property serving as collateral (primary residence, second home, etc.)"  ¶ 72<br><br>Merrill provided "false and misleading information regarding various other material characteristics of the Mortgage Loans that Plaintiff relied upon, including . . . the purpose of the Mortgage Loans."  ¶ 70<br><br>"[Merrill] recklessly misrepresented the composition of the pool of Mortgage Loans . . . by providing false and misleading information regarding various other material characteristics of the individual Mortgage Loans as aforesaid, including but not limited to . . . the purpose of the Mortgage Loans."  ¶ 88 |

*FDIC (Strategic Capital and Citizens National) v. Bear Stearns Asset Backed Securities I LLC, et al.*
*12-cv-4000 (S.D.N.Y.)*

### Appendix E – Owner Occupancy Information

| Deal No. | Certificate | Number of Loans in Loan Pool | Number of Properties with Alleged Misstated Owner Occupancy (based on presence of one factor allegedly suggesting non-occupancy) | Number of Properties that Possess Two Alleged Characteristics of Non-Occupancy | Percentage of Properties in Loan Pool with One Alleged Characteristic of Non-Occupancy | Percentage of Properties in Loan Pool with Two Alleged Characteristics of Non-Occupancy* |
|---|---|---|---|---|---|---|
| 1 | RALI 2006-QS6 | 3552 | 559 | 169 | 15.74% | **4.76%** |
| 2 | RALI 2006-QS18 | 4712 | 854 | 266 | 18.12% | 5.65% |
| 3 | RAST 2007-A1 | 636 | 175 | 34 | 27.52% | 5.35% |
| 4 | RALI 2006-QS8 | 4266 | 661 | 161 | 15.49% | **3.77%** |
| 5 | RALI 2006-QS16 | 3009 | 587 | 135 | 19.51% | **4.49%** |
| 6 | BSABS 2007-AC5 | 1539 | 358 | 77 | 23.26% | **5%** |
| 7 | CSMC 2006-6 | 1822 | 278 | 41 | 15.26% | **2.25%** |
| 8 | MANA 2007-F1 | 1392 | 285 | 59 | 20.47% | **4.24%** |
| 9 | RALI 2007-QS5 | 1696 | 288 | 68 | 16.98% | **4.01%** |
| 10 | RAST 2006-A11 | 240 | 57 | 17 | 23.75% | 7.08% |
| 11 | RAST 2006-A14CB | 1645 | 350 | 90 | 21.28% | 5.47% |
| 12 | CMALT 2006-A6 | 1424 | 331 | 79 | 23.24% | 5.55% |

* Bolded numbers are within the margin of error alleged in the Amended Complaint.