**UNITED STATES DISRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CITIZENS NATIONAL BANK and RECEIVER FOR STRATEGIC CAPITAL BANK,<br><br>          Plaintiff,<br><br>   v.<br><br>BEAR STEARNS ASSET BACKED SECURITIES I LLC; THE BEAR STEARNS COMPANIES LLC.; J.P. MORGAN SECURITIES LLC.; CITICORP MORTGAGE SECURITIES, INC.; CITIMORTGAGE, INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; CREDIT SUISSE MANAGEMENT LLC; CREDIT SUISSE SECURITIES (USA) LLC; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MERRILL LYNCH MORTGAGE CAPITAL INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; ALLY SECURITIES, LLC; DEUTSCHE BANK SECURITIES INC.; HSBC SECURITIES (USA) INC.; RBS SECURITIES INC.; and UBS SECURITIES LLC,<br><br>          Defendants. | No. 12 Civ. 4000 (LTS) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ............................................................................................................ 4

I.  ALL OF THE FDIC'S CLAIMS ARE TIMELY ........................................... 4

   A.  The FDIC Has Adequately Pled Compliance with Section 13 of
      the 1933 Act ......................................................................................... 4

   B.  Defendants Have Not Shown That a Reasonable Investor
      Would Have Had Sufficient Facts Regarding Untrue or
      Misleading Statements About These Securities to File a Well-
      Pled Complaint That Would Have Withstood a Motion to
      Dismiss Under Rule 12(b)(6) Before May 22, 2008 .............................. 7

      1.  Because the Certificates Remained Investment Grade Until
         at least May 2008, Defendants Cannot Show as a Matter of
         Law That the Statute of Limitations Began Before That
         Date ............................................................................................ 8

      2.  The Facts on Which the Amended Complaint Is Based
         Were Not Available to a Reasonable Investor Before May
         22, 2008 ..................................................................................... 10

      3.  Other Information Available Before May 22, 2008 Was
         Not Sufficient to Trigger the Statute of Limitations ......................... 13

         a.  EPD Data ......................................................................... 14

         b.  Rating Agency Reports and Actions ................................... 16

         c.  News Articles .................................................................... 17

         d.  Information About Certain Originators ............................... 19

         e.  Other Complaints .............................................................. 21

   C.  The FDIC's Claims Are Also Timely Under the 1933 Act's
      Three-Year Statute of Repose as Extended by 12 U.S.C. §
      1821(d)(14) ......................................................................................... 24

      1.  The Extender Provision in FIRREA Applies to the Statute
         of Repose in the 1933 Act ............................................................. 25

      2.  The Extender Provision in FIRREA Applies to Federal
         Statutory Claims ........................................................................... 29

II.  THE SECTION 11 CLAIMS ARE NOT SUBJECT TO
    DISMISSAL ON ANY OTHER GROUND ................................................... 30

   A.  Defendants May Not, and Did Not, Disclaim Their Statutory
      Duty ................................................................................................... 32

   B.  The Allegations About LTVs and Property Appraisals Are
      Sufficient ............................................................................................ 34

      1.  Even If Appraisals Are Properly Deemed Opinions, the

Amended Complaint Adequately Pleads That the
Statements in the Prospectus Supplements About
Appraisals and LTV Ratios Were Actionably False ......................................... 35

2. The FDIC's AVM-Based Allegations Are More Than
Sufficient to State a Plausible Claim for Relief ................................ 37

3. The Amended Complaint Sufficiently Alleges That the
AVM Used in the Amended Complaint Is Reliable ......................... 38

4. The AVM-Based Allegations Are Not an Attempt to Plead
"Fraud by Hindsight" ...................................................................... 41

5. The AVM-Based Allegations Do Not Fail Because Some of
the Certificates Were Backed in Part by Purchase-Money
Loans ................................................................................................ 42

C. The Allegations About Undisclosed Additional Liens Are
Sufficient ................................................................................................ 44

D. The Allegations About Owner Occupancy Are Sufficient ..................... 45

E. The Allegations About Departures from Underwriting
Standards Are Sufficient ........................................................................ 49

1. Early Payment Defaults and Delinquencies .................................... 51

2. Publicly Available Sources .............................................................. 53

F. The Allegations About Credit Ratings Are Sufficient ........................... 54

G. Reliance Is Not an Element of the FDIC's Claims ................................ 56

H. In Any Event, the Amended Complaint Adequately Pleads
Reliance .................................................................................................. 57

III. THE AMENDED COMPLAINT PLEADS A CLAIM FOR
CONTROL PERSON LIABILITY UNDER SECTION 15 OF
THE 1933 ACT .................................................................................................... 59

CONCLUSION ................................................................................................................ 60

# TABLE OF AUTHORITIES

## CASES

*Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011) ................................................................................................ 12

*Barneby v. E.F. Hutton & Co*, 715 F. Supp. 1512 (M.D. Fla. 1989) ......................... 46

*Bates v. Long Island R.R. Co.*, 997 F.2d 1028 (2d Cir. 1993) ................................... 32

*Borden, Inc. v. Spoors Behrins Campbell & Young, Inc.*, 735 F. Supp. 587 (S.D.N.Y. 1990) ................................................................................................ 59

*Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 WL 4469101 (D. Mass. Sept. 28, 2012) ................................................................ *passim*

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 703 F. Supp. 2d 253 (E.D.N.Y. 2010) ............................................................. 6, 23

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011) .................................................................................................................. 7

*Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ..................................................................... 6, 13

*Fed. Deposit Ins. Corp. as Receiver for the Bank of New England v. Zibolis*, 856 F. Supp. 57 (D.N.H. 1994) ......................................................... 30

*Fed. Deposit Ins. Corp. as Receiver for United W. Bank, F.S.B. v. Countrywide Fin. Corp.*, No. 11-CV-10400-MRP (MANx), 2013 WL 49727 (C.D. Cal. Jan. 3, 2013) ............................................................... 11, 37

*Fed. Deposit Ins. Corp. v. Barton*, 96 F.3d 128 (5th Cir. 1996) ............................... 25

*Fed. Home Loan Bank of Chi. v. Banc of Am. Funding Corp.*, No. 10 CH 45033, slip op. (Ill. Cir. Ct. Sept. 19, 2012) ............................................... 11

*Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071, slip op. (Ind. Super. Ct. July 3, 2012) ...................... 8

*Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.*, No. 2:12-CV-1059-MRP (MANx), 2012 WL 5275327 (C.D. Cal. Oct. 18, 2012) ................ 28, 29, 30

*Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 WL 5395646 (S.D.N.Y. Nov. 5, 2012) ................................... 17, 53

*Fed. Hous. Fin. Agency v. Morgan Stanley*, No. 11 Civ. 6739 (DLC), 2012 WL 58683000 (S.D.N.Y. Nov. 19, 2012) .......................................... 43, 44

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. May 4, 2012) ........................................................................................... *passim*

*Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011) ........................................................... 56, 57

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) ................................................................................................................ 33

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................................ 17

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..................................................................... *passim*

*In re Chaus Sec. Litig.*, 801 F. Supp. 1257 (S.D.N.Y. 1992) ...................... 5

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311 (S.D.N.Y. 2009) ...................................................................................... 33

*In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ................................................... 59

*In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010) ................................................................................... 8, 50

*In re IndyMac Mortg.-Backed Sec. Litig.*, No. 09 Civ 4583 (LAK), 2012 WL 3553083 (S.D.N.Y. Aug. 17, 2012) ................................................ 56

*In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) ................................................ 50, 52, 53

*In re Lehman Bros. Securities & ERISA Litigation*, 800 F. Supp. 2d 477 (S.D.N.Y. 2011) ...................................................................................... 25

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) ............................... 56

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS), 2012 WL 2899356 (S.D.N.Y. July 16, 2012) ...................... *passim*

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650 (S.D.N.Y. 2011) ...................................... 9, 16, 19

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ........................... 16

*In re Municipal Mortg. & Equity, LLC Sec. and Derivative Litig.*, No. MJG-08-1961-MDL, 2012 WL 2450161 (D. Md. June 26, 2012) ................................. 7

*In re Phar-Mor, Inc. Litig.*, 848 F. Supp. 46 (W.D. Pa. 1993) ................................................. 46

*In re Textrainer P'ship Sec. Litig.*, No. C 05-0969, 2006 WL 1328851 (N.D. Cal. May 15, 2006) ..................................................................... 39

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ....................... 7

*In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958 (N.D. Cal. 2010) ...................................................................... 9, 19

*In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 WL 2856519 (S.D.N.Y. July 21, 2008) ..................................................................... 59

*Int'l Star Class Yacht Racing Assoc. v. Tommy Hilfiger, U.S.A., Inc.*, 146 F.3d 66 (2d Cir. 1998) .................................................................... 40

*Inv. Co. of the Sw. v. Reese*, 875 P.2d 1086 (N.M. 1994) ........................ 26

*Iowa Pub. Emps.' Ret. Sys. v. M.F. Global Ltd.*, 620 F.3d 137 (2d Cir. 2010) ................................................................................................ 32

*Lennon v. Seaman*, 63 F. Supp. 2d 428 (S.D.N.Y. 1999) .......................... 54

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, No. 11 Civ. 398 (GBD), 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012) ........................ 4

iv

*Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) ........................................................................................... 33

*Luminent Mortg. Capital v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576 (E.D. Pa. 2009) ................................................................................ 22

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302-MRP (MANx), 2011 WL 4389689 (C.D. Cal. May 5, 2011) ........................... 33, 50, 52

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191 (D. Mass. 2012) ............................................................................ *passim*

*McKenna v. SMART Techs. Inc.*, No. 11 Civ. 7673 (KBF), 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) ........................................................... 59

*McMahon & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044 (2d Cir. 1995) ........................ 34, 52

*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) ...................................... 7

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................................................. 36

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ...................... 56, 57

*N.J. Carpenters Health Fund v. Novastar Mortg., Inc.*, No. 08 Civ. 5310 (DAB), 2012 WL 1076143 (S.D.N.Y. Mar. 29, 2012) ............................... 6

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ......................... 51

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2011 WL 2020260 (S.D.N.Y. May 19, 2011) ................... 7, 14, 21, 57

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254 (S.D.N.Y. 2010) ................................................... 50, 53

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, No. 11-2340-RDR, 2012 WL 3028803 (D. Kan. July 25, 2012) ........................................... *passim*

*Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D. Cal. Mar. 15, 2012 Tentative Ruling, adopted by Civil Minutes of Sept. 4, 2012) .............................................................................. 29

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, No. 11 Civ. 5887 (C.D. Cal. Dec. 19, 2011 Tentative Ruling) ......................................... 29

*Newman v. Warnaco Grp., Inc.*, 335 F.3d 187 (2d Cir. 2003) ............................... 8

*P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004) ........................ 25, 32, 50

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001) ......................................................................................... 39

*Pearson v. United States*, 831 F. Supp. 2d 514 (D. Mass. 2011) ......................... 31

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ...................................... 7, 18, 23, 35

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299 (D. Mass. 2009) .................................... 23

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011) ........................................... 23, 50

*Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2012 WL 2026556 (S.D.N.Y. May 31, 2012) ............................................. 6

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09 CV 1110 (HB), 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) ............................................. *passim*

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 714 F. Supp. 2d 475 (S.D.N.Y. 2010) ............................................................................. 6, 9

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.., Inc.*, 277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................................... 56, 57

*Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ...................................................................................... 7

*SMS Fin., LLC v. ABCO Homes, Inc.*, 167 F.3d 235 (5th Cir. 1999) ....................................... 27

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) ............................... 17-18

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012) ................................................................................... 56

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010) .......................................................................... 50

*UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173 (10th Cir. 1999) ............................................................................................................ 26

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) ....................................................... 32

## STATUTES

12 U.S.C. § 1787(b)(14) ............................................................................................... 28

12 U.S.C. § 1821(d)(14) ................................................................................... 24, 25, 29, 30

12 U.S.C. § 4617(b)(12) ............................................................................................... 27

15 U.S.C. § 77l(a)(2) .................................................................................................. 46

15 U.S.C. § 77k(a) ..................................................................................................... 56

15 U.S.C. § 77m ........................................................................................................ 25

15 U.S.C. § 77o(a) ..................................................................................................... 59

Fed. R. Evid. 201(b)(2) .............................................................................................. 40

Pub. L. No. 101-73, 103 Stat. 183 (1989) ................................................................... 26

## OTHER AUTHORITIES

135 Cong. Rec. S10182-01 (1989) .............................................................................. 27

135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) (statement of Sen. Riegle) ........................................................................................................ 26

FDIC, *Interagency Appraisal and Evaluation Guidelines*, 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010) ......................................................................... 38

The Appraisal Foundation, Uniform Stamdards of Professional Appraisal
    Practice (*available at* http://www.uspap.org/#/166/) ........................................................... 38

**INTRODUCTION**

Citizens National Bank (CNB) and Strategic Capital Bank (SCB) (collectively, the Banks) bought 19 residential mortgage-backed securities that the defendants issued and underwrote in 12 securitizations. (Am. Compl. ¶¶ 1, 38 & Item 38 of Schedules 1-12.) The certificates all were rated triple-A or double-A at purchase (*id.* ¶¶ 137, 139 & Item 38 of Schedules 1-12), and were backed by "Alt-A," not subprime, mortgage loans. The Banks' investment policies required that they purchase only certificates that were rated at least "A." (*Id.* ¶ 126.)

In the offering documents for each of the securitizations, defendants made hundreds of detailed statements about the specific mortgage loans in that securitization. The Banks had no access to information about those individual loans when deciding whether (and at what price) to purchase a particular certificate other than what the defendants included in the offering documents that they filed with the Securities and Exchange Commission (SEC).[1]

According to the detailed allegations in the amended complaint, which must be taken as true for purposes of this motion to dismiss, many of the material statements that the defendants made about the mortgage loans that backed each of the Banks' certificates were untrue or misleading. Faced with allegations that they made hundreds of material untrue or misleading statements and with a statute that makes them strictly liable without

---

[1] Defendants attempt to paint a picture of CNB and SCB as reckless investors that "knew exactly what they were buying, and were doing so intentionally in the hope of making a profit on MBS certificates purchased at substantial discounts." (Defs. Br. at 1.) But the fact that the Banks bought these certificates at a discount – even if true – hardly shows that they knew or should have known that the defendants had made material untrue or misleading statements in the prospectus supplements. Likewise, that regulators later concluded that these investments proved to be a poor selection of risk for the Banks overall (Defs. Br. at 1, 10-11), says nothing about what the Banks knew or should have known about the truth of the statements in the prospectus supplements when they bought these securities.

proof of anything else, defendants nevertheless try to persuade the Court that, as a matter of law, they are not responsible for a single one of their untrue or misleading statements.

