**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL DEPOSIT INSURANCE CORPORATION
*as Receiver for* CITIZENS NATIONAL BANK *and*
*Receiver for* STRATEGIC CAPITAL BANK,

*Plaintiff,*

v.

BEAR STEARNS ASSET BACKED SECURITIES I
LLC; THE BEAR STEARNS COMPANIES LLC; J.P.
MORGAN SECURITIES LLC; CITICORP
MORTGAGE SECURITIES, INC.; CITIMORTGAGE,
INC.; CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP.; CREDIT SUISSE
MANAGEMENT LLC; CREDIT SUISSE SECURITIES
(USA) LLC; MERRILL LYNCH MORTGAGE
INVESTORS, INC.; MERRILL LYNCH MORTGAGE
CAPITAL INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.; ALLY SECURITIES, LLC;
DEUTSCHE BANK SECURITIES INC.; HSBC
SECURITIES (USA) INC.; RBS SECURITIES INC.;
and UBS SECURITIES LLC,

*Defendants.*

No. 12-cv-4000 (LTS)(KNF)

**JOINT MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# Table of Contents

**Page**

INTRODUCTION ..................................................................................................1

PRELIMINARY STATEMENT .............................................................................1

BACKGROUND ...................................................................................................5

    A.    The RMBS Securitization And Offering Process. .................................5

    B.    The Banks Invested Heavily In RMBS During And After The Housing Market Collapsed. .................................................................................7

    C.    The FDIC's And OIG's Assessment Of The Banks' Failure. ...............8

    D.    The FDIC's Allegations In The Second Amended Complaint. ...........10

ARGUMENT .......................................................................................................11

I.    THE FDIC'S CLAIMS ARE TIME-BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS ......................................................................................11

    A.    Securitization-Specific Data Regarding Increasing EPDs, Which The FDIC Relies On For Its Underwriting Claims, Were Available In Monthly Distribution Reports Before May 22, 2008 ....................................13

    B.    Lawsuits Making Similar Allegations Against Relevant Originators Of The Loans Backing The Bank's Certificates Were Filed Before May 22, 2008. ....................................................................................16

    C.    Rating Agency Reports Revealed Growing Pessimism About The Quality Of The Certificates. .........................................................................17

    D.    News Articles Supplied Additional Negative Views On Relevant Originators' Practices. ....................................................................18

II.   THE FDIC'S § 11 CLAIMS AGAINST CERTAIN DEFENDANTS FAIL BECAUSE THE STATUTE EXPRESSLY REQUIRES THE FDIC TO PLEAD RELIANCE, WHICH IT HAS NOT DONE ...............................................20

    A.    Distribution Reports Are "Earning Statements" And Were Available For At Least Twelve Months After The Effective Date Of The Registration Statements ....................................................................................22

    B.    A Ruling That Distribution Reports Do Not Constitute "Earnings Statements" Is Inconsistent With The Text And History Of SEC Rule 158 And Would Lead To Absurd Results ..................................................25

    C.    Requiring The FDIC To Plead Reliance Is Particularly Appropriate In This Case .............................................................................................28

III.  THE FDIC'S § 11 CLAIMS FAIL WHERE DEFENDANTS DID NOT UNDERWRITE THE CERTIFICATES PURCHASED BY THE BANKS ..................29

IV.  THE § 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL ................31

CONCLUSION ....................................................................................................32

i

# TABLE OF AUTHORITIES

## CASES

*APA Excelsior III L.P. v. Premiere Techs. Inc.*,
  76 F.3d 1261 (11th Cir. 2007) ............................................................................. 20

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) ............................................................................ 14

*Cty. of Santa Clara v. Astra USA, Inc.*,
  2008 WL 5055395 (N.D. Cal. Nov. 25, 2008) ...................................................... 9

*Dodds v. Cigna Sec., Inc.*,
  12 F.3d 346 (2d Cir. 1993) ................................................................................... 11

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ..................................... 3, 11, 12, 16

*FDIC v. Shrader & York*,
  991 F.2d 216 (5th Cir. 1993) ............................................................................... 11

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*,
  858 F. Supp 2d 306 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ............................ 3

*Federal Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg.*
  *Fin. Corp., et al.*,
  No. 12 CIV. 6166 LLS, 2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013) ..................... 11, 30

*Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Secs. LLC, et al.*,
  No. GD-09-016892, 2012 WL 6210336 (Pa. C.P. Allegheny Cty. Nov.
  26, 2012) ............................................................................................................... 12

*Fernandez v. UBS AG*,
  222 F. Supp. 3d 358 (S.D.N.Y. 2016) .................................................................. 16

*Hutchinson v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ................................................................................. 31

*In re Barclays Bank PLC Sec. Litig.*,
  No. 09 CIV 1989 PAC, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ......................... 13

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) .............................................................. 13, 18

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  2013 WL 1598680 (C.D. Ca. Apr. 8, 2013) ............................................................ 3

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    934 F. Supp. 2d 1219 (C.D. Cal. 2013) ..................................................................17

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ........................................................32

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ........................................................32

*In re IndyMac MBS Litig.*,
    793 F. Supp. 2d 637 (S.D.N.Y. 2011) ..................................................................13

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ..........................................................................25

*In re Lehman Bros. Mortg. Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ................................................................................32

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    616 Fed. Appx. 442 (2d Cir. 2015) ......................................................................13

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................................14

*In re Morgan Stanley Pass-Through Certificates Litig.*,
    2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ..............................................12, 15

*In re WorldCom, Inc. Securities Litigation*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ..........................................................................26

*Jackson v. Broad. Music, Inc.*,
    2006 WL 250524 (S.D.N.Y. Feb. 1, 2006) ............................................................9

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012) ..................................................................13

*Martin v. EVP Second Corp.*,
    1991 WL 131176 (S.D.N.Y. July 9, 1991) ...........................................................32

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ..............................................................................................12

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
    No. 08 Civ. 5653(PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 18, 2011) ........25, 26

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260 (S.D.N.Y.
    May 19, 2011) .......................................................................................................25

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994) ..................................................................................................11

*Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) ...................................................12, 13, 16

*Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan*
   *Acceptance Corp. I*,
   No. 08 CV 1713(ERK)(WDW), 2012 WL 601448 (E.D.N.Y. Feb. 23,
   2012).......................................................................................................................30

*Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
   277 F.R.D. 97 (S.D.N.Y. 2011)..............................................................................25

*Rudnick v. Franchard Corp.*,
   237 F. Supp. 871 (S.D.N.Y. 1965) ..................................................................20, 27

*Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*,
   2013 WL 1955012 (Del. Ch. May 13, 2013)...........................................................7

*Special Situations Fund, III, L.P. v. Cocchiola*,
   Civ. No. 02-3099 (WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007) ..................31

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008) ............................................................................12, 14

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) .................................................................16

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) ...........................................................................25

*Wilson v. Venture Fin. Grp., Inc.*,
   2010 WL 2028088 (W.D. Wash. May 18, 2010) .....................................................9

*Youngers v. Virtus Investment Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ..............................................................12, 13

**STATUTES**

15 U.S.C. § 77b(a)(11) ....................................................................................................4, 30

15 U.S.C. § 77k(a) ................................................................................................................20

15 U.S.C. § 77k(a)(5) ...........................................................................................................30

15 U.S.C. § 77m ...............................................................................................................2, 11

15 U.S.C. § 78o(d)................................................................................................................24

## REGULATIONS AND ADMINISTRATIVE MATERIALS

17 C.F.R. § 229.1121(a) .................................................................................................6

17 C.F.R. § 230.158(a) .........................................................................................22, 26

17 C.F.R. § 230.158(a)(1)(i) .........................................................................................22

17 C.F.R. § 230.158(a)(2).............................................................................................22

17 C.F.R. § 240.17g-1 ...................................................................................................5

SEC Exchange Act Release No. 34-55146, 72 Fed. Reg. 4148, 4162 (Jan. 29, 2007).................................................................................................................25

SEC Securities Act Release No. 33-6902, Exchange Act Release No. 34-29354, 56 Fed. Reg. 30036, 30043, 30054 (July 1, 1991) ....................................26

SEC Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 70 Fed. Reg. 1506 (Jan. 7, 2005).............................................23, 24, 25, 26

SEC Securities Act Release, No. 33-6485, 48 Fed. Reg. 44767 (Sept. 30, 1983).........................................................................................................passim

## GLOSSARY OF ABBREVIATIONS AND TERMS

**SAC**:                          Second Amended Complaint

**Banks**:                        Citizens National Bank and Strategic Capital Bank

**Certificate(s)**:               One or more of the mortgage-backed pass-through certificates that the Banks allegedly purchased from some of the Defendants, and on which the FDIC bases its claims in this action

**Distribution Reports**:         Monthly remittance reports published pursuant to SEC Regulation AB that contain detailed information about the financial performance of the Certificates

**EPD**:                          Early payment default

**LTV**:                          Loan-to-value

**RMBS**:                         Residential mortgage-backed securities

**Offering(s)**:                  Any of the RMBS offerings from which the FDIC alleges the Banks purchased the Certificates (*see* Schedules 1, 2, 3, 5, 7, 10, 11 and 12 to the Second Amended Complaint)

**Offering Documents**:           Registration statements, prospectuses, and prospectus supplements for the Offerings

**OIG**:                          Office of the Inspector General of the United States Department of the Treasury

**P.S.**:                         Prospectus Supplement

**USPAP**:                        Uniform Standards of Professional Appraisal Practice

**CMALT 2006-A6**:                CitiMortgage Alternative Loan Trust REMIC Pass-Through Certificates, Series 2006-A6

**CSMC 2006-6**:                  CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-6

**RALI 2006-QS6**:                Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS6

**RALI 2006-QS16**:               Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS16

**RALI 2006-QS18**:               Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18

**RAST 2006-A11**:                Residential Asset Securitization Trust, Series 2006-A11

**RAST 2006-A14CB**:    Residential Asset Securitization Trust, Series 2006-A14CB

**RAST 2007-A1**:    Residential Asset Securitization Trust, Series 2007-A1

## INTRODUCTION

Defendants Credit Suisse First Boston Mortgage Securities Corp. ("CSFB Mortgage Securities"), Credit Suisse Management LLC ("Credit Suisse Management"), Credit Suisse Securities (USA) LLC ("Credit Suisse Securities"), Deutsche Bank Securities Inc. ("Deutsche Bank"), HSBC Securities (USA) Inc. ("HSBC"), RBS Securities Inc. ("RBS"), and UBS Securities LLC ("UBS") (collectively, "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss the Second Amended Complaint filed by the Federal Deposit Insurance Corporation ("FDIC"), as receiver for Strategic Capital Bank ("Strategic Capital") and Citizens National Bank ("Citizens National") (collectively, the "Banks").

