**UNITED STATES DISRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CITIZENS NATIONAL BANK and RECEIVER FOR STRATEGIC CAPITAL BANK,<br><br>            Plaintiff,<br><br>   v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; CREDIT SUISSE MANAGEMENT LLC; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK SECURITIES INC.; HSBC SECURITIES (USA) INC.; RBS SECURITIES INC.; and UBS SECURITIES LLC,<br><br>            Defendants. | No. 12 Civ. 4000 (LTS)(KNF) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT ......................................................................................................................4

I.      ALL THE FDIC'S CLAIMS ARE TIMELY. .....................................................4

      A.      Defendants have not shown that before May 22, 2008, a reasonable
investor would have discovered enough facts to file a complaint about
these certificates that would have withstood a motion to dismiss under
Rule 12(b)(6). ..........................................................................................4

          1.      The facts on which the second amended complaint is based
were not available to a reasonable investor before May 22,
2008. ................................................................................................6

          2.      Because the certificates were not downgraded below investment
grade until at least May 2008, defendants cannot show as a
matter of law that the statute of limitations began to run before
then. ................................................................................................7

          3.      Other information available before May 22, 2008, was not
enough to trigger the statute of limitations. ...................................10

II.     THE FDIC IS NOT REQUIRED TO ALLEGE RELIANCE, BUT HAS
DONE SO ANYWAY. ........................................................................................23

      A.      Reliance is not an element of the FDIC's claims........................................23

      B.      The second amended complaint adequately pleads reliance........................27

III.    DEFENDANTS THAT DID NOT UNDERWRITE THE PARTICULAR
CERTIFICATES THAT THE BANKS PURCHASED ARE STILL LIABLE
AS "UNDERWRITERS." ....................................................................................29

IV.     THE SECOND AMENDED COMPLAINT PLEADS A CLAIM FOR
CONTROL PERSON LIABILITY UNDER SECTION 15 OF THE 1933
ACT......................................................................................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010)..........................................................................11

*In re Barclays Bank PLC Sec. Litig.*,
No. 09 CIV 1989 PAC, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011)................................5

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)................................................................... *passim*

*Brecher v. Citigroup, Inc.*,
797 F. Supp. 2d 354 (S.D.N.Y. 2011) (Stein, J.), *vacated on other grounds,* No.
09 CIV. 7359(SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) ............................4

*Capital Ventures Intern. v. J.P. Morgan Mortg. Acquisition Corp.*,
Civil Action No. 12-10085-RWZ, 2013 WL 535320 (D. Mass.
Feb. 13, 2013) .....................................................................................................13, 22

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
703 F.Supp. 2d 253 (E.D.N.Y.2010) .......................................................................6, 14

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011).........................................................................................4

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., Fed. Deposit Ins. Corp.
as Receiver for Strategic Capital Bank v. J.P. Morgan Secs. LLC,*
No. 12-CV-8415, No. 11-ML-2265-MRP, 2013 WL 2178861 (C.D. Cal. Apr.
22, 2013) ....................................................................................................................5

*Dijulio v. Digicon, Inc.*, 325 F. Supp. 963 (D. Md. 1971)................................................32

*Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016)................................................27

*Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide
Fin. Corp.*, No. 2:12-CV-4354 MRP, 2012 WL 5900973 (C.D. Cal. Nov. 21,
2012) .......................................................................................................................5, 6

*Fed. Deposit Ins. Corp. v. Chase Mortg. Fin. Corp.*,
No. 12 Civ. 6166 (LLS), 2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013) ........... *passim*

*Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*,
No. 10 CH 45033, slip op. at 13 (Ill. Cir. Ct. Sept. 19, 2012) ......................................7

*Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*,
No. 49D05 1010 PL 45071, slip op. (Ind. Super. Ct. July 3, 2012)............................8

*Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*,
902 F. Supp. 2d 476 (S.D.N.Y. 2012)..........................................................19

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*,
873 F.3d 85 (2d Cir. 2017)..................................................................9, 19

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................................. *passim*

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
862 F.Supp. 2d 322 (S.D.N.Y. 2012)....................................................30, 31

*Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust*
2006-3, 825 F. Supp. 2d 1082 (D.N.M. 2011)......................................24, 25

*Harden v. Raffensperger, Hughes & Co., Inc.*,
65 F.3d 1392 (7th Cir. 1995) ..............................................................31, 32

*In re IndyMac MBS Litig.*,
793 F. Supp. 2d 637 (S.D.N.Y. 2011)............................................................5

*In re IndyMac Mortg.-Backed Sec. Litig.*,
286 F.R.D. 226 (S.D.N.Y. 2012) ...............................................................24

*In re IndyMac Mortg.-Backed Sec. Litig.*,
718 F. Supp. 2d 495 (S.D.N.Y. 2010) (no inquiry notice as of May 2008)..................5

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011)...............................................................29, 32

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
902 F. Supp. 2d 329 (S.D.N.Y. 2012)............................................................5

*Mass. Mut. Life. Ins. Co. v. Residential Funding Co., LLC*,
843 F. Supp. 2d 191 (D. Mass. 2012) ......................................10, 12, 13, 22

*Merck & Co. Inc. v. Reynolds*,
559 U.S. 633 (2010)............................................................4, 5, 11, 12

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)...............................................................23, 24

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
810 F. Supp. 2d 650 (S.D.N.Y. 2011)..............................................7, 18, 22

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
No. 09 Civ. 2137 (LTS) (MHD), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) .......13

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,* No. 09 Civ.
2137(LTS)(MHD), 2012 WL 2899356 (S.D.N.Y. July 16, 2012) .....................6, 8, 13

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
No. 08 Civ. 5653 (PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011)..............24, 25

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260
(S.D.N.Y. May 19, 2011).........................................................................4, 11, 24, 25

*Nat' Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.*,
No. 13 Civ. 6705(DLC), 2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) .................19, 21

*Nat'l Credit Union Admin. Bd. v. Credit Suisse Securities (USA) LLC*,
939 F. Supp. 2d 1113 (D. Kan. 2013) ...........................................................13

*Nat'l Credit Union Admin. Bd., v. RBS Secs. Inc.*,
No. 11-2340-JWL, 2016 WL 4565689 (D. Kan. 2016)........................................16, 17

*Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*,
900 F. Supp. 2d 1222 (D. Kan. 2012)..................................................10, 13, 16, 17, 22

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)........................................................................30

*Newman v. Warnaco Grp., Inc.*,
335 F.3d 187 (2d Cir. 2003).........................................................................5

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)............................................................5

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan
Acceptance Corp.*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448
(E.D.N.Y. Feb. 23, 2012).........................................................................4, 15, 21. 22

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
658 F. Supp. 2d 299 (D. Mass. 2009) ...........................................................14, 15

*Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*,
No. 10 Civ. 4429 (MGC), 2012 WL 2026556 (S.D.N.Y. May 31, 2012) ...................6

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
No. 09 CV 1110(HB), 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011).................5, 18, 19

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................................6

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ................................................................23, 24, 25

*SEC v. Spectrum, Ltd.*,
    489 F.2d 535 (2d Cir. 1973)................................................................................29

*Special Situations Fund III, L.P. v. Cocchiola*,
    No. 02-3099 (WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007) ...............................32

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)...........................................................................11, 16

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ......................................................................24

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) (Sullivan, J.) ...........................................4

*In re Washington Mutual Mortg.-Backed Sec. Litig.*,
    276 F.R.D. 658 (W.D. Wash. 2011) ...............................................................24, 25

*In re Wells Fargo Mortgage-Backed Certificates Litigation*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ..............................................................22

*Western & Southern Life Ins. Co., v. JPMorgan Chase Bank, N.A.*,
    54 F. Supp. 3d 888 (S.D. Ohio 2014) .........................................................13, 14, 22

*Yi Xiang v. Inovalon Holdings, Inc.*,
    16–CV–4923 (VM), 2017 WL 3208042 (S.D.N.Y. July 28, 2017) ...........................4

*Youngers v. Virtus Investment Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016).................................................................4

**Statutes, Regulations and Administrative Materials**

15 U.S.C. § 77b(a)(11) ..................................................................................................29

15 U.S.C. § 77k(a) ..................................................................................................23, 24

15 U.S.C. § 77k(a)(5) ..................................................................................................29

17 C.F.R. § 230.158 ..................................................................................................24

Asset-Backed Securities, SEC Securities Act Release No. 33-8518, Exchange Act
    Release No. 34-50905, 70 Fed. Reg. 1506, 1508 (Jan. 7, 2005) .................................26

Section 11 of the Securities Act of 1933 ................................................................. *passim*

## INTRODUCTION

Defendants were the underwriters or issuers of 12 residential mortgage-backed securities (RMBS) that Citizens National Bank (CNB) and Strategic Capital Bank (SCB) (collectively, the Banks) purchased. The certificates all were rated triple-A or double-A when the Banks purchased them,[1] and were backed by more creditworthy "Alt-A," not subprime, mortgage loans. The Banks' investment policies required that they purchase only certificates that were rated at least single-A.[2] In the offering documents for each securitization, defendants made many statements of material facts about the specific mortgage loans in that securitization. The Federal Deposit Insurance Corporation as Receiver for CNB and as Receiver for SCB (collectively, the FDIC) has alleged, in detail, that many of those statements were untrue or misleading.

