**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL DEPOSIT INSURANCE CORPORATION
*as Receiver for* CITIZENS NATIONAL BANK *and*
*Receiver for* STRATEGIC CAPITAL BANK,

               *Plaintiff*,

     v.

BEAR STEARNS ASSET BACKED SECURITIES I
LLC; THE BEAR STEARNS COMPANIES LLC; J.P.
MORGAN SECURITIES LLC; CITICORP
MORTGAGE SECURITIES, INC.; CITIMORTGAGE,
INC.; CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP.; CREDIT SUISSE
MANAGEMENT LLC; CREDIT SUISSE SECURITIES
(USA) LLC; MERRILL LYNCH MORTGAGE
INVESTORS, INC.; MERRILL LYNCH MORTGAGE
CAPITAL INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.; ALLY SECURITIES, LLC;
DEUTSCHE BANK SECURITIES INC.; HSBC
SECURITIES (USA) INC.; RBS SECURITIES INC.;
and UBS SECURITIES LLC,

               *Defendants*.

No. 12-cv-4000 (LTS)(KNF)

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ...............................................................................................................3

   I.    THE FDIC'S CLAIMS ARE TIME-BARRED ................................................3

        A.   The FDIC's Decision To Perform A Particular Type Of Retrospective Analysis Does Not Toll The Statute Of Limitations ................................................5

        B.   The Accrual Of A Securities Claim Is Not Contingent On A Ratings Downgrade Below Investment Grade ....................................................6

        C.   The FDIC's Own Allegations, Combined With Information In The Public Domain, Show That The Facts On Which It Bases Its Claims Were Available To The Banks Before May 22, 2008 ..........................................9

   II.   THE FDIC HAS NOT PLED RELIANCE FOR CERTIFICATES PURCHASED AFTER THE RELEASE OF MORE THAN TWELVE MONTHS OF EARNING STATEMENTS ..............................................................................14

   III.  THE FDIC'S CLAIMS FAIL WHERE DEFENDANTS DID NOT UNDERWRITE THE CERTIFICATES PURCHASED BY THE BANKS ..............................17

   IV.  THE SECTION 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL..............20

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
    824 F. Supp. 2d 1164 (C.D. Cal. 2011) ...................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................................19

*Berwecky v. Bear, Stearns & Co.*,
    197 F.R.D. 65 (S.D.N.Y. 2000) ................................................................................10

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,
    703 F. Supp. 2d 253 (E.D.N.Y. 2010) .....................................................................10

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,
    No. CV 08-1418, 2010 WL 6617866 (E.D.N.Y. Dec. 23, 2010) ......................6, 10

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*,
    No. 2:12–CV–4354 MRP, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) .....................passim

*Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.*,
    No. 12 CIV. 6166 LLS, 2013 WL 5434633 (S.D.N.Y. Sept. 27, 2013) ................................20

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012) .......................................................................9

*Fernandez v. UBS AG*,
    222 F. Supp. 3d 358 (S.D.N.Y. 2016) .....................................................................10

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    862 F. Supp. 2d 322 (S.D.N.Y. 2012) .....................................................................18

*Freidus v. ING Groep N.V.*,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010) .......................................................................8

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) .....................................................................................19

*Hutchinson v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011) ......................................................................................20

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...........................................................7, 9, 14

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    934 F. Supp. 2d 1219 (C.D. Cal. 2013) ....................................................................11

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  No. 02 Civ. 910(GEL), 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ..................................20

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ............................................................................................19

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  616 F. App'x 442 (2d Cir. 2015) .........................................................................................4

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  No. 09 Civ. 2137 (LTS) (MHD), 2012 WL 2899356
  (S.D.N.Y. July 16, 2012) ..............................................................................................4, 13

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  810 F. Supp. 2d 650 (S.D.N.Y. 2011) .................................................................................12

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  No. 09 Civ. 2137(LTS)(MHD), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) .....................9

*Landow v. Wachovia Sec., LLC*,
  966 F. Supp. 2d 106 (E.D.N.Y. 2013) .................................................................................11

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012) .................................................................................3

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*,
  843 F. Supp. 2d 191 (D. Mass. 2012) .................................................................................9

*Merck & Co. v. Reynolds*,
  130 S. Ct. 1784 (2010) .......................................................................................................4

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
  No. 08 Civ. 5653(PAC), 2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011) ..............................16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ..............................................................................................18

*Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) ..................................................................................4

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013) .....................................................................................8, 11, 12

*Plumbers & Pipefitters Local #562 Supp. Plan & Tr. v. J.P. Morgan Acceptance Corp. I*,
  No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448
  (E.D.N.Y. Feb. 23, 2012) ...........................................................................................6, 10, 17

*Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011)..............................................................................10

*Special Situations Fund, III, L.P. v. Cocchiola*,
   No. 02-3099 (WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007)...........................19

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008) ..............................................................................13

## STATUTES

15 U.S.C. § 77k ....................................................................................................14

15 U.S.C. § 77m ....................................................................................................4

## REGULATIONS

17 C.F.R. § 229.1121(a) ........................................................................................10

17 C.F.R. § 230.158(a) ..........................................................................................14

70 Fed. Reg. 1564 .................................................................................................16

70 Fed. Reg. 1566 .................................................................................................16

Securities Act Release No. 33-6485, 48 Fed. Reg. 44767 (Sept. 30, 1983).....................14, 15, 16

Securities Act Release No. 33-8518, Exchange Act Release, No. 34-50905, 70 Fed. Reg.
   1506 (Jan. 7, 2005) ...........................................................................................15

## GLOSSARY OF ABBREVIATIONS AND TERMS

**SAC**:                          Second Amended Complaint

**Banks**:                        Citizens National Bank and Strategic Capital Bank

**Certificate(s)**:               One or more of the mortgage-backed pass-through certificates that the Banks allegedly purchased from some of the Defendants, and on which the FDIC bases its claims in this action

