UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
CITIZENS NATIONAL BANK,

                        Plaintiff,

        v.

DEUTSCHE BANK SECURITIES INC.,[1]

                     Defendant.

No. 12-CV-4000-LTS-JW

OPINION AND ORDER

YETTER COLEMAN, LLP
By:    R. Paul Yetter
        Bryce Callahan
811 Main Street, Suite 4100
Houston, TX 77002

           -and-

GRAIS & ELLSWORTH LLP
By:    David J. Grais
667 Madison Avenue, Ste 5th Floor
New York, NY 10065

*Attorneys for Plaintiff Federal Deposit
Insurance Corporation as receiver for
Citizens National Bank*

SIMPSON THACHER & BARTLETT LLP
By:    Linton Mann, III
425 Lexington Avenue
New York, NY 10017

*Attorney for Defendant Deutsche Bank
Securities Inc.*

---

[1]    Deutsche Bank Securities Inc. is the only remaining Defendant, and Plaintiff Federal Deposit Insurance Corporation's only remaining claim is brought on behalf of Strategic Bank Capital Bank. Infra note 2. The Clerk of the Court is respectfully directed to change the case caption to Federal Deposit Insurance Corporation as Receiver for Citizens National Bank v. Deutsche Bank Securities Inc., as reflected here.

LAURA TAYLOR SWAIN, Chief United States District Judge

Plaintiff Federal Deposit Insurance Corporation ("Plaintiff" or "FDIC"), as receiver for Citizens National Bank ("CNB"), brings this action pursuant to the Securities Act of 1933, 15 U.S.C. § 77a et seq., against Defendant Deutsche Bank Securities Inc. ("Defendant" or "DBS") in connection with CNB's purchase of residential mortgage-backed securities.[2] The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331.

This Opinion and Order addresses Defendant DBS's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket entry no. 267.) The Court has considered thoroughly all of the parties' submissions and arguments. (Docket entry no. 268 ("Def. Mem."); docket entry no. 269 ("Def. 56.1 St."); docket entry no. 274 ("Pl. Opp."); docket entry no. 275 ("Pl. Resp. to Def. 56.1 St. & SAMF"); docket entry no. 286 ("Def. Reply"); docket entry no. 288 ("Def. Resp. to Pl. SAMF").[3]) For the reasons set forth below, Defendant's motion for summary judgment is granted.

---

[2]    The claims asserted by FDIC, as receiver for Citizens National Bank, against Deutsche Bank, are the only ones remaining in this action. (See docket entry nos. 101 (dismissing with prejudice claims against Ally Securities, LLC (f/k/a GMAC Residential Funding Securities, LLC)), 102 (dismissing with prejudice claims against Bear Stearns Asset Backed Securities I L.L.C., The Bear Stearns Companies L.L.C., and J.P. Morgan Securities L.L.C.), 115 (dismissing with prejudice claims against Citicorp Mortgage Securities, Inc., CitiMortgage, Inc., and Citigroup Global Markets Inc.), 126 (dismissing with prejudice claims against Merrill Lynch Mortgage Investors, Inc., Merrill Lynch Mortgage Capital, Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated), 244 (dismissing with prejudice claims against HSBC Securities (USA) Inc.), 261 (dismissing with prejudice claims against NatWest Markets Securities Inc. (f/k/a RBS Securities Inc.)), 263 (dismissing with prejudice claims against Credit Suisse Securities (USA) L.L.C., Credit Suisse First Boston Mortgage Securities Corp., and Credit Suisse Management L.L.C.), 273 (dismissing with prejudice claims against UBS Securities L.L.C.).)

[3]    Pincites to materials filed on the docket refer to ECF-designated pages.

I.    BACKGROUND

Plaintiff seeks to hold DBS strictly liable under Section 11 of the Securities Act of 1933 as an underwriter of the securities that CNB purchased, for alleged misstatements and omissions in connection with those securities. The Court presumes familiarity with decisions previously rendered in connection with this dispute: in particular, the Court's March 24, 2015 Opinion and Order (docket entry no. 135, also available at F.D.I.C. ex rel. Citizens Nat'l Bank & Strategic Cap. Bank v. Bear Stearns Asset Backed Sec. I LLC, 92 F. Supp. 3d 206 (S.D.N.Y. 2015), vacated & remanded sub nom., F.D.I.C. ex rel. Citizens Nat'l Bank & Strategic Cap. Bank v. Credit Suisse First Bos. Mortg. Sec. Corp., 674 F. App'x 86 (2d Cir. 2017)) and the Court's October 18, 2019 Memorandum Order (docket entry no. 190, also available at F.D.I.C. ex rel. Citizens Nat'l Bank & Strategic Cap. Bank v. Credit Suisse First Bos. Mortg. Sec. Corp., 414 F. Supp. 3d 407 (S.D.N.Y. 2019)). This Opinion and Order recites only the facts necessary to resolve Defendant's motion for summary judgment. The following background is, unless otherwise noted, drawn from the undisputed facts in the submissions and documentary exhibits filed by the parties.[4]

---

[4]    Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be undisputed. See S.D.N.Y. Local Civil Rule 56.1(c), (d); Biberaj v. Pritchard Indus., Inc., 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). When a nonmoving party fails to respond to a Local Civil Rule 56.1 Statement, the court is "permit[ted] . . . to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009). However, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014). "In so doing, the Court may rely on other evidence in the record even if uncited." Id. (citing Fed. R. Civ. P. 56(c)(3)). The Court has applied these principles in resolving the instant motion practice. Furthermore, citations to the parties' Local Rule 56.1 statements incorporate by reference the documents and deposition testimony cited therein. See Local Rule 56.1(d).