Defendants first argue that all of the claims in the amended complaint are time-barred as a matter of law because any reasonable investor not only would have suspected by May 22, 2008 (one year before the Banks failed and the Federal Deposit Insurance Corporation was appointed receiver for each), that defendants had made untrue or misleading statements in the offering materials, but also could have filed by that date a well-pleaded complaint with sufficient facts to withstand a motion to dismiss under Rule 12(b)(6). That argument is refuted by decisions of this Court and others that when a reasonable investor would have discovered such untrue or misleading statements remains a question of fact at least until the certificates were downgraded below investment grade, which in this case did not occur until at least May 2008. Moreover, the information to which defendants point as the source of actual or constructive knowledge of their violations of law is no different than the information that this Court and others have rejected as a trigger of the statute of limitations because it is not factual information specifically relating to these certificates and these defendants, but rather is information concerning only general market practices or conditions.

Defendants next argue that none of the claims pleads a plausible claim for relief. They contend that, despite writing and filing prospectus supplements in which they made hundreds of statements about the mortgage loans that were the sole source of payment on the certificates being sold, the Banks should have paid no attention whatsoever to any of those statements. Defendants assert that investors should have disregarded those statements either because the statements were opinions,  the defendants were not the

source of that information, or the offering documents contained statements that purported to disclose or disclaim the risk of each of these misstatements. Defendants also challenge the "statistical" analyses underlying the amended complaint, but those methodologies have been upheld repeatedly by other courts on motions to dismiss.

In sum, defendants ask the Court to decide – at the outset of these actions and as a matter of law – that defendants are not responsible for a single one of the hundreds of untrue or misleading statements that they made about the mortgage loans that backed each of the certificates that the Banks purchased. This Court has rejected similar motions in other RMBS cases before it, and the Federal Deposit Insurance Corporation, as Receiver for CNB and as Receiver for SCB (collectively, FDIC), respectfully urges the Court to do the same here.

## BACKGROUND

On May 22, 2009, CNB and SCB were closed and the Federal Deposit Insurance Corporation was appointed the receiver for each. The FDIC then undertook an investigation into possible claims that it is authorized to bring as receiver for the Banks. That investigation included a detailed analysis of a random sample of the relevant loans in each of the 12 securitizations, using a comprehensive, industry-standard automated valuation model (AVM), among other tools, to test the truth of the assertions defendants made in the offering documents. (*See, e.g.*, Am. Compl. ¶¶ 2-3, 50-55, 59-62, 81-84.) As a result of that investigation, the FDIC discovered in late 2011 the untrue or misleading statements made by the defendants. (*Id.* ¶ 134.)

The FDIC filed a complaint in this Court on May 19, 2012, asserting claims under sections 11 and 15 of the Securities Act of 1933. The defendants moved to dismiss that

complaint as time-barred and for failure to state a claim. Pursuant to Rule 15(a)(1)(B) of

the Federal Rules of Civil Procedure, the FDIC filed an amended complaint as of right on

October 12, 2012. Defendants now move to dismiss the amended complaint on the same

grounds.

　　　　As discussed below, defendants fail to meet their burden of demonstrating that the

amended complaint either is time-barred or fails to state a claim as a matter of law.

## ARGUMENT

## I.　　ALL OF THE FDIC'S CLAIMS ARE TIMELY.

### 　　A.　The FDIC Has Adequately Pled Compliance with Section 13 of the 1933 Act.

　　　　This Court has made clear that to withstand a motion to dismiss based on the

statute of limitations in section 13 of the 1933 Act the plaintiff

> need only plead facts sufficient to allege plausibly that a reasonable
> investor could not have brought a complaint, prior to [the relevant trigger
> date], that could have withstood a Rule 12(b)(6) motion. Thereafter, the
> burden shifts to Defendants to show that "'uncontroverted evidence
> irrefutably demonstrates [that the] plaintiff discovered or should have
> discovered' facts sufficient to adequately plead a claim'" prior to that date.

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS)

(MHD), 2012 WL 2899356, at *2 (S.D.N.Y. July 16, 2012) ("*Morgan Stanley III*")

(quoting *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d

746, 763 (S.D.N.Y. 2012)). In doing so, the Court squarely rejected the heightened, three-

pronged pleading burden that defendants seek to impose on the FDIC here.[2] *See id.*

---

[2] *See* Defs. Br. at 14 (arguing that FDIC must specifically allege "(1) the time and
circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not
discovered earlier; and (3) the diligent efforts which plaintiff undertook in making or seeking
such discovery"). The case on which defendants purport to rely in holding the FDIC to this three-
pronged standard, *Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*, No. 11
Civ. 398 (GBD), 2012 WL 4616958, at *12 (S.D.N.Y. Sept. 28, 2012), involved 1933 Act claims

The allegations in the amended complaint are more than sufficient to meet this standard. The FDIC has alleged that:

- A reasonably diligent plaintiff could not have filed a well-pled complaint, based in fact (versus on mere speculation), before May 22, 2008 that would have withstood a motion to dismiss because it did not have access to facts about the specific loans underlying its certificates that would have alerted investors that the statements defendants made about those loans were untrue or misleading. (Am. Compl. ¶¶ 132-33.) Such facts could have been found in loan files or records maintained by the servicers of the loans, but reasonable investors like CNB and SCB did not have access to those sources of information. (*Id.*) The necessary facts did not become available until early 2010.[3] (*Id.*)

- A reasonably diligent plaintiff could not have discovered sufficient facts about defendants' untrue and misleading statements to file a complaint by May 22, 2008, because 14 of the certificates involved in this action were not downgraded below investment grade until well after that date, and the remaining five were downgraded only eight days before that date. (*Id.* ¶¶ 135-139 and Item 38(e) of Schedules 1-12.) If the rating agencies, which were monitoring these certificates and are much more sophisticated than a reasonable investor, did not discover such facts and downgrade the certificates before May 2008, then there is no reason to conclude that a reasonable investor would have been able to discover those facts. (*Id.*)

- The FDIC discovered the untrue or misleading statements by defendants in late 2011 in the course of its investigation of possible claims of CNB and

---

that sounded in fraud and thus were subject to Rule 9(b). Like the authority rejected by this Court in *Morgan Stanley III*, it therefore is inapposite. *See Morgan Stanley III*, 2012 WL 2899356, at *2 (stating that Court has never adopted the three-pronged pleading requirement set forth in *In re Chaus Securities Litigation*, 801 F. Supp. 1257, 1265 (S.D.N.Y. 1992)), because the claims in that case sounded in fraud and thus were subject to the more stringent pleading requirements of Rule 9(b)). But even if this were the appropriate standard, the FDIC has met it, as demonstrated below.

[3] Although the amended complaint does not identify the specific data that was unavailable before 2010, the FDIC could easily do so if the Court finds that necessary. In cases brought by the Federal Deposit Insurance Corporation as Receiver for Colonial Bank, as well as in its capacity for other receiverships, it has alleged that, to perform the retrospective AVM, additional liens, and owner-occupancy analyses that are the bases for these complaints, it was necessary to have property addresses for the specific loans backing the certificates, which were not available before early 2010, when the same vendor that provided the AVM developed a method for cross-referencing information about the loans that backed a mortgage-backed security with information in its other proprietary databases of land and tax records. (*See, e.g.*, Amended Complaint, *Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.*, No. 12 Civ. 6166 (LLS) (MHD) (S.D.N.Y. filed Dec. 4, 2012) (Matthews Decl. Ex. C) at ¶¶ 51, 60 n.4, 82.)

SCB that the FDIC is authorized to bring as receiver of these two failed banks. (*Id.* ¶ 134.)

This Court has found similar allegations sufficient to meet the plaintiff's pleading burden under section 13. *See, e.g., Morgan Stanley III*, 2012 WL 2899356, at *3 (allegation that reasonable investor could not have discovered claim before certificates were downgraded below investment grade was sufficient). The Court therefore should reject defendants' argument that the FDIC has not met its pleading burden.[4]

---

[4] Defendants urge this Court to follow a recent decision from Judge Pfaelzer in the Central District of California, which the FDIC has since appealed, dismissing a complaint that the FDIC brought as receiver for SCB. Defs. Br. at 2, 14 (citing *Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)). There are several reasons why the Court should not do so. First, Judge Pfaelzer concluded that when a certificate was downgraded below investment grade is irrelevant for purposes of the statute of limitations analysis. *Id.* at *7. Second, she also concluded that a reasonable investor could have stated a claim that would have withstood a Rule 12(b)(6) motion based entirely on allegations in other complaints about Countrywide's underwriting and appraisal practices generally, without any specific information tied to the particular certificates that the investor purchased. *Id.* at *4-6. Because these rulings conflict with this Court's prior holdings, as well as the weight of authority in RMBS cases generally, Judge Pfaelzer's decision should be disregarded. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67 (holding that statute of limitations did not begin before certificates were downgraded below investment grade); *Morgan Stanley III*, 2012 WL 2899356, at *3 (same); *Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2012 WL 2026556, at *1 (S.D.N.Y. May 31, 2012) (dismissing complaint where plaintiff failed to allege that misrepresentations specified in the complaint applied to the particular mortgages underlying the certificates it purchased); *Fed. Housing Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 321-22 (S.D.N.Y. May 4, 2012) (holding that statute of limitations did not begin before certificates were downgraded below investment grade); *N.J. Carpenters Health Fund v. Novastar Mortg., Inc.*, No. 08 Civ. 5310 (DAB), 2012 WL 1076143, at *5 (S.D.N.Y. Mar. 29, 2012) (dismissing claim where plaintiff did not "provide details that would tie its claim of loosened underwriting guidelines to the specific loans that secured the Class M-1 Certificates that Plaintiff bought"); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring plaintiffs to plead how alleged misstatements "are tied to the loans in which they invested"); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010) (finding it inappropriate to resolve statute of limitations question on motion to dismiss where certificates were not downgraded below investment grade until after limitations date).

**B. Defendants Have Not Shown That a Reasonable Investor Would Have Had Sufficient Facts Regarding Untrue or Misleading Statements About These Securities to File a Well-Pled Complaint That Would Have Withstood a Motion to Dismiss Under Rule 12(b)(6) Before May 22, 2008.**

The Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), as well as the Second Circuit's application of *Merck*, makes clear that until a reasonably diligent plaintiff would have discovered the facts supporting its claims and could plead those facts "with sufficient detail and particularity to survive a motion to dismiss," the one-year statute of limitations does not begin to run. *See City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *see also In re Bear Stearns*, 851 F. Supp. 2d at 763 (relevant question is "whether a plaintiff could have pled '33 Act claims with sufficient particularity to survive a 12(b)(6) motion to dismiss more than a year prior to the filing of the operative complaint").[5] Furthermore, whether sufficient facts could have been discovered more than a year before a plaintiff filed its complaint "is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *In re Bear Stearns*, 851 F. Supp. 2d at 763. Thus, the Court will grant a motion to dismiss only where "'uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered' facts

---

[5] Despite defendants' assertion to the contrary (Defs. Br. at 16 n.15), there is no reason for the Court to reconsider this ruling, which is well supported by the weight of authority both in this Circuit and elsewhere. *See, e.g., Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 319-20 (S.D.N.Y. 2012); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448, at *10 & n.11 (E.D.N.Y. Feb. 23, 2012); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 370-71 & n.39 (S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011); *Nat'l Credit Union Admin Bd. v. RBS Sec., Inc.*, No. 11-2340-RDR, 2012 WL 3028803, at *21 (D. Kan. July 25, 2012); *In re Mun. Mortg. & Equity, LLC Sec. & Deriv. Litig.*, No. MJG-08-1961-MDL, 2012 WL 2450161, at *28 n.47 (D. Md. June 26, 2012); *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *9 & n.1 (N.D. Cal. Jan. 5, 2011).

sufficient to adequately plead a claim" before that date. *Id.* (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003)).

Defendants have not irrefutably demonstrated by uncontroverted evidence that CNB and SCB should have discovered facts sufficient to state a claim before May 22, 2008, which, for the reasons explained in Part I.C below, is the relevant date for determining that the claims are timely. Indeed, courts have been reluctant to find that purchasers of mortgage-backed securities were even on *inquiry notice* of similar claims by mid-2008, much less that they could have pled a viable claim by that date. *See, e.g., In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010 (no inquiry notice as of May 2008); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09 CV 1110 (HB), 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12, 2011) ("*Miss. PERS/Goldman*") (no inquiry notice as of February 2008). As a result, and for the reasons explained below, the Court should deny defendants' motion to dismiss the FDIC's claims as untimely.

> **1.  Because the Certificates Remained Investment Grade Until at Least May 2008, Defendants Cannot Show as a Matter of Law That the Statute of Limitations Began Before That Date.**

Most courts – including this one – have found that when the limitations period began to run is a question of fact at least until the certificates were downgraded below investment grade. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67; *Morgan Stanley III*, 2012 WL 2899356, at *3; *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, No. 11-2340-RDR, 2012 WL 3028803, at *23-24 (D. Kan. July 25, 2012) ("*NCUA*"); *Fed. Hous. Fin. Agency v. UBS Am., Inc.,* 858 F. Supp. 2d 306, 321-22 (S.D.N.Y. 2012) ("*FHFA/UBS*"); *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071, slip op. at 2 (Ind. Super. Ct. July 3, 2012) (Matthews Decl.

Ex. A). Indeed, even courts applying a pre-*Merck*, inquiry notice standard have found it inappropriate to resolve the statute of limitations question on a motion to dismiss when the "certificates at issue were not downgraded below investment grade until . . . after the . . . limitation date." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010) ("*Miss. PERS/Merrill I*"); *see also In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966-68 (N.D. Cal. 2010); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 664-65 (S.D.N.Y. 2011) ("*Morgan Stanley II*"). As this Court has explained, "absent a decline in the Certificates' ratings (or some other indicator of a steep decline in the Certificates' value), it is difficult to see how a plaintiff could have plausibly pled that the epidemic of indiscretions in the MBS industry had infected his or her Certificates." *In re Bear Stearns*, 851 F. Supp. 2d at 764-65.