## PRELIMINARY STATEMENT

The FDIC alleges that Defendants misrepresented the quality of the loans that backed certain RMBS Certificates purchased by the Banks, when in reality the Banks' losses flowed from their own high-risk and ill-timed investment strategy. The Banks purchased the Certificates near the height of the economic crisis—several months (and, in some cases, years) after the Certificates were offered for sale, when the Certificates' trade value and credit ratings were already reflecting distressed performance, and long after voluminous press coverage and numerous lawsuits by investors based on the same claims the FDIC makes here. As the Banks' regulators' (including the FDIC) own post-mortem assessments of the Banks' investments concluded, the Banks knew exactly what they were buying, and they acted intentionally in the hope of making a profit on millions of dollars of RMBS certificates purchased in the secondary market when the housing market was showing clear signs of decline. After the Banks were placed into receivership on May 22, 2009, the FDIC and the Office of Inspector General of the Department of the Treasury ("OIG"), conducted inquiries into the causes of the Banks' failures and published their findings in public reports known as Material Loss Reviews. Both reports denounced the Banks' post-financial crisis buying spree as "high-risk," "speculative and ill-

timed," and blamed inadequate internal risk management controls for losses the Banks experienced on their RMBS investments.[1]

Despite these findings of its own inquiry, the FDIC attempts to shift the blame for the Banks' losses to the parties involved in the securitization process for the Certificates. Specifically, the FDIC alleges that the Offering Documents misrepresented the credit quality of the underlying mortgages because property appraisals were overstated, loan-to-value ratios were inaccurate, owner-occupancy status was misrepresented, mortgage underwriting guidelines were not followed, and credit ratings for the Certificates were too high.  The FDIC asserts claims under §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act") against seven Defendants arising from twelve of the Banks' secondary market purchases of Certificates from eight separate RMBS Offerings.  But the Second Amended Complaint must be dismissed for, among other reasons: (1) untimeliness; (2) failure to plead reliance; and (3) failure to plead any actionable misstatement or omission with respect to Defendants who did not underwrite the Certificates or any certificate sold in the same tranches of the securitizations as the Certificates.

*Untimeliness.*  The FDIC's claims are untimely under the 1933 Act's statute of limitations because a reasonably diligent investor (and certainly sophisticated RMBS investors like the Banks) should have discovered its claims before May 22, 2008 (*i.e.*, more than one year before the FDIC was appointed receiver).  *See* 15 U.S.C. § 77m.  Thus, the claims were already time-barred when the FDIC was appointed as receiver on May 22, 2009.  *See* Section I, *infra*. Against a backdrop of increasingly frequent and urgent news[2] about the failing housing market was a constellation of information *specific* to the securitizations from which the Banks allegedly

---

[1]  Ex. 1 at 3 (Material Loss Review of Strategic Capital Bank, Champaign, Illinois, Office of Inspector General, FDIC, Report No. MLR-10-007 (Dec. 2009)); Ex. 2, at 4 (Material Loss Review of Citizens National Bank, Office of Inspector General, U.S. Department of the Treasury, OIG-10-038 (Mar. 2010)).  All citations to "Ex." are to the exhibits attached to the Declaration of Andrew T. Frankel.

[2]  Appendices C and D provide a chronology of the publicly available news, reports, and lawsuits relevant to the FDIC's claims, which are too numerous to mention individually in this memorandum.  This information supports a finding that the Banks should have discovered their claims prior to May 22, 2008.

purchased the Certificates *and* the relevant originators who originated the mortgage loans that backed the Certificates.  Altogether, this information should have put the Banks on notice of their claims before May 22, 2008.  The Banks had enough facts that should have prompted them to investigate further and allowed them to make a well-pleaded complaint before May 22, 2008.  For example:

- As early as August 2006 and throughout 2007 and 2008, there were multiple news articles highlighting concerns with IndyMac's origination practices, as well as lawsuits alleging that IndyMac had disregarded its underwriting guidelines and failed to provide independent and effective appraisals.  *See* Section I.D, *infra*.  IndyMac originated or acquired 100% of the loans backing at least three of the Certificates.

  It is this type of publicly available information specific to relevant entities that compelled other courts to dismiss with prejudice identical claims brought by the FDIC as receiver for Strategic Capital.  *See FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *8 (C.D. Cal. Nov. 21, 2012); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2013 WL 1598680, at *1 (C.D. Ca. Apr. 8, 2013).

- Other originators of the loans backing the Certificates filed for bankruptcy prior to May 22, 2008.  American Home filed for bankruptcy on August 6, 2007.  Ex. 3.  In 2007, Bloomberg downgraded GMAC/Residential Capital bonds from "buy" to "neutral" because of rising default rates on the residential mortgages originated by GMAC/Residential Capital.  Ex. 5.  By April 2008, Residential Capital had announced six straight quarters of recording losses, and then declared bankruptcy on May 14, 2012.  Exs. 4, 92.

- The three RALI 2006-QS18 1MI Certificates were downgraded below investment grade before May 22, 2008.  *See* Appendix B.  Courts in this district have considered this event to trigger the statute of limitations.  *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013).  Many of the certificate classes in the Offerings that were subordinate to the Certificates purchased by the Banks were also downgraded throughout 2007 and 2008.  In March 2008, Fitch warned RMBS investors that these downgrades were important because "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes, mostly notably for the later 2006 and 2007 transactions."  Ex. 6.

- Distribution Reports for each Certificate (which provided the Banks with information about each Certificate's earnings and other measures of financial performance) were already showing increasing delinquencies and defaults in the mortgage loans backing the Certificates by the time the Banks purchased them.  And between the time of purchase and May 22, 2008, the Banks had several months' worth of Distribution Reports showing that the delinquency and default rates of the mortgage loans backing the Certificates were continuing to rise to increasingly significant levels.  *See* Section I.A, *infra*.

3

**Failure to Plead Reliance.**  The FDIC's failure to plead reliance requires dismissal of its claims pertaining to the seven Certificates purchased more than one year after the initial offering.  *See* Section II, *infra*.  Section 11 expressly requires investors that buy securities in the secondary market after more than twelve months of earning statements have been released to plead and prove reliance.  Here, the Banks bought seven certificates after the release of more than twelve monthly Distribution Reports.  As a result, the FDIC bears the burden of pleading reliance.  The cursory, non-factual allegations of reliance in the Second Amended Complaint are plainly inadequate.  Indeed, the undisputed fact is that the Banks bought the Certificates knowing full well that the Certificates were distressed.  This fact belies any assertion that the Banks relied on the stale information in the Offering Documents.

**Failure to State a Claim.**  The Second Amended Complaint also fails to state a claim for liability under the 1933 Act with respect to certain Defendants.[3]  *See* Section III, *infra*.  For the five RALI 2006-QS18, RAST 2006-A11 and RAST 2007-A1 Certificates on which the FDIC sues Deutsche Bank and UBS, neither of these Defendants underwrote or sold any certificates in the tranches of the securitizations from which the Banks allegedly purchased the Certificates.  By definition, an "underwriter" can only be liable for violations of Section 11 if it, in connection with the distribution of any security, "participates or has a participation in the direct or indirect underwriter of any such undertaking…"  15 U.S.C. § 77b(a)(11).  In several No-Action Letters, the Securities and Exchange Commission ("SEC") has explained that each tranche of certificates in a securitization is viewed as a different security.  Thus, the securities purchased by the Banks from the RALI 2006-QS18, RAST 2006-A11 and RAST 2007-A1 offerings are not ones that Deutsche Bank or UBS underwrote and they cannot be held liable to the FDIC.

---

[3]   The Second Amended Complaint fails to state a claim for all the reasons asserted by Defendants in their motion to dismiss the Amended Complaint.  To the extent the Second Amended Complaint survives this motion, Defendants will demonstrate the lack of merit in the FDIC's allegations on a more complete record.  Defendants do not intend to waive any of their rights or defenses by not addressing those issues further in this memorandum.

Finally, the Second Amended Complaint fails to state a claim for control person liability under § 15 of the 1933 Act, both because it fails to allege a primary violation of the 1933 Act and because its allegations of control consist entirely of conclusory boilerplate, not facts. *See* Section IV, *infra*.