In their motion, defendants try to shift the focus—and blame—onto the Banks by portraying them as reckless investors that "knew exactly what they were buying" and that "acted intentionally in the hope of making a profit on millions of dollars of RMBS certificates." (Defs. Br. 1.) But none of these purported "facts"—even if they were true and could be properly considered on a motion to dismiss—shields defendants from liability now. That the Banks bought these certificates at a discount or that regulators concluded that these investments were unwise (Defs. Br. 8-10) hardly shows that the Banks knew that the statements that defendants made about the certificates in their

---

[1] Second amended complaint ("SAC") ¶¶ 118, 120 & Schedules, Item 28. The second amended complaint includes a Schedule that provides detailed information for each Securitization as follows: Schedule 1 (for RAST 2006-QS6), Schedule 2 (for RAST 2006-QS18), Schedule 3 (for RAST 2007-A1), Schedule 5 (for RALI 2006-QS16), Schedule 7 (for CSMC 2006-6), Schedule 10 (for RAST 2006-A11), Schedule 11 (for RAST 2006-A14CB), and Schedule 12 (for CMALT 2006-A6) (collectively, the Schedules).

[2] SAC ¶ 107.

offering documents were untrue or misleading. Stripped of its irrelevant blame-shifting rhetoric, defendants' motion to dismiss largely rehashes arguments that they have made and lost in similar RMBS cases.

Defendants' main argument is that the FDIC's clams are time-barred because any reasonable investor not only would have suspected by May 22, 2008 (one year before the Banks failed and the FDIC was appointed receiver for each) that defendants had made untrue or misleading statements in their offering documents, but also could have filed by that date a complaint with facts sufficient to withstand a motion to dismiss. That argument is refuted by decisions of this Court and others that courts should not grant a motion to dismiss on the statute of limitations unless the "uncontroverted evidence irrefutably demonstrates" that a reasonable investor would have discovered facts sufficient to plead a claim before the expiration of the statute of limitations. There is no such uncontroverted evidence here. (*See* Part I.)

Defendants argue next that the FDIC must plead that the Banks relied on the untrue or misleading statements in their offering documents. But a plaintiff generally is not required to plead reliance under Section 11 of the Securities Act of 1933, and attempts to invoke the narrow exception that defendants rely on has been rejected by every court that has addressed it. (*See* Part II.) Finally, some of the defendants assert that none of the statements should be attributed to them at all, despite either being named as underwriters in the offering documents (*see* Part III) or owning and controlling the entities that were. (*See* Part IV.) This Court has rejected similar motions in other RMBS cases, and the FDIC respectfully urges the Court to do the same here.

## BACKGROUND

On May 22, 2009, CNB and SCB were closed and the Federal Deposit Insurance Corporation was appointed the receiver for each. The FDIC then undertook an investigation into possible claims that it is authorized to bring as receiver for the Banks. That investigation included a detailed analysis of a random sample of the relevant loans in each of the eight securitizations, using a comprehensive, industry-standard automated valuation model, among other tools, to test the truth of the statements defendants made in the offering documents about the quality of those loans. (*See, e.g.*, SAC ¶¶ 2-3, 40-46, 50-53, 72-76.) From that investigation, the FDIC discovered in late 2011 that many of the statements made by the defendants were untrue or misleading. (*Id.* ¶ 115.)

The FDIC filed a complaint in this Court on May 18, 2012, asserting claims under sections 11 and 15 of the 1933 Act. The defendants moved to dismiss that complaint as time-barred and for failure to state a claim. The FDIC filed an amended complaint as of right on October 12, 2012. Defendants moved to dismiss the amended complaint, and the Court granted the motion on the grounds that the FDIC's claims were barred by the statute of repose in section 13 of the 1933 Act. The Second Circuit overruled that decision. With the consent of the defendants, the FDIC filed a second amended complaint. Defendants now move to dismiss that complaint as barred by the statute of limitations in section 13 and for failure to state a claim.

# ARGUMENT

## I.     ALL THE FDIC'S CLAIMS ARE TIMELY.

### A.  Defendants have not shown that before May 22, 2008, a reasonable investor would have discovered enough facts to file a complaint about these certificates that would have withstood a motion to dismiss under Rule 12(b)(6).

The Supreme Court's decision in *Merck & Co. Inc. v. Reynolds*, 559 U.S. 633

(2010), and the Second Circuit's application of *Merck*, make clear that until a reasonably

diligent plaintiff would have discovered the facts supporting its claims and could plead

those facts "with sufficient detail and particularity to survive a 12(b)(6) motion to

dismiss," *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir.

2011), the statute of limitations does not begin to run. *See also In re Bear Stearns Mortg.*

*Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012) (relevant

question is "whether a plaintiff could have pled '33 Act claims with sufficient

particularity to survive a 12(b)(6) motion to dismiss more than one year prior to the filing

of the operative complaint").[3] Whether sufficient facts could have been discovered more

---

[3] Defendants dispute in a footnote whether the *Merck* standard should apply to Section 11 claims, and cite some decisions from this District that have held it does not. (Defs. Br. n.17.) But in *In re Bear Stearns,* this Court held that *Merck* applies. 851 F. Supp. 2d at 762. That decision is well supported by the weight of authority both in this Circuit and elsewhere, and there is no reason for the Court to reconsider its holding. *See, e.g., Yi Xiang v. Inovalon Holdings, Inc.*, 16–CV–4923 (VM), 2017 WL 3208042, at *5 (S.D.N.Y. July 28, 2017) (Marrero, J.) (applying *Merck* to claims under the '33 Act and noting "that the weight of authority leans toward the courts which have applied the *Merck* statute of limitations standard to Securities Act cases and, further, those courts have provided more substantive analysis of the issues in so holding."); *Fed. Deposit Ins. Corp. v. Chase Mortg. Fin. Corp.*, No. 12 Civ. 6166 (LLS), 2013 WL 5434633, at *3 (S.D.N.Y. Sept. 27, 2013) (Stanton, J.) ("*FDIC/Chase*"); *Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 319-20 (S.D.N.Y. 2012) (Cote, J.) ("*FHFA/UBS*"); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448, at *10 & n.11 (E.D.N.Y. Feb. 23, 2012) (Korman, J.); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 370-71 & n.39 (S.D.N.Y. 2011) (Sullivan, J.); *Brecher v. Citigroup, Inc.*, 797 F. Supp. 2d 354, 366 (S.D.N.Y. 2011) (Stein, J.), *vacated on other grounds,* No. 09 CIV. 7359(SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) (applying *Merck* to Section 12 claims); *N.J. Carpenters Health Fund v. Residential Capital, LLC,* No. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011) (Baer, J.). Moreover, the authority cited by defendants is not persuasive. Other than *Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016), which did not substantively engage with the question of which standard applies, the other cases cited

than a year before a plaintiff filed its complaint "is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage." *Id*. Thus, the Court will grant a motion to dismiss only where "'uncontroverted evidence irrefutably demonstrates [that the] plaintiff discovered or should have discovered' facts sufficient to adequately plead a claim" before that date. *Id*. (quoting *Newman v. Warnaco Grp., Inc*., 335 F.3d 187, 193 (2d Cir. 2003)).

Defendants have not irrefutably demonstrated by uncontroverted evidence that a reasonable investor would have discovered facts sufficient to state a claim on these certificates before May 22, 2008. Indeed, courts have been reluctant to find that investors in mortgage-backed securities were even on inquiry notice (which is no longer the applicable standard) of similar claims by mid-2008, much less that they could have pled a viable claim by then. *E.g., In re IndyMac Mortg.-Backed Sec. Litig*., 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010) (no inquiry notice as of May 2008); *see also Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc*., No. 09 CV 1110(HB), 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12, 2011) ("*Miss. PERS/Goldman*") (no inquiry notice as of February 2008).[4] The Court should therefore deny defendants' motion to dismiss the FDIC's

---

by defendants that reject the *Merck* standard are earlier cases that either did not consider whether *Merck* applied to '33 Act cases or rely on irrelevant differences in the language of the '33 and '34 Acts. *See, e.g., In re IndyMac MBS Litig*., 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp*., 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012); *In re Barclays Bank PLC Sec. Litig*., No. 09 CIV 1989 PAC, 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011); *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 346 n.11 (S.D.N.Y. 2012).