**Distribution Reports**:         Monthly remittance reports published pursuant to SEC Regulation AB that contain detailed information about the financial performance of the Certificates

**EPD**:                          Early payment default

**LTV**:                          Loan-to-value

**RMBS**:                         Residential mortgage-backed securities

**Offering(s)**:                  Any of the RMBS offerings from which the FDIC alleges the Banks purchased the Certificates (*see* Schedules 1, 2, 3, 5, 7, 10, 11 and 12 to the Second Amended Complaint)

**Offering Documents**:           Registration statements, prospectuses, and prospectus supplements for the Offerings

**CMALT 2006-A6**:                CitiMortgage Alternative Loan Trust REMIC Pass-Through Certificates, Series 2006-A6

**CSMC 2006-6**:                  CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-6

**RALI 2006-QS6**:                Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS6

**RALI 2006-QS16**:               Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS16

**RALI 2006-QS18**:               Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18

**RAST 2006-A11**:                Residential Asset Securitization Trust, Series 2006-A11

**RAST 2006-A14CB**:              Residential Asset Securitization Trust, Series 2006-A14CB

**RAST 2007-A1**:                 Residential Asset Securitization Trust, Series 2007-A1

## PRELIMINARY STATEMENT

The FDIC's opposition does not establish that its claims are timely or sufficiently pled. As the FDIC determined after its own investigation, rather than filing a lawsuit before May 2008, the Banks continued to invest massively in mortgage-backed securities ("MBS") at discounted prices in the hope that the housing market would recover and prices would rebound from their unprecedented decline. The FDIC does not dispute that while the Banks failed to pursue any potential claims, other investors were bringing RMBS suits against the same Defendants the FDIC sues here, making the same core allegations the FDIC relies on here. Moreover, a flood of news articles and publicly available information revealed not only a general deterioration in the residential mortgage market but also problems specifically tied to the particular mortgage-backed certificates at issue in this lawsuit (the "Certificates"). Indeed, all of the Certificates were placed on negative watch—and three were downgraded below investment grade by the ratings agencies—before May 22, 2008.

Set against this backdrop, the FDIC argues that certain purported facts underlying its allegations were not available until the FDIC was able to run a specific automated valuation model ("AVM") analysis in 2010; that a certificate must be downgraded below investment grade to trigger the statute of limitations; and that the information publicly available at that time was insufficient to trigger the statute of limitations. Each of these arguments fails. *First*, the particular AVM analysis the FDIC relies on in support of its appraisal-related allegations was not required for the FDIC to file a well-pleaded complaint—as demonstrated by other RMBS plaintiffs who filed similar lawsuits without the AVM analysis and whose complaints were sustained.[1] *Second*, "[n]othing in Section 13 or the securities laws suggest[s] that the statute

---

[1] Even if an AVM analysis was required to sustain the appraisal allegations, the FDIC does not even suggest that such AVM analysis supports other portions of its claim, such as its

does not run until ratings downgrade." *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 2:12–CV–4354 MRP, 2012 WL 5900973, at *7 (C.D. Cal. Nov. 21, 2012) ("*Strategic Capital Bank*").  *Finally*, the FDIC's other RMBS case brought on behalf of Strategic Capital Bank—filed the same day as this one—was dismissed as time-barred.  *See id.* at *8, *15.  The FDIC now asks this Court for an inconsistent result by making the same arguments it asserted unsuccessfully in its companion *Strategic Capital Bank* case.  However, the FDIC's own allegations, the extent of information in the public domain about the entities connected to the Certificates (including other RMBS lawsuits against Defendants and relevant originators), and the Certificate-specific rating downgrades and negative watches reveal that the Banks could have made the same allegations and asserted the same claims the FDIC asserts here before May 22, 2008.  Accordingly, the FDIC's claims are time-barred and must be dismissed with prejudice. (*See* Section I, *infra*.)

The FDIC also fails to state a claim with respect to seven of the Certificates because the Banks purchased those Certificates after the release of more than twelve months of Distribution Reports, which qualify as earning statements under SEC Rule 158.  The FDIC is therefore required to plead reliance, but has not done so.  The FDIC's argument that Distribution Reports are not "earning statements" is at odds with the SEC's adoptive releases regarding the definition of "earning statements" and with SEC Regulation AB (which sets forth disclosure requirements for issuers of asset-backed securities) because the Distribution Reports fall within the non-exclusive definition of "earning statements" for purposes of Section 11.  Having failed to make

---

allegations concerning compliance with underwriting guidelines or owner occupancy misrepresentations.  Accordingly, the FDIC's professed need for the AVM analysis cannot save its non-appraisal related allegations from being declared time-barred.

more than boilerplate, conclusory allegations of reliance, the FDIC's claims fail as to these seven Certificates.  (*See* Section II, *infra*.)

The FDIC also fails to establish that it has statutory standing to state a claim against certain Defendants who did not underwrite the Certificates that the Banks allegedly purchased. The Securities Act subjects underwriters to potential liability only with respect to securities they actually underwrote, and as the SEC has made clear, each tranche in an offering should be treated as a discrete security.  Therefore, the underwriters cannot be subject to liability for the securities/tranches they did not underwrite.  Even if an underwriter of one security could be held liable for participating in the distribution of another security, the FDIC's claims would still fail because the Second Amended Complaint does not plead that the underwriters did so here.  (*See* Section III, *infra*.)

Finally, because the FDIC has not established an underlying violation of § 11, its claims for control person liability under § 15 necessarily fail.  (*See* Section IV, *infra*.)

Accordingly, the Second Amended Complaint should be dismissed in its entirety with prejudice.