The RALI 2006-QS18 Trust issued 26 classes of senior certificates (Class I-A-1, Class I-A-2, Class I-A-3, Class I-A-4, Class I-A-5, Class I-A-6, Class I-A-7, Class I-A-P, Class I-A-V, Class II-A-1, Class II-A-2, Class II-A-3, Class II-A-4, Class II-A-5, Class II-A-6, Class II-A-P, Class II-A-V, Class III-A-I, Class III-A-2, Class III-A-3, Class III-A-P, Class III-A-V, Class R-I, Class R-II, Class R-III, and Class R-IV) and 6 classes of subordinated certificates (Class I-M-1, Class I-M-2, Class I-M-3, Class II-M-1, Class II-M-2, and Class II-M-3) (collectively, the "Offering").[5]  (Pl. Resp. to Def. 56.1 St. & SAMF St. ¶ 5; docket entry no. 270-3 ("Prospectus Supplement") at 2.)  CNB purchased three certificates in the subordinate Class I-M-1.  (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 1.)  Each of the certificates in the Offering was entitled to payments from mortgage loans; different classes, however, received payments from different groups of loans.  (Id. ¶ 5.)[6]  The senior certificates offered investors higher priority of payment and greater protection against losses compared to the subordinated certificates.  (Id. ¶ 6.)  The subordinated certificates offered higher interest rates than the senior certificates.  (Id. ¶ 7.)

The Offering was issued pursuant to a Registration Statement filed with the Securities and Exchange Commission on January 23, 2006 (docket entry no. 281-10), as well as a Prospectus Supplement filed with the Securities and Exchange Commission on December 27, 2006 (docket entry no. 270-3).  The first page of the Prospectus Supplement lists DBS, GMAC

---

[5]    Plaintiff has voluntarily dismissed all claims against Defendant relating to the RAST 2007-A1 offering.  (Docket entry no. 271.)

[6]    "To create the securities [in such an offering of residential mortgage-backed securities], an originator first determines whether potential borrowers have sufficient credit standing and collateral to quali[f]y for mortgage loans.  A sponsor then purchases loans from the originator and transfers them to a depositor.  The depositor, or issuer, transfers the loans to a trust, which sells the certificates."  F.D.I.C. ex rel. Colonial Bank v. First Horizon Asset Secs. Inc., 443 F. Supp. 3d 505, 506 (S.D.N.Y. 2020).

RFC Securities ("GMAC" which is also known as Residential Funding Securities, LLC), and Lehman Brothers as the "Underwriters."[7]  (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 15.)  That same page also explains that "Deutsche Bank Securities Inc. will purchase 20 of the senior certificates, Residential Funding Securities, LLC will purchase the Class I-M Certificates from the depositor [(Residential Accredit Loans, Inc.)] and Lehman Brothers Inc. will purchase the Class II-M Certificates from the depositor."  (Id.)

In a section titled "Method of Distribution," the Prospectus Supplement explains that "Deutsche Bank Securities Inc. will serve as the senior underwriter and has agreed to purchase, and the depositor has agreed to sell, the Senior Certificates. . . .  The certificates being sold to Deutsche Bank Securities Inc. are referred to as the senior underwritten certificates."  (Id. ¶ 8.)  In that same section, the Prospectus Supplement explains that "Residential Funding Securities, LLC will serve as the Class I-M underwriter and has agreed to purchase, and the depositor has agreed to sell, the Class I-M Certificates.  The certificates being sold to the Class I-M underwriter are referred to as the Class I-M underwritten certificates."  (Id. ¶ 12.)  Similarly, the Prospectus Supplement explains that "Lehman Brothers Inc. will serve as the Class II-M underwriter and has agreed to purchase, and the depositor has agreed to sell, the Class II-M Certificates.  The certificates being sold to the Class II-M underwriter are referred to as the Class II-M underwritten certificates."  (Prospectus Supplement at 141.)

Each of the three underwriters (DBS, GMAC, and Lehman Brothers) entered into a separate Underwriting Agreement with the depositor Residential Accredit Loans, Inc.

---

[7]    Generally speaking, in transactions such as the one at issue here, "[a]n underwriter purchases certificates, provides information about them and their underlying loans to potential investors, and distributes them to investors."  Colonial Bank, 443 F. Supp. 3d at 506.

("RALI") and the sponsor Residential Funding Company, LLC ("RFC").  The Underwriting Agreement among DBS, RALI, and RFC provides that "the Company [RALI] agrees to sell to you [DBS], and you agree to purchase from the Company, the Certificates[.]"  (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 19.)  "Certificates" is defined in the Underwriting Agreement to mean the 20 senior certificates.  (Id. ¶ 20.)  "Certificates" as so defined does not include the subordinate Class I-M-1 certificates.  (Id.)  In turn, DBS would "propose to offer . . . for sale" and "solicit offers to purchase" those "Certificates."  (Docket entry no. 270-5 ("DBS Underwriting Agreement") at 9.) The DBS Underwriting Agreement also provides that RALI and RFC will indemnify DBS for any claim arising out of or based on breach of a representation or warranty given by RALI to DBS as to the accuracy of information in the Prospectus Supplement.  (Def. Resp. to Pl. SAMF ¶ 87.)