Because 14 of the 19 certificates involved in this action were not downgraded below investment grade until well after May 22, 2008, and five were downgraded only eight days before that (Am. Compl. ¶¶ 137, 139 & Item 38(e) of Schedules 1-12), defendants have not shown, as a matter of law, that the statute of limitations expired before the FDIC was appointed receiver for CNB and SCB.[6]

---

[6] Although RALI 2006-QS18 1-M-1 (in which CNB bought three certificates) and RALI 2006-QS8 M-1(in which CNB and SCB each bought one certificate) were downgraded below investment grade on May 14, 2008 (Am. Compl. ¶ 139, Item 38(e) of Schedules 2 & 4), that is not a sufficient reason to find as a matter of law that the statute of limitations for claims on these certificates has expired. Even if a reasonable investor would have learned of the downgrades on May 14, 2008, the Court should not conclude as a matter of law that it would have been possible to state a viable claim by May 22, 2008 – just eight days later – because "downgrades alone do not convey facts sufficient to plead a Section 11 or 12(a)(2) claim." *In re Bear Stearns*, 851 F. Supp. 2d at 766.

### 2. The Facts on Which the Amended Complaint Is Based Were Not Available to a Reasonable Investor Before May 22, 2008.

Defendants erroneously contend that, because the allegations in the amended complaint are based in large part on a forensic analysis of the underlying loans, and some of the information used in that analysis was available before May 22, 2008, the FDIC's claims are time-barred as a matter of law. (Defs. Br. at 15-21.)

First, no investor could have obtained the data necessary to perform the forensic analysis described in the amended complaint until long after May 22, 2008. To develop information about a particular loan, an investor must know the address of the property that secures the loan. To take obvious examples, an investor could not run an AVM on a property or learn whether there were undisclosed additional liens on the property without knowing the address of the property. But, as the amended complaint alleges, it was not possible for investors like CNB and SCB to know the addresses of the properties that secured the loans backing the certificates or the names of the mortgagors of those properties because the loan files and servicing records that contain this information were not provided to them. (Am. Compl. ¶¶ 132, 133.)

That essential prerequisite became available to the FDIC for the first time in early 2010, when the leading vendor of real estate data first developed a way to cross-reference databases of securitized loans and other databases of land records and thereby learn the address of the property that secured a loan.[7] (Am. Compl. ¶ 133.) Only with that information could the FDIC use the AVM and do the additional-liens and occupancy

---

[7] Defendants cite one unsubstantiated, two-page article for the proposition that AVMs generally could be used as early as April 2007 to take "a second look at loans." (Frankel Decl. Ex. 16.) Even if the Court properly could take judicial notice of the truth of the matters asserted in this article – which it cannot (*see* note12, *infra*) – defendants have no basis to link this article to the specific type of retrospective analysis described in the amended complaint. Ultimately, whether a particular AVM technology existed as of a certain date remains a question of fact.

analyses on a random sample of the loans that backed CNB's and SCB's certificates to test the truth of defendants' statements in the prospectus supplements. *See Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, No. 10 CH 45033, slip op. at 13 (Ill. Cir. Ct. Sept. 19, 2012) (Matthews Decl. Ex. B) (finding that plaintiff adequately pled facts demonstrating that its claims were brought within the statute of limitations where it alleged that it did not have access to loan files for loans that secured its MBS and had no independent way to verify defendants' representations about the credit quality of the underlying loans). At a minimum, questions of fact exist about whether and how such information would have been available to a reasonable investor before May 22, 2008.

Second, defendants are wrong that the FDIC's complaint is "very different from most MBS complaints" because it relies in large part on this type of retrospective analysis. (Defs. Br. at 15.) Other courts have refused to dismiss as time-barred complaints that were based on AVMs or other similar loan-level analyses, despite the fact that some of the data inputs into those analyses were publicly available more than a year before the complaint was filed. *See, e.g.*, *Fed. Deposit Ins. Corp. as Receiver for United W. Bank, F.S.B. v. Countrywide Fin. Corp.*, No. 11-CV-10400-MRP (MANx), 2012 WL 49727, at *1 (C.D. Cal. Jan. 3, 2013) ("While the amended complaint relies heavily on an automated valuation model ('AVM,') which uses data that could theoretically have been available as early as April 2007, the Court cannot hold as a matter of law . . . that such data would have led a reasonable investor both to recognize the misstatements and to link those to the possibility that the securities purchased by United Western Bank would suffer losses."); *FHFA/UBS*, 858 F. Supp. 2d at 320-22, 324 (finding that complaint, which relied principally on forensic analysis of loan-level data, including AVM, was not

11

time-barred by September 2008); *Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 WL 4469101, at *9, *13 (D. Mass. Sept. 28, 2012) (refusing to hold that reasonable investor was on inquiry notice in late 2007 even where allegations were premised on results of AVM that used publicly available data including county assessor records, tax rolls, and data on comparable properties); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 202-03, 208-09 (D. Mass. 2012) ("*MassMutual/RFC*") (same).

Third, the case on which defendants principally rely – *Allstate Insurance Co. v. Countrywide Financial Corp.,* 824 F. Supp. 2d 1164 (C.D. Cal. 2011) – is inapposite. In *Allstate*, the court criticized the loan-level analysis that the plaintiff conducted as nothing more than "summaries of other, previously disclosed facts" that were "available in the Prospectus Supplements that Allstate claims to have relied upon." *Id.* at 1181. As a result, the court determined that "a reasonable investor could and should have engaged someone to copy and paste the Prospectus Summaries into a spreadsheet and analyze the numbers well before 2008." *Id.* This critique does not apply to the FDIC's analysis of the loans underlying these certificates. The FDIC did much more than copy and paste information from the prospectus supplements into a spreadsheet. Rather, it used newly available information (the property addresses) to test the accuracy of the assertions made in the offering documents. None of the FDIC's analyses could have been done before it had that information. Thus, the statute of limitations could not have begun before the information became available in early 2010.[8]

_____

[8] In dismissing the amended complaint in *FDIC as Receiver for Strategic Capital Bank v. Countrywide Financial Corp.*, Judge Pfaelzer did not reach this issue. She concluded that it was not necessary to decide whether her prior decision in *Allstate* applied because she found that yet unproven allegations in complaints by other investors about Countrywide's practices in general

### 3. Other Information Available Before May 22, 2008 Was Not Sufficient to Trigger the Statute of Limitations.

Although defendants pay lip service to *Merck* and acknowledge that the statute of limitations does not begin to run until a plaintiff has or should have sufficient facts to draft a complaint that meets the legal standard under Rule 12(b)(6) (Defs. Br. at 13), they urge the Court to find that information publicly available by May 2008 that said nothing about whether *these defendants* made untrue or misleading statements in *these offering documents* was sufficient to trigger the limitations period.

But this Court and others repeatedly have held that the availability of precisely the same types of information upon which defendants rely here (*i.e.*, monthly distribution reports reflecting information about delinquencies and defaults; news articles and other reports discussing problems in the RMBS market generally; negative rating agency actions other than downgrades below investment grade; and other complaints or investigations about the practices of various loan originators) would not have enabled a reasonable investor to plead a plausible claim for material untrue statements or omissions in the offering materials because it did not provide the necessary link to the particular certificates that the plaintiff purchased. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764 (finding that complaint assembled from this sort of information would not have survived Rule 12(b)(6) motion because it discussed "general, industry-wide practices" "untethered to the transactions that are the subject of the" complaint); *NCUA*, 2012 WL 3028803, at *22-26 (press and regulatory reports, lawsuits, and data about early payment defaults and delinquencies was insufficient to trigger statute of limitations where

---

were sufficient to trigger the statute of limitations. 2012 WL 5900973, at *6 & n.14. As discussed above in footnote 4, this conclusion is contrary to the weight of authority.

certificates had not been downgraded below investment grade); *MassMutual/RFC*, 843 F.
Supp. 2d at 208 (newspaper articles, industry publications, government reports, and
monthly reports disclosing deficiencies and defaults in underlying loans were not
sufficient to put investor on inquiry notice that specific underwriting and appraisal
practices represented in offering materials were false); *N.J. Carpenters Health Fund v.
Residential Capital, LLC*, No. 08 CV 8781 (HB), 2011 WL 2020260, at *5 (S.D.N.Y.
May 19, 2011) ("*NJ Carpenters/ResCap*") (finding combination of elevated delinquency
rates, collapse of Bear Stearns, and fact that rating agency had put certificates on watch
for possible downgrades insufficient to show that reasonable investor would have
discovered facts constituting violation by May 18, 2008). As Judge Cote recently
explained:

> The 2007 reports, lawsuits, and investigations regarding loan origination
> practices cited by defendants may have signaled a potential for problems
> in the RMBS market generally – and may, as plaintiff suggests, have
> triggered a duty on the part of *defendants* to scrutinize the loans included
> in their securitizations more closely – but such reports were insufficient to
> trigger the Securities Act's statute of limitations. . . . Whatever questions
> the GSEs might have harbored in 2007 about the quality of the
> securitizations they bought from defendants, it cannot be said that they
> should have "discovered" that those securitizations in fact contained loans
> that failed to meet the standards set out in the offering materials until they
> were alerted to this possibility by the ratings agencies in early 2008.

*FHFA/UBS*, 858 F. Supp. 2d at 321-22.

As explained in further detail below, the same reasoning applies here with respect
to each source of information to which the defendants point, and thus precludes the
dismissal of the FDIC's claims.

### a.   **EPD Data**

The availability before May 22, 2008 of data about early payment defaults (EPDs)
on the loans backing the certificates does not show that the statute of limitations began to

run before that date. (Defs. Br. at 16-18.) Even if defendants could establish on a motion

to dismiss precisely what EPD data was available to reasonable investors by May 22,

2008, taken in isolation, that information still would not have enabled a reasonable

investor to state a plausible claim that the defendants had made untrue or misleading

statements in the offering documents for these certificates.[9] As numerous courts have

found, a reasonably diligent investor would not have been able to link evidence of

increased defaults and delinquencies in the loan pools underlying its certificates with a

failure to follow the underwriting and appraisal guidelines specified in the offering

materials. *See, e.g., MassMutual/RFC*, 843 F. Supp. 2d at 208 (access to monthly reports

regarding defaults and delinquencies insufficient even to put plaintiff on *inquiry notice* of

misrepresentations about underwriting and appraisal practices); *NCUA*, 2012 WL

3028803, at *24 (early spike in default and delinquency rates was insufficient to show

that "a reasonably diligent investor would have sufficient notice to file a plausible claim

by March 2008"). Defendants' reliance on this Court's conclusion in an earlier decision

---

[9] Indeed, defendants make that precise point in arguing that the FDIC's allegations about EPDs fail to state a claim. Defendants argue, on the one hand, that EPD data should have triggered the statute of limitations because it would have put a reasonable investor on notice of wholesale departures from the underwriting guidelines, and on the other hand, that this same data does not support a claim. (*See* Defs. Br. at 48 ("[A] bare allegation of high EPD rates does not suffice to state a claim.")) Thus, it is defendants – not the FDIC – that seek to "have it both ways." (*Id.* at 48 n. 47.) Indeed, Judge Cote recently addressed and rejected the same argument that defendants make here (*i.e.*, that information in the complaint either is insufficient to plead a claim or plaintiff had enough information to plead its claims whenever that information became available). *See FHFA/UBS*, 858 F. Supp. 2d at 320-21. Judge Cote explained that this argument "pose[s] a false dichotomy" because, between the date on which the relevant information became available and the filing of the complaint, "an important event occurred that caused the GSEs to discover that the loans included in the securitizations they bought from defendants were not as advertised: the securities were downgraded from investment grade to near-junk status." *Id.* The same reasoning applies here.

in *In re Morgan Stanley*[10] that *inquiry notice* arose in part from similar data in monthly distribution reports is misplaced given that (a) inquiry notice is not the applicable standard here and (b) the Court later held in the same case that the statute of limitations was not triggered where none of the certificates had been downgraded below investment grade before the relevant date. *See Morgan Stanley III*, 2012 WL 2899356, at *3.

### b.  Rating Agency Reports and Actions

Defendants argue that various rating agency reports and actions show that CNB and SCB had actual or constructive notice of their claims before May 22, 2008. (Defs. Br. at 22 (noting that eight certificates were put on "negative outlook" and that some classes subordinate to the tranches CNB and SCB bought were downgraded below investment grade before May 2008.)) But because only a downgrade that brings the certificate below investment grade is potentially relevant for purposes of the statute of limitations, defendants' argument should be rejected.

First, as this Court has recognized, "negative watches" are not downgrades and do not trigger the statute of limitations. *In re Bear Stearns*, 851 F. Supp. 2d at 766-67; *see also Morgan Stanley II*, 810 F. Supp. 2d at 663-65; *Miss. PERS/Goldman*, 2011 WL 135821, at *8. That is particularly true where, as here, the investor has risk-related investment criteria that allow it to purchase only certificates of a particular grade.[11] *See Morgan Stanley II*, 810 F. Supp. 2d at 664-65. Second, downgrades of the ratings for subordinate tranches likewise do not give rise to actual or constructive knowledge

---

[10] Defs. Br. at 18 (citing *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) ("*Morgan Stanley I*").

[11] *See* Am. Compl. ¶¶ 126, 137, & Item 38 of Schedules 1-12 (stating that investment policy of CNB and SCB was to purchase only certificates that were rated at least "A" and that all of the certificates on which the FDIC's claims are based were rated "AA" or "AAA" at purchase).

because it is the purpose of such subordinated tranches to absorb losses to the underlying collateral and protect the cash flow of higher-rated certificates like those purchased by CNB and SCB. *See Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 WL 5395646, at *19 (S.D.N.Y. Nov. 5, 2012) ("*FHFA/JPM*") (given purpose of subordinate tranches, finding "little, if any reason to believe that the downgrade of those tranches should have led the [investors] to discover that the underlying mortgages were not simply risky, but so poorly underwritten as to put at risk even the most senior certificates"); *In re Bear Stearns*, 851 F. Supp. 2d at 766 (disregarding downgrades to subordinate tranches in performing statute of limitations analysis). The same is true for downgrades that did not bring the plaintiff's certificates below investment grade. *See Miss. PERS/Goldman,* 2011 WL 135821, at *8 (downgrades in 2007 did not trigger statute of limitations, particularly where it was not until February 2008 that any rating agency downgraded the certificate below investment grade).