In short, the Second Amended Complaint suffers from numerous incurable legal defects, and should be dismissed with prejudice.[4]

## BACKGROUND

### A.    The RMBS Securitization And Offering Process.

RMBS are fixed-income investments that provide investors with exposure to the residential real estate market.  In a typical securitization, a mortgage lender or aggregator sells hundreds or thousands of home loans it has originated or acquired to an entity that will act as the sponsor for the securitization.  SAC ¶¶ 15-22.  The sponsor may be an affiliate of the originator or a third-party financial institution.  The sponsor then "pools" the mortgage loans and deposits them into a trust in exchange for certificates, and sells the certificates to underwriters, which in turn sell them to sophisticated institutional investors like the Banks.  The certificates are backed by the pool of mortgages held by the trust and entitle the investors to a portion of the income stream generated by the homeowners' monthly mortgage payments.  *Id.*

The incoming cash flows are usually divided into "tranches" corresponding to different certificate classes in an RMBS offering.  SAC ¶ 19.  Tranches are differentiated based on, among other things, the priority of payment, the degree of risk, the yield to investors, and the credit rating of an independent and nationally recognized rating agency.  *See* 17 C.F.R. § 240.17g-1.  Generally, the certificates from the more senior tranches (*i.e.*, those with comparatively less risk) will pay lower yields, while certificates from the more subordinate tranches (*i.e.*, those with comparatively greater risk) will pay higher yields.  SAC ¶ 20.  The SEC views each tranche of asset-backed securities, such as RMBS, as a separate security.  *See* Ex. 7,

---

[4]   To aid the Court's consideration of this Motion, attached as Appendix A is a chart ("Grounds for Dismissal of Claims"), which is organized by securitization, and sets forth the Defendant(s) associated with each Offering and the corresponding grounds for dismissal.

SEC, No-Action letter, PSA The Bond Market Trade Ass'n (Feb. 7, 1997) ("[I]n the case of a multi-tranche offering of ABS, each tranche . . . shall be treated as a different Registered Security."); Ex. 8, SEC No-Action Letter, Bear, Stearns & Co. Inc. (Aug. 29, 1994); *see also* Ex. 9 (Asset-Backed Securities, 69 Fed. Reg. 26,688 n.212 (May 13, 2004)) ("Consistent with the existing no-action letter, in the case of a multi-tranche registered offering of asset-backed securities, each tranche would be treated as a different security.").

RMBS certificates are registered for sale with the SEC.  An RMBS issuer typically files a shelf registration statement that contains general information about the issuer and allows the issuer to register securities for sale in the future, but does not contain detailed information about the securities that may be offered for sale because that information may not yet exist.  When conducting an RMBS offering, the issuer uses a prospectus and prospectus supplement to convey detailed information about the offering to initial investors, including information about the certificates, the pool of mortgages that backs them, and the risks associated with the offering.  The prospectus and prospectus supplements encourage investors to consider general and specific risk factors before purchasing certificates.[5]  *See* SAC ¶ 26.

After the initial offering, investors have access to ongoing loan performance information through monthly trustee reports ("Distribution Reports").[6]  The issuance of Distribution Reports is mandated by SEC Regulation AB.  Among other things, Distribution Reports "[d]escribe the [cash] distribution for the [monthly] period and the performance of the asset pool during the . . . period," including "[d]elinquency and loss information for the period,"

---

[5]   *See* Ex. 10 (cover pages of Offering Documents warning investors to review relevant "risk factors" before purchasing certificates).

[6]   *See also* Ex. 11 (excerpt of Free Writing Prospectus for CMALT 2006-A6 filed shortly before the initial offering.  This filing contained multiple loan-level data points, including loan numbers, property type, property location, LTV ratios, owner-occupancy status, and original and remaining balances on the mortgage loans).  Moreover, with respect to other Certificates, additional loan-level data was available to investors within a month of the initial offerings. Sometimes listed under the heading "loan schedule" when filed as an exhibit to a Form 8K, these disclosures also provided LTV ratios, property location, and original and remaining balances on the mortgage loans. *See, e.g.*, Ex. 12 (excerpt of a loan schedule for RALI 2006-QS6).  These filings are accessible on the SEC's public website by searching the trust name at http://www.sec.gov/edgar/searchedgar/companysearch.html.

17 C.F.R. § 229.1121(a), and generally provide details on the certificates' performance over the period.[7]  The Offering Documents directed investors to the websites where the monthly reports could be accessed.[8]

      **B.**      **The Banks Invested Heavily In RMBS During And After The Housing Market Collapsed.**

Prior to their failure in 2008, Citizens National and Strategic Capital were Illinois-based banks under common control of John E. Gorman and Gary L. Svec (d/b/a JGS Investment Group).[9]  Prior to the fall of 2007, neither Bank had invested in any type of mortgage-backed security.  Ex. 1 at 4; Ex. 2 at 7.  But between September 2007, when the housing market had already shown clear signs of decline, and April 2008, the Banks collectively invested more than $94 million to allegedly purchase the Certificates.  *See* Item 28(b) of Schedules 1, 2, 3, 5, 7, 10, 11, and 12 to SAC.  As illustrated in Figure 1, the sharp downward trend in housing prices during this time did not dissuade the Banks from investing in the Certificates.[10]

---

[7]  Ex. 13 contains a copy of the April 2008 Distribution Report for RAST 2006-A11 and is representative of the information contained in the monthly Distribution Reports for all of the Certificates.

[8]  Ex. 14 (excerpts of Offering Documents informing investors of the websites where the Distribution Reports could be accessed).

[9]  Together, Gorman and Svec owned a majority stake in the Banks' respective holding companies, Citizens Central Bancorp, Inc. and Strategic Capital Bancorp, Inc.  Ex. 1 at 2; Ex. 2 at 24.

[10]  *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *11 (Del. Ch. May 13, 2013) (taking judicial notice of Case-Shiller house price index).

Figure 1



Source: S&P Case-Shiller home price composite (20) Index

In 2008, the FDIC issued a cease-and-desist order to Strategic Capital to "compel the bank to discontinue its high-risk investment strategy." Ex. 1 at 13. Specifically, the FDIC ordered Strategic Capital to stop "[o]perating with an excessive concentration of risk in securities backed by nontraditional mortgages with less than full documentation on underlying loans."[11] Similarly, the Office of the Comptroller of the Currency warned Citizens National that its risk management controls were inadequate, and urged it to "supplement credit ratings [given to RMBS] with internal credit analysis." Ex. 2 at 8. These warnings appear to have gone unheeded.

### C.   The FDIC's And OIG's Assessment Of The Banks' Failure.

After the FDIC was appointed receiver for the Banks, the FDIC and the OIG conducted Material Loss Reviews for Strategic Capital and Citizens National respectively, which

---

[11]  Ex. 15 (*In re Strategic Capital Bank*, Order to Cease and Desist, 2008 WL 4592001, at *1 (F.D.I.C. Aug. 14, 2008)).

addressed, among other things, the Banks' RMBS investments.[12]  Both the FDIC and the OIG

agreed that the Banks' management had engaged in a "speculative and ill-timed growth strategy

involving high-risk assets and volatile funding" that was in "contravention to long-standing

supervisory guidance."  Ex. 1 at 3; *see also* Ex. 2 at 2 ("[Citizens National] failed because

management undertook a high-risk strategy of investing heavily in private-label collateralized

mortgage obligations [a type of mortgage-backed security] and commercial real estate loan

participations.").  The FDIC and the OIG found that the Banks "embarked on [this] speculative

growth strategy by increasing [their] reliance on brokered deposits to fund significant

concentrations of . . . private-label mortgage-backed securities . . . backed by nontraditional

mortgages with less than full documentation . . . [and commercial real estate loan

participations]."  Ex. 1 at 3-4; *see also* Ex. 2 at 2.

   The FDIC's report noted that Strategic Capital's management "concluded that

[2007] was an opportunistic time to invest in private-label MBS because these securities were

being offered at a significant discount."  Ex. 1 at 4.  But, the FDIC observed, in the short span of

time between the fourth quarter of 2007 and the first quarter of 2008 when the Banks made their

RMBS investments, "market conditions rapidly deteriorated, and [the Banks] faced credit

downgrades associated with [their] investment portfolio[s]."  Ex. 1 at 3.  Ultimately, the FDIC

found that the "rapid growth and high concentration in assets vulnerable to economic downturn

resulted in significant losses to [the Banks]."  Ex. 2 at 6.

   The OIG, in reviewing Citizens National, likewise concluded that "[t]he decision

to purchase the private-label [RMBS] in such a short period of time was made by the bank's

senior management."  Ex. 2 at 7.  But as Citizens National was taking on increased risk, its board

of directors "did not ensure that bank management identified, measured, monitored, and

---

[12]  Material Loss Review reports are publicly available and judicially noticeable.  *See Wilson v. Venture Fin. Grp., Inc.*, 2010 WL 2028088, at *11 (W.D. Wash. May 18, 2010) (taking judicial notice of FDIC material loss review because "[t]he Loss Review is a public report of the FDIC's Office of Inspector General"); *see also Jackson v. Broad. Music, Inc.*, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006); *Cty. of Santa Clara v. Astra USA, Inc.*, 2008 WL 5055395, at *2 n.1 (N.D. Cal. Nov. 25, 2008).

controlled the high risks associated with [its] assets" nor did it "establish adequate controls commensurate with the risks associated with these assets."  Ex. 2 at 2, 4.

>  **D.**    **The FDIC's Allegations In The Second Amended Complaint.**

Despite the Banks' deliberate risk-taking, the FDIC now seeks to recoup the Banks' investment losses through litigation.  The Second Amended Complaint is one of three substantively identical pleadings that the FDIC brought as receiver for one or both of the Banks based on the Banks' alleged purchases of RMBS certificates.[13]  As noted, the court overseeing the *Countrywide* MDL dismissed the two other *Strategic Capital* complaints as untimely under the 1933 Act's statute of limitations.