[4] Defendants urge this Court to follow two decisions of the late Judge Pfaelzer of the Central District of California, dismissing two complaints that the FDIC brought as receiver for SCB with respect to Countrywide RMBS. Defs. Br. 3, 11, 12, 16 (citing *Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp*., No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) and *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. J.P. Morgan Secs. LLC*, No. 12-CV-8415 (JS-6), No. 11-ML-2265-MRP (MANx), 2013 WL 2178861 (C.D. Cal. Apr. 22, 2013)). There are several reasons why the Court should not do so. First, and foremost, the certificates at issue in that case were not the certificates in this case, and as discussed, discovery is a fact-intensive inquiry that must be assessed on a case by case basis.

claims as untimely.

### 1. The facts on which the second amended complaint is based were not available to a reasonable investor before May 22, 2008.

The FDIC's claims rely on a forensic analysis of the mortgage loans that backed the 12 certificates that the defendants sold CNB and SCB. To analyze a particular loan, an investor must know the address of the property that secures the loan. To take obvious examples, an investor could not run an automated valuation model on a property or learn whether there were undisclosed additional liens on the property without knowing the address. But, as the second amended complaint alleges, it was not possible for investors to know the addresses of the mortgaged properties or the names of the mortgagors because they had no access to the loan files and servicing records that contain this information. (SAC ¶¶ 40, 41.)

That essential prerequisite, the address of the property, became available to investors for the first time in early 2010, when the leading vendor of real estate data first

---

As Judge Stanton noted in distinguishing Judge Pfaelzer's decision from the facts in *FDIC/Chase*, defendants in that action were not "subject to the same kind of early and widespread public criticism as Countrywide." 2013 WL 5434633 at *6. The same is true of the defendants in this action. Second, Judge Pfaelzer also erroneously concluded that a reasonable investor could have stated a claim that would have withstood a Rule 12(b)(6) motion based entirely on allegations in other complaints about Countrywide's underwriting and appraisal practices generally, without any specific information tied to the particular certificates that the investor purchased. *Id.* at *4-6. This conflicts with the weight of authority in other RMBS cases. *See, e.g., Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2012 WL 2026556, at *1 (S.D.N.Y. May 31, 2012) (dismissing complaint where plaintiff failed to allege that misrepresentations specified in the complaint applied to the particular mortgages underlying the certificates it purchased); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,* 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring plaintiffs to plead how alleged misstatements "are tied to the loans in which they invested"). Finally, Judge Pfaelzer concluded that when a certificate was downgraded below investment grade is irrelevant for purposes of the statute of limitations analysis. *Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank*, 2012 WL 5900973, at *7. But that holding conflicts with this Court's prior holdings and the holdings of other courts. *In re Bear Stearns*, 851 F. Supp. 2d at 764-67 (holding that statute of limitations did not begin before, at a minimum, certificates were downgraded below investment grade); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.,* No. 09 Civ. 2137(LTS)(MHD), 2012 WL 2899356, at *3 (S.D.N.Y. July 16, 2012) ("*Morgan Stanley III*") (same); *FHFA/UBS*, 858 F. Supp. 2d at 321-22 (same); *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010) ("*Miss. PERS/Merrill I*")(finding it inappropriate to resolve statute of limitations question on motion to dismiss since certificates had not even been downgraded below investment grade until after limitations date).

6

developed a way to cross-reference databases of securitized loans and other databases of land records, and thereby learn the address of the property that secured a loan. (SAC ¶¶ 40, 41, 114.) Only with that information could the FDIC use the automated valuation model and do the additional-liens and occupancy analyses on a random sample of the loans that backed CNB's and SCB's certificates to test the truth of defendants' statements in the prospectus supplements. *See Fed. Deposit Ins. Corp. v. Chase Mortg. Fin. Corp.*, No. 12 Civ. 6166 (LLS), 2013 WL 5434633, at *4 (S.D.N.Y. Sept. 27, 2013) (Stanton, J.) ("*FDIC/Chase*") (finding that plaintiff could not be charged with knowledge of properties' true market value, additional liens, or occupancy status where plaintiff alleged that it was not possible to discover such information before the start of the limitations period); *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, No. 10 CH 45033, slip op. at 13 (Ill. Cir. Ct. Sept. 19, 2012) (Reznik Decl. Ex. 2) (denying motion to dismiss where plaintiff alleged that it did not have access to loan files and had no way to test the accuracy of defendants' representations about the credit quality of the underlying loans). At a minimum, there are genuine disputes about whether such information, and how much of it, was available to a reasonable investor before May 22, 2008. Thus, the statute of limitations could not have been triggered as a matter of law before that information became available in early 2010.

> **2. Because the certificates were not downgraded below investment grade until at least May 2008, defendants cannot show as a matter of law that the statute of limitations began to run before then.**

When the limitations period began to run is a question of fact. And many courts have acknowledged that for certificates that remained investment grade, the statute of limitations could not have begun to run as a matter of law. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67; *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,

810 F. Supp. 2d 650, 664-65 (S.D.N.Y. 2011), *vacated on other grounds*, 23 F. Supp. 3d 203 (S.D.N.Y. 2014) ("*Morgan Stanley II*"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137(LTS)(MHD), 2012 WL 2899356, at *3 (S.D.N.Y. July 16, 2012) ("*Morgan Stanley III*"); *Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 321-22 (S.D.N.Y. 2012) (Cote, J.) ("*FHFA/UBS*"); *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071, slip op. at 2 (Ind. Super. Ct. July 3, 2012) (Reznik Decl. Ex. 1). As this Court has explained, "absent a decline in the Certificates' ratings (or some other indicator of a steep decline in the Certificates' value), it is difficult to see how a plaintiff could have plausibly pled that the epidemic of indiscretions in the MBS industry had infected his or her Certificates." *In re Bear Stearns*, 851 F. Supp. 2d at 764-65.

As shown in the table below, nine of the 12 certificates were not downgraded below investment grade until well after May 22, 2008, and the other three (all issued in the same securitization) were downgraded just eight days before then:[5]

| Certificate | Schedule | Number of certificates bought by the Banks | Date of downgrade to below investment grade |
|---|---|---|---|
| RALI 2006-QS6 1A16 | 1 | 1 | October 30, 2008 |
| RALI 2006-QS18 1M1 | 2 | 3 | May 14, 2008 |
| RAST 2007-A1 A9 | 3 | 1 | October 27, 2008 |
| RALI 2006-QS16 A7 | 5 | 2 | October 27, 2008 |
| CSMC 2006-6 1A8 | 7 | 1 | December 9, 2008 |
| CSMC 2006-6 1A12 | 7 | 1 | December 9, 2008 |
| RAST 2006-A11 1A3 | 10 | 1 | August 14, 2008 |
| RAST 2006-A14CB 1A2 | 11 | 1 | July 31, 2008 |
| CMALT 2006-A6 1A4 | 12 | 1 | December 17, 2008 |

---

[5] *See* Schedules, Item 28(e).

As to the nine certificates, the statute of limitations could not have begun to run as a matter of law because they had not been downgraded more than a year before the FDIC was appointed receiver for CNB and SCB. (SAC ¶¶ 118, 120 & Item 28(e) of Schedules 1, 3, 5, 7, 10-12.) Nor did the May 14, 2008 downgrade alone trigger the statute of limitations for the remaining three, as this Court has made clear: "downgrades alone do not convey facts sufficient to plead a Section 11 or 12(a)(2) claim." *In re Bear Stearns*, 851 F. Supp. 2d at 766. *See also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc*, 873 F.3d 85 at *23 (2d Cir. 2017) (stating that "under *Merck*, it was Defendants' burden to prove that a reasonable investor in the GSEs' shoes would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim for relief by September 6, 2007—just weeks after the credit downgrades"); *FDIC/Chase*, 2013 WL 5434633, at *6 (stating that, with respect to certificates whose ratings had been put on negative outlook before August 2008 and were downgraded in early August 2008, "it is doubtful that in the time available [the plaintiff] could have filed a complaint [by August 14, 2008] complying with *City of Pontiac* on that basis") (internal citation omitted). Indeed, without an investigation, the cause of a downgrade is unknown. As this Court has noted, "a downgrade can occur for any number of reasons—for example, a recession or a collapse in housing prices—that are unrelated to the problematic underwriting and quality control practices that form the basis of each complaint." *In re Bear Stearns*, 851 F. Supp. 2d at 766. It was not until the FDIC made a proper investigation that it learned that statements in the offering documents about the credit quality of the mortgage loans were untrue or misleading.