## ARGUMENT

## I.    THE FDIC'S CLAIMS ARE TIME-BARRED

Where, as here, "the facts needed for [the statute of limitations] determination can be gleaned from the complaint and related documents," it is appropriate to resolve the issue at the motion to dismiss stage.  *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 346 (S.D.N.Y. 2012).  As an initial matter, because the FDIC does not "affirmatively plead facts demonstrating that [its § 11 claims] are within [§ 13's one-year] statute of limitations," it has not met its pleading burden under § 13.  *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2012 WL 2899356, at *1-*2

3

(S.D.N.Y. July 16, 2012) (Swain, J.) ("*Morgan Stanley III*"); *see also* 15 U.S.C. § 77m (precluding § 11 claims from being brought more than "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence").[2]  As demonstrated further below, the FDIC's attempt to meet its burden is negated by the remainder of the allegations in the SAC and the publicly available information concerning the Certificates and the entities connected to the Certificates.  Such factors, when taken together, "irrefutably demonstrate[] that the [Banks] . . . should have discovered facts sufficient to adequately plead a claim prior to [May 22, 2008]."  *Morgan Stanley III*, 2012 WL 2899356, at *2.

The FDIC's timeliness arguments boil down to three assertions, none of which is accurate.  In the FDIC's view: (1) the facts on which the Second Amended Complaint rests were not available until the FDIC was able to run a forensic retrospective AVM analysis sometime after early 2010, Pl.'s Mem. Of Law in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. ("Opp.") at 4-7; (2) a certificate downgrade below investment grade is necessary to trigger the statute of limitations and many (but not all) of the Certificates were not downgraded below investment grade until after May 22, 2008, Opp. at 7-9; and (3) the publicly available

---

[2]     Due to developments in Second Circuit jurisprudence published after Defendants filed their opening brief, Defendants concede that the discovery standard set forth in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), applies to the accrual of § 11 claims.  However, as set forth in their opening brief, Defendants submit that "the application of *Merck* makes no difference in this action" because the FDIC's own allegations and all publicly available information reveal that dismissal is warranted.  *Pa. Pub. School Emps.' Ret. Sys. v. Bank of Am.*, 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012); *see In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 447 (2d Cir. 2015) (regardless of whether *Merck* applies "we nevertheless conclude that the Securities Act claims are untimely because [defendant's] public disclosures . . . would have led a reasonably diligent plaintiff to have discovered the facts underlying his claim").

information was insufficient to trigger the statute of limitations, Opp. at 10-23.  These arguments
fail for the reasons outlined below.

### A.    The FDIC's Decision To Perform A Particular Type Of Retrospective Analysis Does Not Toll The Statute Of Limitations

The FDIC's decision to rely on the purported results of an AVM analysis in its attempt to
state a claim does not toll the statute of limitations.  The FDIC contends that its claims are timely
because "an investor could not run an automated valuation model on a property or learn whether
there were undisclosed additional liens on the property without knowing the address."  Opp. at 6.
In rejecting the identical argument made by the FDIC here, the court in the FDIC's other
*Strategic Capital Bank* case found that the FDIC's alleged inability to obtain more specific
information about the loans backing the certificates did *not* prevent the accrual of the claims.  As
the court explained, the statute of limitations begins to run when a reasonable investor "has or
should have knowledge sufficient to draft a complaint," but "[t]he source of the knowledge is
irrelevant."  *Strategic Capital Bank*, 2012 WL 5900973, at *7 (applying *Merck*).  Thus, where, as
here, information providing the basis of a claim was available more than a year before the
FDIC's receivership began, "the complaint was time-barred."  *Id.* at *8.

The specific AVM analysis relied upon by the FDIC was not required to sustain the
complaint because more than enough information was publicly available by May 22, 2008 to
provide the basis for its claims.  In dismissing RMBS claims as untimely, courts have relied on a
combination of factors—apart from when an AVM analysis could have been performed—in
determining that the statute of limitations started running more than a year before the filing of a
complaint.  These factors include the plaintiff's own allegations, monthly distribution reports
showing increased delinquencies, ratings actions, media and other industry reports, and the
existence of lawsuits filed prior to the limitations date.  *See, e.g.*, *Strategic Capital Bank*, 2012

5

WL 5900973, at *8; *Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365-66; *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1179-80 (C.D. Cal. 2011). All of these factors are present here and, when taken together, demonstrate that the Banks should have discovered facts sufficient to adequately plead a claim prior to May 22, 2008. Neither case law nor logic supports the FDIC's contention that the statute of limitations cannot begin to run until the plaintiff decides to buy a particular type of computer analysis from a third-party vendor—especially where, as here, the plaintiff already had detailed information at its disposal concerning the Certificates and the performance of the underlying mortgage loans. Indeed, other RMBS complaints have been sustained despite the fact that the plaintiff did not rely upon an AVM. *See, e.g., City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, No. CV 08-1418, 2010 WL 6617866, at *6-7 (E.D.N.Y. Dec. 23, 2010); *Plumbers & Pipefitters Local #562 Supp. Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448, at *13 (E.D.N.Y. Feb. 23, 2012).[3]

**B. The Accrual Of A Securities Claim Is Not Contingent On A Ratings Downgrade Below Investment Grade**

Contrary to the FDIC's argument, Opp. at 7-9, "[n]othing in Section 13 or the securities laws suggest that the statute does not run until [a] ratings downgrade." *Strategic Capital Bank*, 2012 WL 5900973, at *7. Indeed, "the rule offered by the FDIC absolves investors from monitoring the performance and truthfulness of the representations in their investments, and delegates all responsibility for assessing representations to the rating agencies. . . . [S]uch a rule would transform this suit from a claim about misrepresentations in the Offering Documents into

---

[3]     Even if the AVM analysis is deemed necessary to sustain the appraisal related allegations in the SAC, that AVM analysis does not support the portion of the FDIC's claim regarding compliance with underwriting guidelines or owner occupancy misrepresentations. Accordingly, the underwriting guideline and owner occupancy allegations should be dismissed as untimely.

a suit over the downgrade itself." *Id.* This Court too should reject the FDIC's attempt to create

such a rule.