Separately, GMAC, RALI, and RFC executed an Underwriting Agreement providing that "the Company [RALI] agrees to sell to you [GMAC], and you agree to purchase from the Company, the Certificates[.]"  (Docket entry no. 270-6 ("GMAC Underwriting Agreement") at 9; see also Pl. Resp. to Def. 56.1 St. & SAMF ¶ 21.)  "Certificates" is defined by the GMC Underwriting Agreement to mean the subordinate Class I-M-1, Class I-M-2, and Class I-M-3 certificates.  (GMAC Underwriting Agreement at 2; see also Pl. Resp. to Def. 56.1 St. & SAMF ¶ 21.)  In turn, GMAC would "propose to offer . . . for sale" and "solicit offers to purchase" those "Certificates."  (GMAC Underwriting Agreement at 9.)  The GMAC Underwriting Agreement also includes an indemnification provision substantially similar to that in the DBS Underwriting Agreement.  (Id. at 19.)  DBS was not a party to the GMAC Underwriting Agreement.  (See generally id.)

Finally, Lehman Brothers, RALI, and RFC executed an Underwriting Agreement providing that "the Company [RALI] agrees to sell to you [Lehman Brothers], and you agree to purchase from the Company, the Certificates[.]"  (Docket entry no. 287-2 ("Lehman Brothers Underwriting Agreement") at 9.)  "Certificates" is defined by the Lehman Brothers Underwriting Agreement to mean the subordinate Class II-M-1, Class II-M-2, and Class II-M-3 certificates. (Id. at 2.)  In turn, Lehman Brothers would "propose to offer . . . for sale" and "solicit offers to purchase" those "Certificates."  (Id. at 9.)  The Lehman Brothers Underwriting Agreement also includes an indemnification provision substantially similar to those in the DBS and GMAC Underwriting Agreements.  (Id. at 19.)  DBS was not a party to the Lehman Brothers Underwriting Agreement.  (See generally id.)

As disclosed in the Registration Statement and Prospectus Supplement and as provided in the DBS Underwriting Agreement, DBS purchased the senior certificates and sold and offered to sell those certificates to investors.  (Def. Resp. to Pl. SAMF ¶ 84.)  DBS did not purchase, sell, or offer to sell the subordinate Class I-M-1 certificates.  (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 41.)

Three different groups of mortgage loans backed all of the certificates in the Offering.  (Def. Resp. to Pl. SAMF ¶ 42.)  The senior certificates underwritten by DBS were backed by loans in each of these three groups.  (Id.)  The Prospectus Supplement explains that "Class I-A-1, Class I-A-2, Class I-A-3, Class I-A-4, Class I-A-5, Class I-A-6, Class I-A-7, Class I-A-P, Class I-A-V and Class R-I Certificates will receive payments from the group I loans, the Class II-A-I, Class II-A-2, Class II-A-3, Class II-A-4, Class II-A-5, Class II-A-6, Class II-A-P and Class II-A-V Certificates will receive payments primarily from the group II loans, and the Class III-A-I, Class III-A-2, Class III-A-3, Class III-A-P, Class III-A-V, Class II-M, Class R-II,

Class R-III and Class R-IV Certificates will receive payments primarily from the group III

loans." (Prospectus Supplement at 17-18.) The subordinate Class I-M certificates, which CNB

purchased, "represent rights to receive payments from the group I loans and group II loans." (Id.

at 18.) Thus, the same mortgage loans in group I and group II backed both the senior certificates

underwritten by DBS and the subordinate Class I-M-1 certificates purchased by CNB. (Def.

Resp. to Pl. SAMF ¶ 42.)

Plaintiff alleges that Defendant made material misrepresentations and omissions

in the Prospectus Supplement relating to the mortgage loans backing all of the certificates in the

Offering, including the subordinate Class I-M-1 certificates. (Id. ¶¶ 47-49.) The alleged

misrepresentations and omissions include representations about the loan-to-value ratios of the

mortgage loans, the loans' compliance with appraisal standards, the occupancy status of the

properties securing the loans, and the loans' compliance with underwriting guidelines. (Id. ¶ 47.)

## II.   DISCUSSION

Defendant DBS moves for summary judgment. Summary judgment is to be

granted in favor of a moving party if "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A fact is considered material if it "might affect the outcome of the suit under the

governing law," and an issue of fact is a genuine one where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co.

Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)). The moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact. See Celotex v. Catrett, 477 U.S. 317, 325 (1986). "In moving for

summary judgment against a party who will bear the ultimate burden of proof at trial, the

movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995) (citing Celotex, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," Overton v. N.Y. State Div. of Military & Naval Affs., 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). To defeat a summary judgment motion, the nonmoving party must advance more than a "scintilla of evidence," Anderson, 477 U.S. at 252, and "must do more than simply show that there is some metaphysical doubt as to the material facts," Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

Defendant DBS contends that it is not liable to Plaintiff under Section 11 because it is not a statutorily defined "underwriter" with respect to the securities CNB purchased. For the reasons explained below, the Court agrees. DBS is, accordingly, entitled to summary judgment dismissing Plaintiff's Section 11 claims against it.