Thus, none of the rating agency reports or actions to which defendants point shows as a matter of law that the statute of limitations began before May 22, 2008.

### c.  **News Articles**

The 14 news articles that defendants cite do not demonstrate that a reasonable investor in *these* securities would have been aware by May 22, 2008 of facts demonstrating a violation of the 1933 Act.[12] (Defs. Br. at 22-24; Appx. C; Frankel Decl.

---

[12] Defendants ask the Court to take judicial notice of these news articles. However, judicial notice may be taken of newspaper articles at the motion to dismiss stage only in order to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true. *See In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) ("On a motion to dismiss, a court may take judicial notice of the publication of a newspaper article . . . provided that consideration is limited to the fact of publication and not the truth of the article's content."); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior

Exs. 20-21, 23-24, 28-33, 41, 45-47). Eleven of those articles address issues in the *subprime* mortgage market. The certificates in this case, in contrast, all are backed by Alt-A mortgages. None of the articles refers to any defendant's involvement in Alt-A mortgage loans or securitizations. Indeed, the vast majority do not mention the defendants at all, and a few specifically note that no investment banks have been accused of any wrongdoing (*see, e.g.,* Frankel Decl. Ex. 30).

At most, these articles show only that the subprime market had deteriorated, that declining home values had begun to affect the delinquency rates of certain "exotic" loans, and that certain subprime lenders were experiencing financial difficulties as a result. A reasonable investor who read these articles might have begun to suspect that some statements about securitizations of subprime loans had been untrue or misleading, but it is not possible to conclude *as a matter of law* that a reasonable investor would have suspected the same of securitizations of Alt-A mortgage loans, much less discovered facts sufficient to state a claim as to these certificates by May 22, 2008.

For these reasons, courts routinely have rejected the argument that similar news reports were sufficient to trigger the statute of limitations. *See, e.g., Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) (holding that 70 articles, 39 of which mentioned originators of loans in the relevant offerings, did not trigger statute of limitations because they did not "refer to the offerings,

---

lawsuits, or regulatory filings contained certain information, *without regard to the truth of their contents*.") (emphasis added). But *Merck* makes the mere fact that these articles were published irrelevant to the Court's analysis. The Court is no longer to determine when a reasonable plaintiff would have been alerted to investigate (to which the mere publication of these articles may be relevant), but when a plaintiff could have filed a valid complaint, to which only the *substance* of these articles could be relevant.

the Certificates, or tie the originators to securities offered by the defendants," and most simply "describe[d] the high rate of default experienced by subprime mortgages and the worsening business situation of the originators," which "would not establish that their offering documents contained material misstatements and omissions"); *Morgan Stanley II*, 810 F. Supp. 2d at 665 (news articles and SEC report were too general even to provide *inquiry notice* where they did not specifically mention the defendant and did not address specific misrepresentations alleged in complaint); *In re Wells Fargo*, 712 F. Supp. 2d at 966-67 (news articles, including some that discussed inflated appraisals, hazards of low-documentation loans, and flawed assumptions underlying ratings, did not put investor on *inquiry notice* as a matter of law where they gave rise to competing inferences because they contained assurances from banks and ratings agencies as to quality of MBS).

### d.  **Information About Certain Originators**

Defendants' reliance on publicly available information about certain loan originators as evidence that a diligent investor should have known before May 2008 that those originators were abandoning their underwriting standards is equally flawed. (Defs. Br. at 24-26.) The sources of information to which defendants point – even if a reasonable investor would have discovered them – would not have demonstrated the existence of a claim against these defendants for untrue or misleading statements in the offering documents for these certificates.

First, a fundamental flaw in defendants' argument is its assumption that a reasonable investor would have had cause to scour court dockets, the internet, and the press for information about the originators of loans backing its certificates before it had reason to suspect that  its certificates were tainted by any misconduct (*i.e.*, before they were downgraded below investment grade). But, in any event, even if the Banks had

19

discovered such information about the originators, they "were entitled to assume that defendants had made diligent efforts to ensure that the originators' dubious lending practices did not infect the particular loans included in these securitizations." *FHFA/UBS*, 858 F. Supp. 2d at 322 n.11.

Second, although a few articles mention an originator of loans in one or more of the securitizations, they do not call into question those originators' practices with respect to the origination of Alt-A loans, much less the loans in these particular securitizations. *See Miss. PERS/Goldman*, 2011 WL 135821, at *9 (articles about practices of originators of loans in underlying pools did not give rise even to *inquiry notice* where none related directly to the Goldman Sachs issuing trusts involved in suit). Moreover, some of those articles included assurances that would have suggested to a reasonable investor that the issues discussed in the articles were isolated incidents. *See*, *e.g.*, Frankel Decl. Ex. 23 (referring to statement from Ameriquest spokesman describing conduct of "rogue former employee," and statement from IndyMac representative referring to incident as "action of an individual underwriter and not company practice"). Other reports to which the defendants point simply noted the financial difficulties or bankruptcy of an originator. *See, e.g.,* Frankel Decl. Ex. 22 (bankruptcy filing of American Home Corporation); Ex. 24 (noting closure of Ameriquest). But as this Court has recognized, that information would not have alerted a reasonable investor to the existence of a claim for misrepresentations in the offering documents for these securities. *See In re Bear Stearns*, 851 F. Supp. 2d at 765 (concluding that collapse of Bear Stearns and bankruptcy of American Home did not suggest that plaintiffs knew or should have known "by May or July of 2008 that *their securities* were tainted by the irresponsible practices that drove"

these entities into bankruptcy); *NJ Carpenters/ResCap*, 2011 WL 2020260, at *5

(concluding that collapse of Bear Stearns would not have caused reasonable investor to

discover misstatements or omissions in offering documents).[13]

Third, the few complaints that were filed against some of the originators of the

loans underlying these trusts all were brought by shareholders of those companies who

challenged the originators' business practices. (Defs. Br. at 23-24; Frankel Decl. Exs. 34,

36, 40.) None of those complaints mentioned these securitizations, and they would not

have alerted a reasonable RMBS investor to the fact that loans in these securitizations

were tainted by those alleged practices. *See, e.g., FHFA/UBS*, 858 F. Supp. 2d at 321

(concluding that when GSEs learned of loan originators' "dubious underwriting practices

says little about when they discovered the facts that form the basis of this complaint,"

because plaintiff's claim "is not that the *originators* failed to scrutinize loan applicants

adequately *in general*; it is that *defendants* failed to act diligently to ensure that,

consistent with the representations in the offering materials, the originators' questionable

practices did not lead to the inclusion of non-conforming loans in the *particular*

securitizations sold to the GSEs").

### e.   **Other Complaints**

Finally, defendants cite a handful of complaints that were filed before May 22,

2008 against some of the defendants. (Defs. Br. at 26-27.) None of those complaints,

---

[13] Similarly, that American Home's mortgage banking licenses in New York and New Jersey were suspended in August 2007 does not establish that it was abandoning its underwriting practices generally, much less with respect to the loans in these securitizations. And even if a reasonable investor would have learned before May 2008 that one former American Home employee pleaded guilty to fraud in a case pending in Alaska, or that another made allegations of misconduct on an internet chat site, that would not have enabled it to plead a claim that would survive a Rule 12(b)(6) motion. The same is true with respect to the information about DLJ Mortgage and EMC to which defendants point. (Defs. Br. at 24-26.)

however, involved any of the trusts from which CNB and SCB bought certificates.
Moreover, all of those complaints either were dismissed for failure to state a claim or
have never been tested by a Rule 12(b)(6) motion. As a result, none of them demonstrates
that a reasonable investor could have discovered facts sufficient to state a viable claim for
misrepresentations in the offering documents for these certificates by May 2008. Each
complaint is addressed briefly below.

- *Luther v. Countrywide Home Loans Servicing LP*, No. BC 380698 (Cal.
  Super. Ct. filed Nov. 14, 2007), involved only Countrywide-issued
  RMBS, none of which are involved in this action. Although Countrywide
  originated some of the collateral underlying these certificates, that is not a
  sufficient basis to find that *Luther* triggered the statute of limitations on
  the FDIC's claims against the defendants. *See, e.g., NCUA*, 2012 WL
  3028803, at *25 (rejecting argument that lawsuits against Countrywide,
  which was an originator of loans but not a defendant in the present action,
  triggered statute of limitations, because "notice in late November 2007
  that a mortgage originator has been sued for abandoning underwriting
  standards" would not necessarily "lead a reasonable investor to discover
  by March 20, 2008 that he or she has a plausible claim under § 11 or
  § 12(a)(2) against the defendant MBS issuers and sellers in this case").
  Moreover, the *Luther* complaint was based entirely on allegations about
  Countrywide's underwriting and appraisal practices generally and
  therefore does not show that a reasonable investor in November 2007
  could have pled the necessary connection between those general practices
  and plaintiff's particular certificates, as this Court has required to state a
  viable claim.[14]

- The complaint in *Luminent Mortgage Capital v. Merrill Lynch & Co.*, No.
  2:07-cv-05423 (E.D. Pa. filed Dec. 24, 2007), was dismissed for failure to
  state a claim. *See* 652 F. Supp. 2d 576 (E.D. Pa. 2009). Moreover, the
  facts alleged in that case bear no relation to those alleged here. Among
  other things, plaintiffs in that case bought the junior-most classes of
  certificates from the issuing trusts in a *private offering* – not pursuant to a
  prospectus supplement – and the alleged misrepresentations primarily
  involved whether the loans had "soft" or "hard" prepayment penalty
  terms. (*Id.* at 9-10.) That complaint also did not involve any of the trusts
  involved here.

---

[14] The *Luther* complaint also has never been tested by a Rule 12(b)(6) motion to dismiss.

- *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08 Civ. 10446 (RGS), which was filed in Massachusetts state court on March 19, 2008 and later removed, also was dismissed for failure to state a claim because it did not tie allegations about general practices to the specific trusts involved in the suit.[15] *See Nomura*, 658 F. Supp. 2d 299, 307 (D. Mass. 2009) ("That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans.")[16] It also asserted claims only as to Nomura trusts, none of which are involved in this action.

- *City of Ann Arbor Employees Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. 08-005187 (N.Y. Sup. Ct. filed Jan. 31, 2008), also did not involve any of the same trusts that are involved in this action. In addition, the complaint filed in January 2008 was found insufficient by the court; plaintiffs were ordered to replead and allege specifically the false statements and omissions on which they relied and "*how those statements and/or omissions are tied to the loans in which they invested.*" *City of Ann Arbor*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (emphasis added).

- *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713, which was filed in Nassau County Supreme Court on March 26, 2008, related only to J.P. Morgan trusts, none of which are involved in this suit. Moreover, that complaint was never tested by a Rule 12(b)(6) motion. After the action was removed to federal court, a consolidated class action complaint was filed and then amended, and that amended complaint ultimately was dismissed in part in early 2012. The court found its allegations about underwriting practices insufficient except to the extent that they inferred a "nexus" to the specific certificates involved. *See Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *13-18.

---

[15] The original complaint filed in March 2008 was superseded by two later amended complaints. It was the Consolidated Amended Complaint filed in January 2009 that was dismissed by an Order dated September 30, 2009, which only serves to show that a complaint filed nearly a year earlier certainly would not have withstood a motion to dismiss.

[16] Although the First Circuit reversed the district court's dismissal of plaintiffs' allegations about departures from underwriting standards, it still required some link to the particular certificates involved in the suit. *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773-74 (1st Cir. 2011) (finding that "the sharp drop in the credit ratings after the sales and the *specific* allegations as to FNBN [the originator of the loans] offer enough basis to warrant some initial discovery aimed at these precise allegations"). Moreover, it affirmed the dismissal of plaintiffs' allegations about appraisal practices for lack of any facts specific to the trusts involved in the suit. *Id.* at 774.

Thus, for all of these reasons, defendants have failed to show that the FDIC's claims are time-barred as a matter of law under the one-year statute of limitations in section 13 of the 1933 Act.

### C.  The FDIC's Claims Also Are Timely Under the 1933 Act's Three-Year Statute of Repose as Extended by 12 U.S.C. § 1821(d)(14).

All of the claims in the amended complaint also are timely under the three-year statute of repose in section 13 of the 1933 Act, as extended by 12 U.C. § 1821(d)(14). FIRREA extends the statute of limitations on certain claims (including 1933 Act claims) by three years from the date on which the Federal Deposit Insurance Corporation was appointed receiver or the date on which the claim accrued, whichever is later. *See* 12 U.S.C. §§ 1821(d)(14)(A)(ii) – (B).[17] As long as the claims were not already time-barred at the time the Federal Deposit Insurance Corporation was appointed receiver – and here

---

[17] The extender provision in FIRREA states:

(14) Statute of limitations for actions brought by conservator or receiver

(A) In general

> Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be--

> …

(ii) in the case of any tort claim (other than a claim which is subject to section 1441a(b)(14) of this title), the longer of--

> (I) the 3-year period beginning on the date the claim accrues; or

> (II) the period applicable under State law.

(B) Determination of the date on which a claim accrues

> For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of--

> (i) the date of the appointment of the Corporation as conservator or receiver; or

> (ii) the date on which the cause of action accrues.

12 U.S.C. §§ 1821(d)(14)(A)(ii) – (B).

they were not[18] – then under FIRREA, the FDIC had three years from the date of its appointment in which to file those claims. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Barton*, 96 F.3d 128, 132-33 (5th Cir. 1996). The Federal Deposit Insurance Corporation was appointed as Receiver for CNB and as Receiver for SCB on May 22, 2009. The FDIC filed this action less than three years later on May 18, 2012. The FDIC's claims therefore are timely.

Defendants' contention that the extender provision in FIRREA does not apply to statutes of repose or to federal securities claims is incorrect. (Defs. Br. at 28-31.)

### 1. The Extender Provision in FIRREA Applies to the Statute of Repose in the 1933 Act.

In arguing that the extender provision does not apply to the three-year period of repose under section 13 of the 1933 Act, defendants rely on decisions discussing the difference between statutes of limitation and repose generally, and particularly in the context of tolling. *See* Defs. Br. at 29 (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (concluding that *American Pipe* tolling does not apply to statutes of repose), and *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004) (addressing whether statute of repose begins at first or last bona fide public offering and discussing distinction between statutes of limitation and repose)). Defendants miss the point. First, section 1821(d)(14) is not a tolling provision. FIRREA does not simply stop the running of any relevant limitations periods when the Federal

---

[18] Defendants do not argue that the statute of repose expired before the Federal Deposit Insurance Corporation was appointed as Receiver for CNB and as Receiver for SCB on May 22, 2009. Under section 11, that period begins to run when the security was offered to the public. 15 U.S.C. § 77m. The earliest date on which any of the certificates was offered is June 2006. (Am. Compl. at Item 38 of Scheds. 1-12.) Thus, the three-year period had not expired on any claim when the Federal Deposit Insurance Corporation was appointed as Receiver for either CNB or SCB.