In this case, as in its dismissed complaints, the FDIC alleges that the Offering Documents, which were filed with the SEC several months and, in some cases, years prior to the Banks' purchases, were false or misleading because (a) the LTV ratios of the mortgages were understated due to properties being appraised during the housing boom for more than they were "really" worth; (b) owner-occupancy rates were overstated on account of some homeowners not living in the properties despite indicating that they would on their loan applications; (c) the Offering Documents did not disclose that mortgage originators had abandoned their mortgage underwriting guidelines; and (d) the credit ratings conferred on the Certificates by Moody's, S&P and/or Fitch (nationally recognized credit rating agencies) were higher than they should have been.  Drawing few distinctions among the various unrelated Defendants,[14] the Second Amended Complaint tries to place the blame on Defendants for the Banks' mismanagement of their RMBS investments, divining misstatements in the Offering Documents that either do not exist or were made by entities other than the Defendants.  These allegations, however, could

---

[13]  Ex. 16 (Complaint, *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 12-cv-04354 (C.D. Cal. May 18, 2012)); Ex. 17 (Complaint, *FDIC as Receiver for Strategic Capital Bank v. J.P. Morgan Secs. LLC*, No. 12-cv-08415 (C.D. Cal. May 18, 2012), transferred from, 12-cv-4001 (S.D.N.Y. May 18, 2012)).

[14]  The details of each Offering and any differences in allegations against each Defendant have been relegated to "schedules" attached to the Second Amended Complaint.

have been made prior to May 22, 2008, and in any event, are insufficient to state a claim.  For the reasons set forth below, the Second Amended Complaint should be dismissed with prejudice.

## ARGUMENT

## I.   THE FDIC'S CLAIMS ARE TIME-BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS

Section 13 of the 1933 Act precludes §§ 11 and 15 claims from being brought more than "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m; *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well."). Because the FDIC's claims could have been initiated by May 22, 2008—a full year prior to the FDIC's appointment as receiver on May 22, 2009—they were already time-barred under § 13 when the FDIC became receiver, and therefore remain time-barred today.  *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *2 ("[I]f SCB [Strategic Capital] discovered or should have discovered the misstatements before May 22, 2008, then the claims here were not live when the FDIC was appointed receiver, and are untimely now.").  This is because, when the FDIC is appointed as receiver for a bank, it "steps into the shoes" of the bank, making "any defense [that is] good against the [bank] . . . good against the [FDIC]."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (internal quotations marks omitted); *accord FDIC v. Shrader & York*, 991 F.2d 216, 220-27 (5th Cir. 1993) (holding the FDIC's claims time-barred where the bank should have known of the claims before the FDIC receivership began).  The magnitude of specific information available to the Banks sets this case apart from other RMBS decisions denying motions to dismiss on statute of limitations grounds because the information defendants identified in those cases was too general.[15]  And as this Court

---

[15]  For example, in *Federal Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp., et al.*, No. 12 CIV. 6166 LLS, 2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013), Judge Stanton found that news articles and public filings about the mortgage industry in general and entities involved in the origination and sale of similar certificates, was "too general" and not sufficiently "connected" to the specific certificates at issue in that case.  *Id.* at *4; *see also Federal Home Loan Bank of Pittsburgh v. J.P. Morgan Secs. LLC, et al.*, No.

held, MBS claims under the 1933 Act can be rendered untimely based on Distribution Reports showing rising delinquencies (*see* Section I.A, *supra*); ratings downgrades of the certificates prior to the limitations date; "news reports of questions regarding the integrity of ratings" of asset-backed securities; and prior lawsuits involving "similar allegations regarding MBS-related misconduct." *In re Morgan Stanley Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (Swain, J.) ("*Morgan Stanley I*"); *accord Strategic Capital*, 2012 WL 5900973, at *8 (finding that "media sources, complaints and judgments created a roadmap" for RMBS investors to initiate litigation). All these factors are present here.

As shown below, between tranche-specific performance data in monthly Distribution Reports, Certificate-specific credit rating downgrades, and publicly available information about the mortgage market and relevant originators before May 22, 2008,[16] a reasonably diligent plaintiff had enough to investigate further and uncover the facts allowing it to adequately plead its claims before May 22, 2008. *See Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016).[17] This is especially so against a backdrop of

---

GD-09-016892, 2012 WL 6210336, (Pa. C.P. Allegheny Cty. Nov. 26, 2012). However, not present before these courts was the compelling combination of security-specific information as it exists here—namely, credit downgrades of at-issue certificates to below investment grade, in addition to the information available about the performance of each Certificate in monthly Distribution Reports, and litigation filings and widespread public criticism relating to the actions of the very originators who originated the loans backing the Certificates. These courts did not address how the availability of these types of information would have altered the mix of information available to a reasonable investor for statute of limitations purposes. For reasons discussed in Sections I.A-D, *infra*, this Court should find that the Banks were charged with knowledge of *specific* and sufficient facts prior to May 22, 2008 to have pled the Section 11 claims alleged here.

[16] Distribution Reports, press coverage, ratings events, prior lawsuits, and regulatory filings referenced throughout this brief are judicially noticeable for determining that the Banks had actual or constructive knowledge of their claims before May 22, 2008. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents"); *Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 366 n.6 (S.D.N.Y. 2012) (dismissing plaintiff's § 11 claims as time-barred where the defendants "rel[ied] on news articles, SEC filings, and various lawsuits to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation prior to" the limitations date).

[17] Whether inquiry notice or the "discovery rule" set forth in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) is the appropriate standard for assessing the timeliness of Section 11 claims is not

voluminous media reports about the housing market's decline in general.[18]  Indeed, the FDIC's own allegations confirm that the facts on which the FDIC relies in bringing this action were discoverable before May 22, 2008.

### A. Securitization-Specific Data Regarding Increasing EPDs, Which The FDIC Relies On For Its Underwriting Claims, Were Available In Monthly Distribution Reports Before May 22, 2008

The FDIC alleges that the Offering Documents failed to disclose that mortgage originators were systematically disregarding their own mortgage underwriting standards.  SAC ¶¶ 79-80.  According to the FDIC, the originators' disregard of their underwriting standards is evidenced by the number of early payment defaults ("EPDs") and purportedly high rates of delinquencies in the securitizations.  *Id.* ¶¶ 90, 94.  Because the EPD and delinquency data was available for each Certificate through monthly Distribution Reports, these allegations could have been made prior to May 22, 2008 and are therefore all time-barred.

Early payment defaults, by definition, occur *early* in the life of a securitization. Indeed, according to the FDIC, EPDs occur when loans become "60 or more days delinquent *within six months after they were made*."  SAC ¶ 83 (emphasis added).  For the at-issue

---

settled law within the Second Circuit.  *See Youngers*, 195 F. Supp. 3d at 520.  Some courts in this District have held that *Merck* applies to § 11 claims, *see In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 762-63 (S.D.N.Y. 2012) (Swain, J.).  It has been observed that a "majority" of courts in this District have maintained that inquiry notice applies to Section 11 claims.  *Youngers*, 195 F. Supp. 3d at 520.  Defendants respectfully submit that *Merck* does not apply and urge the Court to hold otherwise in accordance with significant case law in this District.  *See, e.g., In re IndyMac MBS Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (noting that *Merck*'s holding was "based on the precise language of" 28 U.S.C. § 1658(b) and therefore "does not apply" to § 11 claims); *Pa. Pub. School Emps.' Ret. Sys.*, 874 F. Supp. 2d at 366; *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV 1989 PAC, 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011); *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 346 n.11 (S.D.N.Y. 2012).  As discussed below, however, this lawsuit is untimely under either the *Merck* standard or the inquiry notice standard.  *Cf. Pa. Pub. School Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365 (noting that the choice between *Merck* and an inquiry notice standard makes "no difference . . . because of the more relaxed requirements for pleading a Section 11 claim than pleading a Section 10-b claim"); *see also In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 Fed. Appx. 442, 447 (2d Cir. 2015) (refraining to decide which standard applies because "we nevertheless conclude that the Securities Act claims are untimely because [defendant's] public disclosures . . . would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim.").

[18] *See* Appendices C and D.

Certificates, the underlying loans were originated in the 2001 to 2006 period.[19]  If EPDs are, as the FDIC alleges, "strong evidence that the originator did not follow its underwriting standards in making the loan," *id.*, then the Banks had this "strong evidence" before May 22, 2008 because the monthly Distribution Reports provided details on the performance of the loans backing the Certificates, including delinquency and loss information by tranche.[20]  Indeed, as Figure 2 demonstrates, the Distribution Reports for the Certificates clearly showed a steep and continuing increase in delinquencies and defaults for the mortgage loans backing each of the Certificates prior to May 22, 2008.[21]

---

[19] The loans backing the Certificates were originated between approximately October 2001 and November 2006.  *See* Ex. 93, CMALT 2006-A6, at 9; CSMC 2006-6, at S-26; RALI 2006-QS6, at S-44-45; RALI 2006-QS16, at S-40; RALI 2006-QS18, S-49-51; RAST 2006-A11, at S-33; RAST 2006-A14CB, at S-32; RAST 2007-A1, at S-28.

[20] Distribution Reports for each Offering are available to the public on websites maintained by the securitization trustees, and the Banks are thus "chargeable with knowledge of [their] contents."  *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 (S.D.N.Y. 2000); *accord In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (charging plaintiffs with knowledge, at the dismissal stage, of SEC mandated disclosures on issuers' websites).

[21] Ex. 18 contains the portions of the Distribution Reports used to create Figure 2.  Distribution Reports are publicly available on the trustees' websites pursuant to SEC Regulation AB, and are judicially noticeable.  *See Staehr*, 547 F.3d at 425 (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the *fact* that . . . regulatory filings contained certain information, without regard to the truth of their contents").