9

### 3.   Other information available before May 22, 2008, was not enough to trigger the statute of limitations.

Although defendants appear to acknowledge that the statute of limitations does not begin to run until a plaintiff has or should have facts to draft a complaint that satisfies Rule 12(b)(6) (*see, e.g.*, Defs. Br. 12), they urge the Court to find that information publicly available by May 2008 started the limitations period, even though it said nothing about whether *these defendants* made untrue or misleading statements in *these offering documents.* But this Court and others have held that the same kinds of information would not have enabled a reasonable investor to plead a plausible claim because the information did not provide the necessary link to the particular certificates that the plaintiff purchased. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67 (finding that complaint assembled from such information would not have survived Rule 12(b)(6) motion because it discussed general practices "untethered to the transactions that are the subject of the" complaint); *Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*, 900 F. Supp. 2d 1222, 1246-51 (D. Kan. 2012), *cert. granted and judgment vacated on other grounds*, *Nomura Home Equity Loan, Inc. v. Nat'l Credit Union Admin. Bd.*, 134 S. Ct. 2818 (2014) ("*NCUA/RBS I*") (finding that press and regulatory reports about the housing market, lawsuits against securities underwriters and loan originators, and data about early payment defaults and delinquencies of the loans that backed the RMBS at issue were insufficient to trigger statute of limitations as a matter of law when certificates had not been downgraded below investment grade); *Mass. Mut. Life. Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) ("*MassMutual/RFC*") (news articles, industry publications, and trustee distribution reports were not sufficient to put investor on inquiry notice that "the specific underwriting and appraisal practices

represented in the offering materials were false"); *N.J. Carpenters Health Fund v. Residential Capital, LLC,* No. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *5 (S.D.N.Y. May 19, 2011) (Baer, J.) ("*NJ Carpenters/ResCap*") (finding combination of higher delinquency rates, collapse of Bear Stearns, and fact that rating agency had put certificates on watch for possible downgrade insufficient to show that reasonable investor would have discovered facts constituting violation by May 18, 2008). As Judge Cote recently explained:

> The 2007 reports, lawsuits and investigations regarding loan origination practices cited by defendants may have signaled a potential for problems in the RMBS market generally—and may, as plaintiff suggests, have triggered a duty on the part of *defendants* to scrutinize the loans included in their securitizations more closely—but such reports were insufficient to trigger the Securities Act's statute of limitations.

*FHFA/UBS*, 858 F. Supp. 2d at 321. As explained in further detail below, the same reasoning applies here with respect to each source of information on which the defendants rely.

Moreover, much of that information (such as complaints, media articles, and the like) is hearsay and does not prove facts sufficient to plead a complaint under *Merck*. At most, such documents show what information was public at the time, but not that the information was actually true. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, *without regard to the truth of their contents*") (emphasis added); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) ("On a motion to dismiss, a court may take judicial notice of the publication of a newspaper article . . . provided that consideration is limited to the fact of publication and not the truth of the

article's content."). But under *Merck*, the mere fact that these documents were published

is irrelevant. The Court must determine when a plaintiff could have filed a plausible

complaint, to which only the *substance* of these documents could be relevant.

### a. Data about early payment defaults (EPDs)

The availability before May 22, 2008, of data about EPDs on the loans that

backed the certificates did not trigger the statute of limitations. (Defs. Br. 13-15.)

Defendants misquote the allegations about EPDs in the second amended complaint. The

FDIC did not allege that EPDs are "strong evidence that the originator did not follow its

underwriting standards in making the loan," (Defs. Br. 14.), but rather that "[a]n EPD, *in

combination with other evidence cited herein*, is *evidence* that the originator may not

have followed its underwriting standards in making the loan." (SAC ¶ 83 (emphasis

added).) By itself, however, EPD data still would not have enabled a reasonable investor

to state a plausible claim that the defendants had made untrue or misleading statements in

the offering documents for these certificates. In *FDIC/Chase*, Judge Stanton explained

why EPD data is not sufficient to trigger the statute of limitations:

> [I]t is one thing to know that the securities were not making their expected
> returns, or had even lost long term value in the eyes of investors, and quite
> another entirely to have cause to suspect that [defendant] had materially
> misrepresented the characteristics of the collateralized loans and its own
> due diligence. A period of poor performance by itself may reflect any
> number of unrelated economic or market factors, and is not necessarily
> sufficient to put investors on notice of *systematic* disregard of
> underwriting procedures, inflation of underwriting data or the seller's
> material misrepresentations.

2013 WL 5434633, at *5 (omitting citations) (emphasis in original).

Numerous other courts have found that a reasonably diligent investor would not

have been able to link EPD data to a failure to follow the underwriting and appraisal

guidelines specified in the offering materials. *See, e.g., MassMutual/RFC*, 843 F. Supp.

12

2d at 208 (access to monthly reports of defaults and delinquencies was insufficient even

to put plaintiff on *inquiry notice* of misrepresentations about underwriting and appraisal

practices); *NCUA/RBS I*, 900 F. Supp. 2d at 1247-48 (early spike in default and

delinquency rates was insufficient to show that "a reasonably diligent investor would

have sufficient notice to file a plausible claim by March 2008"); *Nat'l Credit Union*

*Admin. Bd. v. Credit Suisse Securities (USA) LLC*, 939 F. Supp. 2d 1113, 1121 (D. Kan.

2013) (finding EPD data insufficient to trigger statute of limitations and denying motion

to dismiss for untimeliness); *Western & Southern Life Ins. Co., v. JPMorgan Chase Bank,*

*N.A.*, 54 F. Supp. 3d 888, 902 (S.D. Ohio 2014) (delinquencies in the 10% to 50% range

were insufficient to put plaintiff on inquiry notice); *Capital Ventures Intern. v. J.P.*

*Morgan Mortg. Acquisition Corp.*, Civil Action No. 12-10085-RWZ, 2013 WL 535320,

at *7 (D. Mass. Feb. 13, 2013) (monthly trustee reports that showed marked increase in

delinquency and default rates on the specific loans underlying plaintiff's certificates were

insufficient to show claims were untimely).[6]

### b.  Other complaints

Defendants' reliance on complaints from two actions against the originator

IndyMac and a handful of other complaints cited in Appendix D also does not show that

the statute of limitations was triggered. (Defs. Br. 16-17; Defs. App. D.)

---

[6] Defendants rely on this Court's conclusion in an earlier decision in *In re Morgan Stanley* that *inquiry notice* arose in part from similar data in monthly distribution reports. (Defs. Br. 15 (citing *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) ("*Morgan Stanley I*")).) But that reliance is misplaced because (a) inquiry notice is not the applicable standard here and (b) the Court later held in the same case that the statute of limitations was not triggered where none of the certificates had been downgraded below investment grade more than one year before the complaint was filed. *See Morgan Stanley III*, 2012 WL 2899356, at *3.

First, none of the lawsuits filed before May 2008 shows that the Banks could have discovered facts sufficient to state a viable claim by then because those complaints either were dismissed for failure to state a claim or were never tested by a Rule 12(b)(6) motion. (*See* Appendix 1: Plaintiff's Response to Complaints Listed in Defendants' Appendix D and Memorandum of Law.) Several of the complaints were dismissed precisely because they failed to tie allegations about general practices to the specific securitizations involved in the suit. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 307 (D. Mass. 2009) (dismissing plaintiff's allegations concerning appraisal practices and observing, "[t]hat questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans"); *aff'd in part and vacated in part*, 632 F.3d 762, 773-74 (1st Cir. 2011) (affirming dismissal of allegations about appraisal practices); *City of Ann Arbor Emps.' Ret. Sys.*, 703 F. Supp. 2d at 263 (ordering plaintiffs to replead and allege specifically the false statements and omissions on which they relied and "how those statements and/or omissions are tied to the loans in which they invested"). As a result, none of these lawsuits demonstrates that a reasonable investor could have discovered facts sufficient to state a viable claim for misrepresentations in the offering documents for these certificates by May 2008. *See Western & Southern Life Ins. Co.*, 54 F. Supp. 3d at 903 ("The Court agrees that it can take notice of the prior lawsuits, the dates such suits were filed, and the existence of the allegations made in the filings in such suits. However, the Court does not consider the complaint allegations from earlier-filed lawsuits to be adjudicative facts because they are subject to reasonable dispute.").