The FDIC mischaracterizes the cases on which it relies in support of its contention that

the statute of limitations cannot begin to run until after a downgrade below investment grade.

*See* Opp. at 7. Not a single one of the cited cases held that certificate downgrades below

investment grade were a required prerequisite for the statute of limitations to run. While those

cases may have found a ratings downgrade to be sufficient to start the clock on the limitations

period, none held that it was *required* for the accrual of a § 11 claim and Defendants are not

aware of any court that has adopted such a rigid test. To the contrary, as this Court has

explained, the plaintiff need only have some indicator that its certificates had been impacted

sufficient to allege some conceivable statutory damages. *See In re Bear Stearns Mortg. Pass-*

*Through Certificates Litig.*, 851 F. Supp. 2d 746, 764-65 (S.D.N.Y. 2012) (Swain, J.). Here, the

combination of the Certificate-specific early payment default rates and the negative rating

actions (including downgrades of three Certificates to below investment grade) linked the

general problems in the RMBS industry to the specific Certificates at issue here and provided a

further basis to plead damages. *See id.*

Courts have routinely found plaintiffs on notice of their claims even in the absence of a

rating downgrade. *See e.g.*, *Strategic Capital Bank*, 2012 WL 5900973, at *7 ("The FDIC

finally argues that it is inappropriate to dismiss their claim when the certificates were not

downgraded by the credit rating agencies below investment levels until months after May 22,

2008. . . . As stated above, the complaints in the Derivatives, Securities and *Luther* class actions

were sufficient to alert a reasonable investor that the Offering Documents contained

misstatements, regardless of any action of the credit rating agencies."); *Pension Tr. Fund for*

7

*Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 277 (3d Cir. 2013) (holding that plaintiff was on notice of its claims even though the Certificates at issues were not downgraded until months after the claim could have been brought).

In any event, the FDIC concedes that three of the twelve Certificates at issue in this action (the three certificates from the RALI 2006-QS18 Offering) were downgraded below investment grade prior to May 22, 2008.  Opp. at 8.  Thus, by the FDIC's own logic, the claims relating to these three Certificates are untimely.  Recognizing its inconsistent position as to these three Certificates, the FDIC argues that the downgrades happened eight days before May 22, 2008 and that "without an investigation, the cause of the downgrade is unknown" and that it "was not until the FDIC made a proper investigation that it learned that statements in the offering documents about the credit quality of the mortgage loans were untrue or misleading."  *Id.* at 9.  However, the FDIC ignores the deluge of other publicly available information that should have placed them on notice of their claims with respect to those three Certificates (the ratings downgrade being just one of many indicators).  This included early payment defaults on those Certificates, *see* Ex. 18[4] (showing a six-fold increase in EPDs for RALI 2006-QS18 from February 2007 to April 2008), as well as news articles about the originators of the loans backing those Certificates and the sponsors/issuers of the Certificates, *see* Exs. 4, 5, 24, and 92.

A statute of limitations analysis does not look at each piece of information available to a potential plaintiff in isolation, but rather requires a court to determine whether in "the totality of the circumstances" a plaintiff knew or should have known of the claim as of the limitations date. *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 829 (S.D.N.Y. 2010); *accord In re Morgan*

---

[4]     Unless otherwise indicated, Exhibits 1-93 cited herein are attached to the Declaration of Andrew T. Frankel filed on September 14, 2017 (Dkt. No. 174), and Exhibits 94-100 cited herein are attached to the Reply Declaration of Andrew T. Frankel filed herewith.

*Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137(LTS)(MHD), 2010 WL 3239430, at *7 (S.D.N.Y. Aug. 17, 2010) ("*Morgan Stanley I*") (noting that in a statute of limitations analysis, courts "evaluat[e] the totality of the circumstances").  When applying that analysis and considering the ratings downgrade of the three Certificates to below investment grade in addition to all other information available about the Certificates, it is clear that the Banks knew more than enough before May 22, 2008 to file their claims.  Indeed, when one considers the information available about *all* the twelve Certificates at issue (discussed *infra*), the Banks had more than sufficient information prior to May 22, 2008 to file their claims.

C.   **The FDIC's Own Allegations, Combined With Information In The Public Domain, Show That The Facts On Which It Bases Its Claims Were Available To The Banks Before May 22, 2008**

The FDIC's own allegations, the extent of information in the public domain about the entities connected to the Certificates (including Defendants here), and the Certificate-specific ratings downgrades and negative watches reveal that the Banks could have made the same allegations and asserted the same claims before May 22, 2008.[5]

As demonstrated more fully in Defendants' opening brief, the availability of monthly Distribution Reports for each of the Certificates clearly shows that the Banks could have made the same underwriting guideline compliance allegations long before May 22, 2008.  The FDIC alleges that "the rising incidence of early payment defaults" was "evidence that the originator

---

[5]     Because the volume of publicly available information significantly increased from early 2008 through May 22, 2008, *see* Joint Memorandum of Law in  Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Br.") at App. C, no weight should be given to cases relied on by the FDIC where an accrual date prior to May 2008 was proposed.  *See, e.g.*, *Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 320-21 (S.D.N.Y. 2012) (proposed accrual date of September 2007); *Bear Stearns*, 851 F. Supp. 2d at 763 (August 2007); *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) ("early 2007").

may not have followed its underwriting standards."  SAC ¶ 83.  The FDIC does not dispute that Distribution Reports provided investors with, among other things, a detailed description of the performance of the mortgage pool, including EPD and other delinquency and loss information. *See* 17 C.F.R. § 229.1121(a); *see also* Ex. 14 (excerpts of Offering Documents disclosing that Distribution Reports would be released monthly and made available on trustees' websites). Investors, such as the Banks, are "chargeable with knowledge of [these publicly available] contents."  *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 (S.D.N.Y. 2000).  Accordingly, and by the FDIC's own logic, the Banks knew or should have known of the rising delinquency and default rates prior to May 22, 2008, *see* Defs.' Br. at 15, Fig. 2, and could have drawn the same conclusions with respect to underwriting guidelines that the FDIC belatedly asserts.