A.      The Definition of "Underwriter" in the Securities Act of 1933

Section 11 of the Securities Act of 1933 provides a cause of action for "any person acquiring such security" to "sue . . . every underwriter with respect to such security" if the registration statement for the security "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading." 15 U.S.C. § 77k(a)(5). An "underwriter" is defined as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11).

The Second Circuit breaks down the "underwriter" definition into two prongs delineating types of actors. The first is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11). The second is "any person who . . . participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." Id. Below, the Court explains each prong.

### 1. The First Prong

The first prong embraces "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11). Looking to the plain language of the statute, the Second Circuit has interpreted the first prong to include (1) "any person who has purchased from an issuer with a view to . . . the distribution of any security" and (2) any person who . . . offers or sells for an issuer in connection with . . . the distribution of any security." See In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 176 (2d Cir. 2011). The Second Circuit has emphasized that the "distribution requirement" applies to both categories of this first prong. Id.

Furthermore, the phrase "any security" in the definition of "underwriter" must be interpreted with reference to the predicate statute, Section 11, which creates a cause of action for "any person acquiring such security" to "sue . . . every underwriter with respect to such security." 15 U.S.C. § 77k(a)(5). Because the definition of "underwriter" for Section 11 liability

purposes must be narrower than the predicate statute that establishes liability, "any security" in

the definition of "underwriter" must be interpreted as referring to "such security" in Section 11

(i.e., a security holder may "sue . . . every underwriter with respect to such security"), which is in

turn a reference to the security purchased by the security holder (i.e., "any person acquiring such

security").  See F.D.I.C. ex rel. Colonial Bank v. First Horizon Asset Secs. Inc., 443 F. Supp. 3d

505, 508 (S.D.N.Y. 2020) ("[T]he right to sue that Section 11 gives a purchaser of a security is to

sue 'every underwriter with respect to such security,' or 'underwriters of the security at issue.'"

(first quoting 15 U.S.C. § 77k(a); then quoting Lehman Bros., 650 F.3d at 175)).  In the context

of residential mortgage-backed securities, "each tranche is a discrete security"[8] and, while

---

[8]     This proposition is supported by multiple persuasive authorities.  See Asset-Backed Securities, 69 Fed. Reg. 26650-01, at 26688 n.212 (May 13, 2004) ("[I]n the case of a multi-tranche registered offering of asset-backed securities, each tranche would be treated as a different security."); Asset-Backed Securities, 70 Fed. Reg. 1506-01, at 1511, 1560 & n.421 (Jan. 7, 2005) ("ABS [asset-backed securities] transactions often involve multiple classes of securities, or tranches. . . .  Consistent with the existing [February 7, 1997] no-action letter, in the case of a multi-tranche registered offering of asset-backed securities, each tranche is to be treated as a different security."); Dissemination of Research Materials Relating to Asset-Backed Securities, SEC Staff No-Action Letter, 1997 WL 51780, at *2 (Feb. 7, 1997) ("[I]n the case of a multi-tranche offering of ABS, each tranche . . . shall be treated as a different Registered Security."); Bear, Stearns & Co. Inc. & Bear Stearns Sec. Corp., SEC Staff No-Action Letter, Fed. Sec. L. Rep. P 76,967, 1994 WL 484175, at *11 (Aug. 29, 1994) (considering, under Section 11(b)(1) of the Securities Exchange Act of 1934, "each tranche having differing generic characteristics to be separate issuances of securities rather than considering the entire CMO [collateralized mortgage obligation] offering as one 'new issue'"); Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. v. U.P. Morgan Acceptance Corp., No. 08-CV-1713-ERK, 2012 WL 601448, at *7 n.8 (E.D.N.Y. Feb. 23, 2012) ("There is no question that an offering's tranches are financially interrelated, but there is also no question that each tranche is a discrete security."); Am. Int'l Grp., Inc. v. Bank of Am. Corp., 712 F.3d 775, 778 n.2 (2d Cir. 2013) ("Each pass-through certificate [issued by a residential mortgage-backed securities trust] represents the right to a payment stream stemming from an equity interest in a specific tranche."); see also Zeller v. Bogue Elec. Mfg. Corp., 476 F.2d 795, 800 (2d Cir. 1973) (noting that SEC guidance on interpretation is entitled to "substantial weight" (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944))).

different underwriters may underwrite different tranches that are offered in the same securitization, a plaintiff may only sue the underwriter of the specific tranche that the plaintiff purchased.  Id. at 508-09.  A plaintiff cannot "su[e] every underwriter with respect to the entire securitization and each of its securities."  Id. at 508.  By the same token, an underwriter is only a statutorily-defined "underwriter" for purposes of Section 11 liability with respect to the specific tranche purchased by a plaintiff.  See id. at 508-09.