Deposit Insurance Corporation is appointed receiver; it replaces those limitations periods – repose or otherwise – altogether. Second, although *Stolz* discusses the conceptual distinction between statutes of limitation and repose, it is nevertheless beyond dispute that "Congress, the courts and learned commentators regularly use the term 'limitations' to encompass both types of timeliness provision." *FHFA/UBS*, 858 F. Supp. 2d at 315 (noting that even the title of the treatise on which the *Stolz* court relied uses the term "limitation" to cover both types of provisions). Indeed, a search of the entire United States Code does not reveal *a single instance* in which Congress has used the term "statute of repose."

 Moreover, the FDIC's position that the extender provision applies to the statute of repose comports with the express purpose of FIRREA, while defendants' argument undermines that purpose. Congress enacted FIRREA in 1989 in response to the savings-and-loan crisis "[t]o strengthen the enforcement powers of Federal regulators of depository institutions." Pub. L. No. 101-73, 103 Stat. 183, 187 (1989). The extender provision in particular "was expressly constructed to give the FDIC the power to maximize potential recoveries by offering the agency a longer period in which to act." *Inv. Co. of the Sw. v. Reese*, 875 P.2d 1086, 1093 (N.M. 1994) (*citing* 135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) (statement of Sen. Riegle)); *see also UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173, 1178 (10th Cir. 1999) (stating that Congress intended for the extender provision of FIRREA to "be construed to maximize potential recoveries . . . by preserving to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods")

(citation omitted). Courts have explained the importance of the extended limitation periods:

> "Extending these limitations periods will significantly increase the amount of money that can be recovered by the Federal Government through litigation, and help ensure the accountability of the persons responsible for the massive losses the Government has suffered through the failures of insured institutions. The provisions should be construed to maximize potential recoveries by the Federal Government by preserving to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods."

*SMS Fin., LLC v. ABCO Homes, Inc.*, 167 F.3d 235, 242 n.21 (5th Cir. 1999) (*quoting* 135 Cong. Rec. S10182-01 (1989)).

Not surprisingly, several courts have rejected defendants' argument with respect to two comparable extender provisions, one in the Housing and Economic Recovery Act (HERA)[19] and the other in the Federal Credit Union Act (FCUA).[20] In *FHFA/UBS*, Judge

---

[19] The extender provision in HERA states:

(12) Statute of limitations for actions brought by conservator or receiver

(A) In general. Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be-

> …

(ii) in the case of any tort claim, the longer of-

> (I) the 3–year period beginning on the date on which the claim accrues; or

> (II) the period applicable under State law.

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of--

> (i) the date of the appointment of the Agency as conservator or receiver; or

> (ii) the date on which the cause of action accrues.

12 U.S.C. § 4617(b)(12).

[20] The extender provision in FCUA states:

(14) Statute of limitations for actions brought by conservator or liquidating agent

Cote rejected the argument that the extender provision in HERA does not apply to the statute of repose in section 13 of the 1933 Act, holding that "Congress intended to prescribe comprehensive time limitations for 'any action' that the Agency might bring as conservator, including claims to which a statute of repose generally attaches." 858 F. Supp. 2d at 317. In *Federal Housing Finance Agency v. Countrywide Financial Corp.*, No. 2:12-CV-1059-MRP (MANx), 2012 WL 5275327, at *8 (C.D. Cal. Oct. 18, 2012) ("*FHFA/Countrywide*"), the court reached the same conclusion, reasoning that, in enacting HERA, Congress "simply created a new set of rules for FHFA alone." Finally, in *NCUA*, the court applied similar reasoning in holding that the extender provision in FCUA applies to the statute of repose under section 13 of the 1933 Act. *NCUA*, 2012 WL 3028803, at *16-17.

    In each of these cases, the defendants argued that the relevant extender provision unambiguously applies to "applicable statutes of limitations," but not to statutes of repose. All three courts, however, concluded that the word "limitations" is ambiguous because it has been used to refer both to statutes of limitation and repose. The courts then

---

    (A) In general. Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Board as conservator or liquidating agent shall be –

        . . .

    (ii) in the case of any tort claim, the longer of –

        (I)     the 3-year period beginning on the date the claim accrues; or

        (II)    the period applicable under State law.

    (B) Determination of the date on which a claim accrues

    For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of –

    (i)     the date of the appointment of the Board as conservator or liquidating agent; or

    (ii)    the date on which the cause of action accrues.

    12 U.S.C. § 1787(b)(14).

looked to legislative history to resolve the ambiguity, and held that Congress did not

intend to exclude periods of repose. *See FHFA/Countrywide,* 2012 WL 5275327, at \*8-9;

*FHFA/UBS*, 858 F. Supp. 2d at 314-17; *NCUA*, 2012 WL 3028803, at \*16-18.[21]

The same analysis applies with equal force to FIRREA. Nothing in FIRREA or its

legislative history suggests that a statute of repose should shorten the period that section

1821(d)(14) grants to the FDIC to investigate and bring claims. To the contrary, the

legislative history shows that section 1821(d)(14) should be construed to permit the FDIC

sufficient time to file suit and undermines defendants' argument that the three-year

statute of repose under the 1933 Act is somehow an exception to FIRREA.

### 2. The Extender Provision in FIRREA Applies to Federal Statutory Claims.

Defendants also mistakenly argue that the extender provision only applies to state

law contract and tort claims, not to "*sui generis*" federal statutory claims such as those

under section 11 the 1933 Act. (Defs. Br. at 29-31.) FIRREA states that the extender

provision applies to "*any action* brought by the Corporation." 12 U.S.C.

§ 1821(d)(14)(A) (emphasis added).

In the three opinions discussed above, the courts expressly rejected the argument

that the similar extender provisions in HERA and FCUA are limited to state, not federal,

claims. *See FHFA/Countrywide*, 2012 WL 5275327, at \*9; *FHFA/UBS*, 858 F. Supp. 2d

at 317; *NCUA*, 2012 WL 3028803, at \*13-15. The courts held that these extender

---

[21] Defendants cite two unreported decisions from the same judge, who has concluded that the extender provision in FCUA does not apply to statutes of repose. *See* Defs. Br. at 30 n.26 (citing *NCUA v. RBS Sec., Inc*., No. 11 Civ. 5887 (C.D. Cal.) (Dec. 19, 2011 Tentative Ruling), and *NCUA v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D. Cal.) (Mar. 15, 2012 Tentative Ruling, adopted by Civil Minutes of Sept. 4, 2012). In each case, the court relied entirely on the provision's use of the term "statute of limitations." The court did not undertake the same meaningful analysis of legislative history or context that other courts cited herein have done.

provisions apply to "*any action*" brought by the relevant agency, and that this language should be given its plain meaning, which also is consistent with the overall objectives of these statutes. *FHFA/Countrywide*, 2012 WL 5275327, at *9 (emphasis added); *see also FHFA/UBS*, 858 F. Supp. 2d at 317; *NCUA*, 2012 WL 3028803, at *15. For the same reasons, these courts also rejected defendants' argument that the extender provisions in HERA and FCUA do not apply to statutory claims, only to tort and contract claims. *FHFA/Countrywide*, 2012 WL 5275327, at *9 (noting that defendants "once again ignore[] the broad language that Congress used" and that "[c]ourts often apply statutes of limitation to claims not easily characterized as 'tort' or 'contract'"); *NCUA*, 2012 WL 3028803, at *13 ("The term 'any action' should be read to include statutory claims, not just the tort and contract claims mentioned later."); *see also Fed. Deposit Ins. Corp. as Receiver for the Bank of New England v. Zibolis*, 856 F. Supp. 57, 60-61 (D.N.H. 1994) (holding that extender provision in FIRREA applied to claim under state fraudulent transfer statute even though not a "tort" or "contract" action).

Because this reasoning applies equally to the extender provision in FIRREA, the Court should conclude that section 1821(d)(14) applies to the FDIC's claims under the 1933 Act and that they were timely filed.

## II.     THE SECTION 11 CLAIMS ARE NOT SUBJECT TO DISMISSAL ON ANY OTHER GROUND.

The defendants made four types of material untrue or misleading statements about the loans in the securitizations: (1) untrue and misleading statements about the appraisals and loan-to-value ratios (LTVs) of the loans, including that the appraisals of the properties that secured the loans complied with the Uniform Standards of Professional Appraisal Practice; (2) untrue or misleading statements about the number of properties

that were primary residences; (3) untrue or misleading statements about the underwriting standards of the originators of the mortgage loans; and (4) untrue or misleading statements about the credit ratings of the certificates. The Schedules to the amended complaint describe every one of the untrue or misleading statements that the defendants made about each of the 12 securitizations. To establish that those statements were untrue or misleading, the amended complaint includes detailed allegations about the true characteristics of the loans. Because it does not have access to the loan files, the FDIC used sophisticated computer models and analyzed public records to discern that the statements in the prospectus supplements were untrue or misleading. None of defendants' arguments even suggests, let alone demonstrates as a matter of law, that these allegations are insufficient to establish at least one material untrue or misleading statement in the offering documents for each securitization that CNB and SCB purchased.

Defendants nevertheless argue that the amended complaint should be dismissed because it does not state a "plausible" claim for relief. (Defs. Br. at 31.) For the reasons discussed below, none of defendants' arguments shields them from liability for any of these statements.[22]

---

[22] The defendants' argument that the FDIC should not be allowed to "deviate" from a position allegedly taken in an earlier, unrelated litigation – *In re IndyMac MBS Litig.*, No. 09-CIV-4583 (S.D.N.Y. filed Nov. 23, 2009) – is severely flawed. (Defs. Br. at 32 n. 30.) The Federal Deposit Insurance Corporation is *not* a party to that litigation in any of its capacities. First, IndyMac MBS, Inc., a first tier subsidiary of the failed IndyMac Bank, F.S.B., which is a defendant in that litigation, is a separate legal and operating entity from the IndyMac Bank Receivership. Second, even if the Federal Deposit Insurance Corporation as Receiver for IndyMac Bank were a party to the litigation – which it is not – each Federal Deposit Insurance Corporation receivership is a "separate legal entity." *Pearson v. United States*, 831 F. Supp. 2d 514, 516 (D. Mass. 2011). Thus, a position taken by the Federal Deposit Insurance Corporation as receiver for one bank does not bind it in a case where it acts as receiver for a different bank. *See id.* at 518-19 (holding that a plaintiff's notice of claim did not alert Federal Deposit Insurance Corporation to claims relating to receiverships other than the one receivership specifically named in that notice). Moreover, to the extent that the defendants are attempting to invoke the doctrine of judicial estoppel, the Second Circuit applies that doctrine only to inconsistent *factual* assertions

### A.  Defendants May Not, and Did Not, Disclaim Their Statutory Duty.

Because disclaimers, especially general and imprecise disclaimers, cannot shield

defendants from liability for untrue or misleading statements of present or past fact,

defendants' argument that the disclaimers in the offering documents shield them from

liability fails. (Defs. Br. at 32.) First, disclaimers or cautionary language cannot cure

untrue or misleading statements of present or past fact. Although the "bespeaks caution"

doctrine may permit an issuer or underwriter to disclaim liability for statements about the

future, the duty not to make untrue or misleading statements of existing fact cannot be

disclaimed. *See Iowa Pub. Emps.' Ret. Sys. v. M.F. Global Ltd.*, 620 F.3d 137, 144 (2d

Cir. 2010) ("bespeaks caution does not apply" to statements in prospectus about

defendant's risk-management system, because they "communicate present or historical

fact"); *Stolz*, 355 F.3d at 97 ("bespeaks caution" doctrine applies only to forward-looking

statements and not to statements of historical fact because "[i]t would be perverse indeed

if an offeror could knowingly misrepresent historical facts but at the same time disclaim

those misrepresented facts with cautionary language").

Second, as this Court has held, even if issuers and underwriters ever could validly

disclaim liability for their untrue or misleading statements of present fact, to be effective,

disclaimers and "cautionary language . . . must relate directly to that by which the

plaintiffs claim to have been misled." *In re Bear Stearns*, 851 F. Supp. 2d at 768-69

in prior proceedings, not to conclusions of law or legal arguments. *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (noting that a party seeking to invoke judicial estoppel must show that its adversary "advanced an inconsistent factual position in a prior proceeding") (internal quotation marks omitted); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993) (finding judicial estoppel prohibits the assertion of an inconsistent "factual position" in an effort to "preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and "prevent[ ] the perpetuation of untruths"). The doctrine therefore would not apply here.

(quoting *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir.1998)); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) ("The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language."). Disclosures of general risks are ineffective.

Third, whether cautionary language or particular disclaimers are sufficient to shield a defendant from liability almost always is a question of fact not suitable for resolution on a motion to dismiss. *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302-MRP (MANx), 2011 WL 4389689, at *18 (C.D. Cal. May 5, 2011) (defendants' argument that any alleged misrepresentations or omissions were not material because the offering documents contained disclosures that told investors all the material information needed to assess the risk associated with the loans in the pools "is best raised at summary judgment"). Thus, the Court should not consider the effectiveness of the disclaimers cited by defendants at this stage.

Finally, that the offering documents purportedly "informed investors that the underlying loans may not conform to the descriptions contained in the Offering Documents, and contained provisions regarding how to address that situation" is no impediment to the FDIC's claims. (Defs. Br. at 32 (citing *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010).) As this Court has held, although such "cure and repurchase" provisions or "sole remedy" clauses "could be read as an acknowledgment of occasional underwriting violations, [they] cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege" here. *In re Bear Stearns*, 851 F. Supp. 2d at 775; *see also Capital Ventures*, 2012 WL 4469101, at *6

(rejecting same argument, concluding that *Lone Star* is "distinguishable because its holding is 'limited to cases involving a small number of correctable mistakes, and courts have refused to allow such clauses to defeat claims of the type of widespread misrepresentation alleged here'") (citation omitted) (listing numerous cases reaching same conclusion).[23] As a result, this language does not shield defendants from liability for the widespread untrue and misleading statements alleged here.