Figure 2



Number of Delinquencies, Defaults, Foreclosures, Bankruptcies, and Real-Estate-Owned Properties as Percentages of the Total Loans

These percentages were compiled using data from the distribution reports for each certificate. The distribution reports were released to investors on a monthly basis and remain publicly available on the trustees' websites.

As Figure 2 demonstrates, by April 2008, the delinquency and default rates for the Banks' Certificates ranged from 6.3% to as high as 21.37%, and had been rising steadily.  For example, the February 2007 Distribution Report for the three Certificates allegedly purchased from RALI 2006-QS18 reflected delinquencies of just 2.84%, which increased monthly to 11.94% (November 2007), 13.12% (December 2007), 14.58% (January 2008), 15.38% (February 2008), 16.86% (March 2008), and 17.6% (April 2008)—a *six-fold* increase.  *Cf. Morgan Stanley I*, 2010 WL 3239430 at *8  (concluding that "notice arose well before May 2008" in part on the basis of Distribution Reports demonstrating delinquencies rising "from 9% in October 2007, to more than 13% in December 2007, and to more than 20% in March 2008").  Since the FDIC contends that such default rates are sufficient to support a claim, the Banks necessarily had sufficient information to file a complaint well before May 22, 2008.

**B.    Lawsuits Making Similar Allegations Against Relevant Originators Of The Loans Backing The Bank's Certificates Were Filed Before May 22, 2008.**

Prior to May 22, 2008, investors were already filing lawsuits against some of the same parties the FDIC has sued in this court for similar claims.  The ability of other RMBS investors to bring nearly identical claims prior to May 22, 2008 establishes that the FDIC had the same ability.  Accordingly, its claims are untimely and therefore must be dismissed with prejudice.  *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 380 (S.D.N.Y. 2016) (finding that lawsuits, and public coverage of them in the press put plaintiffs on notice of their claims against defendants); *Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365 (dismissing § 11 claims as untimely based primarily on the filing of other lawsuits); *Strategic Capital*, 2012 WL 5900973, at *8 (same); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011) (dismissing claims in part because the filing of other complaints revealed that a reasonable investor would have been aware of its potential claims prior to the limitations date); *see also* Appendix D.

For example, IndyMac, the originator that originated or acquired 100% of the loans backing at least three of the at-issue securitizations,[22] had been targeted by investors who suspected shortcomings in IndyMac's underwriting and appraisal practices almost *two years* before May 22, 2008.  In August 2006, a class action was filed alleging "a systematic and continued failure to provide independent and effective appraisals" at IndyMac that caused harm to "investors in mortgages and mortgage-backed securities."  Ex. 19 (Compl., *Cedeno v. IndyMac Bancorp, Inc. et al.*, No. 06-CV-6438 (S.D.N.Y.), filed Aug. 25, 2006, ¶¶ 22-23).  By July 2007, plaintiffs in that case amended their claim to include allegations regarding inflated appraisals, widespread appraisal bias and pressure to hit target property values at IndyMac.  Ex. 20 (First Am. Compl., *Cedeno v. IndyMac Bancorp, Inc., et al.*, No. 06-CV-6438 (S.D.N.Y.), filed July 20, 2007, ¶¶ 2, 4, 11, 12, 27, 30, 31, 34).  Less than a year later, in March 2007, two individual IndyMac shareholders filed a putative class action on behalf of IndyMac investors

_____
[22]  RAST 2006-A11, RAST 2006-A14CB and RAST 2007-A1.

regarding alleged problems with IndyMac's underwriting practices.  Ex. 21 (Compl., *Reese v. IndyMac Fin., Inc., et al.*, No. 07-CV-01635 (C. D. Cal.), filed March 12, 2007, ¶ 4).  The lawsuit was amended several times, and, by January 2008, the complaint alleged that IndyMac "disregard[ed its] underwriting guidelines" and included other allegations nearly identical to those the FDIC would not make for more than two years.  Ex. 22 (Second Am. Compl., *Tripp v. IndyMac Bancorp Inc. et al.*, No. 07-CV-01635 (C.D. Cal.), filed Jan. 18, 2008, ¶¶ 3, 5-9, 61-64, 76, 210).

>    **C.    Rating Agency Reports Revealed Growing Pessimism About The Quality Of The Certificates.**

Three of the Certificates from the RALI 2006-QS18 securitization that the Banks allegedly purchased were downgraded below investment grade prior to May 22, 2008.  SAC Schedule 2, Item 28.  Many of the certificate classes in the Offerings that were subordinate to the classes purchased by the Banks were downgraded throughout 2007 and 2008.  And prior to May 22, 2008, *every* at-issue securitization included at least one subordinate certificate class that had dropped below investment grade.  *See* Appendix B.   This is significant because, in March 2008, Fitch warned RMBS investors that "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes, most notably for the later 2006 and 2007 transactions."  Ex. 6.

These downgrades, and the accompanying reports published by the rating agencies, were sufficient to give investors such as the Banks actual or constructive knowledge of the purported problems with the Certificates in advance of May 22, 2008.  Courts recognize that "credit rating downgrades give specific information about the documents behind a security," and together with "media sources of problems in underwriting, and other lawsuits," a reasonable investor "could craft a particularly well-pled complaint that states the offering documents contained misrepresentations, because they have both general information about problems with the originator of their loans and specific information about the securities they purchased."  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1228 (C.D. Cal. 2013)

17

(ruling that "when combined with the type of information available here about an investment, a claim accrues soon after the downgrade of a security below investment levels").[23] As sophisticated RMBS investors, the Banks understood the structure of the RMBS transactions and the consequential impact of the ratings downgrades on the Certificates, and had the information to plead their claims before May 22, 2008.

### D.  News Articles Supplied Additional Negative Views On Relevant Originators' Practices.

From the time the Certificates were first issued through May 22, 2008, investors were subjected to a constant barrage of mainstream news articles highlighting the difficulties experienced by mortgage originators and criticizing RMBS products.[24]  Originator-specific news—on top of Certificate-specific Distribution Reports, credit rating downgrades, lawsuits against relevant originators, and a continuous stream of reports about the collapsing housing market generally—would have allowed a reasonable investor to piece together enough information to plead the claims here before May 22, 2008.  For example:

IndyMac:  In addition to the lawsuits described above, IndyMac itself identified problems when it reported net losses of $614.8 million for 2007, down from profits of $342.9 million for 2006, commenting that many of its products had experienced "a significant increase in delinquencies."  Ex. 23 (IndyMac 2007 Annual Report at 19).  In August 2007, *Business Week* published an article concerning IndyMac's alleged improper practices to qualify ineligible borrowers.  Ex. 24.

American Home:  As for American Home (an originator of loans backing at least two of the Bank's certificates),[25] the FDIC concedes that its problems were widely reported

---

[23] Defendants do not take issue with this Court's previous ruling that "downgrades *alone* do not convey facts sufficient to plead" a Section 11 claim, *Bear Stearns Mortg. Pass-Through*, 851 F. Supp. 2d at 766 (emphasis added); however, the Certificate-specific downgrades in this case and the negative watch ratings were only two of the many pieces of information (discussed here in Sections I.A-D) available to the Banks before May 22, 2008 that would have allowed them to adequately plead their claims.

[24] *See* Appendix C.

[25] CMALT 2006-A6 and CMSC 2006-6.

before May 22, 2008.  *See* SAC ¶ 103.  The FDIC alleges that an American Home sales executive pleaded guilty to mortgage fraud in April 2007 and was sentenced to 25 months in prison later that year.  *Id.*  The FDIC also relies on press releases issued in *August 2007* announcing the revocation and suspension of American Home's mortgage banking licenses in New Jersey and New York, respectively.  SAC ¶ 105.  Additionally, the FDIC cites an internet report from January 2008 describing the allegations of an American Home underwriter that her employer purposely overlooked fraudulent loan applications.  SAC ¶ 101.  American Home filed for bankruptcy on August 6, 2007—several months before the Banks purchased Certificates backed by loans originated by American Home.  Ex. 3.

GMAC/Residential Capital: As early as March 2007, Bloomberg reported that GMAC/Residential Capital bonds had been downgraded from "buy" to "neutral" because of, among other things, increasing "concerns about rising default rates on subprime mortgages."  Ex. 5.  On July 30, 2007, GMAC reported a net loss of $254 million for the second quarter of 2007 compared to net income of  $548 million a year earlier due to their residential mortgage business. Ex. 25 (Residential Capital Quarterly Report at 6).  By April 2008, Residential Capital had announced six straight quarters of recording losses, and then declared bankruptcy on May 14, 2012.  Exs. 4, 92.  Residential Capital's affiliates sponsored, issued, underwrote, and originated loans for almost half of the securitizations at issue here.[26]

Wachovia: Wachovia filed a Form 8-K disclosing that it was not adhering to certain policies regarding write-downs of option adjustable-rate mortgage loans, thereby underscoring its material exposure to nonperforming mortgage loans.  Ex. 65.[27]  Wachovia was an originator of loans backing at least two of the eight at-issue securitizations.[28]

---

[26]  RALI 2006-QS6, RALI 2006-QS16 and RALI 2006-QS18.

[27]  The FDIC acknowledges that Strategic Capital's RMBS certificates, several of which were also purchased by Citizens National, were "private-label MBS that were largely backed by nontraditional mortgages and many of the securities featured concentrations in California and Florida," and further explained the difference between agency-issued RMBS and private-label RMBS, which are "generally comprise[d] [of] nonconforming loans."  Ex. 1 at 4 & n.4.

[28]  RALI 2006-QS16 and RALI 2006-QS18.