14

Second, none of the lawsuits concerns the securitizations in this case, and most of them have nothing to do even with these defendants. Defendants' Appendix D lists a handful of RMBS lawsuits filed on or before May 2008 that supposedly show that plaintiff could have filed something similar. But *Luther v. Countrywide Home Loans Servicing LP* and *Plumbers' Union Local No. 12 Pension Fund* (both cited in Appendix D) involved only Countrywide[7] and Nomura trusts respectively, none of which is involved in this action. The other RMBS lawsuits cited in Appendix D—*City of Ann Arbor Employees Retirement System; Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust*; and *Luminent Mortgage Capital v. Merrill Lynch & Co.* —did not involve any of the same trusts or any of the same defendants involved here. Moreover, the facts alleged in the *Luminent* case bear no relation to those alleged here. Among other things, plaintiffs in that case bought the junior-most classes of certificates from the issuing trusts in a *private offering*—not pursuant to a prospectus supplement. (*Id*. at 582.). Defendants do not show why complaints about securitizations other than the ones here—indeed very different in structure from the ones here—would have enabled the Banks to allege a plausible claim. In fact, every one of the complaints listed in defendants' Appendix D has been considered by other courts on motions to dismiss and found insufficient to trigger the statute of limitations. (*See* Appendix 1: Plaintiff's Response to Complaints Listed in

---

[7] As Judge Stanton has recognized, cases against Countrywide have been dismissed as untimely due to the extent of the "early and widespread public criticism stemming from Countrywide's securitization of residential mortgages, which included first-hand witness accounts of deviations from underwriting standards"; in contrast, "defendants [which included Credit Suisse, RBS, Deutsche Bank, HSBC, and UBS]" have not been "subject to the same kind of early and widespread public criticism as Countrywide." *FDIC/Chase*, 2013 WL 5434633, at *6 (internal citation and quotation marks omitted). Judge Stanton denied those defendants' motion to dismiss for untimeliness.

Defendants' Appendix D and Memorandum of Law.) There is no reason for this Court to decide differently.

Third, defendants assume that reasonable investors scour court dockets around the country, which they do not. Moreover, defendants give no proof that these lawsuits were newsworthy enough to come to the notice of a reasonable investor. *In re Bear Stearns*, 851 F. Supp. 2d at 765 n.16 ("Plaintiffs cannot be charged with knowledge of every suit filed against an originator"), citing *Staehr*, 547 F.3d at 418, 435-36 (finding that the only way an investor would have known about the lawsuit would have been to examine the court docket, which was an unreasonable expectation); *Nat'l Credit Union Admin. Bd., v. RBS Secs. Inc.*, No. 11-2340-JWL, 2016 WL 4565689, at *6 (D. Kan. Sept. 1, 2016) ("*NCUA/RBS II*") (finding that news of a lawsuit in one newsletter and one blog was not enough publicity that a reasonable investor would have known of the suit).

Recognizing that the RMBS lawsuits they cite bear no relation to the securities in this case, defendants in their brief highlight complaints filed in two actions against IndyMac, an originator of loans that back three of the 12 certificates. (Defs. Br. 16-17.) But courts have rejected claims of untimeliness based on possible knowledge of originators' practices:

> The truth of the matter is that when the [investors] learned of the loan originators' dubious underwriting practices says little about when they discovered the facts that form the basis of this complaint. [The plaintiff's] claim here is not that the *originators* failed to scrutinize loan applicants adequately *in general*; it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations sold to the [investors].

*FHFA/UBS*, 858 F. Supp. 2d at 321; *NCUA/RBS I*, 900 F. Supp. 2d at 1250 (rejecting argument that lawsuits against Countrywide, which was an originator of loans backing

the RMBS at issue but not a defendant in that action, triggered statute of limitations, because "notice in late November 2007 that a mortgage originator has been sued for abandoning underwriting standards" would not necessarily "lead a reasonable investor to discover by March 20, 2008 that he or she has a plausible claim under § 11 or § 12(a)(2) against the defendant MBS issuers and sellers in this case").

Moreover, even if the Banks had discovered such information about the originators, they "were entitled to assume that defendants had made diligent efforts to ensure that the originators' dubious lending practices did not infect the particular loans included in these securitizations." *FHFA/UBS*, 858 F. Supp. 2d at 321 n.11. *See also NCUA/RBS II*, 2016 WL 4565689, at *5 ("The Court also agrees with plaintiff that a reasonable investor might trust defendants' representations and due diligence concerning the adherence to underwriting guidelines and the avoidance of bad loans, and thus fail to appreciate any possibility that these particular investments did suffer from an abandonment of those guidelines."). In any case, the complaints filed against IndyMac would have done little to apprise the Banks of the facts alleged in the second amended complaint because they did not involve RMBS at all (much less the securitizations involved here), these defendants, or these securitizations. (*See* Appendix 1: Plaintiff's Response to Complaints Listed in Defendants' Appendix D and Memorandum of Law.)

### c.  Rating agency reports and actions

Defendants argue that various rating agency reports and actions show that the Banks would have been able to bring their claims before May 22, 2008. (Defs. Br. 17-18 (noting that classes *subordinate* to the tranches that the Banks bought were downgraded

below investment grade before May 2008); Defs. Br. n.23 (noting negative watches).)[8]
But courts have routinely found that negative watches and downgrades of subordinate
tranches are insufficient to trigger the statute of limitations.

First, as this Court has recognized, "negative watches" are not downgrades and do
not trigger the statute of limitations.[9] *In re Bear Stearns*, 851 F. Supp. 2d at 766-67
(finding negative watches irrelevant for purposes of statute of limitations, in part, because
they "do not constitute rating changes"); *see also Morgan Stanley II*, 810 F. Supp. 2d at
663-65 (disregarding negative watches in statute of limitations analysis); *Miss.
PERS/Goldman*, 2011 WL 135821, at *8 (finding negative watch "does not constitute
'triggering information' [that] relate[s] directly to the misrepresentations and
omissions'") (internal citation omitted). That is particularly true where, as here, the
investor has risk-related investment criteria that allow it to purchase only certificates of a
certain rating or higher.[10] *See Morgan Stanley II*, 810 F. Supp. 2d at 664-65 (focusing on
downgrades below investment grade, after noting that plaintiff's "risk-related investment
criteria are often driven substantially by the investment/non-investment-grade
distinction").

Second, downgrades of subordinate tranches likewise do not trigger the statute of
limitations because subordinated tranches absorb losses on the underlying collateral and

---

[8] Defendants' Appendix C notes that RALI 2006-QS18 was downgraded from AA to A+ with a
negative outlook on January 16, 2008. A rating of A+ is an investment grade rating and is insufficient to
trigger the statute of limitations for the reasons stated above. (*See* Part I.A.2.)

[9] Def. Br. n.23; Defendants' Appendix C lists (1) Fitch's placement of some of the Banks'
certificates on negative watch on March 6, 2008; (2) Moody's and S&P's placement of some of the Banks'
certificates on negative watch on April 1, 2008; (3) Moody's placement of some of the Banks' certificates
on negative watch on May 9, 2008).

[10] *See* SAC ¶¶ 118, 120 & Schedules, Item 28 (stating that investment policy of CNB and SCB
was to purchase only certificates that were rated at least "A" and that all the certificates on which the
FDIC's claims are based were rated "AA" or "AAA" at purchase).

protect the cash flow of higher-rated certificates like those purchased by CNB and SCB. *See Fed. Hous. Fin. Agency*, 873 F.3d 85, at *22 ("Neither would the credit downgrades of junior tranches cause a reasonable investor in the GSEs' shoes to investigate whether the ProSupps contained material misstatements or omissions."); *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.*, No. 13 Civ. 6705(DLC), 2014 WL 241739, at *14 (S.D.N.Y. Jan. 22, 2014) ("*NCUA/Morgan Stanley*") ("downgrades in subordinate tranches were not unexpected, given that the purpose of such subordinate tranches is to suffer losses before the Certificates that the [investors] had purchased. As such, these downgrades would not necessarily lead the [investors] to suspect that their Certificates would also be downgraded."); *Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*, 902 F. Supp. 2d 476, 500 (S.D.N.Y. 2012) (given purpose of subordinate tranches, finding "little, if any reason to believe that the downgrade of those tranches should have led the [investors] to discover that the underlying mortgages were not simply risky, but so poorly underwritten as to put at risk even the most senior certificates"); *In re Bear Stearns*, 851 F. Supp. 2d at 766 (disregarding downgrades to subordinate tranches in performing statute of limitations analysis). The same is true for downgrades that did not bring the plaintiff's certificates below investment grade. *See Miss. PERS/Goldman,* 2011 WL 135821, at *8 (downgrades in 2007 did not trigger statute of limitations, particularly where it was not until February 2008 that any rating agency downgraded the certificate below investment grade). Thus, none of the rating agency reports or actions to which defendants point shows as a matter of law that the limitations period began before May 22, 2008.