Similarly, prior to May 22, 2008, five complaints were filed by RMBS investors asserting § 11 claims against all of the Defendants here.  Defs.' Br. at App. D.  These complaints make nearly identical allegations concerning Defendants' roles in the securitization process.  And not only does the filing of these complaints "demonstrate[ ] that a reasonable investor could have discovered facts sufficient to state a viable claim" before May 22, 2008, Opp. at 14, but contrary to the FDIC's contention, many successfully survived motions to dismiss.[6]  The FDIC's argument that reasonable investors do not "scour court dockets around the country," Opp. at 16, cannot save its claims.  Courts routinely find that publicly available lawsuits are sufficient to put plaintiffs on notice of their claims.  *See, e.g.*, *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 383 (S.D.N.Y. 2016) ("[P]ublished reports of legal proceedings and the proceedings themselves put

---

[6]       *See, e.g.*, *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 777 (1st Cir. 2011); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Tr., Inc.*, No. CV 08–1418, 2010 WL 6617866, at *6-7 (E.D.N.Y. Dec. 23, 2010); *Plumbers & Pipefitters Local #562 Supp. Plan & Tr.*, 2012 WL 601448, at *21.

plaintiffs on notice of their exact allegations against the UBS Defendants and Ferrer."); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 130 (E.D.N.Y. 2013) ("That plaintiff may not have learned, *inter alia*, about every fraudulent act by defendants alleged in the complaint from the previous lawsuits does not prevent a finding that he had inquiry notice of defendants' alleged participation in the fraud and breach of fiduciary duty…"); *Pension Tr. Fund for Operating Eng'rs*, 730 F.3d at 277 (holding that plaintiffs were on notice of their claims when a substantially similar complaint to the operative complaint had been filed in another court); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1228 (C.D. Cal. 2013) ("Reasonable investors, armed with information about downgrades, media sources of problems in underwriting, and other lawsuits, could craft a particularly well-pled complaint that states the offering documents contained misrepresentations, because they have both general information about problems with the originator of their loans and specific information about the securities they purchased.").  Accordingly, the lawsuits filed before May 22, 2008 contribute to the Banks' knowledge of their purported claims, confirm that the Banks had the ability to initiate a lawsuit prior to May 22, 2008, and compel the dismissal of the FDIC's claims as time-barred.  *See Strategic Capital Bank*, 2012 WL 5900973, at *5, *8 (discussing the allegations made in earlier complaints and finding that Strategic Capital Bank knew of the alleged misrepresentations before May 22, 2008 and accordingly the FDIC's complaint was time-barred).

The Certificate-specific ratings downgrades and negative outlooks also contributed to the Banks' knowledge of the purported problems with the Certificates prior to May 22, 2008.  As Fitch warned RMBS investors in one of its press releases, "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes."  Ex. 6.  While a downgrade of a subordinate tranche alone may not be sufficient to put senior

certificate holders on notice, such a downgrade, along with the Certificates at issue being placed on negative outlook,[7] as well as all other publicly available information discussed herein, should have caused a reasonable investor to discover the information sufficient to make their claim prior to May 22, 2008.

Finally, the news articles and other publicly available information identified by Defendants do not simply describe the mortgage market in general. Unlike in the cases identified by the FDIC,[8] these reports specifically related to Defendants and/or the originators associated with the Certificates at-issue here. *See* Defs.' Br. at App. C. Moreover, the articles show more than a simple deterioration in the residential mortgage market—they show specific allegations of misconduct related to the issues at the heart of the FDIC's Second Amended Complaint. For example, an August 2007 *Business Week* article described multiple instances of IndyMac's purported shunning of underwriting guidelines. *See* Ex. 24. IndyMac was the sponsor and originator for RAST 2006-A11, RAST 2006-A14CB, and RAST 2007-A1. Similarly, in January 2008, the *Wall Street Journal* reported on states that had experienced high

---

[7]      All of the Certificates were placed on negative outlook by March 2008, almost two months before May 22, 2008. *See* Defs.' Br. at App B. In an attempt to downplay the importance of these notifications, the FDIC asserts that negative watches are not downgrades and therefore do not trigger the statute of limitations. *See* Opp. at 18. But as articulated above, *supra* Part I.B, ratings downgrades are *not* a necessary pre-condition for putting a plaintiff on notice of its claims. Moreover, if courts can find that the statute of limitations has expired in the *absence* of a ratings downgrade, they can also find that placing an at-issue Certificate on negative outlook is a factor in favor of determining that the Banks were on notice of their claims. *See Strategic Capital Bank*, 2012 WL 5900973, at *7; *Pension Tr. Fund*, 730 F.3d at 277.