Judge Stanton's decision in Colonial Bank is squarely illustrative of this point. 443 F. Supp. 3d 505 (S.D.N.Y. 2020).  In Colonial Bank, senior and subordinate tranches of residential mortgage-backed securities were offered pursuant to the same registration statement. Id. at 507.  The Colonial Bank plaintiff, which had only acquired certificates in the senior tranche, sued the defendant as an "underwriter," even though the defendant had only distributed the subordinate tranche.  Id. at 508.  Judge Stanton rejected the plaintiff's argument that "[the defendant's] liability as an underwriter is not limited to the tranche or class of subordinated certificates," holding that the plaintiff does not have the right to "su[e] every underwriter with respect to the entire securitization and each of its securities."  Id.  Judge Stanton reasoned that "each tranche is a discrete security" and an underwriter is only liable with respect to "the security at issue"—the specific tranche purchased by the plaintiff.  Id. at 508-09.

### 2.    The Second Prong

The second prong encompasses "any person who . . . participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."  15 U.S.C. § 77b(a)(11).  As to this prong, the Second Circuit has held that the phrase "such undertaking" "plainly references the aforesaid [i.e., the first prong] purchases, offers, or sales relating to the distribution of securities."  Lehman Bros., 650 F. 3d at 176.  That is, the second prong expressly incorporates the focus and

limitations of the first prong.  Accordingly, this second prong encompasses "a person [who] participated, directly or indirectly, in [(1)] the purchase of securities with a view toward distribution, or [(2)] in the sale or offer of securities in connection with a distribution."[9]  Id. at 188.  As with the first prong, the Second Circuit has emphasized that the second prong requires a "connection to the activity of distribution."  Id. at 176.  Furthermore, because "such undertaking" expressly incorporates the first prong, the "undertaking" is limited to distributional activity relating to "such security"—i.e., the security that was purchased by the plaintiff.

### B.  DBS is not an Underwriter with Respect to CNB's Securities Under the First Prong

The Court now turns to applying the first prong, finding that there is no genuine dispute of material fact that DBS does not meet the statutory definition of an underwriter.  The first prong encompasses (1) "any person who has purchased from an issuer with a view to . . . the distribution of any security" and (2) any person who . . . offers or sells for an issuer in connection

---

[9]  The Lehman Bros. Court also described the second prong as including three categories of activity.  Lehman Bros., 650 F.3d at 177 ("Thus, to qualify as an underwriter under the participation prongs of the statutory definition, a person must participate, directly or indirectly, [(1)] in purchasing securities from an issuer with a view to distribution, [(2)] in offering or selling securities for an issuer in connection with a distribution, or [(3)] in the underwriting of such an offering.").  The third category traces to the statutory phrase "any person who . . . participates or has a participation in the direct or indirect underwriting of any such undertaking."  This phrase, however, is self-referential because "underwriting" is defined by "underwriter."

The Second Circuit has acknowledged this tautology in collapsing the three categories into two categories.  Id. at 176 (describing the second prong as "two categories"); id. at 182 ("In sum, we conclude that the text, case law, legislative history, and purpose of the statute demonstrate that Congress intended the participation clause of the underwriter definition to reach those who participate in [(1)] purchasing securities with a view towards distribution, or [(2)] in offering or selling securities for an issuer in connection with a distribution, but not further."); id. at 188 ("To qualify as an 'underwriter' under 15 U.S.C. § 77b(a)(11), a person must have participated, directly or indirectly, in [(1)] the purchase of securities with a view toward distribution, or [(2)] in the sale or offer of securities in connection with a distribution.").

with . . . the distribution of any security." 15 U.S.C. § 77b(a)(11). It is undisputed that DBS did not purchase, sell, offer to sell, or distribute the specific securities at issue here—the subordinate Class I-M-1 certificates purchased by CNB. (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 41.) The Prospectus Supplement clearly states that DBS would purchase from the depositor (RALI) for distribution, only the senior certificates and none of the subordinate Class I-M-1 certificates. (Prospectus Supplement at 2, 140-41.) The underwriting agreements delineate the same limited scope of DBS's purchase and distributional activity. The DBS Underwriting Agreement provides that DBS would purchase the senior certificates from RALI and distribute those certificates to investors. (DBS Underwriting Agreement at 2, 9.) Distribution of the Class I-M-1 certificates was addressed by the GMAC Underwriting Agreement, which provides that GMAC would purchase the subordinate Class I-M-1, among other certificates, from RALI and distribute those certificates to investors; DBS was not even a party to the GMAC agreement. (GMAC Underwriting Agreement at 2, 9.) Finally, there is no evidence that DBS ever directly communicated with investors interested in the subordinate Class I-M-1 certificates. (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 36.)

Under Section 11, the underwriter of a security is liable to a purchaser of "such security" and here, "such security" is only the subordinate Class I-M-1 certificate purchased by CNB. Because DBS did not purchase, sell, or distribute the subordinate Class I-M-1 certificates, DBS cannot be liable as an "underwriter" with respect to those certificates under the first prong.