### B.  The Allegations About LTVs and Property Appraisals Are Sufficient.

The amended complaint alleges that the LTVs stated in the prospectus supplements were significantly lower than the actual LTVs for many of the mortgage loans because the values of the properties were overstated to a material extent. (Am. Compl. ¶ 49.) The FDIC sampled loans in each of the securitizations using a "comprehensive, industry-standard automated valuation model" to calculate the value of the underlying property at the time the mortgage loan was originated. (*Id.* ¶ 50.) The AVM results show that the appraised values given to such properties were significantly higher than the actual values of the properties at the time the loans were originated, resulting in a material understatement of the LTVs in the prospectus supplements. (*Id.* ¶¶ 51-56.)

Defendants make several arguments as to why these allegations fail, including that: (1) appraisals and LTVs are opinions that are not actionable unless subjectively false; (2) the AVM on which the allegations are based is another opinion that cannot

---

[23] Moreover, as the Court also has noted, "preclusion of statutory remedies through limiting language in the Offering Documents would violate the well-established rule that 'individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision.'" *In re Bear Stearns*, 851 F. Supp. 2d at 775 (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995)).

second-guess a contemporaneous opinion; (3) without an allegation of the AVM's margin

of error, it is impossible to know whether the allegations based on the AVM's output are

plausible; (4) allegations arising from the AVM are improperly based on hindsight

because the AVM used information that was unavailable to appraisers at the time; and (5)

allegations based on the output of the AVM presume that defendants always used an

appraised value as the denominator when calculating the LTV ratio, when in fact

defendants often used the purchase price of the property. As explained in detail below,

none of these arguments is a sufficient basis to grant defendants' motion to dismiss.

> **1.  Even If Appraisals Are Properly Deemed Opinions, the Amended
> Complaint Adequately Pleads That the Statements in the
> Prospectus Supplements About Appraisals and LTV Ratios Were
> Actionably False.**

Defendants mistakenly argue that the "FDIC's allegations about appraisals and

LTV ratios fail" because "appraisals and their associated LTV ratios are nothing but

statements of subjective opinion." (Defs. Br. at 33 (internal quotation omitted).)

First, the amended complaint does not merely allege that the appraised values

were incorrect. It alleges that the offering documents falsely stated that appraisals were

conducted in accordance with the Uniform Standards of Professional Appraisal Practice

(USPAP). These statements are actionable as "statement[s] of verifiable fact." *In re Bear

Stearns*, 851 F. Supp. 2d at 769; *Plumbers' & Pipefitters' Local #562*, 2012 WL 601448,

at *13 (statement that appraisals conformed to USPAP was a "factual one: the originators

failed to perform a task as the Offering Documents said it would be performed");

*MassMutual/RFC*, 843 F. Supp. 2d at 203 ("A representation that certain specific

standards will be used to generate appraisals is itself an actionable statement of fact.").

Moreover, far from making "bare assertion[s]" (Defs. Br. at 35), the amended complaint

provides detailed allegations in support of this claim. *See* Am. Compl. ¶¶ 68-73 (listing USPAP provisions that were not followed, as evidenced by biased appraisals that used inaccurate property descriptions, disregarded recent sales data, and used properties that were not comparable).[24]

Second, to the extent that the FDIC's claims are based on the inaccuracy of the appraisals, those claims are actionable because the amended complaint raises an inference that these "opinions"[25] were not honestly believed when made, *i.e.*, that they were subjectively false. *See FHFA/UBS*, 858 F. Supp. 2d at 327-28 (explaining that opinions may give rise to liability under section 11 where plaintiff alleges that they were both objectively false and not believed by the speaker); *In re Bear Stearns*, 851 F. Supp. 2d at 769-70 (same).

Defendants argue that the FDIC has failed to plead subjective falsity because the amended complaint expressly disclaims any allegation of fraud by the defendants. (*See* Defs. Br. at 34 (citing Am. Compl. ¶ 160).) But that is irrelevant because a plaintiff need allege only that the appraisers, not the defendants, did not honestly believe their statements of value when made. *FHFA/UBS*, 858 F. Supp. 2d at 327-28. The amended complaint sufficiently alleges that the appraisals were not subjectively believed when

---

[24] Although it is true that the amended complaint makes allegations about deviations from USPAP with respect to only some of the offerings (Defs. Br. at 35), that is because not every prospectus supplement contained statements about compliance with USPAP.

[25] The FDIC acknowledges that this Court has held that appraisals are subjective opinions. The FDIC respectfully submits, however, that not every subjective statement is a non-actionable opinion. As the Supreme Court of the United States has recognized, some opinions address facts about the real world and can be untrue even if they incorporate an element of subjective judgment and are sincerely held ("In my opinion John Jones is a liar," to take the example used by the Supreme Court). *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990). The only opinions that are non-actionable are those that are completely subjective, those that do not address *any* fact about the real world ("In my opinion, Painting A is more beautiful than Painting B") and therefore cannot be untrue unless the person who gives the opinion does not actually hold it.

made. *See* Am. Compl. ¶ 67 ("a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations"). Moreover, the fact that the AVM results show such a widespread deviation from the LTV ratios reported in the prospectus supplements raises a plausible inference that the values were knowingly inflated. *See FHFA/UBS*, 858 F. Supp. 2d at 328 (allegations "that the LTV data reported in the offering materials deviates so significantly from the results of plaintiff's loan-loan level analysis . . . raise a plausible inference that the appraisers knowingly inflated their valuations"); *MassMutual/RFC*, 843 F. Supp. 2d at 204 (allegations based on AVM results "provide further support that the appraisals had no basis in fact . . . [and] create a reasonable inference that the LTV ratios were knowingly understated and the appraisals knowingly inflated").

### 2. The FDIC's AVM-Based Allegations Are More Than Sufficient to State a Plausible Claim for Relief.

Contrary to defendants' contention (Defs. Br. at 36) that the AVM-based allegations fail because "the FDIC provides no basis on which to suppose that its AVM is any more reliable than the appraisals it is second-guessing," the FDIC's allegations are more than sufficient to meet "*Twombly*'s 'plausibility' standard." (*Id.* at 38.) Courts consistently have held that allegations about understated LTVs and inflated appraisals, like the FDIC's, supported by substantially similar retrospective AVM data, are sufficient to allege actionable misrepresentations. *See, e.g., FDIC as Receiver for United W. Bank*, 2013 WL 49727, at *2 ("The amended complaint plausibly states that [LTVs] were inflated. The AVM used by the Plaintiff is not simply an opinion, the appraisals made in the 'Offering Documents' were actionable statements and Countrywide's mathematical arguments regarding margins of error are seriously flawed."); *FHFA/UBS*, 858 F. Supp.

37

2d at 328 (finding AVM results showing that LTVs in offering materials were understated, together with allegations based on news reports, other complaints, and investigations detailing instances in which appraisers overstated property values, sufficient to state a claim); *Capital Ventures*, 2012 WL 4469101, at *9 (plaintiff plausibly alleged actionable misrepresentations about appraisals and LTV ratios by presenting AVM results and other allegations about appraisal practices); *MassMutual/RFC*, 843 F. Supp. 2d at 204 (same). Defendants give no reason for the Court to depart from these rulings.[26]

Furthermore, the interagency guidelines and advisory opinion that defendants cite are irrelevant, because they neither reject the use of AVMs to test appraisal values nor establish pleading standards. The interagency guidelines state only that, for the limited purpose of appraising properties for federally related transactions, a full appraisal – rather than an AVM – must be conducted by a licensed appraiser. *See* FDIC, *Interagency Appraisal and Evaluation Guidelines*, 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010). Likewise, the advisory opinion of the Appraisal Standards Board merely states that, although the "output of an AVM is not, by itself an appraisal . . . [the] output may become a basis for appraisal, appraisal review, or appraisal consulting opinions and conclusions if the appraiser believes the output to be credible." The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, at A-42 (*available at* htttp://www.uspap.org/#/166/).

### 3. The Amended Complaint Sufficiently Alleges That the AVM Used in the Amended Complaint Is Reliable.

---

[26] The cases on which defendants rely, in contrast, involved financial models used by ratings agencies and are irrelevant. (Defs. Br. at 36-37.)

38

Defendants contend incorrectly that the FDIC's allegations based on the AVM should be dismissed because the amended complaint does not plead the AVM's "margin of error," which – according to defendants – makes it "impossible to draw any reasonable inference . . . about whether the model's outputs are consistent or inconsistent with the Offering Documents." (Defs. Br. at 38.) First, the FDIC's description of the methodology behind the AVM far exceeds its pleading burden under Rule 8. The amended complaint includes allegations about the model's objectivity, inputs, scope, and reliability.[27] *See, e.g.*, Am. Compl. ¶ 50 ("The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models."). These allegations are sufficient to allow the court to assess the reliability of the AVM and, thus, the plausibility of the FDIC's claims.[28]

Second, defendants' attack on the reliability of the AVM is premature. *See MassMutual/RFC*, 843 F. Supp. 2d at 204 ("[A]rguments regarding the methodological flaws of the AVM . . . are premature at the motion to dismiss stage, especially considering the significant allegations Plaintiff has made concerning the methodology of

---

[27] The FDIC is not required to plead the AVM's margin of error in order to state a plausible claim that the prospectus supplements contained misrepresentations and omissions, because a "court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). As discussed above, numerous courts have upheld similar allegations about AVMs without regard to whether the complaint pleaded the AVM's margin of error.

[28] Defendants' reliance on *In re Textrainer Partnership Securities Litigation*, No. C 05-0969, 2006 WL 1328851 (N.D. Cal. May 15, 2006), to support their argument that AVM allegations are inadequate, is baseless. (Defs. Br. at 38.) The plaintiff in *Textrainer*, unlike the FDIC here, made allegations about certain price estimates solely "based on a review of industry data [by] an experienced industry consultant," without providing any additional detail about the data, the industry, or the consultant. *Id.* at *5.

the AVM model."); *Capital Ventures*, 2012 WL 4469101, at *9. At this stage, the AVM results need only raise a reasonable inference that the LTV ratios in the offering documents were materially understated.[29]

Finally, neither of the documents that defendants offer in an attempt to show that the FDIC actually used an AVM with a ten percent margin of error (*see* Defs. Br. at 39 (citing news report and CoreLogic marketing piece)) may be considered by the Court for that purpose on a motion to dismiss. *See* Fed. R. Evid. 201(b)(2) (district court may take judicial notice of documents if the documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").[30] There is no basis to infer that the AVM discussed in those documents is the same AVM that the FDIC used, particularly since both publications are at least two years old. Furthermore, nowhere in the marketing piece does CoreLogic refer to any of its AVMs as having a "margin of error." Rather, CoreLogic states that a "confidence score" is assigned to AVM results to indicate "the probability that the value is no more than 10% greater than the true value of the property." (Frankel Decl. Ex. 52 at 2.) The significance of these documents to the AVM in this case is, at the very least, disputed. It therefore is inappropriate for the Court

---

[29] In any event, the Federal Deposit Insurance Corporation, as receiver for various other institutions, has alleged the AVM's "mean error rate" in more recent amended complaints and could do so easily here should the Court find that necessary. *See* Amended Complaint, *FDIC as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.,* (Matthews Decl. Ex. C) at ¶ 50 (alleging that "between the first quarter of 2010 and the second quarter of 2012, the model's mean error rate, on a national basis, was no more than 2.5%").

[30] Furthermore, "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998).

to take judicial notice of these "facts" on a motion to dismiss.[31]

### 4. The AVM-Based Allegations Are Not an Attempt to Plead "Fraud by Hindsight."

Defendants rely on another document published by CoreLogic in 2010 in an effort to show that "the FDIC's AVM plainly is based on hindsight." (Defs. Br. at 40.) Based on a single quote from this document, defendants infer that the FDIC's AVM must have "use[d] comparable sales data that was so recent at the time the property was appraised that it was *not available to the appraiser*." (Defs. Br. at 40.) Defendants are mistaken for several reasons.

First, the purpose of the AVM is to determine the value of the property as of the time that the securitization closed. The fact that for some properties the AVM may have used the sale of a property that was not available to the appraiser of the property in no way impeaches the value of the AVM. The FDIC is alleging that the appraiser arrived at an inflated value. The AVM is another way of determining the value of a property. There is no requirement that it use as inputs the same information that the appraiser of the property used, whether that information was available at the time the property was appraised or not.

Second, the computer model was run as of the date on which each mortgage loan closed, that is, the model used sales of comparable properties that took place only before, not after, the sale of the property that the model was valuing. (*See* Am. Compl. ¶ 50.) It is true that there is some lag between a sale of a comparable property and the loading of that sale into the database, but that lag does not mean that the output of the model is *post hoc*.

---

[31] Although defendants have not filed a formal motion requesting judicial notice, the manner in which they present this evidence in their supporting memorandum makes clear that they seek improperly to have the Court accept the facts within the documents as true.

The actual sale of the comparable property took place before the closing of the loan on which the disclosed LTV was inaccurate. It does not matter how long it then took to load that sale into the database, and any lag does not render the allegations to be "misrepresentation by hindsight."

Moreover, even if the Court were to consider defendants' attack on the AVM's methodology, the two-page marketing piece by CoreLogic – euphemistically called a "white paper" – does not support their argument. The main purpose of that paper is to describe a single experiment that CoreLogic conducted in 2010 that compares the results of AVMs with actual sales prices. The paper concludes that retrospective AVMs run in 2010 were more accurate than AVMs run at the time the properties were sold 2007, 2008, and 2009. As CoreLogic notes, "models are continuously adjusted to produce the most accurate values possible, given the data we have available. Over time, our models have become significantly more accurate – even during times of market volatility." (Defs. Ex. 54.) That says nothing about whether retrospective AVMs consider data that was not available to the appraiser at the time of the original appraisal.

Finally, as many courts have held, whether the results of an AVM may be impeached for the reasons defendants offer is a question of fact. But the AVM-based allegations at the very least give rise to a reasonable inference that the appraisals were inflated and the resulting LTV ratios understated. *See Capital Ventures*, 2012 WL 4469101, at *9; *MassMutual/RFC*, 843 F. Supp. 2d at 204.