*     *     *

In addition to the reams of reports about the collapsing housing market and questionable actions by mortgage loan originators and borrowers generally,[29] a wealth of information was available that was directly connected to the specific Certificates and originators at-issue in this case, and to the alleged misrepresentations. All of this information was available to the Banks and would have enabled the Banks to plead their claims before May 22, 2008.

## II. THE FDIC'S § 11 CLAIMS AGAINST CERTAIN DEFENDANTS FAIL BECAUSE THE STATUTE EXPRESSLY REQUIRES THE FDIC TO PLEAD RELIANCE, WHICH IT HAS NOT DONE

The FDIC's claims with respect to seven of the Certificates must be dismissed because the FDIC fails to plead facts establishing that the Banks relied on any alleged misstatement or omission in the Offering Documents for the Certificates.

An investor's presumed reliance on a registration statement ends under § 11 "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). If an investor makes purchases thereafter, its "right of recovery [is] conditioned on proof that [the investor] acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission." *Id.* The reason is obvious: "[I]n all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated on that statement rather than on the information disclosed upon registration." *Rudnick v. Franchard Corp.*, 237 F. Supp. 871, 873 n.1 (S.D.N.Y. 1965) (quoting H.R. No. 73-1838, at 41 (1934) (Conf. Rep.)); *accord APA Excelsior III L.P. v. Premiere Techs. Inc.*, 476 F.3d 1261, 1275 (11th Cir. 2007).

Notably here, all of the Banks' purchases were made in the secondary market—and in seven instances substantially more than a year after the Offering Documents were issued. By that time, the Banks had available to them Distribution Reports containing detailed information about the performance of the Certificates and underlying mortgage loans.

---

[29] *See* Appendix C.

Specifically, Distribution Reports were made generally available for at least 12 months after the effective date of the prospectus supplements for the following Offerings: [30]

| Purchaser | Offering | Prospectus Supplement Date | 12 Mo. Earning Statement | Purchase Date |
|---|---|---|---|---|
| Citizens National | RALI 2006-QS6 | 6/29/2006 | 7/20/2007 | 12/10/2007 |
| Citizens National | CSMC 2006-6 (tranche 1-A-8) | 6/28/2006 | 7/25/2007 | 4/11/2008 |
| Strategic Capital | CSMC 2006-6 (tranche 1-A-12) | 6/28/2006 | 7/25/2007 | 12/6/2007 |
| Strategic Capital | RAST 2006-A11 | 8/29/2006 | 9/25/2007 | 2/28/2008 |
| Strategic Capital | RAST 2006-A14CB | 11/6/2006 | 11/26/2007 | 1/16/2008 |
| Strategic Capital | CMALT 2006-A6 | 11/30/2006 | 12/21/2007 | 3/3/2008 |
| Citizens National | RAST 2007-A1 | 1/29/2007 | 1/25/2008 | 2/6/2008 |

The FDIC, however, fails to plead any facts demonstrating that the Banks relied on the statements in the Offering Documents that it alleges were false. The FDIC's conclusory assertion that the Banks "relied on the untrue or misleading statements that defendants made in the registration statements, as amended by the prospectus supplements, in deciding to purchase the certificates" or that they "reviewed the prospectus supplements in connection with their decision to purchase the certificates," SAC ¶ 130, fails under *Iqbal* and does not meet this burden with respect to these Certificates. Accordingly, the § 11 claims with respect to the Banks' purchases of these seven Certificates should be dismissed.[31]

---

[30] *See* Ex. 18.

[31] Each of the remaining Defendants is associated with at least one of these Certificates.

A. **Distribution Reports Are "Earning Statements" And Were Available For At Least Twelve Months After The Effective Date Of The Registration Statements**

a. *Distribution Reports are "earning statements" within the meaning of Section 11(a) and SEC Rule 158.*

Distribution Reports issued in connection with RMBS are "earning statements" in every sense of the word. They provide investors in RMBS with detailed information about the earnings of the certificates, other facts about their financial performance such as the allocation of cash flows, and the performance of the underlying mortgage loans such as the number and rates of defaults, delinquencies, and prepayments. *See, e.g.*, Ex. 13. Distribution Reports detailing such information about the *actual performance* of RMBS certificates and the underlying loans are precisely the sort of documents reasonable investors in the secondary market rely on, as opposed to the dated information in the original Offering Documents which, at best, was relevant to predicting how the underlying loans and the certificates *might* perform.

The SEC enacted Rule 158 in 1983 to provide "clear guidelines" on what constitutes an "earning statement" for purposes of Section 11(a). *See* 17 C.F.R. § 230.158(a); Definition of Terms, SEC Securities Act Release, No. 33-6485, 48 Fed. Reg. 44767 (Sept. 30, 1983) (adoptive release). The SEC eschewed a rigid, rules-based approach, recognizing that while an "earning statement" may be sufficient if it includes the sort of "statement[] of income" that is contained in more typical SEC reports like Forms 10-K and 10-Q, *see* 17 C.F.R. § 230.158(a)(1)(i), the SEC also would permit information contained in other types of documents to qualify as an "earning statement." *Id.* The SEC accomplished this in Rule 158 in two ways. *First*, it included a non-exclusivity provision stating that "[a]n 'earning statement' not meeting the requirements of this paragraph" concerning statements of income as found in traditional SEC reports "may otherwise be sufficient" for § 11 purposes. *Id.* § 230.158(a).[32] And *second*, the

---

[32] In fact, in response to comments, the SEC modified the proposed rule to include this non-exclusivity provision. Definition of Terms, SEC Securities Act Release No. 33-6485, 48 Fed. Reg. 44,767-01, 44,768 (Sept. 30, 1983) ("[A] number of commentators suggested that a nonexclusivity provision be added to paragraph (a). Because this change would be consistent with paragraph (b) of the Rule, the Commission is amending paragraph (a) to provide that an 'earning statement' not meeting the requirements of that paragraph may otherwise be

SEC provided that the necessary information could be "contained in one report or any combination of reports," *id.* § 230.158(a)(2), meaning that "the information in the 'earning statement' may be contained in multiple documents." 48 Fed. Reg. at 44768. As the SEC explained, Rule 158, as adopted, "provide[s] explicitly that paragraph (a)['s] [description of an earning statement] is nonexclusive." *Id.* at 44767.

Distribution Reports provide the relevant § 11 "earning statements" in the context of RMBS. In 2005, the SEC adopted Regulation AB, which concerns the reporting requirements for asset-backed securities ("ABS") such as RMBS. *See* Asset-Backed Securities, SEC Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 70 Fed. Reg. 1506 (Jan. 7, 2005). The SEC exempted ABS issuers from filing Form 10-Q quarterly reports and audited financial statements with their Form 10-K annual reports. *See* 70 Fed. Reg. at 1510, 1561-62, 1568-69. As the SEC explained in granting these exemptions, the financial data in Forms 10-Q and 10-K "are designed primarily for *corporate* issuers and their securities" and simply "*do not elicit relevant information for most asset-backed securities transactions*." *Id.* at 1508 (emphasis added). As the SEC noted, ABS investors are focused on the performance of an *underlying asset pool*, not the performance of a company:

> Asset-backed securities and ABS issuers differ from corporate securities and operating companies. In offering ABS, there is generally no business or management to describe. ***Instead, information about the transaction structure and the characteristics and quality of the asset pool and servicing is often what is most important to investors.***

*Id.* (emphasis added).

Accordingly, Form 10-D was created by the SEC as a *substitute* for Forms 10-Q and 10-K to provide ABS investors with relevant earnings information about the asset pools that back their securities. *Id.* at 1506 (explaining that the SEC changed the disclosure requirements for asset-backed securities to "allow modified Exchange Act reporting that is more tailored and relevant to asset-backed securities"); *see also id.* at 1509-10. Under this modified reporting regime, Distribution Reports are deemed to be the equivalent of financial statements—they

---

sufficient for purposes of Section 11(a).").

include information that purchasers of asset-backed securities in the secondary market consider to be important.  Form 10-D's centerpiece is the distribution and pool performance information.  *See id*. at 1565-66.  The Distribution Reports required to be attached as an exhibit to the Form 10-D provide detailed information about the financial performance of the underlying asset pool and about allocations and distributions of cash flows to certificate holders.  *See id*. at 1565-66.  "[T]he distribution report . . . will likely contain most, if not all, of the disclosures about the distribution and pool performance that will be required" under the federal securities laws' reporting regime and therefore will typically satisfy an RMBS issuer's disclosure obligations.  *Id*. at 1566.  A typical report includes more than fifty pages of data relating to the performance of the underlying loans, including data relating to delinquent payments, foreclosures and realized losses.  Reports like these strongly suggest that "in all likelihood the purchase and price of the security purchased" after these Distribution Reports were "predicated on that statement rather than upon the information disclosed upon registration."  H.R. Rep. No. 73-1838, at 40 (1934) (Conf. Rep.).

> b.    *The Distribution Reports were made "generally available" when posted to the websites of the securitization trustees.*

The reliance requirement under § 11 applies because the Distribution Reports for the seven Certificates were made "generally available" to investors for at least 12 months prior to the Banks' purchases of the RMBS.  An earnings statement is made "generally available" when filed with the SEC or made available to shareholders by "other methods."  17 C.F.R. § 230.158(b).  This catch-all provision was included so that issuers that have obtained suspensions from their duty to file SEC reports pursuant to § 15(d) of the Securities Exchange Act of 1934[33] can still satisfy the § 11 "earning statement" requirements.[34]

---

[33]  *See* 15 U.S.C. § 78o(d) (suspending duty to file SEC periodic reports if there are fewer than 300 holders of each class of securities).