19

### d. News articles

Defendants' Appendix C, which purports to be a chronology of information publicly available to MBS investors before May 22, 2008, does not demonstrate that a reasonable investor in *these* securities would have been aware by then of facts demonstrating a violation of the 1933 Act. Of the 69 items cited in Appendix C,[11] five concern ratings actions on the Certificates, which, as discussed above, are insufficient to trigger the statute of limitations.[12] Four more items are the lawsuits that are listed in defendants' Appendix D, which are discussed above.[13] Defendants even include two opinion pieces.[14] Thirty-four other items listed on defendants' Appendix C have been considered by this Court and others on motions to dismiss for untimeliness, and none were sufficient to trigger the statute of limitations. (*See* Appendix 2: Plaintiff's Response to Defendants' Appendix C Listing Chronology of Publicly Available Information.)

The remaining 26 items listed in defendants' Appendix C are no different from the items already considered and rejected by other courts.[15] Seven address issues primarily in the subprime mortgage market.[16] The Banks' certificates, in contrast, all are backed by much more creditworthy Alt-A mortgage loans. None of the items mentions any defendant's involvement in originating or securitizing Alt-A mortgage loans. Indeed,

---

[11] Although Defendants' Appendix C contains 65 entries, a few of those entries list multiple items.

[12] These five ratings actions are: (1) Fitch's downgrade of the Banks' RALI 2006-QS18 certificates from AA to A+ (within investment grade) with a negative outlook on January 16, 2008; (2) Fitch's placement of some of the Banks' certificates on negative watch on March 6, 2008; (3) Moody's and S&P's placement of some of the Banks' certificates on negative watch on April 1, 2008; (4) Moody's placement of some of the Banks' certificates on negative watch on May 9, 2008; and (5) Fitch's downgrade of the Banks' RALI 2006-QS18 certificates to below investment grade on May 14, 2008.

[13] *See* Defs. Ex. 61, 67, 79, and 80.

[14] *See* Defs. Ex. 31 and 48.

[15] These items are Defs. Ex. 22, 23, 26, 31, 33, 37, 47, 52, 53, 54, 55, 58, 62, 63, 64, 65, 68, 70, 76, 77, 78, 81, 82, 84, 85, 90.

[16] *See* Defs. Ex. 52, 55, 58, 63, 81, 82, and 84.

few of the 26 items mention defendants at all. (*See* Appendix 2: Plaintiff's Response to

Defendants' Appendix C Listing Chronology of Publicly Available Information.) At

most, these items show only that the subprime market had deteriorated, that there was an

increase in mortgage fraud, that declining home values had begun to affect the

delinquency rates of certain loans and the value of RMBS, and that certain subprime

lenders were experiencing financial difficulties as a result. A reasonable investor who

read these articles might have begun to suspect that some statements about securitizations

of *subprime* loans had been untrue or misleading, but it is not possible to conclude *as a*

*matter of law* that a reasonable investor would have suspected the same of securitizations

of Alt-A mortgage loans, much less discovered facts sufficient to state a claim as to these

certificates by May 22, 2008.

For these reasons, courts routinely have rejected the argument that news reports

similar to the ones defendants cite were sufficient to trigger the statute of limitations. *See,*

*e.g., NCUA/Morgan Stanley,* 2014 WL 241739, at *14 ("as the information contained in

such reports pertained to *originators*, not Morgan Stanley or the other *defendants* in these

NCUA actions, this information was insufficient to trigger the statute of limitations")

(emphasis in the original); *Plumbers' & Pipefitters' Local #562 Supplemental Plan &*

*Trust*, 2012 WL 601448, at *11 (70 articles, 39 of which mentioned originators of loans

in the relevant offerings, did not trigger statute of limitations because they did not "refer

to the offerings, the Certificates, or tie the originators to securities offered by the

defendants," and many simply "describe[d] the high rate of default experienced by

subprime mortgages and the worsening business situation of the originators," which

"would not establish that their offering documents contained material misstatements and

omissions"); *Morgan Stanley II*, 810 F. Supp. 2d at 665 (news articles and SEC report were too general even to provide *inquiry notice* where they did not specifically mention the defendant and did not address specific misrepresentations alleged in complaint); *FDIC/Chase*, 2013 WL 5434633, at *4 (negative news about the mortgage industry or securities similar to what investor purchased were insufficient where "none of that information is connected to the specific certificates or transactions at issue here").[17] As a result, none of the items in defendants' Appendix C demonstrates that a reasonable investor could have discovered facts sufficient to state a viable claim for misrepresentations in the offering documents for these certificates by May 2008.

In an attempt to link these general news reports to the specific certificates in this case, defendants highlight news stories about a handful of originators whose loans backed some of the certificates in this case. (Defs. Br. 18-19.) But these reports are no more tied to the certificates or defendants in this case than any others previously rejected by this and other courts.[18] [19] Thus, for all these reasons, defendants have failed to show that the

---

[17] Courts outside of this circuit have come to the same conclusion. *See NCUA/RBS I,* 900 F. Supp. 2d at 1246 (press and regulatory reports about the housing decline were insufficient to trigger statute of limitations); *MassMutual/RFC,* 843 F. Supp. 2d at 208 (newspaper articles, industry publications, and government reports were insufficient to put investor on inquiry notice); *In re Wells Fargo Mortgage-Backed Certificates Litigation¸* 712 F. Supp. 2d 958, 966-67 (N.D. Cal. 2010) ("*In re Wells Fargo*") (news articles, including some that discussed inflated appraisals, hazards of low-documentation loans, and flawed assumptions underlying ratings, did not put investor on *inquiry notice* as a matter of law where they gave rise to competing inferences because they contained assurances from banks and ratings agencies as to quality of MBS); *Western & Southern Life Ins. Co.*, 54 F. Supp. 3d at 902-03 (media reports did not address relevant defendants or offerings); *Capital Ventures*, 2013 WL 535320, at *7 (media reports and government publications that associated the erosion of underwriting guidelines and increased default rates with the originators whose loans backed plaintiff's certificates insufficient to bar claim as untimely).

[18] For example, defendants rely on IndyMac's worsening financial condition and increases in delinquencies, and a single article describing improper lending practices by IndyMac. (Defs. Br. 18.) For originator GMAC/Residential Capital, defendants rely on reports of rising default rates on subprime mortgages, GMAC/Residential Capital's worsening financial condition, and Residential Capital's ultimate bankruptcy. (Defs. Br. 19.) For Wachovia, defendants rely on a single SEC filing concerning Wachovia's accounting improprieties. (*Id.*) But defendants fail to link these originator's financial condition or their improper lending or accounting practices to the Banks' certificates. In addition, increases in delinquencies and purported knowledge about an originator are insufficient to render claims against defendants untimely. (*See* discussion of EPD data and other complaints, *supra.*) For originator American Home, defendants rely

FDIC's claims are time-barred as a matter of law under the one-year statute of limitations in section 13 of the 1933 Act.

## II.     THE FDIC IS NOT REQUIRED TO ALLEGE RELIANCE, BUT HAS DONE SO ANYWAY.

Defendants argue that the second amended complaint should be dismissed because section 11 requires the FDIC to plead reliance and the FDIC has not. (Defs. Br. 20-29.) Defendants' arguments should be rejected because (1) reliance is not an element of the FDIC's claims, and (2) the second amended complaint adequately pleads reliance in any case.

### A.  Reliance is not an element of the FDIC's claims.

Under section 11, a plaintiff is not required to plead or prove reliance. 15 U.S.C. § 77k(a); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 112 (S.D.N.Y. 2011) ("*Miss. PERS/Merrill II*") (same). The only exception is that an investor is required to prove reliance if it "acquired the security after

_____

on news reports cited in the FDIC's second amended complaint as evidence of an originator's violations of underwriting guidelines and argue that the same reports were sufficient for the Banks to have successfully pled a claim against *defendants* concerning statements that *defendants* made in offering documents. (Defs. Br. 18-19.) Courts have rejected such arguments. *See, e.g., FHFA/UBS*, 858 F. Supp. 2d at 321 & n.11. In addition, this Court has already recognized that there is no connection between American Home's bankruptcy and the kinds of allegations made in this action. *See In re Bear Stearns*, 851 F. Supp. 2d at 765.

[19] Defendants also cherry-pick the originators whose bad business practices they argue the Banks should have been aware of. They make no mention of any negative news concerning other major originators of loans that were securitized in the Banks' certificates, such as Homecomings Financial and Credit Suisse-affiliates, which originated the largest number of the loans for eight of the Banks' certificates. *See* SAC, Item 28(a) and (b) of Schedule 1 (Homecomings Financial originated 21.4% of group 1, which backed RALI 2006-QS6 1A16); SAC, Item 28(a) and (b) of Schedule 2 (Homecomings Financial originated 70.1% of groups 1 and 2, which backed RALI 2006-QS18 1M1); SAC, Item 28(a) and (b) of Schedule 5 (Homecomings Financial originated 30.4% of the group backing RALI 2006-QS16 A7); SAC, Item 28(a) and (b) of Schedule 7 (Credit Suisse Financial Corporation and DLJ Mortgage Capital originated 71.1% of the loans in the entire CSMC 2006-6 securitization). DLJ Mortgage Capital was an affiliate of Credit Suisse Financial Corporation. SAC ¶ 91.

the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). SEC Rule 158 defines "earning statement" and how an issuer can make an earning statement "generally available to its security holders." 17 C.F.R. § 230.158. Defendants argue that monthly distribution reports issued by RMBS trustees are "earning statements" under Rule 158. (Defs. Br. 22.) But nothing in the case law, statutory framework, or regulatory history supports defendants' argument.