[8]      Given the volume of information that Defendants have identified specifically related to the entities connected with the Certificates, to the performance of the Certificates, and to the Defendants here, the FDIC's reliance on cases where the defendants failed to put forward the same type of information is unpersuasive. *See*, *e.g.*, *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 665 (S.D.N.Y. 2011) ("*Morgan Stanley II*") ("The cited articles and report[s] were not specifically about [Defendants] and were therefore too general to provide inquiry notice.").

mortgage fraud activity, including California, Texas, Florida, and Arizona, where most of the

mortgage loans underlying the Certificates were originated.  *See* Ex. 88; Ex. 94 (excerpts of

Offering Documents disclosing the geographic concentrations of mortgage loans); Ex. 95

(excerpts of Offering Documents disclosing the risk associated with geographic concentrations

of the mortgage loans).  And in March 2008, in connection with putting the Banks' RAST 2007-

A1, RALI 2006-QS8, RALI 2006-QS16, RALI 2007-QS5, RAST 2006-A14CB, and CMALT

2006-A6 Certificates on negative watch, Fitch issued a press release stating that rapidly rising

delinquency levels were partially "attributable to the use of high risk mortgage products such as

'piggy-back' second liens and stated-income documentation programs, which in many instances

were poorly underwritten and susceptible to borrower/broker fraud."  Ex. 6.  Accordingly, as

these press reports demonstrate,[9] there was a wealth of information in the public domain

specifically relating to "the entities that were involved in the origination, packaging, and sale of

the Certificates."  *Morgan Stanley III*, 2012 WL 2899356, at *3.

        In response, the FDIC tries to downplay several of the articles identified by Defendants

on the grounds that the articles discussed issues in the subprime market whereas the Certificates

were backed by Alt-A loans.  *See* Opp. at 20-21.  However, it was widely reported by early 2008

that securitized Alt-A loans were "starting to create a second tide of defaults for lenders

swamped by the [sub-prime] meltdown . . . [because] stated-income loans made during the

housing boom have proved to be riddled with exaggeration."  Ex. 96.  By February 2008,

*Bloomberg News* had reported that the market "for AAA rated securities backed by Alt-A loans"

---

[9]        Contrary to the FDIC's contention, *see* Opp. at 11, Defendants do no more than ask the
Court to take judicial notice of the fact that these articles existed in the public domain, and
therefore should have contributed to the Banks' knowledge of potential § 11 claims prior to May
22, 2008.  *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

had "slumped" or dissipated entirely.  Ex. 97.  Because the Offering Documents disclose that the

Certificates were backed by stated income and similar loans, Ex. 100, the Banks had all they

needed to link the problems in the RMBS industry to the Certificates before May 22, 2008.  *See*

*also* Exs. 98, 99 (describing problems with securities backed by Alt-A mortgage loans).

Defendants have done far more than demonstrate problems in the RMBS industry

generally.  Rather, Defendants directly connected publicly available information to the specific

Certificates owned by the Banks (on whose behalf the FDIC brings this action).  *Cf. Bear*

*Stearns*, 851 F. Supp. 2d at 764-65.  When taken together, and combined with what the Banks

should have known based on the FDIC's own allegations, there was more than enough

information for the Banks to have filed a well-pleaded complaint before May 22, 2008.  *See*

*Strategic Capital Bank*, 2012 WL 5900973, at *8.

## II.   THE FDIC HAS NOT PLED RELIANCE FOR CERTIFICATES PURCHASED AFTER THE RELEASE OF MORE THAN TWELVE MONTHS OF EARNING STATEMENTS

An investor's presumed reliance on a registration statement ends under § 11 "after the

issuer has made generally available to its security holders an earning statement covering a period

of at least twelve months beginning after the effective date of the registration statement."  15

U.S.C. § 77k (a).  The FDIC's position that the monthly Distribution Reports are not "earning

statements" is at odds with the SEC's adoptive releases regarding "earning statements" and with

Regulation AB (which sets forth disclosure requirements for issuers of asset-backed securities

("ABS")).[10]  *See* 17 C.F.R. § 230.158(a).  SEC Rule 158's description of what constitutes an

---

[10]    RMBS are a particular type of asset-backed securities.

earnings statement is non-exclusive.[11]  The SEC's releases show that in revising Rule 158, the

SEC conformed the rule to how issuers were already making required disclosures in practice.[12]

Where "current practice [did] not mandate audited earning statements," the SEC did not require

audited financial statements to satisfy Rule 158's definition of "earning statement" because in

those situations, "requiring an audit for earning statements under Rule 158 would impose an

undue burden on registrants."  48 Fed. Reg. at 44768.

     The FDIC's contention that Distribution Reports "contain much less information than the

type of reports that the SEC has recognized as 'earning statements,'" Opp. at 24,

mischaracterizes the purpose of Form 10-D and distribution reports for ABS issuers and

investors.  Noting that "[m]any of the [SEC]'s existing disclosure and reporting requirements . . .

do not elicit relevant information for most asset-backed securities transactions," and that "ABS

investors are generally interested in the characteristics and quality of the underlying assets, the

standards for their servicing, the timing and receipt of cash flows from those assets and the

structure for distribution of those cash flows," the SEC changed the reporting requirements for

issuers of ABS to provide investors with information that is actually relevant to their ABS

investment decisions.[13]  Thus, Form 10-D is inherently different from reports enumerated in Rule

158, not because it includes less information than Form 10-K and Form 10-Q provide to

---

[11]    *See* Definition of Terms, Securities Act Release No. 33-6485, 48 Fed. Reg. 44767, 44768 (Sept. 30, 1983) ("an 'earning statement' not meeting the requirements of that paragraph [(a) of Rule 158] may otherwise be sufficient for purposes of Section 11(a) [of the 1933 Act]").

[12]    *See* 48 Fed. Reg. at 44767-68 (adopting language to allow multiple documents to qualify as "earning statements" because issuers generally reported only three months' worth of information on each Form 10-Q).