Plaintiff advances several arguments in its opposition. First, Plaintiff argues that the statutory term "underwriter" should be read "to include all underwriters in a public offering with no limitation by tranche." (Pl. Opp. at 24 (emphasis in original).) According to Plaintiff, the definition of "underwriter" includes "[a]ny person who has purchased from an issuer with a

view to, or offers or sells for an issuer in connection with, the distribution of any security," 15 U.S.C. § 77b(a)(11), and Section 11 imposes liability on "every underwriter with respect to such security," 15 U.S.C. § 77k(a)(5). While the definition of "underwriter" and Section 11 both use broad language, Plaintiff's interpretation overlooks the fact that the definition of "underwriter" is limited by "such security," which specifically refers to the security purchased by the plaintiff. 15 U.S.C. § 77k(a)(5) (allowing "any person acquiring such security" to "sue . . . every underwriter with respect to such security"); supra pp. 10-12.

Second, Plaintiff argues that, "in the context of standing," "'such security' in Section 11(a) [15 U.S.C. section 77k(a)]" "is not limited by tranche but refers to any security issued pursuant to the registration statement that contains an untrue or misleading statement." (Pl. Opp. at 27 (citing In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 779 (S.D.N.Y. 2012); Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 339-40 (S.D.N.Y. 2012)).) The cases cited by Plaintiff generally hold, in the class action context, that purchasers of one tranche may have standing to assert claims on behalf of purchasers of other tranches issued pursuant to the same offering documents. That standing inquiry, however, is distinct from the inquiry here. Plaintiff's authorities concern who can bring a suit; the question here, however, is who can be sued. See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 158 (2d Cir. 2012) (describing class standing as analyzing whether plaintiff has "standing to assert claims on behalf of purchasers of Certificates from other Offerings, or from different tranches of the same Offering" (emphasis in original)). The class standing cases cited by Plaintiff have no bearing on the latter question, which is at issue here.

Next, Plaintiff contends that Colonial Bank and its reasoning are inapplicable to this action because DBS was the "lead underwriter" and "sole manager" of the entire Offering, while the defendant in Colonial Bank was only a "subordinate underwriter."  (Pl. Opp. at 20-23, 28).  Plaintiff contends that, as the "lead underwriter," DBS "managed nearly all aspects of the offering," which included the senior certificates and the subordinate Class I-M-1 certificates.  (Pl. Opp. at 8-9.)  This factual proposition, which Defendant disputes, is irrelevant because Section 11 "underwriter" liability is plainly limited to underwriter status with respect to the security ("such security") purchased by the plaintiff.  Defendant is not an "underwriter" in the context of Plaintiff's claim because it did not purchase, sell, offer to sell, or distribute the security purchased by CNB—the Class I-M-1 certificates.  That fact is undisputed, and the statutory inquiry begins and ends there.  Nothing in the statutory definition of "underwriter" or in Section 11 refers to a concept of a "lead underwriter" or a "sole manager," or to activities in connection with securities that were not purchased by the plaintiff.

Finally, Plaintiff advances a social policy argument.  Plaintiff contends that failing to ascribe liability to DBS as the "lead underwriter" would undermine the entire regulatory system.  According to Plaintiff, "'Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering' and that 'subjecting underwriters to the liability provisions would provide the necessary incentive to ensure their careful investigation of the offering.'"  (Pl. Opp. at 22-23 (quoting The Regulation of Securities Offerings, 63 Fed. Reg. 67174, at 67230 (Dec. 4, 1998)).)  However, Congress' decision to limit strict liability on the underwriters of specific securities to the purchasers of those securities is consistent with that policy goal.  Even if Plaintiff's broader net might serve the goal more thoroughly, the Court is bound by the plain text of the statute because

"'even the most formidable' policy arguments cannot 'overcome' a clear statutory directive."

BP P.L.C. v. Mayor & City Council of Baltimore, 593 U.S. 230, ------, 141 S. Ct. 1532, 1537

(2021) (quoting Kloeckner v. Solis, 568 U.S. 41, 56 n.4 (2012)).

> ### C.  DBS is not an Underwriter with respect to CNB's Securities Under the Second Prong

Next, the Court addresses the second prong, again finding that there is no genuine

dispute of material fact that DBS does not meet the statutory definition of underwriter.[10]  This

prong encompasses "a person [who] participated, directly or indirectly, in [(1)] the purchase of

securities with a view toward distribution, or [(2)] in the sale or offer of securities in connection

with a distribution."  Lehman Bros., 650 F.3d at 188.  The key question is whether DBS

"participate[d] in the purchase, offer, or sale of securities for distribution."  Id. at 175-76.

"[S]uch participation may be indirect as well as direct[.]"  Id. at 176; id. at 181 n.10 ("Persons

may be liable for participation even though they did not themselves directly sell or offer

securities or purchase securities for resale.").  Nonetheless, "the statute does not reach further to

identify as underwriters persons who provide services that facilitate a securities offering, but who

do not themselves participate in the statutorily specified distribution-related activities."  Id. at

---

[10]    At the motion to dismiss stage, this Court found "plausible Plaintiff's allegation that Deutsche Bank . . . indirectly participated . . . in the relevant offerings, even if Deutsche Bank . . . did not directly sell the particular tranches that Plaintiff purchased" because DBS was named as a "co-underwriter[] in the relevant prospectus supplements," DBS "endorsed alleged misstatements relating to asset pools backing the entire securitization," and DBS "had a financial interest in the success of the offering as a whole, not just the specific tranches that [it] sold."  (Docket entry no. 190 at 8, also available at F.D.I.C. ex rel. Citizens Nat'l Bank & Strategic Cap. Bank v. Credit Suisse First Bos. Mortg. Sec. Corp., 414 F. Supp. 3d 407, 413 (S.D.N.Y. 2019).)  At the time, the Court merely found Plaintiff's claim "plausible" within the meaning of the governing pleading standard, and did not determine that the claim could ultimately be viable.  On the developed record and in light of the current state of the law, Plaintiff has failed to frame a viable case against DBS for underwriter liability based on direct or indirect participation.