### 5.   The AVM-Based Allegations Do Not Fail Because Some of the Certificates Were Backed in Part by Purchase-Money Loans.

Defendants argue that the FDIC's AVM-based allegations fail because the prospectus supplements disclosed that "appraised values were not always used to

generate LTV ratios." (Defs. Br. at 41 (noting that, "[f]or purchase-money loans, LTV ratios were calculated using *either* the appraised values *or* the sales prices of the mortgaged properties, whichever was *lower*.")) The Court should reject this argument as well, as other courts have done when the defendants have raised it in response to similar allegations.

First, as Judge Cote recently held, this argument "addresses the merits of the claim and is better suited to trial." *Fed. Hous. Fin. Agency v. Morgan Stanley*, No. 11 Civ. 6739 (DLC), 2012 WL 5868300, at *3 (S.D.N.Y. Nov. 19, 2012) ("*FHFA/Morgan Stanley*").

Second, even in those instances in which the purchase price was used to calculate LTV, it was only because the purchase price was *lower* than the appraised value. (LTV was calculated based on the lower of the purchase price or the appraised value of the property. (Am. Compl. ¶ 42.)) But had the appraisal been accurate (that is, not inflated), then it would have been lower than the purchase price, and thus would have been used instead of the purchase price to calculate LTV. Thus, in all cases, the AVM supports the FDIC's allegations that the values that were actually used to calculate LTVs (however those values were determined) were too high, and thus that the LTVs that defendants disclosed were untrue or misleading.

Thus, as Judge Cote did in *FHFA/Morgan Stanley,* this Court should reject defendants' argument that the "automated appraisal data does not bear on the falsity of LTV statistics for purchase-money mortgages," and should hold that the FDIC "has plausibly asserted the falsity of the representations regarding LTV ratio[s], even in . . . securitizations [backed by purchase-money loans]." *FHFA/Morgan Stanley*, 2012 WL

5868300, at *3.[32]

In sum, defendants will have the opportunity at a later date to present their case about the alleged deficiencies in the AVM and the weight that the trier of fact should attribute to its results. It is beyond dispute, however, that retrospective AVM-based allegations at least provide ample support for a plausible section 11 claim.

### C. The Allegations About Undisclosed Additional Liens Are Sufficient.

The amended complaint alleges that defendants did not disclose in the prospectus supplements that many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to additional liens, making defendants' statements about the LTVs of the mortgage loans misleading. (Am. Compl. ¶¶ 57-63.) Defendants argue that the "Offering Documents make explicit that the 'LTV' or 'loan-to-value' ratios they provided consist of the ratio of only the *subject mortgage* to the value of the property," and also "made clear that the LTV figures referred only to the value of the subject mortgage on the property at the time of *origination*." (Defs. Br. at 43.)

These disclosures, however, are not sufficient to shield defendants from liability for *omissions*. Defendants' statements about LTVs in the prospectus supplements were materially misleading because they omitted information about the additional liens already in existence on the properties backing the mortgage loans. The FDIC does not allege that

---

[32] Although it is not required to do so to state a plausible claim under section 11, the Federal Deposit Insurance Corporation, as receiver for various other institutions, has addressed this issue in more recent amended complaints and could do so easily here should the Court find that necessary. *See, e.g.*, Amended Complaint, *FDIC as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.*, (Matthews Decl. Ex. C) at ¶ 52 & n.3 ("The denominator in the LTVs stated in the prospectus supplements generally is the lower of the appraised value or the purchase price of the property if the transaction is for the purchase of the property. If the mortgage is being taken out to refinance an earlier mortgage, then there is, of course, no purchase price, and the denominator in the LTV is the appraised value. References in this Complaint to the denominator in the LTVs are to the value of the property that was used in the calculation of the LTV as stated in the prospectus supplement.").

defendants failed to disclose that there *might* be additional liens, but rather that there actually *were* such liens already in existence before the prospectus supplements were disseminated. (Am. Compl. ¶¶ 59-63.) Nowhere did defendants tell investors of the actual, not merely possible, existence of additional liens or of the magnitude of the risk they posed. The existence of those additional liens made defendants' statements about LTVs materially misleading, and the general disclosures to which defendants point are not specific or precise enough to have cautioned the Banks about the particular risk of the existing additional liens.

### D.  The Allegations About Owner Occupancy Are Sufficient.

"Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky." (Am. Compl. ¶ 75.) In each prospectus supplement, the defendants made statements about the number of loans in the pool that were secured by primary residences. Those numbers were overstated because many of the properties that secured loans in the pool were not actually primary residences. (*See, e.g.*, *id.* ¶¶ 77-78, 80.)

The FDIC used loan-level data to demonstrate that many of the properties that defendants stated to be the primary residences of their owners most likely were not. First, the data showed that certain borrowers instructed local tax authorities to send the bill for the real-estate taxes on the property to an address other than the property itself. Second, certain borrowers failed to designate the property as their "homestead," which grants special benefits for a primary residence, even though they had the legal right to do so if the property actually was their primary residence. Third, many borrowers did not receive any bills at the address of the mortgaged property even six months after the loan closed, but did receive their bills at a different address or addresses. It is very likely that each of

45

these borrowers did not occupy the mortgaged property. (Am. Compl. ¶¶ 81-84.)

Defendants argue that they are not liable for their untrue or misleading statements about the number of owner-occupied properties in each securitization because the prospectus supplements disclosed that the occupancy status of the properties was based on "*representations of the mortgagor* at the time of origination of the related mortgage loan." (Defs. Br. at 44.) Defendants are mistaken for several reasons.

First, as issuers and underwriters, defendants are not mere passive conduits of information obtained from others. Absent an affirmative showing that they did not know, and in the exercise of reasonable care could not have known, of the untrue statement or omission, defendants are strictly liable for untrue or misleading statements in the offering documents. *See* 15 U.S.C. § 77l(a)(2). That is true even if defendants were only repeating information obtained from third parties. Indeed, it is "plain from the statutory structure itself that a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials." *FHFA/UBS*, 858 F. Supp. 2d at 330; *see also In re Phar-Mor, Inc. Litig.*, 848 F. Supp. 46, 49 (W.D. Pa. 1993) (statement in offering document that defendant did not independently verify information or make any warranties as to its accuracy or completeness did not absolve defendant of liability under section 12(2)); *Barneby v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1523-24 (M.D. Fla. 1989) (seller could not avoid liability under section 12(2) by asserting that all statements in offering document were those of a third party and not warranted by it). Thus, courts have refused to absolve defendants of liability for untrue or misleading statements about owner occupancy rates even where those statements were based solely on representations

46

by the borrowers at the time of origination. *See, e.g.*, *FHFA/UBS*, 858 F. Supp. 2d at 330 ("[T]he Securities Act does not condition liability on a showing that defendants themselves inaccurately represented the data that they received from the borrowers.").

Second, the only disclaimer on which defendants purport to rely is the general statement in each prospectus supplement that "Occupancy type is based on *representations of the mortgagor* at the time of origination of the related mortgage loan." (Defs. Br. at 44.)  For the reasons stated in Part II.A above, this disclaimer is ineffective. Notably, none of the prospectus supplements includes the type of disclosure that some courts have found sufficient to protect an underwriter from liability for misrepresentations about owner occupancy rates. In *MassMutual/RFC*, for example, Judge Ponsor noted that the offering materials did not merely disclose that statements about owner occupancy were based on representations of the borrowers at the time of origination. Rather, they went further and "*explicitly disclosed the possibility of borrower misrepresentations or fraud*." 843 F. Supp. 2d at 205 (emphasis added). Although Judge Ponsor's opinion did not quote the relevant language from the offering documents, a recent decision from the same court does. *See Capital Ventures*, 2012 WL 4469101, at *8.

In *Capital Ventures*, Judge Casper made clear that, unlike the prospectus supplements disseminated by the defendants here, the offering documents that Judge Ponsor addressed in *MassMutual/RFC* highlighted the particular risks associated with borrower misrepresentations:

> Fraud committed in the origination process may increase delinquencies and defaults on the mortgage loans. For example, a borrower may present fraudulent documentation to a lender during the mortgage loan underwriting process, which may enable the borrower to qualify for a

> higher balance or lower interest rate mortgage loan than the borrower
> would otherwise qualify for.

*Capital Ventures*, 2012 WL 4469101, at *8 (quoting statement from prospectus

supplement in *MassMutual/RFC*). Judge Casper concluded that, without such an explicit

warning of borrower misrepresentation or fraud, the same general disclaimer invoked

here was insufficient to shield defendants in that case from liability for their untrue or

misleading statements about owner occupancy. *Id.* Because the disclosures that

defendants cite here (Defs. Br. at 44-45 & Frankel Decl. Ex. 56) contain no such explicit

warning about the possibility of borrower misrepresentation or fraud and the effects such

fraud may have on delinquency and default rates, they do not preclude liability as a

matter of law.[33]

Defendants also contend that the "inferences the FDIC would have the Court draw

from its owner-occupancy allegations cannot plausibly be drawn." (Defs. Br. at 45.) But

whether the fact that a borrower had tax bills sent elsewhere or failed to designate a

property as his "homestead" actually indicates that the borrower did not live in the

property is not appropriately resolved on a motion to dismiss. Indeed, Judge Cote

recently upheld similar allegations despite defendants' argument that "where borrowers'

---

[33] Defendants assert that the "Offering Documents also disclosed that there was a possibility of misrepresentation by the borrowers." (Defs. Br. at 45 (citing Frankel Decl. Ex. 56).) But the statements to which the defendants point have nothing to do with the probability that borrowers actually misrepresented their occupancy status or committed fraud. Instead, the passages highlighted by defendants simply disclose the terms of the loan pool insurance policy, which included broad exclusions for fraud at origination. *See* Frankel Decl. Ex. 56 (CSMC 2006-6 Pros. Supp. at 87) ("No pool insurance policy will insure, and many primary mortgage insurance policies may not insure, against loss sustained by reason of a default arising from, among other things: (1) fraud or negligence in the origination or servicing of a mortgage loan, including misrepresentation by the mortgagor, any unaffiliated seller, the originator or other persons involved in the origination thereof."). This "disclaimer" in no way resembles the disclosure that Judge Ponsor found sufficient to defeat liability as a matter of law in *MassMutual/RFC*.

property tax bills were being mailed six-months after the loan closed" was insufficient to

allege a misrepresentation in the offering materials. *FHFA/UBS*, 858 F. Supp. 2d at 330.

Judge Cote concluded:

> Whether or not defendants are correct with regard to the proof that would
> be required at trial, at the very least, the [allegations] render plausible
> [plaintiff's] claim that the owner-occupancy rates reported in the offering
> materials were materially false. That is all that is required at this stage of
> the litigation.

*Id.* The FDIC's owner-occupancy allegations should be upheld for the same reason.

### E.  The Allegations About Departures from Underwriting Standards Are Sufficient.

The amended complaint alleges that statements in the prospectus supplements that

the originators made mortgage loans in compliance with their underwriting standards, and

made exceptions to those standards only when compensating factors were present, were

untrue or misleading because defendants omitted to state that (i) the originators were

disregarding those underwriting standards; (ii) the originators were making extensive

exceptions to those standards when no compensating factors were present; (iii) the

originators were making wholesale, rather than case-by-case exceptions to those

standards; (iv) the originators were making mortgage loans that the borrowers could not

repay; and (v) the originators were failing frequently to follow quality-assurance

practices necessary to detect and prevent fraud intended to circumvent their underwriting

standards. (Am. Compl. ¶¶ 87-88.) The FDIC supports these allegations with detailed

information about (i) the deterioration in undisclosed credit characteristics of the loans

made by these particular originators; (ii) the high rates of delinquency and default that the

loans in these pools have experienced; and (iii) specific information about the origination

practices of certain of the originators, including information obtained from depositions

and documents released in other litigation. (*Id.* ¶¶ 89-124 & Items 87, 94-96 of Schedules 1-12.) Courts across the country, including this Court, repeatedly have held that allegations similar to those made here are sufficient to plead that statements about adherence to underwriting standards were untrue or misleading.[34] Defendants do not offer any compelling reason to treat the FDIC's allegations differently than those addressed in these rulings.[35]

Defendants nevertheless argue that the FDIC's purported failure to allege facts "supporting a systematic abandonment of underwriting standards is fatal, because the Offering Documents clearly disclosed a wide variety of limitations to underwriting standards." (Defs. Br. at 47-48.) But as discussed in Part II.A above, "the cautionary language must . . . *warn[] of the specific contingency* that lies at the heart of the alleged misrepresentation." *P. Stolz*, 355 F.3d at 97 (emphasis added). None of the "disclosures" to which defendants point revealed that the originators *systematically* disregarded their

---

[34] *See, e.g., Nomura*, 632 F.3d at 773-74 (concluding that drop in credit ratings after sales and specific allegations as to one originator were sufficient to warrant discovery; "Plaintiffs' allegation of wholesale abandonment may not be proved, but – if accepted at this stage – it is enough to defeat dismissal"); *Maine State*, 2011 WL 4389689, at *17 (allegations about ratings downgrades and high default and delinquency rates, along with specific allegations as to practices of Countrywide, "fairly give rise to an inference that Countrywide had systematically disregarded its underwriting guidelines . . . . Plaintiffs' allegations are sufficient"); *In re IndyMac*, 718 F. Supp. 2d at 509-10 (upholding allegations of widespread deviation from stated underwriting standards, as supported by evidence of increased delinquency and foreclosure rates of the underlying mortgages, ratings downgrades, and allegations relating to practices of particular originator); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010) (same); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010) (same); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 270 (S.D.N.Y. 2010) (same).

[35] Although it is true that some complaints that courts have found sufficient included facts obtained from confidential witnesses, defendants cite no authority holding that this is a prerequisite to state a plausible claim for relief. (Defs. Br. at 47.) *See, e.g., MassMutual/RFC*, 843 F. Supp. 2d at 202 (upholding complaints that cited to internal documents and witnesses as well as those that did not, where plaintiffs had alleged widespread abandonment of underwriting guidelines and poor performance of the specific loans).

underwriting standards and did not evaluate borrowers' ability to repay. *See In re Bear Stearns*, 851 F. Supp. 2d at 768-69 (disclaimer that originators would grant exceptions from stated guidelines did not preclude liability because "[n]o language in the Offering Documents disclosed, for example, that the originators had systematically violated their own stated underwriting standards, [or] that exceptions were *improperly* granted"); *accord Miss. PERS/Goldman*, 2011 WL 135821, at *10.