[34]  *See* 48 Fed. Reg. at 44768 ("[T]he Commission believes that the number of registrants that have made public offerings within a preceding twelve month period, but no longer have a reporting obligation under Section 15(d) of the Exchange Act, is small.  *Because [Rule 158(b)] is non-exclusive, these registrants can meet the general availability requirement . . . in ways other than those specified*.") (emphasis added).

Here, Defendants obtained § 15(d) reporting suspensions for the Offerings.[35] Therefore, in lieu of filing the Distribution Reports with the SEC, Defendants made them generally available to investors through the websites of the securitization trustees.[36]  Consistent with SEC regulations, the Offering Documents for each Offering disclose to investors how to access those websites and obtain the Distribution Reports.  *See* Ex. 14; *see also* 70 Fed. Reg. at 1551.  This is more than sufficient to satisfy the "generally available" requirement.  *See* Internet Availability of Proxy Material, SEC Exchange Act Release No. 34-55146, 72 Fed. Reg. 4148, 4162 (Jan. 29, 2007) (permitting distribution of proxy materials to investors by means of the internet).

> **B.  A Ruling That Distribution Reports Do Not Constitute "Earnings Statements" Is Inconsistent With The Text And History Of SEC Rule 158 And Would Lead To Absurd Results**

Defendants acknowledge that several district courts have concluded that Distribution Reports do not constitute "earning statements" for purposes of § 11.[37]  These rulings are not persuasive and should not be extended here because none of them addresses the relevant history of the statute or the regulatory framework regarding RMBS, which makes clear that Distribution Reports were intended to serve as earning statements for RMBS issuers.  For example, some courts have concluded that § 11 "earning statements" must contain statements of income like those found in Forms 10-K or 10-Q, *see Tsereteli v. Residential Asset Securitization*

---

[35] *See* Ex. 27.  This is not surprising.  When adopting Regulation AB, the SEC noted that most certificates in RMBS offerings "are not presently listed and are held by less than three hundred record holders" and that "most publicly offered asset-backed securities cease reporting with the Commission" after the end of the first fiscal year.  70 Fed. Reg. at 1561.

[36] The Distribution Reports are publicly available on the following websites: (a) for the CMALT offering: https://sf.citidirect.com/; and (b) for the RAST (IndyMac) and CSMC offerings: https://tss.sfs.db.com/investpublic/.  For security purposes, some of the websites require the visitor to create a user name and password.

[37] *See In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 240 (S.D.N.Y. 2012); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 215 (S.D.N.Y. 2012); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 114-15 (S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653(PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 18, 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *6 (S.D.N.Y. May 19, 2011).

*Trust 2006-A8*, 283 F.R.D. 199, 215 (S.D.N.Y. 2012); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 114-15 (S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *6 (S.D.N.Y. May 19, 2011), and have either ignored the non-exclusivity provision of Rule 158(a)[38] or have misinterpreted that provision as applying only where a "'subsidiary [is] issuing debt securities guaranteed by its parent.'" *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653(PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 18, 2011) (quoting 17 C.F.R. § 230.158(a)(2)).[39]

These decisions are flatly inconsistent with Rule 158, which expressly provides that reports not specifically identified therein can constitute § 11 earning statements. *See* 17 C.F.R. § 230.158(a). Further, the rulings are inconsistent both with the SEC's own interpretive guidance that "paragraph (a) [of Rule 158] is nonexclusive," 48 Fed. Reg. at 44767-68, and the SEC's determination that RMBS issuers should be exempt from general reporting requirements

---

[38] Each of those courts also extended an inapposite decision in *In re WorldCom, Inc. Securities Litigation*, 219 F.R.D. 267 (S.D.N.Y. 2003). In *WorldCom*, a case involving corporate stock and debt securities, but not an asset-backed security, the issue before the court was whether a class could be certified where a number of putative class members purchased after the issuer made generally available its financial information in a Form 10-Q quarterly report. *See id.* at 293. The *WorldCom* court held that the quarterly report did not constitute a § 11 earning statement, and therefore did not raise any individual questions of reliance, because it contained materially misleading statements. *See id.* at 293-94. But *WorldCom* did not purport to interpret the non-exclusivity language of SEC Rule 158. The court would have had no basis to do so given that the filing at issue was a Form 10-Q quarterly report. Furthermore, that court was focused on its conclusion that the earning statements themselves had been shown to be misleading. *Id.* at 293. There is no such allegation here and there is no allegation that the Distribution Reports did not comply with the SEC rules and regulations.

[39] In *DLJ*, Judge Crotty found that the non-exclusivity provision was "not a general exception." *DLJ*, 2011 WL 3874821, at *7. But that holding is inconsistent with the SEC's guidance that the requirements in "*paragraph (a)* [are] nonexclusive." 48 Fed. Reg. at 44767-68 (emphasis added). When Rule 158 was first adopted, the text of subsection (a) was contained within a single paragraph, thus explaining the SEC's comments regarding the non-exclusivity provision's scope. *Id.* at 44770. In 1991, the SEC amended Rule 158 to provide that filings by Canadian issuers could constitute § 11 "earning statements," and moved the non-exclusivity provision to its current location. *See* Multijurisdictional Disclosure and Modifications to the Current Registration and Reporting System for Canadian Issuers, SEC Securities Act Release No. 33-6902, Exchange Act Release No. 34-29354, 56 Fed. Reg. 30036, 30043 n.68, 30054 (July 1, 1991). There is nothing in the adoptive release even remotely suggesting that the SEC intended to change the scope of the non-exclusivity provision. *Id.*

on Forms 10-K and 10-Q because (unlike Distribution Reports) these forms do not provide the type of information of interest to RMBS investors.  *See* 70 Fed. Reg. at 1508, 1510.  Instead, these decisions would allow for the protections afforded under § 11 for aftermarket purchases only if the issuers filed statements of income on traditional SEC forms containing information that the SEC has determined to be of no relevance to RMBS investors.[40]  At the same time, RMBS would effectively be carved out of Section 11(a) entirely, even as trustees issue detailed monthly reports that provide precisely the sort of information about RMBS that would plainly be considered "earning statements" for other asset classes.

Treating Distribution Reports as earnings statements is consistent with both the text and purposes of the reliance requirement under § 11, which, as noted above, is predicated on the commonsense notion that once detailed financial information describing the performance and value of the security has been made available to investors, investors should be presumed to rely on *that* information rather than on statements in prior registration statements.  *See Rudnick*, 237 F. Supp. at 873 & n.1.  Thus, to the extent that an investor claims that a stale, outdated registration statement was false or misleading, the investor should be required to show that, in fact, it relied on the alleged misstatement or omission in the prior document.  *See id.*

Moreover, construing SEC Rule 158(a) narrowly such that "earning statements" are limited to reports containing the financial information disclosed in Forms 10-K, 10-Q, 20-F, 40-F or other forms enumerated in Rule 158(a) leads to absurd results.  Because asset-backed trusts are neither required nor expected to issue financial statements on these reports, reliance would never have to be shown for *any* Section 11 claim relating to an asset-backed securities offering, no matter how stale the information in the original offering documents or how much information about performance of the underlying assets became available to purchasers in the twelve-plus months after the initial offering documents were published.

---

[40]  As the SEC explained in the adoptive release for Rule 158, the rule was modified to avoid "making mandatory the filing of optional" statements of income, which would "confuse rather than inform investors."  48 Fed. Reg. at 44767.  This is particularly true in this context, given that most RMBS issuers would have no income to report on a traditional income statement.

### C.      Requiring The FDIC To Plead Reliance Is Particularly Appropriate In This Case

Requiring the FDIC to plead reliance is particularly appropriate in this case where the Banks purchased the Certificates in the secondary market an average of 13.98 months after the allegedly misleading statements in the Offering Documents were issued:[41]

| Certificate | Issuance Date | Purchase Date | Elapsed Period [42] |
|---|---|---|---|
| RALI 2006-QS6 (1-A-16) | June 29, 2006 | December 10, 2007 | 17.37 |
| RALI 2006-QS16 (A-7) | November 29, 2006 | December 7, 2007 | 12.27 |
| RALI 2006-QS16 (A-7) | November 29, 2006 | December 14, 2007 | 12.50 |
| RAST 2006-A14CB (1-A-2) | November 3, 2006 | January 16, 2008 | 14.33 |
| CMALT 2006-A6 (1-A-4) | November 29, 2006 | March 3, 2008 | 15.10 |
| RAST 2006-A11 (1-A-3) | August 29, 2006 | February 28, 2008 | 17.97 |
| RAST 2007-A1 (A-9) | January 30, 2007 | February 6, 2008 | 12.23 |
| CSMC 2006-6 (1-A-12) | June 29, 2006 | December 6, 2007 | 17.23 |
| CSMC 2006-6 (1-A-8) | June 29, 2006 | April 11, 2008 | 21.42 |
| RALI 2006-QS18 (1-M-1) | December 28, 2006 | September 24, 2007 | 8.90 |
| RALI 2006-QS18 (1-M-1) | December 28, 2006 | September 27, 2007 | 9.00 |
| RALI 2006-QS18 (1-M-1) | December 28, 2006 | October 12, 2007 | 9.47 |

It is simply implausible that the Banks would have placed any meaningful weight on the stale disclosures in the Offering Documents rather than the actual, detailed performance data on the Certificates' supporting assets available in the Distribution Reports: principal and interest distributions and balances for each tranche of certificates; the number and value of payoffs, defaults and prepayments; and information about modifications, credit enhancements, cash flows, and uses of funds, among other financial information.