Defendants acknowledge that "several district courts have concluded that Distribution Reports do not constitute 'earning statements' for purposes of § 11." (Defs. Br. 25.) This is an understatement. Every single decision on this issue—five in this District and two others—has reached that conclusion.[20] Defendants would have the Court ignore all this authority because, they say, those seven decisions did not "address[] the relevant history of the statute or the regulatory framework regarding RMBS." (Defs. Br. 25.) But those seven decisions make perfectly clear why distribution reports are not "earning statements" for purposes of section 11. Distribution reports are different from, and contain much less information than, the types of reports that the SEC has recognized as "earning statements." *See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,* No. 08 Civ. 5653 (PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 16, 2011) (reasoning that Rule 158 "specifically defines 'earnings statements' to include certain required data,

---

[20] *See In re IndyMac Mortg.-Backed Sec. Litig.,* 286 F.R.D. 226, 240 (S.D.N.Y. 2012); *Tsereteli v. Residential Asset Securitization Trust 2006-A8,* 283 F.R.D. 199, 215 (S.D.N.Y. 2012); *Miss. PERS/Merrill II,* 277 F.R.D. at 114-15; *N.J. Carpenters v. DLJ Mortg. Capital, Inc.,* No. 08 Civ. 5653 (PAC), 2011 WL 3874821, at *7 (S.D.N.Y. Aug. 16, 2011); *NJ Carpenters/ResCap,* 2011 WL 2020260, at *6; *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3,* 825 F. Supp. 2d 1082, 1215-17 (D.N.M. 2011); *In re Washington Mutual Mortg.-Backed Sec. Litig.,* 276 F.R.D. 658, 668 (W.D. Wash. 2011).

which Defendants admit the trustee reports do not contain"); *NJ Carpenters/ResCap*, 2011 WL 2020260, at *6 (noting that regulations defining "earning statement" "are specific and do not appear to contemplate the kind of Distribution Summaries at issue here"); *Miss. PERS/Merrill II*, 277 F.R.D. at 114 (same). As the District of New Mexico recognized in *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011)*,* trustee distribution reports (which can be filed with the SEC on Form 10-D) do not include information about risk factors, financial data about the company, management's analysis of financial conditions, or financial statements. *Id.* at 1082, 1216-17.

Reports on Form 10-K and similar filings with the SEC cover an issuer's finances and business comprehensively and thus usually make it unnecessary for an investor to refer back to the issuer's registration statement. The opposite is true of mortgage-backed securities. A distribution report says nothing about how the mortgage loans were underwritten, their initial loan-to-value ratios, occupancy status, and the initial rating of each certificate, all of which is available only in the prospectus supplement. This information is important to investors in deciding whether to purchase an RMBS, even long after issuance, because underwriting, initial loan-to-value ratios, and occupancy status predict how a mortgage performs in the future, even years later. (SAC ¶¶ 36, 67, 78, 107.) Defendants are mistaken in their speculation that these disclosures are superseded by the information in the distribution reports, because the distribution reports say nothing about these important characteristics of the mortgage loans when they were first made. (Defs. Br. 29.) Whether an originator complied with the underwriting guidelines when making a loan does not change as the borrower makes payments.

Defendants are wrong in their unsupported assertion that "[i]t is simply implausible that the Banks would have placed any meaningful weight on the stale disclosures in the Offering Documents rather than the actual, detailed performance data." (Defs. Br. 28.)

Defendants suggest that Regulation AB, which was adopted by the SEC in 2005 and relates to reporting for asset-backed securities, explains why trustee distribution reports should be considered "earning statements." (Defs. Br. 23-24.) But Regulation AB never mentions Rule 158 (which defines "earning statement"), section 11(a), or even the phrase "earning statement." Regulation AB simply recognized that existing SEC rules about reporting were tailored for corporate issuers and that issuers of asset-backed securities should have different reporting requirements. The SEC therefore created Form 10-D as a way for asset-backed securities issuers to report on the performance of their securities. *See* Asset-Backed Securities, SEC Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 70 Fed. Reg. 1506, 1508 (Jan. 7, 2005). The SEC has never amended Rule 158 to add trustee distribution reports as a permitted "earning statement,"[21] whether filed with the SEC on Form 10-D or distributed on trustee websites, and it has never suggested anywhere that trustee distribution reports are "earning statements" as that term is used in section 11(a). Defendants want the Court to infer from Regulation AB that the SEC intended to include trustee distribution reports in the definition of "earning statements" but somehow forgot to amend Rule 158 accordingly. But the more logical inference is that the SEC recognized the differences between corporate issuers and asset-backed issuers, and concluded that trustee

---

[21] Rule 230.158 has been amended twice since Regulation AB took effect, but neither of those amendments added Form 10-D as a kind of "earning statement."

distribution reports do not satisfy the definition of earning statements for the purpose of section 11.

Even if defendants were right that trustee distribution reports are "earning statements" for the purpose of section 11, those distribution reports were not made "generally available" to investors. Under Rule 158(b), "[a] registrant may use other methods to make an earning statement 'generally available to its security holders' for purposes of the last paragraph of section 11(a)." But subsection (d) of that same Rule states:

> If an earnings statement was made available by "other methods" than those specified in paragraphs (a) and (b) of this section, *the earnings statement must be filed as exhibit 99 to the next periodic report required by section 13 or 15(d) of the Exchange Act* covering the period in which the earnings statement was released.

17 C.F.R. § 230.158(d) (emphasis added). Defendants claim that the trustee distribution reports were made through "other methods," namely on trustee websites (Defs. Br. 25 & n.36), but the trustee distribution reports were never "filed as exhibit 99 to the next periodic report required by section 13 or 15(d)," as required by Rule 158(d).

**B. The second amended complaint adequately pleads reliance.**

Even assuming that allegations of reliance are required with respect to the seven certificates that, according to defendants, were the subject of more than 12 months of distribution reports, the second amended complaint adequately pleads reliance. (*See* SAC ¶ 130.) The allegations in the complaint must be taken in "the light most favorable to upholding the plaintiff's claim," and the Court must "draw[]reasonable inferences in [the plaintiff's] favor." *Doe v. Columbia University*, 831 F.3d 46, 48 (2d Cir. 2016). The FDIC alleged in detail why the untrue and misleading statements that the defendants

made were important to investors when making their investment decisions.  For example, the second amended complaint alleges that defendants made material untrue or misleading statements in the prospectus supplements about LTVs (SAC ¶ 37), occupancy status (*id.* ¶¶ 68-69), underwriting standards (*id.* ¶¶ 79-80), and ratings (*id.* ¶¶ 106, 108), and that such statements were important to reasonable investors, like CNB and SCB, when making the decision to purchase the certificates. *See, e.g.*, *id.* ¶ 36 ("[A] reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans.").

Moreover, the second amended complaint expressly alleges that CNB and SCB could only purchase certificates that were rated at least single-A (*id.* ¶ 107), and that the offering documents expressly state that each of the certificates were rated triple-A or double-A. (*Id.* ¶¶ 118, 120 & Schedules, Item 28.)  Likewise, the second amended complaint alleges that

> CNB and SCB did understand the statements about the LTVs as statements of fact. CNB and SCB had no access to appraisal reports or other documents or information from which [they] could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

(*Id.* ¶ 38.) The second amended complaint also expressly alleges that "CNB and SCB reviewed the prospectus supplements in connection with their decision to purchase the certificates" and that CNB and SCB "relied on the untrue or misleading statements that defendants made." (*Id.* ¶ 130.) At a minimum, these allegations about the importance of the statements in the prospectus supplements, CNB's and SCB's investment policies, and their review of the prospectus supplements give rise to a reasonable inference that CNB and SCB read and relied on defendants' untrue or misleading statements.

### III.    DEFENDANTS THAT DID NOT UNDERWRITE THE PARTICULAR CERTIFICATES THAT THE BANKS PURCHASED ARE STILL LIABLE AS "UNDERWRITERS."