[13]    *See* Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release, No. 34-50905, 70 Fed. Reg. 1506, 1508, 1510-11 (Jan. 7, 2005).  Accordingly, the Distribution Reports provide detailed financial information about the performance of the loans supporting the Certificates.  Defs.' Br. at 29.

investors in traditional operating companies, but because it is tailored to provide information that
is *actually relevant to investors in ABS*.

In the ABS context, Distribution Reports are the equivalent of the "types of reports that
the SEC has recognized as 'earning statements,'" Opp. at 24, and fall within the non-exclusive
definition of "earning statements" for purposes of § 11. *See* 70 Fed. Reg. at 1564-65
(recognizing that issuers of ABS will file "distribution and pool performance information" on
Form 10-D in lieu of filing Form 10-Q or Form 8-K). Indeed, the SEC has acknowledged that
distribution reports "will likely contain most, if not all, of the disclosures about the distribution
and pool performance that will be required" by Form 10-D. 70 Fed. Reg. at 1566.

Given the SEC's comments, it is clear that Distribution Reports qualify as "earning
statements" under Rule 158.[14] Because the FDIC purchased seven of the Certificates after
twelve months of Distribution Reports were made generally available,[15] *see* 15 U.S.C. § 77k(a);
Ex. 14 (excerpts of Offering Documents disclosing that Distribution Reports would be released

---

[14]     The FDIC's reliance on the limited case law on this issue, *see* Opp. at 24, 25 & n.20, is
misplaced. These rulings are at odds with the plain language of Rule 158, the SEC's express
purpose in amending this rule, and an understanding of the reporting regime for ABS issuers.
*See* Defs.' Br. at 25-26. For example, in holding that trustee reports were not "earning
statements," the court in *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.* stated that
the exception to Rule 158 "is not a general exception" and that "if Congress wanted to make a
generalized exception, it knows how to do so." No. 08 Civ. 5653(PAC), 2011 WL 3874821, at
*7 (S.D.N.Y. Aug. 16, 2011). However, making a "generalized exception" is exactly what the
SEC did in amending Rule 158 to be non-exclusive. *See* 48 Fed. Reg. at 44767 ("[T]he [SEC]
has added a provision to provide explicitly that paragraph (a) is nonexclusive"). Accordingly,
the rulings cited by the FDIC on this issue are not persuasive.

[15]     The FDIC asserts that the Distribution Reports were not publicly available because they
were never filed as Exhibit 99 to the next periodic report required by § 13 or 15(d), as stated in
17 C.F.R. § 230.158(d). Opp. at 27. Importantly, however, the FDIC does not dispute that the
reports were released monthly and made available on trustees' websites. This access, along with
the disclosures in the Offering Documents concerning the availability of the Distribution Reports
on the trustees' websites, *see* Ex. 14, was sufficient to make these reports "generally available."

monthly and made available on trustees' websites), the FDIC must plead reliance as to these seven Certificates.[16]

But the FDIC offers no more than a conclusory allegation of reliance, and its suggestion that LTV ratios, occupancy status, underwriting standards, and ratings were "important" to a "reasonable investor," Opp. at 25, does not create an inference that the Banks actually relied on the alleged misrepresentations and omissions in deciding to invest.  In light of the FDIC's failure to sufficiently plead reliance, the claims with respect to these seven Certificates must be dismissed.

## III.    THE FDIC'S CLAIMS FAIL WHERE DEFENDANTS DID NOT UNDERWRITE THE CERTIFICATES PURCHASED BY THE BANKS

Under § 11, an investor in a security only has standing to sue "every underwriter with respect to such security."  15 U.S.C. § 77k (a)(5).  It is simply incorrect to assert that an underwriter is liable "even if it did not sell a particular class of securities that the Bank bought." *See Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Tr.*, 2012 WL 601448, at *7 n.8 ("There is no question that an offering's tranches are financially interrelated, but there is also no question that each tranche is a discrete security.").  Indeed, this understanding has been consistent with the SEC's view for *more than two decades*.  Ex. 8 (SEC No-Action Letter, Bear, Stearns & Co. Inc. (Aug. 29, 1994)); Ex. 7 (SEC No-Action Letter, The Bond Market Trade Ass'n (Feb. 7, 1997) ("[I]n the case of a multi-tranche offering of ABS, each tranche . . . shall be treated as a different Registered Security.")); Ex. 9 (Asset-Backed Securities, 69 Fed. Reg. 26688 n.212 (May 13, 2004) ("Consistent with the existing no-action letter, in the case of a multi-

---

[16]      The Offerings for which the FDIC must plead reliance are RALI 2006-QS6, RALI 2006-QS8, CSMC 2006-6 (tranche 1-A-8), CSMC 2006-6 (tranche 1-A-12), RAST 2006-A11, RAST 2006-A14CB, and CMALT 2006-A6.

tranche registered offering of asset-backed securities, each tranche would be treated as a different security.")).  The FDIC therefore lacks standing to assert § 11 claims against any underwriter Defendant that did not underwrite the Certificates the Banks purchased.

The FDIC's reliance on *Bear Stearns* and *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322 (S.D.N.Y. 2012), is misplaced.  Opp. at 30.  In those cases, the district courts permitted a plaintiff to assert *class* claims concerning tranches in which the lead plaintiff did not invest, so long as the lead plaintiff invested in other tranches in the same offering.  However, the FDIC seeks to assert *individual* claims concerning tranches in which it never invested.  The Second Circuit has made clear that a plaintiff "*clearly lacks standing* to assert . . . claims on its behalf" concerning "*different tranches* of the same Offering" because "it did not purchase those Certificates."  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012) (emphasis added).[17]  The same reasoning applies here.[18]

The FDIC's contention that "[a] person may be liable as an underwriter of securities that it did not actually sell if it directly or indirectly 'participated' in the distribution of the security," Opp. at 31, also does not salvage its claims.  Tellingly, the FDIC misrepresents the authorities it cites.  The court in *In re Lehman Bros. Mortg.-Backed Sec. Litig.* declined to extend underwriter liability beyond the narrow categories in § 11 and stated that "§ 11 was designed to impose its

---

[17]  Although the Second Circuit further concluded that the named plaintiff in *NECA-IBEW Health & Welfare Fund* could represent a *class* of investors in those other tranches, it did so only "[b]ecause the class standing analysis is different" from the statutory standing analysis under § 11.  *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 158.