176; id. at 181 ("[P]articipation must be in the statutorily enumerated distributional activities, not in non-distributional activities that may facilitate the eventual distribution by others."). Examples of participating in distribution-related activities include "referring investors to sellers or offerors for a fee; organizing selling efforts; or acting as an intermediary in a purchase of securities for resale." Id. at 181 n.10 (citations omitted). On the other hand, activities such as "structuring or creating securities," "drafting, reviewing, commenting, and disseminating offering documents," and performing due diligence are not "distribution-related." See, e.g., Lehman Bros., 650 F.3d at 182, 184; Colonial Bank, 443 F. Supp. 3d at 509; In re REFCO, Inc. Sec. Litig., No. 05-CV-8626-GEL, 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008); Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 509 (S.D.N.Y. 2018). Furthermore, as explained above, the defendant's distributional activity must be in connection with "such security" purchased by the plaintiff—here, the Class I-M-1 certificates. Supra pp. 10-12.

In opposing summary judgment, Plaintiff proffers evidence intended to demonstrate that Defendant managed and led nearly all aspects of the Offering (Def. Resp. to Pl. SAMF ¶¶ 50-87), that Defendant made misrepresentations about the same mortgage loans that backed the senior certificates as well as the subordinate Class I-M-1 certificates (id. ¶¶ 42-49, 73, 76, 82), and that Defendant had a generalized financial and reputational interest in the Offering as a whole, not just in the specific tranche of senior certificates that Defendant sold (id. ¶¶ 88-94). Regardless of whether Plaintiff's arguments have sufficient factual premises, none of the proffered evidence is material because none of it demonstrates participation in distributional activity vis-à-vis the Class I-M-1 certificates.

That Defendant made decisions regarding the structure of the Offering, including how to divide the Offering into different tranches and the payment flows for each tranche, is not relevant because it is not distributional activity.  (Id. ¶¶ 55-56, 58-59); Lehman Bros., 650 F.3d at 182-83 ("[S]tructuring or creating securities does not constitute the requisite participation in underwriting" because this "occur[s] during the initial stages of securitization, not during efforts to disperse certificates to investors.").  Similarly, Defendant's alleged role in drafting, reviewing, commenting, approving, and disseminating offering documents is not distribution-related.  (Def. Resp. to Pl. SAMF ¶¶ 57, 70-74, 82-83); Lehman Bros., 650 F.3d at 184 ("[W]e reject [plaintiff] Wyoming's claim that the [defendant] Rating Agencies' alleged review of and comments on draft prospectus supplements . . . stated a § 11 claim.  Similarly, we reject the Union Plaintiffs' conclusory pleading that [defendants] S & P and Moody's are liable under § 11 for their alleged participation in drafting and disseminating offering documents."); REFCO, 2008 WL 3843343, at *4 ("[M]erely commenting on a draft of a registration statement for a[n] offering in which they took no part in the distribution of the [securities]" does not render one an underwriter.).  The same can be said of Defendant's role in performing due diligence on and making representations as to the entire pool of loans that backed the certificates in the Offering, including the same loans that backed both the senior certificates and the subordinated Class I-M-1 certificates.  (Def. Resp. to Pl. SAMF ¶¶ 42-49, 51-54, 61-87); Lehman Bros., 650 F.3d at 182, 184-85 (rejecting claim of underwriter liability for "commenting on draft offering documents," "structuring the certificate transactions," and "dictating the kinds and quantity of loans or credit enhancements"); Colonial Bank, 443 F. Supp. 3d at 509 (finding that defendant was not an underwriter despite "performing due diligence on the loans backing the certificates in the securitization, verifying the accuracy of the statements in the prospectus supplements, asking accountants to perform

procedures on the prospectus supplements, obtaining counsel's opinions on the prospectus supplements, and approving the prospectus supplements' final content"); Silvercreek Mgmt., 346 F. Supp. 3d at 509 ("[O]btaining the right to conduct due diligence into the notes as part of the preparation of the registration statement" "has no bearing on [defendant's] status as an underwriter for purposes of Section 11 liability."). Finally, a generalized financial or reputational interest in the Offering as a whole,[11] without more, is not distributional as to the specific Class I-M-1 certificates at issue.[12] See Lehman Bros., 650 F.3d at 177 (cautioning against "expanding the definition of underwriter to reach persons not themselves participating in such purchases, offers, or sales, but whose actions may facilitate the participation of others in such undertakings"); see also id. at 180 (observing that the legislative history of Section 11 reflects that "changes were made to exclude from the definition [of underwriter] those who merely furnish an underwriter money, and to adopt a test 'of participation in the underwriting undertaking rather than that of a mere interest in it'" (quoting H.R. Rep. No. 73-152, at 24 (1933)); cf. id. at 181 n.10 ("referring investors to sellers or offerors for a fee" is distributional activity (citing Sirianni v. SEC, 677 F.2d 1284, 1287 (9th Cir. 1982))).