Defendants' challenge to the amended complaint's "remaining statistics" is similarly baseless. (Defs. Br. at 48.) First, allegations about EPDs on loans made by the originators support a claim that the originators wholly disregarded their underwriting guidelines, and defendants cannot challenge those allegations with competing factual assertions. Second, allegations derived from news reports, public testimony, and government investigations, together with the other allegations in the amended complaint, properly support a claim that statements about adherence to underwriting guidelines were untrue or misleading.

## 1.  Early Payment Defaults and Delinquencies

As have plaintiffs in other cases, the FDIC alleges that mortgage loans included in these securitizations have experienced high rates of delinquency and default over time (Am. Compl. ¶¶ 89-96 & Items 94-96 of Schedules 1-12), and that the initial triple or double-A ratings of the certificates are now significantly below investment grade or worse. (*Id.*, Item 38 of Schedules 1-12.) Courts have found similar allegations sufficient to support a reasonable inference that the originators disregarded their underwriting guidelines. *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *5-6 (S.D.N.Y. Mar. 31, 2010) (allegations of credit

rating downgrades and increase in delinquencies and defaults supported inference that

underwriting guidelines were "totally disregarded"); *In re Lehman Bros.*, 684 F. Supp. 2d

at 493 (allegations that delinquency and foreclosure rates on loans in pool increased

supported claim that originators departed from underwriting guidelines); *Maine State*,

2011 WL 4389689, at *17 (allegations "regarding high default and delinquency rates and

a widespread downgrade of the Certificates" gave rise "to an inference that Countrywide

had systemically disregarded its underwriting guidelines" and were sufficient).

In response, defendants contend that the FDIC's allegations based on EPDs are

insufficient because high EPD rates could have been caused by broad economic factors

and indicate only that the loans were not performing well, not that the offering documents

contained material misstatements and omissions. (Defs. Br. at 48.) But as this Court has

held, defendants cannot counter allegations in the amended complaint simply by offering

their own factual explanations for the high EPD rates:

> Defendants . . . argue that an unforeseen event—namely, the housing
> collapse—and not the abandonment of underwriting standards caused the
> Certificates to decline in value. However, "any decline in value is
> presumed to be caused by the misrepresentation in the registration
> statement." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d
> 1044, 1048 (2d Cir. 1995). If Defendants wish to challenge that
> presumption they may present evidence at a later stage establishing an
> alternative cause of loss. *Id.*

*In re Bear Stearns*, 851 F. Supp. 2d at 769 n.25; *see also Maine State*, 2011 WL

4389689, at *17; *MassMutual/RFC*, 843 F. Supp. 2d at 202. Thus, for purposes of this

motion, the FDIC's allegations about EPDs, considered in conjunction with its other

allegations, are sufficient to support its claim that originators of the subject loans wholly

abandoned their underwriting standards.

Likewise, defendants' assertion that delinquency rates on the loans underlying the

certificates "provide no basis for a misrepresentation claim" because "[d]efault rates in the worst housing market since the Great Depression say absolutely nothing about the extent to which any mortgage originator departed from its underwriting guidelines *years earlier*" (Defs. Br. at 48-49), raises a disputed question of fact that should not be resolved on a motion to dismiss. The FDIC's allegations concern the "very high" 90- and 30- day delinquency rates on the particular loans underlying the certificates in this case (Am. Compl. ¶¶ 95-96 & Items 95-96 of Schedules 1-12), which give rise to a presumption that the certificates that the Banks purchased "were not as advertised." *FHFA/JPM*, 2012 WL 5395646, at *9. Once again, if defendants "wish to challenge that presumption they may present evidence at a later stage establishing an alternative cause of loss." *In re Bear Stearns*, 851 F. Supp. 2d at 769 n.25; *see also MassMutual/RFC*, 843 F. Supp. 2d at 202 ("Defendants[] contend that the poor performance of the loans is due solely to the economic downturn, but this is a question of fact that cannot be resolved on a motion to dismiss.").

### 2.  Publicly Available Sources

Defendants also argue that the FDIC cannot rely on public information to support its allegations about deviation from underwriting standards. But press and government reports, when combined with other allegations, clearly provide proper support for claims of systematic disregard of underwriting guidelines. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493 (S.D.N.Y. 2010) (allowing claim for "departure of underwriting guidelines" based on news and government reports, among other evidence); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC,* 720 F. Supp. 2d 254, 269 (S.D.N.Y. 2010) (same).

Moreover, the FDIC's allegations about the origination practices of EMC, DLJ Mortgage, and American Home consist of more than "a selection of anecdotal accounts," as defendants suggest. (Defs. Br. at 49.) Rather, the amended complaint contains allegations about these originators that are derived from sources including deposition testimony and internal documents, and that are similar to allegations that other courts routinely have considered in upholding such claims as sufficient.[36] Collectively, these alleged facts and good faith assertions made upon the FDIC's information and belief provide proper support for a claim that these originators abandoned their underwriting standards and, thus, that the statements in the offering materials were untrue or misleading.

### F.  The Allegations About Credit Ratings Are Sufficient.

Each of the certificates that CNB and SCB purchased was rated double or triple-A, and these ratings were disclosed in the prospectus supplements. (Am. Compl. ¶ 125 & Items 38(c) & 125 of Schedules 1-12.) "The ratings were important to the decision of any reasonable investor whether to purchase the certificates." (*Id.* ¶ 126.) But the statement of these ratings was misleading because the rating agencies did not have accurate information about the loans in the collateral pool of each securitization, and the defendants never disclosed that. As described in the amended complaint, "[i]f the LTVs

---

[36] Defendants argue that the Court should strike or not consider the FDIC's allegations that contain deposition testimony from ongoing litigations. (Defs. Br. at 49 n.48.) But none of the cases that the defendants cite involved allegations like the ones made here, which are based on sworn testimony and documents from the originators of loans that back the certificates in this case. Just because these facts were made public through other litigations does not render them immaterial as a matter of law. To the contrary, these facts are highly relevant to the allegations in this case. In any event, defendants cannot show, as they must, that the allegations "can have no possible bearing on the subject matter of the litigation." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999).

of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect." (*Id.* ¶ 44.) Similarly, if the rating agencies had known that the number of loans actually secured by primary residences was overstated, or that the originators did not follow their underwriting standards, then the ratings of the certificates that the defendants sold CNB and SCB would have been lower. Defendants' statement of each rating of the certificates was misleading because the defendants did not disclose that rating agencies did not and could not take into account the true facts about the mortgage loans in rating the certificates.

Defendants argue that the FDIC's allegations about credit ratings are "entirely derivative of the other allegations" and, thus, "fail along with them." (Defs. Br. at 50.) Because the FDIC's other allegations are sufficient to state a claim for all of the reasons discussed above, defendants are wrong on this point as well.

In addition, defendants assert that allegations about credit ratings are not actionable absent assertions that either the ratings agencies or the defendants believed that the ratings were inaccurate when made. (*Id.*) But defendants miss the point. The amended complaint alleges that defendants omitted to state that the ratings were inaccurate because they were based on the same untrue or misleading statements that the defendants made in the prospectus supplements (Am. Compl. ¶ 127), and therefore materially understated the risk of the certificates.[37] (*Id.* ¶ 130.)

---

[37] The FDIC does not need to plead that the defendants were aware that the rating agencies believed the ratings to be false or misleading, as liability may attach for accurately conveying false or misleading ratings. *See In re Bear Stearns*, 851 F. Supp. 2d at 771.

### G. Reliance Is Not an Element of the FDIC's Claims.

Under section 11, "reliance may be established without proof of the reading of the registration statement by such person." 15 U.S.C. § 77k(a). Courts have interpreted this to mean that reliance is presumed and a plaintiff need not allege reliance to state a claim under section 11. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 114-15 (S.D.N.Y. 2011) ("*Miss. PERS/Merrill II*"). The only exception to this rule is where an investor "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). Although the defendants purport to invoke that exception here, it does not apply because the monthly distribution reports issued by an RMBS trust are not "earning statements."

Defendants acknowledge that "a few courts have concluded that Distribution Reports do not constitute 'earnings statements' for purposes of § 11." (Defs. Br. at 54.) What defendants fail to mention is that *every single decision* to address this issue – the four that they cite as well as two others – has reached this same conclusion.[38] Defendants would have the Court ignore all of this authority because – they assert – those courts did not "address[] the relevant history of the statute or the regulatory framework regarding MBS." (Defs. Br. at 55.) But those decisions make perfectly clear why distribution reports should not be considered "earning statements" for purposes of section 11.

---

[38] *See In re IndyMac Mortg.-Backed Sec. Litig.*, No. 09 Civ. 4583 (LAK), 2012 WL 3553083, at *8 (S.D.N.Y. Aug.17, 2012); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 215 (S.D.N.Y. 2012); *Miss. PERS/Merrill II*, 277 F.R.D. at 114-15; *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 16, 2011); *NJ Carpenters/ResCap*, 2011 WL 2020260, at *6; *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1215-17 (D.N.M. 2011).

56

Distribution reports on Form 10-D, although permitted by the SEC, are inherently different from, and contain much less information than, the types of reports that the SEC has recognized as "earning statements." *See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,* No. 08 Civ. 5633 (PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 16, 2011) (reasoning that Rule 158 "specifically defines 'earnings statements' to include certain required data, which Defendants admit the trustee reports do not contain"); *NJ Carpenters/ResCap*, 2011 WL 2020260, at *6 (noting that regulations defining "earning statement" "are specific and do not appear to contemplate the kind of Distribution Summaries at issue here"); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1216-17 (D.N.M. 2011) (explaining that corporate reports enumerated in Rule 158 "differ fundamentally from" the monthly distribution reports because of the more rigorous disclosure requirements imposed on operating companies); *Miss. PERS/Merrill II*, 277 F.R.D. at 114 (same). Although defendants may disagree with these holdings, they cannot cite to any case that has adopted the interpretation they urge.

Moreover, the regulatory history that defendants cite does not support their interpretation of the Rule. Although it is true that Rule 158(a) was amended in 1983 to provide that its enumeration of the documents that will be deemed to constitute "earning statements" is not exclusive, that does not mean that a report that bears no resemblance to those types of documents will suffice.

Thus, the Court should reject defendants' argument that the FDIC must plead reliance with respect to any of CNB and SCB's purchases.

### H.  In Any Event, the Amended Complaint Adequately Pleads Reliance.

Even assuming that allegations of reliance are required with respect to the seven

certificates that defendants claim were the subject of more than 12 months of distribution reports, the amended complaint sufficiently pleads reliance. (*See* Am. Compl. ¶ 159.) Contrary to the defendants' assertion, the FDIC has made more than a conclusory allegation of reliance. (Defs. Br. at 58.) For example, the amended complaint alleges that defendants made material untrue or misleading statements in the prospectus supplements about LTVs, and that

> CNB and SCB did understand the statements about the LTVs as statements of fact. CNB and SCB had no access to appraisal reports or other documents or information from which [they] could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

(Am. Compl. ¶ 48.) Likewise, the amended complaint alleges that defendants made material untrue or misleading statements in the prospectus supplements about LTVs (*id.* ¶ 47), occupancy status (*id.* ¶¶ 77-78), underwriting standards (*id.* ¶¶ 87-88), and ratings (*id.* ¶¶ 125, 127), and that such statements were important to reasonable investors, like CNB and SCB, when making the decision to purchase the certificates. *See, e.g.*, Am. Compl. ¶ 46 ("[A] reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans."); *id.* ¶ 126 ("ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including CNB and SCB, have investment policies that require a certain minimum rating for all investments. The policy of CNB and SCB was to purchase only certificates that were rated at least A.").[39] At a minimum, these allegations give rise to a reasonable inference that CNB and SCB read and relied on defendants' untrue or

---

[39]The amended complaint also alleges that "CNB and SCB did not know when they purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading." (Am. Compl. ¶ 161.)

misleading statements.

### III.    THE AMENDED COMPLAINT PLEADS A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 15 OF THE 1933 ACT.

Section 15 extends liability to "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [section 11 or 12]." 15 U.S.C. § 77o(a). "In order to state a claim for control person liability under Section 15, a plaintiff must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re WorldSpace Sec. Litig.,* No. 07 Civ. 2252 (RMB), 2008 WL 2856519, at *7 (S.D.N.Y. July 21, 2008) (internal quotations omitted). Section 15 claims must satisfy the minimal notice pleading standard of Rule 8, not the heightened pleading requirements of Rule 9(b) or the PSLRA. *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005).

As set forth fully above, the amended complaint adequately alleges primary violations of section 11. Moreover, the control person liability of the defendants is alleged by their ownership and control of the primary violators. (Am. Compl. ¶¶ 165-177.) Each of the section 15 defendants was, at the relevant time, the parent of a wholly-owned subsidiary that has violated section 11.[40] *See McKenna v. SMART Technologies Inc.*, No. 11 Civ. 7673 (KBF), 2012 WL 1131935, at *20 (S.D.N.Y. Apr. 3, 2012) (considering information included in Prospectus on motion to dismiss and finding that information contained therein regarding ownership and control was sufficient to establish section 15 claim); *Borden, Inc. v. Spoors Behrins Campbell & Young, Inc.,* 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (allegation that defendants were sole shareholders of primary

---

[40] *See* Matthews Decl. Ex. D (BSABS 2007-AC5 Pros. Supp. at S-36; CMALT 2006-A6 Pros. at 84; CSMC 2006-6 Pros. Supp. at S-43; MANA 2007-F1 Pros. Supp. at 17).

violator clearly met standard for control person liability because "[d]efendants' positions strongly suggest that they had the potential power to influence and direct the activities of [the primary violator]"). Under the liberal notice pleading rules, the allegations in the amended complaint are sufficient to state a claim of control person liability under section 15.

## CONCLUSION

For all of the foregoing reasons, the Court should deny defendants' motion to dismiss the amended complaint in its entirety.


Dated: January 11, 2013

Respectfully submitted,

**GRAIS & ELLSWORTH LLP**


By: /s/ Mark B. Holton

David J. Grais (DG 7118)
Mark B. Holton (MH 4939)
Kathryn E. Matthews (KN 0932)
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 755-0100

*Attorneys for Federal Deposit Insurance*
*Corporation as Receiver for Citizens*
*National Bank and Receiver for Strategic*
*Capital Bank*