While the Banks allege that statements or omissions in the Offering Documents concerning loan-to-value ratios, the occupancy status of those acquiring the mortgages, and the originators' compliance with their underwriting guidelines are material, the Banks concede that

---

[41]  Information in this chart is based on Schedules 1, 2, 3, 5, 7, 10, 11 and 12 of the Second Amended Complaint.

[42]  Amounts shown in months.

each of the statements in the Offering Documents is limited to the *initial* information that was provided at the time the loan was made.  *See* SAC ¶¶ 32; 67-69; 78-80.  At most, such information could be used by an RMBS investor to consider the future performance of the Certificate.[43]  But these loan-level characteristics change over time.  For example, loan-to-value ratios change as the value of the underlying property changes, particularly in the midst of the most significant housing crisis since the Great Depression.  And an owner's intention to live in a particular property as their primary residence may obviously change years after the loan is offered.

Thus, once information about the actual performance of the underlying loans becomes available, the stale data in the Offering Documents are of little relevance to secondary market investors such as the Banks, just as information in a registration document for an equity securities issuance becomes presumptively irrelevant once actual earnings statements become available to prospective investors.  The relevant information about the performance of the loans underlying each RMBS would be found in the Distribution Reports.  And that is in addition to the wealth of other information the Banks also had available to them prior to their purchases, such as the housing market decline, credit rating downgrades and lawsuits involving claims against relevant originators.  To exempt the Banks from the reliance requirement of Section 11(a) only because updated financial information for RMBS is reported on something other than a Form 10-K or 10-Q would make no sense.

## III.   THE FDIC'S § 11 CLAIMS FAIL WHERE DEFENDANTS DID NOT UNDERWRITE THE CERTIFICATES PURCHASED BY THE BANKS.

The FDIC brings claims against Deutsche Bank and UBS based on their role as underwriter for certain tranches of certificates in the RALI 2006-QS18, RAST 2006-A11 and

---

[43]  *Id.* ¶ 32 ("LTV is a primary determinant of the likelihood of default"); ¶ 66 (alleging that owner occupancy is important to investors because "[m]ortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky."); ¶ 78 (compliance with underwriting guidelines allegedly "ensure[s] that loans are made only to borrowers with credit standing and financial resources to repay the loans and only against collateral with value, condition, and marketability sufficient to secure the loans.").

RAST 2007-A1 securitizations, but neither Deutsche Bank nor UBS underwrote the certificates

that the Banks allegedly purchased.  Plaintiff's claims for these securities against Deutsche Bank

and UBS thus fail because a plaintiff only has standing to state a claim against the underwriters

of the securities it actually purchased: "any person acquiring such security . . . may sue . . . every

underwriter *with respect to such security*."  15 U.S.C. § 77k(a)(5) (emphasis added).[44]   In other

words, the 1933 Act subjects underwriters to potential liability, but only with respect to the

securities they actually underwrite.  Courts within this Circuit have observed that there is "no

question that each tranche is a discrete security," *Plumbers' & Pipefitters' Local No. 562 Supp.*

*Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713(ERK)(WDW), 2012 WL

601448 at *7 n.8 (E.D.N.Y. Feb. 23, 2012), which is consistent with the SEC's view of the

matter.  Ex. 7 (SEC, No-Action Letter, The Bond Market Trade Ass'n (Feb. 7, 1997) ("In the

case of a multi-tranche offering of ABS, each tranche . . . shall be treated as a different

Registered Security.")); Ex. 8 (SEC No-Action Letter, Bear, Stearns & Co. Inc. (Aug. 29, 1994));

*see also* Ex. 9 (Asset-Backed Securities, 69 Fed. Reg. 26688 n.212 (May 13, 2004) ("Consistent

with the existing no-action letter, in the case of a multi-tranche registered offering of asset

backed securities, each tranche would be treated as a different security.")).[45]

   Here, the Banks allegedly purchased three certificates in class 1-M-1 of RALI

2006-QS18, one certificate in class 1-A-3 of RAST 2006-A11 and one certificate in class A-9 of

RAST 2007-A1.  SAC Sched. 2, Item 28(b); SAC Sched. 3, Item 28(b); SAC Sched. 10, Item

---

[44]  An "underwriter" subject to liability for violating the 1933 Act is defined as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking."  15 U.S.C. § 77b(a)(11).

[45]  Although the court denied defendants' motion to dismiss on this basis in *FDIC as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.*, No. 12 CIV. 6166 LLS, 2013 WL 5434633, at *10 (S.D.N.Y. Sept. 27, 2013), the court did so without prejudice because of the absence of authority the court deemed sufficiently persuasive to decide the question.  The court, however, did not address the merits of the issue in any detail, deciding instead to defer ruling until a later stage in the litigation.  Here, Defendants present additional support, including the SEC No-Action Letters, to show that treating each tranche of an RMBS as a different security is consistent with the SEC's view of the matter.  Given that the Banks did not purchase the securities underwritten by Deutsche Bank and UBS, Section 11 does not authorize claims against these Defendants in their capacity as underwriters.

28(b).  However, the offering documents for these securities make clear that neither Deutsche

Bank nor UBS underwrote any of the classes of certificates the Banks allegedly purchased in

those offerings.  *See* Ex. 28 (RALI 2006-QS18 P. at S-139-40) (Deutsche Bank underwrote only

certain Class A certificates, but not the Class M certificates such as 1-M-1); Ex. 29 (RAST 2006-

A11 P. at S-124) (UBS only underwrote the Class B-1, B-2, and B-3 Certificates, but not the

Class 1-A certificates such as 1-A-3) and Ex. 30 (RAST 2007-A1 P. at S-94) (Deutsche Bank

only underwrote the Class B-1, B-2, and B-3 certificates, but not the Class A certificates such as

A-9).  Because Deutsche Bank and UBS did not sell certificates from the tranches from which

the Banks allegedly purchased, the FDIC's claims against them as to those Certificates must fail.

   The fact that Deutsche Bank and UBS were co-underwriters on an Offering that

included the Certificates that the Banks purchased from other parties does not change the

outcome.  Simply because underwriters of different tranches take part in the preparation of the

prospectus supplement should not expose an underwriter to liability for securities they were not

involved in underwriting.  *Special Situations Fund, III, L.P. v. Cocchiola*, Civ. No. 02-3099

(WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007) ("In itself, that a person is listed as an

underwriter in a prospectus or registration statement does not require, as a matter of law, a court

to find that the person is an underwriter.").  But even if an underwriter of one security could be

held liable for "participat[ing] in the distribution" of another security, the FDIC's claims would

still fail because the Second Amended Complaint does not plead that Deutsche Bank and UBS in

any way participated in the distribution of the securities purchased by the Banks.

## IV. THE § 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL.

   The FDIC's § 15 claims "necessarily fail[]" because the FDIC has not adequately

alleged an underlying violation of § 11.  *Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479,

490 (2d Cir. 2011).  Further, the FDIC does not adequately allege control; all it offers is the

boilerplate that some Defendants "controlled" others "by or through stock ownership, agency, or

otherwise."  SAC ¶ 137; *see also id.* ¶ 7.  Such "[c]onclusory allegations of control are

insufficient as a matter of law."  *In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12

31

(S.D.N.Y. Aug. 8, 2005); *accord In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5-7 (S.D.N.Y. Feb. 20, 2002) (cursory allegation that one defendant "had the power to influence and control and did influence and control the decision-making of" another was insufficient to state a claim for controlling person liability); *Martin v. EVP Second Corp.*, 1991 WL 131176, at *3 (S.D.N.Y. July 9, 1991) (rejecting conclusory allegation that "EVP was at all times material hereto a controlling person of the Partnership with[in] the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act").[46]

## CONCLUSION

For the reasons stated above, the Second Amended Complaint should be dismissed with prejudice.

---

[46] The standards for "control" are the same under § 15 as they are under § 20(a) of the Securities Exchange Act of 1934, and case law under the latter is therefore applicable. *See In re Lehman Bros. Mortg. Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011).

Dated:   New York, New York                        Respectfully submitted,
            September 14, 2017


SIMPSON THACHER & BARTLETT LLP          CRAVATH, SWAINE & MOORE LLP

By:  /s/ Andrew T. Frankel                         By:  /s/ Richard W. Clary
Thomas C. Rice (trice@stblaw.com)           Richard W. Clary (rclary@cravath.com)
Andrew T. Frankel (afrankel@stblaw.com)    Michael T. Reynolds (mreynolds@cravath.com)
Linton Mann III (lmann@stblaw.com)          Lauren A. Moskowitz (lmoskowitz@cravath.com)
425 Lexington Avenue                               825 Eighth Avenue
New York, New York  10017                      New York, New York  10019
Phone: (212) 455-2000                             Phone: (212) 474-1000
Fax: (212) 455-2502                                 Fax: (212) 474-3700

*Attorneys for Defendants Deutsche Bank Securities*     *Attorneys for Defendants Credit Suisse First*
*Inc., RBS Securities Inc., and UBS Securities LLC*       *Boston Mortgage Securities Corp., Credit Suisse*
                                                                      *Management LLC, and Credit Suisse Securities*
                                                                      *(USA) LLC,*


MAYER BROWN LLP

By:  /s/ Michael O. Ware
Michael O. Ware (mware@mayerbrown.com)
Charles S. Korschun
(ckorschun@mayerbrown.com)
Emma M. Kurose (ekurose@mayerbrown.com)
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 506-2500
Fax: (212) 262-1910

BOIES, SCHILLER & FLEXNER

By:  /s/ Andrew Z. Michaelson
Andrew Z. Michaelson (amichaelson@bsfllp.com)
575 Lexington Avenue, 7th Floor
New York, New York 10022
Phone:  (212) 446-2300

*Attorneys for Defendant HSBC Securities (USA),*
*Inc.*