Each defendant is liable to the FDIC as an underwriter under section 11 even if it did not sell a particular class of securities that the Banks bought. Section 11 imposes liability on "every underwriter with respect to such security." *See* 15 U.S.C. § 77k(a)(5). "The term 'underwriter' has been broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' . . . to the public."[22] *SEC v. Spectrum, Ltd.*, 489 F.2d 535, 541 n.11 (2d Cir. 1973). *See also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 177 (2d Cir. 2011) (explaining actions necessary to qualify as an "underwriter" under the "participation prongs" of the definition in the 1933 Act).

Deutsche Bank and UBS are each named as underwriters in the prospectus supplements for three of the securitizations.[23] Moreover, the second amended complaint alleges that Deutsche Bank and UBS participated in the distribution of securities from the relevant RMBS trust to the public by means of those prospectus supplements. (*See* SAC, Items 28(b), 37, 62, 68, 79, 106, and 109 of Schedules 2, 3, 10.) Defendants assert, however, that because Deutsche Bank and UBS did not underwrite the *specific class* or "tranche" of certificates that the Banks purchased, the Banks lack standing to assert

---

[22] Under section 11, an underwriter is defined as:

[A]ny person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11).

[23] Prospectus Supplement for RALI 2006-A11 at S-124 (stating that Credit Suisse and UBS were, together, the "underwriters") (Reznik Decl. Ex. 21); Prospectus Supplement for RALI 2006-QS18 at S-139 – S-140 (stating that Deutsche Bank, Residential Funding Securities, and Lehman Brothers were, together, the "underwriters") (Reznik Decl. Ex. 22); RAST 2007-A1 at S-94 (stating that HSBC and Deutsche Bank were, together, the "underwriters") (Reznik Decl. Ex. 23).

section 11 claims against them.[24] (Defs. Br. 30.) In other words, defendants argue—but

without citing any authority—that the liability of an underwriter must be determined at

the tranche level. Defendants purport to rely on the language in section 11 stating that an

investor may sue "every underwriter *with respect to such security*," which they argue

refers to the *specific tranche* purchased by the investor. (*Id.*)  But Judge Stanton declined

to adopt this very argument by defendants in *FDIC/Chase* and ruled that it was premature

to decide this issue as a matter of law on a motion to dismiss. 2013 WL 5434633, at *10.

Several courts, including this Court, have rejected the meaning that defendants attribute

to this language in class action standing cases. *See, e.g., In re Bear Stearns*, 851 F. Supp.

2d at 779 ("While the phrase 'such security' has no grammatical referent in Section

11(a), the text makes clear that the only prerequisite to filing suit is the presence of a

misrepresentation or omission in its registration statement"; finding nothing that would

"warrant treating the tranches – which were issued pursuant to the same, allegedly

defective Offering Documents – as 'different' securities for the purpose of Sections 11

and 12(a)(2)"); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp.

2d 322, 339-40 (S.D.N.Y. 2012) (noting that statute does not explain what "such

security" refers to, and rejecting notion that it refers to particular tranches of RMBS).

   In fact, most of the allegedly untrue or misleading statements contained in the

prospectus supplements are not specific to any particular tranche of security, but relate to

the underlying loans generally or to loans in particular groups that back more than one

tranche. *See, e.g.*, SAC ¶¶ 37, 62, 68, 79. *See also Fort Worth Emps.' Ret. Fund*, 862 F.

---

   [24] Defendants cite a case that addresses whether a lead plaintiff in a class action has standing to
assert claims on behalf of purchasers of certificates from tranches that it did not purchase. (Defs. Br. 30.)
Although it is not the relevant question here, the Second Circuit has held that it can. *See NECA-IBEW
Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 164-65 (2d Cir. 2012).

Supp. 2d at 336-37 (noting, in addressing standing under section 11, that alleged

misstatements about underwriting standards, appraisal standards, and LTVs were not

tranche-specific). In one securitization (RAST 2007-A1), every tranche was backed by

the same mortgage loans.[25] In another (RAST 2006-QS18), the certificates purchased by

CNB were backed by some of the same mortgage loans that backed the senior certificates

offered by Deutsche Bank.[26] And in a third (RAST 2006-A11), CNB's certificate was

cross-collateralized by the mortgage loans that backed the certificates offered by UBS.[27]

There is no reason to condition liability on whether the defendants underwrote the

particular tranche that the plaintiff purchased when the alleged misstatements applied to

all the underlying mortgage loans.

But even treating each tranche as a separate security does not shield Deutsche

Bank and UBS from liability here. A person may be liable as an underwriter of securities

that it did not actually sell if it directly or indirectly "participated" in the distribution of

the security. "Participation" in a distribution of securities is interpreted broadly and does

not require that the defendant actually sell the securities. *See In re Lehman Bros. Mortg.-*

*Backed Sec. Litig.,* 650 F.3d at 181 n.10 ("Persons may be liable for participation even

though they did not themselves directly sell or offer securities or purchase securities for

resale."); *Harden v. Raffensperger, Hughes & Co., Inc.,* 65 F.3d 1392, 1400-01 (7th Cir.

1995) (holding that defendant was subject to liability under section 11 as an

---

[25] *See* SAC at Item 28(a) and (b) of Schedule 3 (all certificates were backed by a single group of mortgage loans).

[26] *See* SAC at Item 28(a) and (b) of Schedule 2 (CNB's certificate was backed by group 1 and group 2); RAST 2006-QS18 Prospectus Supplement at S-16 – S-17 (stating that the senior certificates will receive payments from groups 1, 2, and 3) (Reznik Decl. Ex. 22).

[27] SAC at Item 28(a) and (b) of Schedule 10 (CNB's certificate was backed by group 1); RAST 2006-A11 Prospectus Supplement at S-94 – S-95 (senior certificates are entitled to cross-collateralization by loans backing the subordinate certificates) (Reznik Decl. Ex. 21).

"underwriter" even though it "neither purchased [the issuer's] notes with a view to distribute them, nor offered or sold notes in connection with their distribution," because its role was "necessary to the distribution" of the securities).[28] Participation may include, for example, contributing information about the securities to the documents that were used to sell the securities. *See, e.g., Special Situations Fund III, L.P. v. Cocchiola*, No. 02-3099 (WHW), 2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) (describing actions that can constitute "participation" under the 1933 Act, including taking part in the preparation of the registration statement or prospectus). Certainly putting one's name on the offering documents is a form of participation in selling all the securities described in those documents.

Finally, the FDIC has not had the opportunity to take discovery about the role that Deutsche Bank and UBS played in these offerings, such as whether they participated in the preparation of the prospectus supplements. For that reason, it would be premature to dismiss its claims against those defendants. *See FDIC/Chase*, 2013 WL 5434633, at *10 (finding it premature to decide this issue as a matter of law on a motion to dismiss).

## IV.   THE SECOND AMENDED COMPLAINT PLEADS A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 15 OF THE 1933 ACT.

Defendants argue that the complaint does not properly plead control person liability. This same argument was considered and rejected by Judge Stanton in *FDIC/Chase*:

---

[28] *See also Special Situations Fund III, L.P. v. Cocchiola*, No. 02-3099 (WHW), 2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) ("Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, mere participation in an offering is enough."); *Dijulio v. Digicon, Inc.*, 325 F. Supp. 963, 965 (D. Md. 1971) (noting, in addressing, whether venue existed over claim under section 11, that all members of underwriting group for the use and benefit of which the registration statement and prospectus were prepared and filed were subject to liability under the 1933 Act "regardless of which underwriter actually made the sale").

> Because the amended complaint adequately states a claim for primary liability against [the primary violators], and alleges that [the control persons] "by or through stock ownership, agency, or otherwise, controlled [those violators] within the meaning of Section 15 of the 1933 Act," . . . the amended complaint adequately states a claim under Section 15 of the 1933 Act against [the control persons].

2013 WL 5434633, at *10 (internal citations omitted). Here, the FDIC has alleged that "Credit Suisse Management, by or through stock ownership, agency, or otherwise, controlled CSFB Mortgage Securities within the meaning of Section 15 of the 1933 Act." (SAC ¶ 137.) Because the control person allegations in the second amended complaint are identical to the allegations in *FDIC/Chase* (other than the identity of the parties), they "adequately state[] a claim under Section 15." 2013 WL 5434633, at *10.

## CONCLUSION

For all the foregoing reasons, the Court should deny defendants' motion to dismiss the second amended complaint in its entirety.

Dated: October 30, 2017

Respectfully submitted,

**GRAIS & ELLSWORTH LLP**

By: /s/ Vickie Reznik

David J. Grais
Vickie Reznik
Kathryn E. Matthews
950 Third Avenue, 24th Floor
New York, New York 10022
Phone: (212) 755-0100

*Attorneys for Federal Deposit Insurance Corporation as Receiver for Citizens National Bank and as Receiver for Strategic Capital Bank*

33