[18]  The FDIC asserts that Judge Stanton refused to adopt this argument in *FDIC/Chase* and ruled that it was premature to decide the issue as a matter of law.  Opp. at 30.  What the FDIC omits is that the court denied defendants' motion without prejudice because of the absence of authority the court deemed sufficiently persuasive to decide the question.  Here, Defendants have presented case law and additional support, including several SEC No-Action Letters, to show that treating each tranche of an RMBS as a different security is fully consistent with the SEC's view of the matter.

exacting standards regarding the provision of accurate and complete information only on the people (or entities) responsible for distributing securities to the public, that is, on those engaged in the public offering" and that "[c]ontrary to plaintiffs' suggestion, limiting liability to those who participate in the listed distributional activities does not render the direct or indirect participation prong of the underwriter definition superfluous."  650 F.3d 167, 181 (2d Cir. 2011). Similarly, in *Harden v. Raffensperger, Hughes & Co.*, the court suggested that a party that *agreed to participate* in the sale of a specific security, even though it did not actually sell that security, could be sued by a purchaser of the specific security it agreed to underwrite.  *See* 65 F.3d 1392, 1400-01 (7th Cir. 1995).  This is far different from the allegations in this case.  The mere fact that Defendants are listed as an underwriter in the prospectus supplements for *some* of the certificates involved in a securitization should not expose an underwriter to liability for *every* certificate involved in the securitization, including those they were not involved in underwriting. *See Special Situations Fund, III, L.P. v. Cocchiola*, No. 02-3099 (WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007).

But even if an underwriter of one security could be held liable for "participat[ing] in the distribution" of every other security in the securitization, the FDIC's claims would still fail because the Second Amended Complaint does not plead that the underwriters did so here. Recognizing as much, the FDIC contends that "it would be premature to dismiss its claims" because it "has not had the opportunity to take discovery."  Opp. at 32.  But this argument is without merit—a complaint must contain "well-pleaded facts [that] permit the court to infer more than the mere possibility of misconduct" *before* a plaintiff can proceed to discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  As the FDIC concedes, the Second

Amended Complaint contains no such facts, and therefore its claims against Defendants that did

not underwrite the specific securities the Banks purchased must be dismissed.

## IV.    THE SECTION 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL

Because the FDIC has not adequately pled an underlying violation of § 11,[19] its claims

for control person liability under § 15 necessarily fail.  *See Hutchinson v. Deutsche Bank Sec.*

*Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).  The § 15 claims fail for the additional reason, as set forth

in Defendants' opening brief, that the FDIC makes only conclusory, non-factual allegations of

control.  *See* Defs.' Br. at 31,32.  Contrary to the FDIC's argument, the mere statement that

Defendants "controlled" others "by or through stock ownership, agency, or otherwise," Opp. at

33, alone is insufficient as a matter of law to establish control person liability.  *See In re Glob.*

*Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8,

2005).  "To be liable as a control person, the defendant 'must actually possess, in fact, rather

than in theory, the ability to direct the actions of the controlled person.'"  *Id.* (quoting *Wallace v.*

*Buttar*, 239 F. Supp.2d 388, 396 (S.D.N.Y. 2003)).  Accordingly, the FDIC's control person

liability claims fail.

## <u>CONCLUSION</u>

For the reasons stated above and in Defendants' opening brief, the Second Amended

Complaint should be dismissed with prejudice.

---

[19]     Unlike in *Fed. Deposit Ins. Corp. as Receiver for Colonial Bank v. Chase Mortg. Fin.*
*Corp.*, No. 12 CIV. 6166 LLS, 2013 WL 5434633, at *10 (S.D.N.Y. Sept. 27, 2013), the FDIC
has failed to plead sufficient facts to establish primary liability.

Dated:  New York, New York
       November 29, 2017

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By:  /s/  Andrew T. Frankel
Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Linton Mann III (lmann@stblaw.com)
425 Lexington Avenue
New York, New York  10017
Phone: (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Defendants Deutsche Bank Securities
Inc., RBS Securities Inc., and UBS Securities LLC*

CRAVATH, SWAINE & MOORE LLP

By:  /s/  Richard W. Clary
Richard W. Clary (rclary@cravath.com)
Michael T. Reynolds (mreynolds@cravath.com)
Lauren A. Moskowitz (lmoskowitz@cravath.com)
825 Eighth Avenue
New York, New York  10019
Phone: (212) 474-1000
Fax: (212) 474-3700

*Attorneys for Defendants Credit Suisse First
Boston Mortgage Securities Corp., Credit Suisse
Management LLC, and Credit Suisse Securities
(USA) LLC*

MAYER BROWN LLP

By:  /s/ Michael O. Ware
Michael O. Ware (mware@mayerbrown.com)
Charles S. Korschun
(ckorschun@mayerbrown.com)
Emma M. Kurose (ekurose@mayerbrown.com)
1221 Avenue of the Americas
New York, New York  10020
Phone: (212) 506-2500
Fax: (212) 262-1910

BOIES, SCHILLER & FLEXNER

Andrew Z. Michaelson (amichaelson@bsfllp.com)
575 Lexington Avenue, 7th Floor
New York, New York 10022
Phone:  (212) 446-2300

*Attorneys for Defendant HSBC Securities (USA),
Inc.*

21