---

[11]  The evidence is clear that Defendant did not receive any compensation from the purchase, sale, or distribution of the Class I-M-1 certificates. (Pl. Resp. to Def. 56.1 St. & SAMF ¶ 22.) Plaintiff's only evidence of Defendant's interests in the Offering is that Defendant's subsequent enterprise marketing materials listed the entire Offering, without limitation to the specific senior tranches, as one of the securitizations that Defendant had worked on in the past. (Def. Resp. to Pl. SAMF ¶¶ 88-94.)

[12]  At the motion to dismiss stage, the Court noted in denying the motion that, "as co-underwriters of the securitizations, Deutsche Bank [DBS] and UBS had a financial interest in the success of the offering as a whole, not just the specific tranches that they sold." F.D.I.C. ex rel. Citizens Nat'l Bank & Strategic Cap. Bank v. Credit Suisse First Bos. Mortg. Sec. Corp., 414 F. Supp. 3d 407, 413 (S.D.N.Y. 2019). That allegation, however, is not supported by the record proffered in this summary judgment motion practice. See supra note 11.

In further opposition, Plaintiff raises several arguments.  First, Plaintiff contends that, "[t]o give any meaning to the participation prong, [DBS's] activities as a lead underwriter must suffice."  (Pl. Opp. at 18.)  Otherwise, according to Plaintiff, the second prong of the "underwriter" definition has no thrust independent of the first prong.  (Pl. Opp. at 16-17 (arguing that DBS "conflates the two distinct prongs").)  That argument fails.  The second prong operates independently of the first prong, in that one does not need to "purchase[] from an issuer with a view to . . . the distribution of any security" or "offer[] or sell[] for an issuer in connection with . . . the distribution of any security"; rather, under the second prong, "direct[ly] or indirect[ly] participat[ing] in any such undertaking [i.e., the first prong]" may support liability, so long as such participation is distribution-related.  15 U.S.C. § 77b(a)(11).  There is clearly a difference between these two prongs because the second prong does not require direct purchasing, offering, or selling.  Thus, the second prong delineates a broader universe of "underwriters" than the first prong.  See, e.g., Sirianni, 677 F.2d at 1286-87 (finding second prong satisfied by referring investors to a seller of securities in exchange for a fee that accrued upon a sale of the securities to those investors); S.E.C. v. Int'l Chem. Dev. Corp., 469 F.2d 20, 31 (10th Cir. 1972) (finding second prong satisfied by "publicizing the [issuer's operations] to the stockholders and the investing public" and by being "in frequent contact . . . with the transfer agent [] regarding the transfer of various stock certificates [issued by the issuer and purchased by the public]").

Next, Plaintiff argues that Defendant was uniquely situated as the "lead underwriter" and "sole manager" of the Offering as a whole, which included the subordinate Class I-M-1 certificates.  (Pl. Opp. at 20-23.)  This label, however, is irrelevant because regardless of whether DBS took a leadership role in the Offering, Plaintiff proffers no evidence

that DBS performed any activities related to the distribution of the subordinate Class I-M-1 certificates.  See Lehman Bros., 650 F.3d at 181 ("[P]articipation must be in the statutorily enumerated distributional activities, not in non-distributional activities that may facilitate the eventual distribution by others."); supra pp. 17-20.

Finally, Plaintiff argues that the "Second Circuit identified several examples of how defendants might 'participate' in underwriting without directly selling or offering securities, several of which require even less participation than that of Deutsche Bank as lead underwriter." (Pl. Opp. at 17 (citing Lehman Bros., 650 F.3d at 181 n.10).)  Again, this argument is misplaced because DBS did not participate in the actual distribution of the securities purchased by the plaintiff, while the persons cited in the Second Circuit's examples did.  For example, in Sirianni, the defendant was deemed an underwriter because he referred investors to a seller of securities in exchange for a fee that accrued upon a sale of the securities to those investors.  677 F.2d at 1286-87.  Similarly, in International Chemical, the defendant was deemed an underwriter by virtue of his role in "publicizing the [issuer's operations] to the stockholders and the investing public" and "was in frequent contact . . . with the transfer agent [] regarding the transfer of various stock certificates [issued by the issuer and purchased by the public]."[13]  469 F.2d at 31. Here, unlike in Sirianni or International Chemical, DBS played no role in distributing "such security" purchased by the plaintiff.

---

[13]   In both Sirianni and International Chemical, the SEC brought an enforcement action against the defendant as an underwriter engaged in the distribution of unregistered securities, in violation of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e). Sirianni, 677 F.2d at 1286; International Chemical, 469 F.2d at 28-29; see also 15 U.S.C. § 77d(1) (providing that "[t]he provisions of section 77e of this title shall not apply to . . . transactions by any person other than an issuer, underwriter, or dealer").

III.    CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment is granted and Plaintiff's claim against DBS is dismissed in its entirety.  Docket entry no. 267 is resolved, and the Clerk of the Court is respectfully directed to: enter judgment in accordance with this Opinion and Order and docket entries 101, 102, 115, 126, 244, 261, 263, and 273; terminate all open motions; and close this action.

SO ORDERED.

Dated: New York, New York
       February 9, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge